**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

N.S. o/b/o W.F.,                                                   Case No. 1:23-cv-448

Plaintiff,

v.

                                                                              Hon.

STURGIS PUBLIC SCHOOLS,

Defendant.

_____/

Elizabeth K. Abdnour (P78203)
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 292-0067
Email: elizabeth@abdnour.com

Jacquelyn N. Babinski (P83575)
BARGER & GAINES
90 North Broadway, Suite 320
Irvington, New York 10533
Telephone: (914) 902-5918
Fax: (914) 902-5917
Email: jacquelyn@bargergaines.com

*Attorneys for Plaintiff*

---

## COMPLAINT AND JURY DEMAND

Plaintiff N.S., on behalf of her son, W.F., by and through her attorneys, ELIZABETH

ABDNOUR and JACQUELYN BABINSKI, hereby brings this civil action against Defendant

Sturgis Public Schools ("SPS" or "the District") appealing the final administrative decision

1

dismissing Plaintiff's state due process complaint under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiff also alleges that SPS violated W.F.'s rights under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; the Michigan Persons with Disabilities Civil Rights Act (PDCRA), M.C.L. 37.1101 *et seq.*; and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), M.C.L. 37.2101 *et seq.*

## INTRODUCTION

1.  W.F., now fifteen years old  and in 9th grade, has been eligible for special education services since 2014.  Despite W.F.'s diagnoses of Autism Spectrum Disorder, Disruptive Mood Dysregulation Disorder, Attention-Deficit/Hyperactivity Disorder – Combined Type (ADHD), Unspecified Communication Disorder, Mood Disorder Not Otherwise Specified, Anxiety Disorder Not Otherwise Specified, Moderate Psychosocial Stressors, Gastrointestinal Issues, and Hearing Impairment; his lack of academic progress year after year; as well as his mother, N.S.'s, persistent, vocal concerns about the inadequacy of W.F.'s accommodations and services, the District failed to comprehensively evaluate W.F. to accurately and comprehensively assess his educational needs.  Without accurate baseline data on W.F.'s academic and cognitive abilities or periodic reevaluations, W.F.'s Individualized Education Plan (IEP) consisted of inappropriate, unattainable goals and inadequate services and accommodations.  N.S. repeatedly asked the District for more services and supports for W.F and more data and tests to assess the appropriateness of W.F.'s IEP.  The District either ignored or rejected W.F.'s requests, instead continuing to utilize increased disciplinary measures in response to W.F.'s behaviors and to dismiss

W.F.'s significant disabilities and related needs and their impact on his functional and academic performance. Accordingly, N.S. on behalf of W.F. alleges that the District denied him a Free and Appropriate Public Education (FAPE) by failing to evaluate him, failing to draft an IEP reasonably calculated to meet her educational needs, by failing to revise his IEP to enable her to make progress, and by failing to follow IDEA's disciplinary procedures when responding to W.F.'s behaviors.

2. Due to the District's denial of a FAPE, W.F. lacks the foundational skills needed to be a productive member of society and to access and make progress in the general education curriculum and toward his IEP goals. W.F. continues to struggle academically and to regulate his behaviors consistently to be included in the general education setting. Thus, Plaintiffs now seek reversal of certain portions of the Administrative Law Judge's (ALJ) February 1, 2023, Decision and Order and an award of additional compensatory education services to help W.F. advance as far as possible towards his grade level in reading, writing, and math and to provide him behavioral and mental supports to address his underlying social-emotional needs.

3. W.F. has also suffered from years of discrimination based on both his disability and his race at SPS due to SPS's failure to train and supervise its staff and its failure to properly respond to incidents of discrimination he and N.S. have reported, and he now seeks damages to remedy these harms.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over Plaintiff's federal claims under 29 U.S.C. § 626 and 28 U.S.C. § 1331.

5.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

6.  The Court also has jurisdiction over Plaintiff's IDEA claims under 20 U.S.C. §§ 1415(i)(2)(A) and (3)(A) and under 34 C.F.R. § 300.516, which confer jurisdiction without regard to the amount in controversy.

7.  The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

8.  Plaintiff has exhausted all administrative remedies pursuant to 20 U.S.C. § 1415(l).

9.  Pursuant to 28 U.S.C. § 1391(b), venue lies in the Western District of Michigan as the Defendants are located and operate in the Western District of Michigan and the events and omissions giving rise to this action occurred within the District.

## **PARTIES**

10. W.F. is a fifteen-year-old individual who resides in the Sturgis Public Schools District. W.F. is biracial as his mother is White and his father is Black.  He resides with his mother, N.S., and is in 9th grade at Sturgis High School.  W.F. has been diagnosed with Autism Spectrum Disorder, Disruptive Mood Dysregulation Disorder, ADHD Combined Type, Unspecified Communication Disorder, Mood Disorder Not Otherwise Specified, Anxiety

Disorder Not Otherwise Specified, Moderate Psychosocial Stressors, Gastrointestinal Issues, and Hearing Impairment. W.F. is eligible for special education and related services under the IDEA. W.F. is also an individual with a disability within the meaning of Title II of the ADA and the PDCRA as he has a physical and mental impairment that substantially limits one or more major life activities including processing information, concentrating, and learning. *See* 42 U.S.C. §§ 1202, 12131(2).

11. Defendant Sturgis Public Schools is a local education agency subject to the provisions of the IDEA. The District was responsible for providing W.F. a FAPE under the IDEA. 20 U.S.C. §§ 1400-1419. The District is a recipient of federal financial assistance, subject to the requirements of Section 504, 34 C.F.R. § 104.31 *et seq.*, and Title VI of the Civil Rights Act of 1964, and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. § 12131, *et seq*. The District is a place of public accommodation subject to the provisions of PDCRA, M.C.L. 37.1101 *et seq*., and an educational institution subject to the provisions of ELCRA, M.C.L 37.2301 *et seq*.

## **LEGAL FRAMEWORK**

12. The IDEA requires that qualifying children with disabilities receive a FAPE. 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a).

13. To achieve this goal, the IDEA and its implementing regulations require that school districts design and develop an IEP for each qualifying child. 20 U.S.C. §§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.112, 300.320-24.

14. In *Endrew F. v. Douglas County School District Re-1*, 137 S. Ct. 988, 999 (2017), the Supreme Court defined FAPE as an offer of education, "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." The Court further

clarified that, in designing an IEP, "every child should have the chance to meet challenging objectives," and the IEP Team must give, "careful consideration to the child's present levels of achievement, disability, and potential for growth."  *Id.* at 999, 1000.

15. Pursuant to the IDEA's Reevaluation mandate, a school district must ensure that "a reevaluation of each child with a disability is conducted . . . if the local educational agency determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation."  20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. § 300.303(a)(1).

16. In conducting an evaluation, the IDEA and its implementing regulations require school districts to, "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . the content of a child's [IEP], including information related to enabling the child to be involved in and progress in the general education curriculum."  20 U.S.C. § 1412(b)(2)(A)(ii); 34 C.F.R. § 300.303(b)(2).

17. The IDEA and its implementing regulations also require school districts to "ensure that the IEP Team . . . revises the IEP as appropriate to address any lack of expected progress toward the annual goals and in the general education curriculum . . . ; the results of any reevaluation conducted . . . ; the child's anticipated needs; or other matters."  20 U.S.C. § 1414(d)(4)(A)(ii); 34 C.F.R. § 300.324(b)(1)(ii).

18. While the IDEA guarantees individually tailored educational services, the ADA and Section 504 mandate non-discriminatory access to federally funded programs.  *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017).

19. Public schools that receive federal funds must comply with all three statutes, and the same underlying conduct—including denial of a FAPE—can violate the IDEA, the ADA, and Section 504 all at once.  *Id.* at 755-56.

20. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

21. Further, under the Title II of the ADA, covered entities must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ."  28 C.F.R. § 35.130(b)(7).

22. Similarly, Section 504 of the Rehabilitation Act and its implementing regulations provide that no one may be excluded from a program receiving federal funds "solely by reason" of her disability.  29 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4(a).

23. Under Section 504 of the Rehabilitation Act,, a school district must provide a FAPE, meaning "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of [a child with a disability] as adequately as the needs of [non-disabled students] are met and (iii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R. §§] 104.34, 104.35, and 104.36."  34 C.F.R. § 104.33(a)-(b).

24. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

25. Michigan's Persons with Disabilities Civil Rights Act also guarantees full and equal use of public accommodations, public services, and educational facilities free from discrimination because of a disability.  M.C.L. 37.1102.

26. The PDCRA prohibits educational institutions and public services from "[d]iscriminat[ing] in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability . . . ." M.C.L. 37.1402(a).

27. Michigan's Elliott-Larsen Civil Rights Act provides that an educational institution may not "[d]eny an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of . . . race." M.C.L. 37.2402(a).

## FACTS

28. W.F. has been diagnosed with Autism Spectrum Disorder, Disruptive Mood Dysregulation Disorder, ADHD Combined Type, Unspecified Communication Disorder, Mood Disorder Not Otherwise Specified, Anxiety Disorder Not Otherwise Specified, Moderate Psychosocial Stressors, Gastrointestinal Issues, and Hearing Impairment.

29. W.F. has received special education services through an Individualized Education Plan (IEP) since 2014, initially under the eligibility category of Speech and Language Impairment, but under the eligibility category of Emotional Impairment (EI) since April 2018.

30. Since April 2018, W.F. remained eligible for special education and related services under the EI category.

*2017-2018 School Year*

Februrary 23, 2018, Review of Existing Evaluation Data (REED)

31. On February 23, 2018, REED meeting was held to re-evaluate W.F.'s eligibility category and educational needs in light of new information provided by N.S.

32. Under Parent Input, the REED also noted N.S. was concerned about W.F.'s sensitivity to sounds.

33. Under School Based Observations, concerns about W.F.'s impulse control, anxiety, personal space, facial expression, and struggles with unstructured times and substitutes were listed.

34. Additional Evaluation Data also indicated W.F. had a history of disciplinary removals for destruction of property, defiance, and violent behaviors. W.F. also had a history of difficulties with speech articulation, specifically struggling with the /h, s, z, and sh/ sounds.

35. Without citing to any evaluations, the REED claimed W.F.'s refusal to participate and lack of motivation negatively impacted his ability to make progress.

36. The REED listed the following evaluations would be completed to obtain additional data related to W.F.'s eligibility and disability-related needs: social/emotional adjustment, adaptive behavior, classroom/school observation, speech and language, cognitive, and achievement.

37.  N.S signed her consent to the evaluation plan on March 2, 2018.

April 23, 2018, Multidisciplinary Evaluation Team (MET) Report

38. A MET Report was completed for W.F. on April 23, 2018.

39. Under "Reason for Referral," the report stated W.F. had been exhibiting aggressive behaviors at school.

40. W.F.'s teacher reported the following:

    a.  W.F. struggled with writing and showing his math work.

    b.  W.F. experienced anxiety and insecurities but failed to use calming strategies resulting in W.F. wanting to harm others.

    c.  W.F. was often disruptive in class and had difficulty regulating his emotions and controlling his behavior.

    d.  W.F.'s behaviors were often triggered by peer statements, not following math directions, and changes to routine.

41. N.S. reported the following during her parent interview:

    a.  W.F. is diagnosed with ADHD Combined Type, Anxiety Disorder Not Otherwise Specified, Gastrointestinal Issues, Disruptive Mood Dysregulation Disorder, Autism Spectrum Disorder, Hearing Issues, and Unspecified Communication Disorder.

    b.  W.F. struggles with understanding other peoples' feelings.

    c.  W.F. struggles with attention and impulsivity, as well as regulating his emotions when there are changes in his routine. W.F. is also over-sensitive to sounds.

42. W.F. disclosed the following during his interview:

    a.  His favorite subject is science, and his least favorite subject is math.

    b.  He experiences some bullying from his peers.

    c.  He struggles understanding instructions and sitting still.

    d.  He is often angry, but having time to calm down and then talk to an adult helps.

43. Based on observations by the school social worker and the Diagnostic Teacher Consultant the report included information stating that W.F often appeared distracted or fidgety, disruptive, or off task in the classroom compared to his peers.

44. On the Woodcock Johnson Test of Cognitive Abilities, W.F. generally displayed average skills, but the MET Report noted W.F. presented lacking energy and exhibited decreased motivation as the test was administered. Therefore, the MET Report concluded W.F.'s General Intellectual Ability Score of 85 was not reliable.

45. On the Kaufman Test of Educational Achievement, Third Edition, W.F. scored below average in Reading Composite, Reading Comprehension, Silent Reading Fluency, and Math Fluency.

46. When given the Vineland-3, which measured W.F.'s adaptive behavior, W.F. scored in the 1st percentile on the Parent/Caregiver Form and in the 10th percentile on the Teacher Form.

47. On the Behavior Assessment System for Children, Third Edition, which measured W.F's behaviors and self-perceptions, both N.S. and W.F.'s teacher scored W.F. as clinically significant in aggression and at least one of them scored W.F. as clinically significant in the following areas: Externalizing problems, Anxiety, Somatization, Internalizing Problems, and Behavioral Symptom Index.

48. Both W.F.'s parent and teacher rated W.F. in the severe range for autism spectrum symptoms using the Social Responsiveness Scale, Second Edition.

49. The MET Report concluded, based on the evaluations and information obtained, W.F. qualified for services under the classification of Emotional Impairment and provided several recommendations for the school setting.

April 23, 2018, Individual Education Plan (IEP)

50. On April 23, 2018, an IEP meeting was held. Participants included W.F., N.S., Kevin Thompson (speech pathologist), Marjorie Wisler (special education teacher), Kim Geibe (School Social Worker), Kasey Smith (General Education Teacher), Karen Wagner (Assistant Principal), Gretchen Ennis (Diagnostic Teacher Consultant), and Kayla Lange (Pines Behavioral Health Therapist).

51. The Present Level of Academic Achievement and Functional Performance (PLAAFP) section listed the following as areas of need: reading, behavioral, and communication. When describing behavior, the PLAAFP specifically noted W.F. struggled with unstructured areas and substitute teachers/

52. W.F.'s IEP provided the following goals:

   a. Produce age-appropriate phonemes in connected speech independently with 90% accuracy, specifically the /h, s, z, and sh/ sounds at both the sentence and conversational levels.

   b. Independently answer literal and inferential comprehension questions based on the passage with 80% accuracy.

   c. Manage strong emotions (anger, anxiety) by using appropriate coping strategies with earning one or fewer discipline referrals per marking period.

53. Despite the numerous behavior concerns identified for W.F., the IEP only provided W.F. with direct social work services for 15-30 minutes, 2-4 times a month.

Remainder of 2017-2018 School Year

54. On May 1, 2018, there was an IEP Amendment to add additional accommodations based on N.S research and suggestions of additional ways to support W.F. in the school setting.

55. On May 21, 2018, SPS created an Emergency Intervention Plan (EIP) for W.F., indicating seclusion or restraint would be used if W.F. was exhibiting physical aggression.

56. No Positive Behavioral Interventions and Supports (PBIS) were discussed with N.S. or implemented into W.F.'s IEP.

57. At the end of the 2017-2018 school year, W.F. had not met any of his IEP goal objectives and had approximately 19 disciplinary referrals.

58. Despite the district's belief that W.F. needed an EIP due to behaviors and his minimal progress toward IEP goals, SPS failed to seek consent for a functional behavior assessment or other evaluations and SPS failed to review and revise the IEP to address these concerns.

*2018-2019  School Year*

59. On September 25, 2018, another Amendment was made to W.F.'s IEP, changing the frequency of speech and language sessions from 1-2 times per week to 4-6 times per month. However, despite W.F.'s ongoing behavior issues (including 8 disciplinary referrals already this school year) and minimal progress toward IEP goals previously documented, no actual increase or change to the type, amount, or frequency of services was made. Further, by altering the frequency of the speech and language sessions, the maximum number of sessions per month *decreased* by two sessions.

60. SPS did not convene an IEP meeting for W.F. until April 27, 2019, despite W.F. having approximately 72 documented behavior incidents between September 25, 2018, and April 27, 2019, nor did SPS seek consent for a functional behavior assessment or other evaluations at any time in the 2018-2019 school year, prior to convening the IEP meeting.

61. Participants at the April 27, 2019, IEP meeting included: N.S., Dara McLeod (Speech/Language Pathologist), Amy Cooper (ISD Social Worker), Michael Miller

13

(Principal), Marjorie Wisler (Special Education Teacher), and Mindy Cardiel (General Education Teacher).

62. Under parent concerns, the IEP noted W.F. may "sabotage" time during non-preferred subjects and that N.S. was a strong support during W.F.'s resource time, encouraging W.F.'s decision making.

63. The PLAAFP section listed the same following areas of need: reading, behavioral, and communication.

    a. Under reading, the IEP noted W.F. was reading fluently at a $3^{rd}/4^{th}$ grade level, approximately 1-2 levels behind grade level, and that W.F. primarily struggled with motivation when required to completing reading assignments.

    b. Under behavior, the IEP stated there had been 29 discipline referrals, despite many more incidents being reported in W.F.'s student dashboard. The IEP further noted W.F. had five out of school suspensions.

    c. Under communication, the IEP reported W.F. continued to struggle with the same sounds (h, s/z, and sh), as well as the R sound.

64. W.F.'s IEP provided the following goals:

    a. Manage strong emotions (anger, anxiety) by using appropriate coping strategies with earning one or fewer discipline referrals per marking period. This goal was copied and pasted from the previous IEP.

    b. Begin and maintain to a grade level classroom assignment with two or fewer adult reminders. The IEP claimed this goal was meant to address W.F.'s ability to read and comprehend grade level informational text.

    c.  Produce age-appropriate phonemes in connected speech independently with 75% accuracy, specifically the /h, s, z, sh/, and r sounds in low structure activities and conversational speech. This goal addressed the exact same sounds as the previous IEP, but added a new sound and *lowered* the threshold for mastery from 90% to 75%.

65. Despite the severity of W.F.'s disability and its direct impact on his ability to meet grade level standards, particularly as it related to his speech and behaviors, that W.F. had missed numerous days of school due to disciplinary referrals, and that W.F. had seemingly made little to no progress since the last IEP, the IEP team claimed ESY services were not needed. There were also no changes to the supplementary aids and accommodations provided to W.F. from the previous IEP.

66. Additionally, despite two of the three goals being carried over from the previous year, as well as W.F.'s ongoing below-grade level performance in reading and significant behavior struggles, the services provided to W.F. were either decreased or unchanged, with no rationale provided for the decrease in services.

    a.  Speech and language therapy was only offered to W.F. 5-10 minutes, 4-6 sessions a month, compared to the previous IEP providing 15-30 minutes, and SPS considered discontinuing services entirely.

    b.  W.F.'s time in the alternative special education program was changed to a minimum of 2 hours per week, compared to the previous IEP providing a minimum of 3.5 hours per week.

    c.  Social work services remained the same at only 15-30 minutes, 2-4 times a month, less than one session per week.

67. On May 28, 2019, a Manifestation Determination Review (MDR) meeting was convened for W.F.

    a.  Participants included N.S., Karen Wegner (Assistant Principal), Marjorie Wisler (Special Education Teacher), Amy Cooper (School Social Worker), and Dara McLeod (Speech/Language Pathologist).

    b.  W.F. received a disciplinary referral after a fight with another student in the lunch line, involving physical aggression, and W.F. continued to follow and taunt the other student after he walked away. Notably, prior to the fight, the boys had been physically playing and W.F. did ask the other boy to stop.

    c.  The Team considered teacher observation of W.F., his IEP, his complete student record, and N.S.'s input to determine the behavior was a manifestation of W.F.'s emotional impairment.

68. At the conclusion of the 2018-2019 school year, W.F. had a total of approximately 89 disciplinary referrals, including two days of in school suspensions and 6 days of out of school suspensions. Despite this, SPS failed to increase or change the services and accommodations offered to W.F., and SPS failed to seek parent consent for a Functional Behavior Assessment or any other evaluations to accurately identify W.F.'s educational and related needs.

*2019-2020   School Year*

69. On August 27, 2019, SPS developed a behavior plan for W.F., describing proactive and reactive strategies to address W.F. following directions and physical aggression. However, there is no indication SPS made any effort to request parent consent for a functional behavior assessment prior to developing the behavior plan, to ensure the plan would be

effective. Further, upon information and belief, this behavior plan was a separate plan, distinct from the Emergency Intervention Plan created on May 21, 2018.

70. In September, the ASD consultant observed W.F., but claimed to not have any concerns, despite W.F. repeatedly being recertified for ASD with a high level of symptom severity.

71. The Behavior Plan was updated on October 14, 2019, to also address work completion. Again, there is no indication that a functional behavior assessment was conducted or considered prior to revising the plan, or that PBIS were considered or used.

72. Throughout October 2019, there were numerous emails exchanged between N.S. and SPS staff related to W.F.'s behaviors in school; absences due to disciplinary incidents, W.F.'s behaviors, or medical appointments; and the lack of communication regarding behaviors and makeup work having a negative impact on W.F.'s ability to access his learning. Notably, in one email, N.S. shared her frustration that one of W.F.'s teacher, Ms. Bowman, made it a class assignment for every student to write down what they had seen W.F. do wrong.

73. On November 7, 2019, following another behavior incident, N.S. emailed Karel Gundlach noting that an MDR would need to be scheduled as W.F. had 11 days out of the classroom, including Out of School Suspensions, In School Suspensions, and time in the Behavior Interventionist room. This did not include the numerous "excused absences" resulting from N.S. picking W.F. up early after staff had called her to get him due to behavior issues they were unable to manage. In an earlier email, sent that same day, N.S. also noted it had been seven days since she had requested an IEP and Behavior Plan meeting, but nothing had been scheduled yet.

74. On November 11, 2019, N.S. sent a follow-up email about scheduling these meetings. In her response, Mrs. Gundlach claimed no MDR was required because there had been only 7 out of school suspensions, and the other days did not count as removals for an MDR. Mrs. Gundlach also provided availability for herself and Ms. George to meet, claiming they were the only individuals required to meet for an IEP amendment and behavior plan change.

75. W.F.'s Behavior Plan was updated a second time on November 14, 2019, this time to modify some of the strategies utilized. However, once again, there is no indication that a functional behavior assessment was conducted or considered prior to revising the plan to ensure the plan and the strategies utilized were appropriate and effective.

76. On November 21, 2019, N.S. emailed SPS staff with questions and concerns regarding W.F.'s behavior plan. Upon information and belief, no one from SPS replied to this email or requested a follow-up behavior plan meeting to address N.S.'s concerns.

77. On November 25, 2019, N.S. emailed W.F.'s teacher, Karel Gundlach, with suggestions for W.F.'s behavior plan and noted W.F. was in the hospital due to chest pains, rapid heart rate, and rapid respirations. N.S. further noted that W.F.'s personality was still altered and completely devoid of emotion, except for some crying spells that he had not exhibited since being a toddler. Previously, on November 20, 2019, N.S. had emailed the school with a concern that W.F. wasn't functioning normally and had elected to return from a hunting trip early.

78. Also in November 2019, N.S. requested a mediation with the school to discuss W.F. and her concerns regarding his education. When SPS staff asked N.S. why she requested mediation, N.S. explained it was due to breakdown in communication between N.S. and

SPS staff, SPS' failure to implement agreed-upon actions consistently and with fidelity, SPS not following W.F.'s behavior plan, SPS failing to record suspensions and class removals accurately, SPS failing to provide W.F. makeup work during suspensions,  and SPS failing to address staff threatening, intimidating, or humiliating W.F. Previously, on October 17, N.S. had requested a complete copy of W.F.'s school record, but as of December 3, 2019, SPS had failed to provide the record or propose available dates and times for N.S. to come to the school to review the record.

79. N.S. and SPS participated in mediation on December 10, 2019, and signed an agreement addressing communication for major behavioral incidents and the behavior plan, makeup work for W.F. during suspensions, implementation of the behavior plan, providing N.S. with a copy of W.F.'s educational file, and using restorative practice techniques to rebuild W.F.'s relationship with his teacher.

80. On January 17, 2020, Heather George, SMS's Assistant Principal, sent a truancy letter to N.S., advising that W.F. had missed 303 class periods. However, despite this significant number of absences, many that were due to behavior removals, SPS failed to request consent for a functional behavioral assessment or any other types of evaluations to identify the underlying cause for all the absences and W.F.'s disability-related needs to improve his school engagement and attendance, and PBIS were still not considered or used.

81. On January 23, 2020, N.S. provided a letter to the school from W.F.'s pediatric neurologist, Dr. Brian Woodruff, noting W.F. was being treated for Tourette syndrome and, due to this, may exhibit impulsive words or movements. Dr. Woodruff also requested the school provide accommodations for this new disorder. However, SPS failed to initiate any review or revision of the IEP upon receipt of this letter.

82. On April 16, 2020, SPS convened an annual IEP meeting for W.F. Participants included: N.S., Karel Gundlach (Special Education Teacher), Heather George (Assistant Principal), Allison Carter (ELA Teacher), Megan Williams (Speech Therapist), and Ben Karle (School Social Worker).

83. Under parent concerns, the IEP noted N.S. was concerned with W.F.'s motivation to learn and with the fact that he was experiencing incidents of racism, with some students commenting negatively on his skin color.

84. No data was provided to indicate whether W.F. had met his previous IEP goals.

85. The PLAAFP section listed the same following areas of need: reading, behavioral, and communication. The PLAAFP also added social-emotional learning as an additional area of need.

    a. Under reading, the IEP continued to claim W.F.'s primarily struggled with motivation when required to complete reading assignments, as well as that he continued to perform below grade level.

    b. Under behavior, the IEP stated there had been 37 discipline referrals. The IEP further noted W.F. had been absent around 50 days, including nine days of out of school suspensions.

    c. Under communication, the IEP reported W.F. continued to struggle with the same sounds (h, s/z, and sh) in conversational speech, as well as the R sound at the sentence level.

    d. Under social-emotional, the IEP reported W.F. struggled with lack of motivation and fear of not doing well, impacting his attending to task. W.F. also struggled with following directions.

86. W.F.'s IEP provided the following goals:

    a.   Attend to a task that he is given even when it is a struggle with 60% accuracy or 3 out of 5 trials.

    b.   Begin and maintain a grade level classroom assignment by completing 60% of his assignments. The IEP claimed this goal was almost identical to the previous IEP goal and again meant to address W.F.'s ability to read and comprehend grade level informational text.

    c.   Increase articulation skills with 75% accuracy, specifically the /h, s, z, sh/, and r sounds in words, low structure activities, and conversational speech. This goal was again almost identical to the previous IEP.

    d.   With visual or verbal prompts, will identify his level of frustration and choose and use a strategy to reduce his frustration 50% of the time 4 out of 5 opportunities. This goal was also almost identical to the previous IEP, with only a different threshold for mastery utilized to measure progress.

87. Again, despite the severity of W.F.'s disability and its direct impact on his ability to meet grade level standards, particularly as it related to his speech and behaviors, that W.F. had missed about 50 days of school, and that W.F. had seemingly made little to no progress since the last IEP, the IEP team claimed ESY services were not needed. There were also no changes to the supplementary aids and accommodations provided to W.F.

88. Additionally, despite most of the goals being almost identical to the previous year, as well as W.F.'s ongoing below-grade level performance in reading and significant behavior struggles, the services provided to W.F. failed to be increased or changed to address the lack of appropriate progress.

a. Speech and language therapy was only offered to W.F. 10-20 minutes, 3-5 sessions a month, which was a slight increase in time, but a reduction in frequency.

b. W.F.'s maximum time in the alternative special education program increased to 13 hours per week, but the minimum remained only 2 hours.

c. Social work services time was changed to 10-20 minutes, 3-5 sessions a month, which was a slight increase in frequency, but a reduction in the amount of time per session.

***2020-2021 School Year***

89. N.S. elected to have W.F. attend the 2020-2021 school year virtually, due to concerns with COVID-19 and W.F.'s asthma.

90. In January 2021, W.F. completed his NWEA testing and had decreased scores in reading.

91. In February 2021, N.S. and W.F.'s special education teacher, Stacey Richardson, discussed how W.F. academically performed better, but was continuing to struggle emotionally. N.S. specifically noted that W.F. lacked the ability to name and communicate his emotions and lacked the ability to understand how his actions affected others and how to take personal responsibility for his actions.

92. In March 2021, Mrs. Richardson emailed N.S. asking for input for the IEP and noting achievement testing wasn't necessary as it had been completed in January 2020. However, N.S. does not recall signing consent for any testing in January 2020 nor were any documentation of completed achievement testing provided to N.S. in response to her request for W.F.'s educational records.

93. In providing her input for the IEP, N.S. noted she had numerous concerns about W.F. returning to middle-school in person: W.F. continued to struggle with understanding and

expressing facial expressions and body language; W.F. was highly impulsive (especially when he felt wrong or confused); W.F. had been diagnosed with Tourette syndrome, causing involuntary leg movement and vocal tics; and W.F. needed additional help during virtual learning when he didn't understand the material.

94. In providing input specifically on W.F.'s speech performance, N.S. was not sure virtual speech therapy would be beneficial, but noted W.F. was continuing to work on the "s" sound. N.S. was not sure about the other sounds referenced in W.F.'s speech goal.  Other than collecting information from N.S., SPS did not evaluate W.F.'s speech performance.

95. On April 14, 2021, SPS convened an annual IEP meeting for W.F. Participants included: N.S., Terisa Jones (Special Education District Administrator), Ben Karle (School Social Worker), Megan Williams (Speech Pathologist), Heather George (Assistant Principal), Stacey Richardson (Special Education Teacher), and Aaron Hess (Online Mentor Teacher).

96. Under parent concerns, N.S. noted there were no significant concerns with virtual learning, although W.F. could benefit from more help when he didn't understand schoolwork, but she had numerous concerns if W.F. were to be returned to in-person learning Specifically, N.S. observed that, after a year of virtual learning, reintegration could be "catastrophic" for him, a meeting would be needed prior to the return, and W.F. may need to attend partial days first.

97. The PLAAFP section listed only reading and communication as needs. It entirely removed behavioral and social-emotional as needs, citing W.F.'s virtual attendance presenting no problems. No rationale was provided for the removal of these needs from the PLAAFP.

a. Under reading, the IEP continued to claim W.F.'s primarily struggled with motivation when required to complete reading assignments, as well as showed signs of rapid guessing on his most recent NWEA testing.

b. Under communication, the IEP reported W.F. continued to struggle with the same sounds (h, s/z, and sh) in conversational speech, as well as the R sound at the conversational level and with less structured activities.

c. Despite claiming social-emotional and behavior were no longer areas of need, the PLAAFP observed W.F. still sometimes did not turn in schoolwork.

98. W.F.'s IEP provided only one goal: Will use strategies to determine the context clues and background knowledge to determine word meaning and usage in a sentence with 80% accuracy. Despite the same deficits and lack of progress in communication, no communication goal was developed. Further, despite acknowledging that W.F. still struggled to turn in work consistently, the work completion goal was removed. No rationale was provided for the significant reduction in IEP goals.

99. Again, despite the severity of W.F.'s disability and its direct impact on his ability to meet grade level standards, particularly as it related to his speech and ongoing concerns with ELA performance, and even though W.F. had seemingly made little to no progress since the last IEP, the IEP team claimed ESY services were not needed.

100. Numerous accommodations were removed from W.F.'s IEP, including visual supports (such as a timer), the use of the "cooling off" area, frequent breaks, the provision of frequent feedback, behavioral support, visual supports (such as a visual schedule), utilizing sensory strategies, verbal cues, and the provision of seating arrangements that met W.F.'s needs.

101.     Additionally, all the services and programs provided to W.F. were decreased.

   a.   Social work services were only offered to W.F. as consultation, 5-15 minutes, one to two times per month.

   b.   Speech and language therapy was only offered to W.F. as consultation services, 5-20 minutes, 1-3 times per month.

   c.   W.F.'s alternative special education program was still direct; the frequency was reduced to 0.5-10 hours per week.

102.     The only rationale SPS provided for removing the numerous goals and services was because W.F. had not been observed to engage in the same level of behavioral issues as he had with in-person schooling.

103.     Under options considered, SPS stated speech services were changed to consult, in part due to W.F.'s slow progress and reduced motivation. SPS also noted that, despite W.F. being due for a triennial reevaluation, additional testing was determined unnecessary due to previous testing completed in 2020. However, SPS did not provide any documentation of testing or reevaluations to N.S. in W.F.'s educational record.

*2021-2022 School Year*

104.     W.F. returned to school in person for the 2021-2022 school year. Despite N.S. previously noting an IEP meeting would be needed prior to W.F. returning, and that returning to school without appropriate supports would be "catastrophic" for W.F., no IEP meeting was held nor were any IEP amendments made to address W.F.'s known additional needs in an in-person setting.

105.     In August 2021, numerous text messages were exchanged between N.S. and Ms. Richardson regarding concerns and observations of W.F. returning to in-person learning.

N.S. expressed concern about the order of W.F.'s classes, in case W.F. was removed from school for behaviors after lunch. While W.F.'s first couple days seemed to go well, by the end of August 2021, SPS staff had already made observations regarding W.F.'s mood and the possibility of needing extra supports.

106.    On October 4, 2021, emails were exchanged between N.S. and James Lamb, the middle school principal. W.F. had been suspended for a physical altercation with another student.

    a. Although Mr. Lamb claimed it was only a two-day suspension on the phone, W.F. was effectively suspended for three days as he had also been removed from school the proceeding Friday. W.F. was also removed from the football team. However, despite these consequences, upon information and belief, no Powerschool write ups, nor documentation from the school that a suspendable offense ever occurred, exists in W.F.'s educational record.

    b. Further, N.S. asked about consequences for coaching staff regarding knowledge of racially motivated comments made by other students toward W.F., which contributed to the altercation between the students, but Mr. Lamb did not respond to this concern.

107.    On November 4, 2021, W.F. was involved in a physical altercation on the playground, resulting in disciplinary action and an MDR being held on November 9, 2021.

    a. Participants included: N.S., Heather Brew (General Education teacher), Kim Geibe (social worker), Heather George (Assistant Principal), Stacey Richardson (Special Education Teacher), and Megan Williams (Speech Pathologist).

b.  According to the incident report, W.F. called another student a "fiend," causing the student to slap W.F. W.F. initially walked away, but the other student followed and pushed W.F., so W.F. pushed back. The fight escalated until W.F. was hit in the nose, causing him to bleed, and another teacher was able to break up the fight.

c.  The MDR report simultaneously claimed N.S. hadn't noticed any behaviors lately related to W.F.'s emotional impairment, but also stated the incident occurred when W.F. was overwhelmed and therefore unmotivated to make other choices.

d.  The teacher observation for the day noted W.F. had been disruptive and confrontational from the moment he walked into class and ultimately was sent out for his behaviors.

e.  Despite W.F.'s documented emotional impairment, history of being argumentative and aggressive and having difficulty making appropriate choices in confrontational situations, including a previous MDR where the team found W.F.'s involvement in a fight *was* a manifestation of his disabilities, *and* the fact that W.F. had been physically assaulted by this student twice before, here SPS decided this incident was not a manifestation of W.F.'s disabilities. Instead, SPS concluded without basis that W.F.'s involvement was because of the environment.

108.    On November 29, 2021, N.S. shared a letter from W.F.'s pediatrician with the school noting W.F.'s history of autism, anxiety due to learning disabilities, and anger outbursts.  The letter noted that W.F. had experienced an increase in angry outbursts and anxiety and W.F. had been recommended for additional counseling from Pines Behavioral Health.

109.    Throughout September and October 2021, numerous messages were exchanged between N.S. and Ms. Richardson regarding W.F.'s problematic behaviors in school, including verbal aggression, disrupting the classroom, difficulty with substitute teachers, and refusing to complete work.

    a. As a result of many of these behavior incidents, W.F. was disciplined with either lunch detentions, after school detentions, in school suspensions, or an out-of-school suspension.

    b. On one occasion, Ms. Richardson even specifically requested N.S. keep W.F. home after the family returned late from a vacation, due to preemptive concerns about W.F.'s behaviors.

    c. However, despite the significant number of concerns with W.F.'s behavior and resulting disciplinary incidents, at no time did SPS request N.S.'s consent to conduct an FBA, update W.F.'s behavior plan, conduct an IEP meeting to revise W.F.'s IEP, or implement PBIS.

    d. Within these messages, there were also multiple requests by N.S. for a meeting to discuss W.F. and review his IEP.

110.    In approximately late November 2021, SPS referred W.F. and N.S. to the juvenile court for truancy and a truancy conference was held on December 3, 2021. However, most of the absences were due to out of school suspensions or excused absences that N.S. had communicated to the school in advance and requested work for. One of these times specifically was because N.S. would be out of town and had no one available at home to pick up W.F. from school if there was a behavior incident, which occurred frequently.

111.    On November 29, 2021, W.F. was involved in another physical altercation with a student, resulting in an out of school suspension. According to the incident report, there was a verbal altercation between W.F. and the other student. The other student then repeated something W.F. said, imitating W.F. and his speech impairment. W.F. initially attempted to walk away, but then turned around and engaged in a physical altercation with the other student.

112.    Following the incident, on her own initiative, N.S. emailed SPS formally requesting an FBA, along with a meeting to review W.F.'s behavior plan and IEP.

   a.  In her email, N.S. specifically requested that the meeting occur before W.F. returned to school from his current suspension or, alternatively, that W.F.'s absences be excused, and no truancy proceedings take place until after such meeting.

   b.  In reviewing W.F.'s current absences, N.S. noted that, following the current suspension, over 20% of W.F.'s absences would be attributed to out of school suspension.

113.    On December 6, 2021, another MDR was held for W.F. for the physical altercation that had occurred on November 29, 2021.

   a.  Participants included: N.S., Heather George (Assistant Principal), Stacey Richardson (special education teacher), Anne Gaertner (Advocate), James Lamb (Principal), Amber Peters (general education teacher), Terisa Jones (Special Education Supervisor), and Jill Bissett (Behavior Interventionist).

b.  Both the teacher observation and behavior logs noted W.F. had been disruptive and combative, earning numerous strikes for his in-class behavior and being sent out of the classroom.

c.  Under parent concerns, N.S. identified W.F.'s history of struggling with peers and socialization and noted that here W.F. was specifically mocked for his disability.

d.  Once again, despite W.F.'s documented emotional impairment, including numerous verbal and physical altercations with peers, and the most recent letter from his pediatrician noting the increase in disability-related outbursts and anxiety episodes, SPS still claimed the behavior was not a manifestation of W.F.'s disability.

e.  W.F. was ultimately referred to the juvenile court and placed on informal probation for this incident.

f.  In preparation for the MDR meeting, SPS failed to provide all the relevant information to N.S. During the meeting, Ms. George read directly from student statements in discussing the incident and considering whether or not it was a manifestation, but initially refused to provide these to N.S. Only after numerous emails after the meeting, in which Ms. George initially denied using the statements in the MDR meeting, did Ms. George ultimately provide copies of the information to N.S.

114.    On December 8, 2021, N.S. and Ms. Richardson exchanged emails scheduling a meeting to review W.F.'s behavior plan. When N.S. inquired whether her FBA request would also be considered at this meeting, Ms. Richardson stated no, claiming that was a

different type of meeting that couldn't occur yet. Ms. Richardson provided no explanation for why an FBA could not occur.

115. On December 10, 2021, SPS sent N.S. a notice of expulsion for W.F. but inviting her to participate in a due process meeting that morning, per a previous conversation that occurred on December 8, 2021.

116. On December 13, 2021, SPS held a meeting to review and revise W.F.'s Behavior Plan. Following the meeting, N.S. emailed her concerns with the behavior plan. In her email on December 14, 2021, N.S. specifically noted that the reason for including calls home for pick-up within the behavior plan was to avoid W.F. placing himself into a situation where he would commit a suspendable offense.

117. On December 17, 2021, Heather George (Assistant Principal) and Dave Northrup (Safety Security Director) completed a risk assessment for W.F., based on a statement W.F. made the day prior.

   a. According to the assessment, on December 16, 2021, Jill Bissett (Behavior Interventionist) reported W.F. stated he was going "to take you out to the shed and shoot you in the back of the head," while walking out of class. However, Ms. Bissett did not report that the statement was directed at anyone.

   b. When interviewed, W.F. denied making the statement to anyone, and explained he had been singing a song he heard on the app Tik Tok that goes, "take *me* out to the back of the shed. Shoot *me* in the back of the head." W.F. acknowledged this was probably not a good song for school.

118. On January 5, 2022, W.F.'s behavior plan was updated a second time. The number of target behaviors was significantly expanded from the previous behavior plan to now

include inappropriate language, failing to charge his Chromebook, inappropriate phone use, inappropriate physical contact, being disruptive in class, failing to listen and follow directions, and failing to attempt to complete classwork.

119. On January 9, 2022, only days later, W.F.'s behavior plan was updated a third time to add additional strategies and to modify consequences. The plan also stated that if W.F. went home and it is not an OSS, it would be recorded in Powerschool as agreed upon by school and parent.

120. Despite the numerous behavior plan revisions in a short amount of time, and N.S.'s initial request to amend the IEP and complete an FBA on November 29, 2021, SPS had still not completed or even scheduled an IEP meeting or a REED meeting.

121. An IEP meeting was not held until January 20, 2022. This was an IEP meeting only and at no time did SPS request N.S.'s consent to conduct an FBA, as she had requested on November 29, 2021, almost two months prior.

    a. Participants included: W.F., N.S., Kim Geib (School Social Worker), Aaron Claybaugh (General Education Teacher), Megan Williams (Speech Pathologist), Heather George (Assistant Principal), Stacey Richardson (Special Education Teacher), Preston Ferry (Special Education Teacher), and Nicholas Herblet (High School Principal).

    b. Under parent concerns, it only listed that N.S. was concerned with W.F.'s behavior plan was being followed and communication with her.

    c. Once again, despite the severity of W.F.'s disability and its direct impact on his ability to meet grade level standards, particularly as it related to his behavior

concerns and ability to complete grade-level work in the classroom setting, the IEP team claimed ESY services were not needed.

d.  Under the supplementary aids and services, the IEP did reinstate the following accommodations, but failed to make any further additions or modifications compared to previous IEPs, despite W.F. exhibiting many of the same or increased academic and functional needs: Visual supports (such as a timer), the use of the "cooling off" area, frequent breaks, the provision of frequent feedback, behavioral support, visual supports (such as a visual schedule), utilizing sensory strategies, verbal cues, and the provision of seating arrangements that met W.F.'s needs.

e.  Under options considered, SPS stated it considered increasing the amount of social work referrals, but felt the offered number was more realistic for W.F.

122.  The copy of the IEP provided to N.S. only included the even-numbered pages and, therefore, the following sections are missing in whole or part for review: PLAAFP, goals, complete supplementary aids and services, and the programs and services. N.S. emailed the school requesting a complete copy on April 3, 2022, but to date, has not received a response to her request.

123.  Notably, the IEP failed to include that W.F. is diagnosed with Autism Spectrum Disorder. When N.S. initially reached out to Mrs. Richardson to address this, Mrs. Richardson initially claimed it was left out because ASD eligibility is different than a medical diagnosis. Only after N.S. noted the diagnosis had been included IEPs prior to 2020 under "other considerations" did Mrs. Richardson agree to look at having it added back in. N.S. received no confirmation the IEP was amended accordingly.

124.     According to W.F.'s Winter 2022 MAP Growth scores, W.F. is in only the 3rd

percentile for reading, and therefore likely to be found not proficient on the PSAT, ACT,

and SAT.

125.     On March 11, 2022, N.S. received a call from Mrs. Richardson advising that Mr.

Lamb had approached her and stated he felt like W.F. should go home. Mrs. Richardson

also asked if N.S. wanted to come in and get W.F. or talk to Mr. Lamb. N.S. advised she

would come in.

      a.  When N.S. arrived at the school, Mr. Lamb met her outside and claimed Mrs.

           Richardson said N.S. wanted to talk to him. Mr. Lamb then proceeded to ask N.S.

           about W.F. being involved in drug use, including the use of vapes, and to express

           he was "pretty sure" W.F. was in fact using drugs and had hidden drug

           paraphernalia in a backroom at the school. N.S. then asked Mr. Lamb if he wanted

           W.F. to leave and Mr. Lamb stated yes, he thought that was best.

      b.  When N.S. picked up W.F., he was extremely upset at being forced to leave. W.F.

           had not been aware of any calls to his mother nor any reason for him to need to

           leave that day.

126.     Upon information and belief, on March 17, 2022, Mr. Carey, the middle school

gym teacher and football coach, advised another student not to associate with W.F. if he

ever wanted to play football, and further advised the student that associating with W.F.

would only get him in trouble.

127.     On March 18, 2022, W.F. was suspended again, this time indefinitely, for a

behavior incident.

a.  At 11:50 a.m. that day, W.F. called N.S. extremely upset and anxious, repeating that he needed to be picked up because he could not handle the school day and believed SPS staff were purposely trying to get him arrested. Sensing W.F.'s significant distress, N.S. told W.F. to leave immediately and walk to a family friend's home nearby to be picked up.

b.  Ms. George observed W.F. leaving and began following him. N.S. attempted to call Ms. George to inform her that W.F. had left the school grounds on her permission and order but received no answer. N.S. then advised Mrs. Richardson, who alerted Ms. George and advised W.F. was not a flight risk.

c.  N.S. picked up W.F. and he explained that, prior to leaving math class, he asked the substitute teacher, Mr. Brooks, why another girl was required to stay behind. Mr. Brooks advised W.F. it was none of his business, to which W.F. responded, "you don't have to be a dick about it." Mr. Brooks then ordered W.F. to remain behind as well and blocked the exit, prohibiting W.F. from leaving. Per W.F.'s IEP and behavior plan, W.F. was very sensitive regarding timing and being restrained in an area, and Mr. Brooks' response violated appropriate protocols in W.F.'s IEP. A verbal altercation then occurred between W.F. and Mr. Brooks, as W.F. repeatedly asked Mr. Brooks to move, and Mr. Brooks refused. Mr. Brooks then pretended to fall backwards and got back up. W.F. left the room after Mr. Brooks returned to his feet and immediately called his mother to get picked up.

d.  When N.S. spoke with SPS staff, they reported Mr. Brooks claimed W.F. had "bulldozed through him," knocking him to the ground. However, the three student witnesses all denied seeing W.F. push or touch Mr. Brooks.

e.   In the video of the incident, Mr. Brooks can be seen falling slowly and then returning to his feet. A nearby teacher did not appear concerned with the fall. W.F.'s hands did not show any movement and he did not leave the doorway until after Mr. Brooks had already stood back up.

128.    On March 21, 2022, N.S. spoke with Mr. Lamb. During this conversation, Mr. Lamb denied any previous statements alleging or implying W.F. was involved with drugs. Mr. Lamb advised he did not know how long W.F. was going to be suspended for, as he was waiting to discuss the matter with W.F.'s probation officer. Mr. Lamb further dismissed Mr. Carey's statement to another student advising him against associating with W.F.

129.    Later that day, Mr. Lamb emailed N.S. advising he still did not know how long W.F. would be suspended for. Mr. Lamb requested a written statement from W.F. and N.S. refused.

130.    On March 22, 2022, only *after* N.S. had disclosed in a personal conversation with the assistant superintendent that she had retained a lawyer, did Mrs. Richardson reach out to N.S. and have her come to the school to sign the paperwork for the FBA. In apologizing for the delay, Mrs. Richardson claimed she did not know she was responsible for it and believed the responsibility was the ISD's, and Kim Geib from the ISD had been present when the initial request was made verbally.

131.    Also on March 22, 2022, the school provided notice that W.F.'s suspension would last through March 23, 2022. In subsequent emails, Mr. Lamb claimed there would also be a one-day OSS due to inappropriate language, but this failed to account for the total of 3 days W.F. would have been removed from school. This was also the first time W.F. had

received an out of school suspension for swearing, despite this being an area of identified need for W.F. and a consistent concern. Additionally, despite claiming the suspension was for language, the school documentation stated the suspension was for "Employee Physical Assault."

132. For the remainder of the 2021-2022 school year, W.F. continued to have numerous behavior incidents and was sent home, either formally or informally, for related behavior concerns, as documented in text messages, emails, and behavior logs by SPS and N.S.

***Administrative Due Process Complaint and Hearing***

133. On April 13, 2022, N.S. filed a due process complaint against SPS with the Michigan Department of Education (MDE).

134. On October 17, 18, and 19, 2022, a hearing was held before an Administrative Law Judge to address whether the District denied W.F. a FAPE by:

    a. Failing to develop an IEP reasonably calculated to allow W.F. to make appropriate progress in light of his unique circumstances at the April 16, 2020, April 14, 2021, and January 20, 2022, IEP meetings;

    b. Failing to request N.S.'s consent for and conduct comprehensive reevaluations, including a functional behavior assessment to address W.F.'s lack of progress toward his IEP goals and in the general education curriculum, to conduct a reevaluation upon receipt of new information provided by N.S., and to address W.F.'s anticipated academic and behavior needs related to his ongoing conduct resulting in formal or informal removals from the classroom, from two years of the date of filing the complaint;

c. Failing to seek N.S.'s consent to conduct a Functional Behavior Assessment within 10 school days of her making the request in writing;

d. Failing to implement positive behavior intervention supports (PBIS) to support W.F.'s specific behavioral needs;

e. Failing to provide W.F. extended school year services, from two years of the date of filing;

f. Failing to review and revise W.F.'s IEP to address his academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals and the general education curriculum from two years of the date of filing;

g. Failing to consider all relevant information and finding that W.F.'s behavior was not a manifestation of his disability at the November 24, 2021, and December 6, 2021 MDRs; and

h. Failing to consistently provide W.F. with services to allow him to make progress toward his IEP goals and the general education curriculum for all removals of W.F. after 10 removals within a school year, from two years of the date of filing.

135. Expert witness Dr. David Bateman testified to his assessment and conclusions regarding whether W.F.'s IEPs, FBA, and evaluation provided him with FAPE.

136. Dr. Bateman is a professor at Shippensburg University in the Department of Educational Leadership and Special Education where he teaches courses on special education law, assessment, and facilitating inclusion. He is a former due process hearing officer for Pennsylvania.  In that role, Dr. Bateman presided over and issued decisions for over 580 due process proceedings.  Dr. Bateman has authored or coauthored numerous publications on special education, including A Principal's Guide to Special Education; A

Teacher's Guide to Special Education; Charting the Course: Special Education in Charter Schools; and Current Trends and Legal Issues in Special Education.

137.　　Dr. Bateman testified that his overall findings and conclusions were that W.F.'s IEP "was inconsistent…, lacking in detail, [and] needed additional supports and additional provisions for the student…the FBA was not comprehensive." Tr. 30.

138.　　As for the January 20, 2022, IEP, Dr. Bateman found that:

    a.　There were no positive behavior intervention supports that would address W.F.'s specific behavioral needs (Tr. 40);

    b.　It did not provide sufficient instruction on how to address behavioral referrals (Tr. 33);

    c.　It lacked teacher observation data about his current status and curriculum-based measures (Tr. 35); and

    d.　W.F.'s listed learning goals are too vague to define and measure progress or whether appropriate instruction is being provided (Tr. 37).

139.　　As a result, Dr. Bateman concluded that the January 20, 2022, IEP was not reasonably calculated to allow the student to make progress in light of his unique circumstances, because it did not provide appropriate instruction on how to measure W.F.'s progress or implement adequate supports to address W.F.'s specific behavioral needs. Tr. 40-41.

140.　　The District provided no evidence to rebut Dr. Bateman's testimony regarding the January 2022 IEP.

141.　　As for the April 17, 2019, IEP, Dr. Bateman found that:

a. The language was too vague, and an understanding of W.F.'s specific needs was lacking (Tr. 44);

b. It did not provide a clear baseline of W.F.'s current performance (Tr. 45);

c. W.F.'s present levels did not match what was being measured by the goals (Tr. 46); and

d. It lacked information regarding disciplinary referrals and issues resulting in suspension (Tr. 47).

142.    Dr. Bateman further testified that the goals listed in the April 17, 2019, IEP are identical to the goals listed in the April 16, 2020, IEP, which raised concern as it shows W.F. is not making progress. Tr. 48.

143.    This finding led Dr. Bateman to conclude that the April 16, 2020, IEP was not reasonably calculated to allow W.F. to make progress, because it did not provide an understanding of his current functioning at that time, the goals were too vague to be effectively measured, and there was a lack of specificity of what services were being provided to him. Tr. 54.

144.    The District provided no evidence to rebut Dr. Bateman's testimony regarding the April 2019 and April 2020 IEPs.

145.    Dr. Bateman testified that the April 2021 IEP had updated NWEA scores, but these updates did not provide an actual understanding of W.F.'s current level of function. Tr. 55-56.

146.    Dr. Bateman further testified that the updated goals were  better and that certain goals were reasonably calculated but tough to measure; but he also noted that this IEP still failed to implement any positive behavior intervention supports for W.F. Tr. 60.

147. While there were improvements from the April 2020 IEP to the April 2021 IEP, Dr. Bateman still concluded that the April 2021 IEP was not reasonably calculated to allow W.F. to make appropriate progress in light of his unique circumstances because it still lacked clarity as to his present level and goals, and it lacked understanding of what supports are necessary for him to make progress toward those goals. Tr. 61.

148. The District provided no evidence to rebut Dr. Bateman's testimony regarding the April 2021 IEP.

149. Overall, Dr. Bateman concluded that 2019, 2020, 2021, and 2022 IEPs did not have present levels written in a way that could have provided W.F. with FAPE, since the district could not sufficiently monitor progress, and there were no notable changes in educational programming. Tr. 61-64.

150. Dr. Bateman also reviewed the 2020 MET and concluded that the report was insufficient because it lacked information and observational data from teachers about W.F.'s current functioning level.  He further testified that the MET lacked testing that would provide sufficient information for an IEP to be reasonably calculated based on its findings since W.F.'s current function level could not be readily determined without more data. Tr. 70-72.

151. As for the FBA, Dr. Bateman testified that it lacked detail about W.F.'s functional level in different settings and where the problem behaviors are occurring in school. And as a result, the behavior intervention plan and IEP could not be conducive to W.F. making appropriate progress. Tr. 74-77.

152. The District provided no evidence to rebut Dr. Bateman's testimony regarding the 2020 MDE and FBA.

153.    In summary, Dr. Bateman testified that, in his expert opinion, none of the IEPs were reasonably calculated to allow W.F. to make appropriate progress in light of his unique circumstances, the evaluations conducted lacked observational data to develop IEP goals and assess progress, positive behavior intervention supports were not being implemented, and that W.F.'s progress could not be accurately evaluated.

154.    The District provided no testimony to rebut Dr. Bateman's conclusions.

155.    Expert witness Nathan Vanderweele conducted an independent FBA of W.F. and testified to W.F.'s behavioral needs and the appropriateness of W.F.'s current supports as listed in his IEP's. Mr. Vanderweele is a board-certified behavior analyst (BCBA), certified through the Behavior and Analyst Certification Board. He also holds a master's degree in behavior analysis, licensed as such through the State of Michigan. Mr. Vanderweele currently works as a Behavior Analyst in the Oswego Public Schools in Illinois, but at the time Mr. Vanderweele conducted his testing of W.F. and provided testimony, he was a Clinical Supervisor at the Kalamazoo Autism Center, part of Western Michigan University. Mr. Vanderweele had been in that position since 2017.

156.    Mr. Vanderweele testified that he spent two days observing W.F. in school to conduct the FBA, but that this kind of observational data needs to be collected more frequently so appropriate modifications can be made to a BIP and an IEP as needed to ensure the supports are effectively meeting the student's needs. Tr. 118-119; Tr. 153-154.

157.    As part of his FBA, Mr. Vanderweele conducted a "modified trial-based functional analysis." Tr. 120, l. 25 - Tr. 121, l. 1. Mr. Vanderweele testified that, while a functional analysis is not always a necessary component of an FBA, it was appropriate here given the

context and type of W.F.'s behaviors, specifically his verbal outbursts and out-of-seat behaviors within the classroom. Tr. 120-121.

158.    Mr. Vanderweele testified that there were constraints that prohibited his ability to conduct formal teacher interviews, a standard component of FBAs. Tr. 116-117.  The information gained from these interviews is crucial to gaining a full understanding of the problem behaviors and W.F.'s functioning in the classroom. Tr. 159. Mr. Vanderweele further testified while he typically reviews previous IEPs and any relevant previous assessments, including previous FBAs, in this instance SPS only provided him with W.F.'s current IEP upon his request for records. Tr. 157-158.

159.    Although Dr. Bateman had expressed some concern over the limited amount of observation time (Tr. 35, 70-76), Mr. Vanderweele explained that given the high frequency of W.F.'s target behaviors, the verbal outbursts and out of seat behaviors, and that the observation occurred over four different settings, two days was sufficient to capture the necessary amount of data. Tr. 136-137. Mr.Vanderweele testified that with the two full days of observation and the functional analysis, even without the teacher interviews his FBA was a valid representation of W.F.'s current behavior and needs. Tr. 136; *See also* Tr. 159-160.

160.    Through his FBA, Mr. Vanderweele identified the primary functions of W.F.'s behaviors were attention from teachers or peers and escape from demands. Tr. 128-129. Mr. Vanderweele then testified to a variety of recommendations SPS could implement to address those functions and replace the maladaptive behaviors. Tr. 129-136.

161.     Mr. Vanderweele memorialized these recommendations into a behavior plan for W.F. (Tr. 138), as well as testified to the necessary components of a behavior plan, including:

> a variety of strategies that are tailored towards the specific function of the behavior, along with the operation definitions of the behavior of interest, the context in which the behaviors may or may not occur . . . a visual of what is currently happening, what the current behavior is, what the desired behavior is, and what an appropriate alternative behavior is along with the consequences involved with each of those . . . things to consider for any additional supports, how data is collected, how frequent data may be collected and then depending on the scope of the behavior, whether the behavior is taking place and what environment that behavior plan was going to be implemented.

Tr. 118, l. 1-17.

162.     In implementing a behavior plan, Mr. Vanderweele testified consistency in expectations and consequences across all classroom settings is necessary to manage the student's expectations, avoid a potential increase in variability of behaviors, and to promote more predictable outcomes and behaviors by the student. Tr. 148-150. Mr. Vanderweele also testified it is essential that the data be consistently collected to ensure the behavior plan is working, and it must be collected in a way that can inform decisions. Tr. 118-119; Tr. 190.

163.     In reviewing the appropriateness of the supports and interventions the district claimed to be implementing, Mr. Vanderweele repeatedly testified to the need for data and clear definitions to determine whether or not the intervention was appropriate for W.F. Tr. 179-184.

164.     SPS assistant superintendent Nicole Gittinger testified that she serves as the director of special education for the district and serves in multiple other roles, including overseeing curriculum, grants, and instruction for the district.  Tr. 498-499.

165.     Ms. Gittinger testified that she attended one "behavior-based" meeting for W.F. during the 2021-2022 school year in January 2022 but that she could not recall details of the meeting. Tr. 505.

166.     W.F.'s special education teacher, Stacey Richardson, testified to her qualifications and background, the development of the IEPS, W.F.'s behaviors, and evaluations.

167.     Ms. Richardson testified that she is not a certified special education teacher as she has not completed her master's degree in special education and is currently a long-term substitute in a special education role. Tr. 581, 593

168.     Notably, Ms. Richardson stated that for the two weeks at the beginning of the 2020-2021 school year, when it was unclear whether W.F. would be attending school virtually or in person, that he did not receive any educational services at all. Tr. 608-609.

169.     Ms. Richardson testified that, despite not having completed formal certification or training, she prepared the April 2021 and January 2022 IEPs for W.F. Tr. 589.

170.     As for W.F.'s FBA, Ms. Richardson testified that his FBA was the first one she had never worked on one before and is unfamiliar with MDE's guidance regarding behavior intervention plans and functional behavior assessments, yet was tasked with collecting teacher assessments for these plans and assessments. Tr. 614-615.

171.     Ms. Richardson testified to her opinion on whether some of W.F.'s behaviors and actions are a result of his disabilities and his use of services even though she does not have any formal training as to whether someone is making a choice or whether the behavior stems from their disability. Tr. 634-635.

172.     The ALJ issued a Decision and Order on February 1, 2023, finding that SPS had only partially denied W.F. FAPE, with the following specific conclusions:

a. The district failed to develop an IEP reasonably calculated to allow W.F. to make appropriate progress in light of his unique circumstances at the April 14, 2021, IEP, but not at the April 2020 or January 2022 IEP meetings;

b. The district failed to request parental consent for and conduct comprehensive reevaluations, including a functional behavior assessment, to address W.F.'s lack of progress toward his IEP goals and in the general education curriculum, upon receipt of new information provided by N.S., and to address W.F.'s anticipated academic and behavior needs related to his ongoing conduct;

c. The district failed to seek N.S.'s consent to conduct a Functional Behavior Assessment within 10 school days of making the request in writing;

d. The district did <u>not</u> fail to implement PBIS to support W.F.'s specific behavioral needs;

e. The district did <u>not</u> fail to provide W.F. extended school year services from two years of the date of filing;

f. The district failed to review and revise W.F.'s April 2021 IEP to address his academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals and the general education curriculum;

g. The district did <u>not</u> fail to consider all relevant information and finding that W.F.'s behavior was not a manifestation of his disability at the November 9, 2021, and December 6, 2021 MDRs;

h. The district did <u>not</u> fail to consistently provide W.F. with services to allow him to make progress toward his IEP goals and the general education curriculum for all

removals of W.F. after 10 removals within a school year, from two years of the date of filing; and

    i.   The district did <u>not</u> fail to educate W.F. in the least restrictive environment.

173.    Where the ALJ did find a denial of FAPE, the only remedy she provided to W.F. was 65 hours of general compensatory education in the area of reading within six months, to be provided by the District, which was not sufficient to remedy even the limited harms her decision found.

### *Developments within SPS since the Due Process Hearing*

174.    Upon information and belief, SPS does not have the required continuum of alternative placements, and lacks the necessary staff to identify appropriate programs that may properly accommodate W.F., as documented in November 2022 news article:

> Members of the Sturgis Public Schools Board of Education recently reinstated its special education director position.
>
> Earlier this year, the board had approved a new, expanded position called special populations coordinator, which was to combine special education services with those of ESL (English as a second language).
>
> Most recently, Assistant Superintendent Nicole Gittinger had taken on responsibilities of special education coordinator, along with help from four special education lead teachers.
>
> At a meeting of the board last week, three separate job descriptions were unveiled: one for assistant superintendent, one for special education director, and one for ESL director.
>
> "I really feel like this is necessary for all three of these jobs to be done well," board member Emily Halling said Monday, Nov. 21. "These are heavy loads that require a lot of expertise, involvement and knowledge."

Michelle Patrick, *Special education director position reinstated at Sturgis Public Schools*, Sturgis         Journal         (Nov.         29,         2022),

https://www.sturgisjournal.com/story/news/education/2022/11/29/sturgis-public-schools-board-of-education-reinstates-special-education-director-position/69669306007/.

175.     Upon information and belief, as of the date of filing this Complaint, SPS still has not hired a special education director or coordinator.

176.     Upon information and belief, SPS never even posted the position nor initiated any employment search for a special education director or coordinator.

177.     St. Joseph County Intermediate School District (ISD), the ISD which provides services to SPS and several other school districts, closed its only Emotional Impairment secondary program at the end of 2022, leaving SPS no option for providing appropriate services to students like W.F.  As a result, W.F. is now being educated entirely online through a homeschooling program.

### Race discrimination against W.F. and racially hostile environment at SPS

178.     In or around November 2021, a Sturgis Middle School teacher was recorded on video using the "n-word," a racial slur.

179.     The use of this word at school was extremely disruptive and disturbing to W.F., who is biracial.

180.     W.F. reported this incident multiple times as a concern to SPS staff and teachers, and no one addressed his concerns.

181.     Instead, W.F. was admonished by SPS staff for bringing up the "n-word" and told that his bringing up this concern was "racist."

182.     SPS staff's failure to respond properly to W.F.'s reports violated the SPS Anti-Harassment Policy, which reads:

> Students and other members of the School District community and third parties are encouraged to promptly report incidents of harassing conduct to

48

a teacher, administrator, supervisor or other District official so that the Board may address the conduct before it becomes severe, pervasive, or persistent. Any teacher, administrator, supervisor, or other District employee or official who receives such a complaint shall file it with the District's Anti-Harassment Compliance Officer within two (2) school days….

A student who believes s/he has been subjected to offensive conduct/harassment/retaliation hereinafter referred to as the "Complainant," may file a formal complaint, either orally or in writing, with a teacher, principal, or other District employee at the student's school, the Compliance Officer, Superintendent, or another District employee who works at another school or at the district level…. If a Complainant informs a teacher, principal, or other District employee at the student's school, Superintendent, or other District employee, either orally or in writing, about any complaint of harassment or retaliation, that employee must report such information to the Compliance Officer or designee within two (2) business days….

Upon receiving a formal complaint, the Compliance Officer will consider whether any action should be taken in the investigatory phase to protect the Complainant from further harassment or retaliation, including, but not limited to, a change of work assignment or schedule for the Complainant and/or the alleged harasser….

Within two (2) business days of receiving the complaint, the Compliance Officer or a designee will initiate a formal investigation to determine whether the Complainant has been subjected to offensive conduct/harassment/retaliation….

Although certain cases may require additional time, the Compliance Officer or a designee will attempt to complete an investigation into the allegations of harassment/retaliation within fifteen (15) business days of receiving the formal complaint….

Absent extenuating circumstances, within ten (10) school days of receiving the report of the Compliance Officer or the designee, the Superintendent must either issue a final decision regarding whether the complaint of harassment has been substantiated or request further investigation. A copy of the Superintendent's final decision will be delivered to both the Complainant and the Respondent.

*Anti-Harassment Policy*, Sturgis Public Schools Policy Manual (2019),

http://go.boarddocs.com/mi/stur/Board.nsf/goto?open&id=BP6LPQ576F59.

183.     Upon information and belief, no report was ever filed with SPS's Anti-Harassment Compliance Officers (identified in the policy as Mr. Herblet and Ms. Gittinger).

184.     Upon information and belief, no investigation was conducted into W.F.'s reports.

185.     Upon information and belief, no discipline or other corrective action was taken to respond to the teacher's use of an inappropriate and racially hostile word.

186.     No final decision was ever provided to N.S. or W.F.

187.     On or around September 15, 2022, another student targeted W.F. for his race and began using racial slurs against him, threatened to shoot him at school, later also threatened to shoot him over text messages, and verbally threatened him outside his home.

188.     W.F. and N.S. reported this incident to SPS administrators.

189.     Instead of addressing the incident properly, the district disciplined W.F. for defending himself against this student.

190.     Upon information and belief, no report was ever filed with SPS's Anti-Harassment Compliance Officers.

191.     Upon information and belief, no investigation was conducted into W.F. and N.S.'s reports.

192.     No final decision was ever provided to N.S. or W.F.

193.     Upon information and belief, while the district reported the shooting threats to the police, no discipline or other corrective action was taken to address the student's racial harassment of W.F.

### COUNT I
### Violations of the Individuals with Disabilities in Education Act
### 20 U.S.C. § 1400 *et seq.* and implementing federal regulations

194.　　The Administrative Law Judge ("ALJ") ignored or misinterpreted information in the record demonstrating the District's denial of a FAPE, reached several erroneous conclusions of fact and law, and gave undue deference to the District's main witness–a substitute teacher without a special education teaching certification.　The ALJ also committed errors of law by not considering several issues properly submitted for consideration. As a result, the remedy awarded by the ALJ for the limited issues that she did find for Plaintiff, was insufficient and not reasonably calculated to make the child whole. Accordingly, Plaintiff seeks review of the administrative decision as to all issues presented.　Reversal is warranted under the "modified de novo" standard and based upon a preponderance of the evidence in the record.

***The District failed to develop an IEP reasonably calculated to allow W.F. to make appropriate progress in light of his unique circumstances at the April 2020 and January 2022 IEP meetings***

195.　　The ALJ first erroneously concluded that W.F.'s April 2020 IEP was reasonably calculated to allow him to make appropriate progress in light of his unique circumstances.

196.　　In doing so, the ALJ entirely mischaracterizes the issue, solely looking at whether the supports could or were implemented in a virtual setting to determine reasonableness. This implementation question has nothing to do with whether the IEP was *developed* in compliance with IDEA's standards and omits all of N.S.'s evidence that, based on those standards, the *entirety* of the IEP - the goals, services, *and* supports - was inappropriate and not reasonably calculated to meet his needs, regardless of whether W.F. was in-person or remote.

197.     As the ALJ accurately acknowledged, Dr. Bateman repeatedly testified that the Present Level statements were vague and failed to provide clarity about W.F.'s specific needs, making it impossible to develop an IEP that was reasonably calculated to allow the student to receive FAPE and make progress toward his unique circumstances.

198.     Further, as Dr. Bateman testified and as the ALJ acknowledged, not only did the District fail to indicate what, if any, progress W.F. had made toward his previous goals, the reading goal failed to address W.F.'s stated reading need, W.F. had an increase in his disciplinary referrals, yet some of the objectives were just copied and pasted from the previous IEP.

199.     Despite the lack of progress and lack of change in the goals, the copying and pasting wasn't limited to the goals and objectives, rather the supports and accommodations were entirely copied from the previous year. Direct services were also copied, with only nominal changes in service times from the 2019 IEP.

200.     N.S. further corroborated the concerns with this IEP being substantially similar to the previous IEP and failing to address W.F.'s actual needs and deficits in her testimony. (Tr. 232-233, 235-236).

201.     In concluding the March 2020 IEP was developed to reasonably provide W.F. with FAPE, the ALJ failed to consider the testimony provided by Dr. Bateman, testimony by N.S., and the exhibits themselves showing a clear lack of progress and no substantive or meaningful change in the programs and services from the 2019 IEP. It does not matter whether or not W.F. could or did access the stated supports and services, the services *themselves* were not reasonably calculated to allow W.F. to make appropriate progress based on his unique circumstances.

202.     The ALJ then did go on to find that the April 2021 IEP denied W.F. FAPE, but *only* in regard to W.F.'s reading, considering only the declining score at his subsequent January 2022 IEP to find the April 2021 goal failed to provide W.F. FAPE. The ALJ erred when finding the remainder of the April 2021 IEP provided W.F. with FAPE.

203.     In doing so, the ALJ dismissed or ignored all of N.S.'s evidence regarding W.F.'s continued areas of need and lack of progress, both academically and functionally, placing all blame on W.F., a student with a disability, for declining remote services, rather than the district for failing to offer reasonable in-person alternatives and accurately identifying W.F.'s needs and the responding interventions.

204.     N.S. presented copious evidence on W.F.'s continued needs, lack of progress, and the lack of clarity or changes in the IEP at the April 2021 IEP meeting via testimony by Dr. Bateman, testimony by N.S., W.F.'s IEP progress reports, and W.F.'s IEPs themselves. (Tr. 55-64, 231-234, 236-237, 312-313). Minimal progress, or simply doing comparatively better at home than in a school classroom, does not mean a child has made appropriate progress or received FAPE. As the Supreme Court unanimously made clear in *Endrew F.* - IDEA requires more.

205.     The ALJ then erroneously concluded that W.F.'s January 2022 IEP was reasonably calculated to allow him to make appropriate progress in light of his unique circumstances.

206.     Even a cursory review of the January 2022 IEP compared to the three preceding IEPs provided the ALJ with a clear picture that W.F. had made no progress, and in fact had regressed, in both his reading and his classroom performance.

207.     However, there remained no substantive changes to W.F's goals, his supports, or his direct services in the January 2022 IEP that would support the ALJ's conclusion that

attempting them for a third, and in some cases *fourth*, time would suddenly now allow W.F. to make appropriate progress.

208.    Dr. Bateman reiterated this in his testimony, again tying it back to the issues with the lack of clarity in the Present Levels (Tr. 32-41). Without accurately identifying the problems and W.F.'s needs, the District had no way to address those needs accurately and appropriately, and therefore it was *impossible* for them to be providing W.F. FAPE.

209.    In addition, the ALJ made an error of law by failing to consider whether the District's denial of N.S. a meaningful participatory role in formulating W.F.'s IEPs amounted to denial of a FAPE.

210.    As set forth in 20 U.S.C. § 1415(b)(7)(A)(iii), a due process complaint need only include "a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem."  This is a low pleading standard that requires providing enough specificity "to allow the responding party to understand what the Petitioner believes the Respondent has done or failed to do . . . and how that action or inaction has harmed or interfered with Petitioner's education."  *F.C. v. Tenn. Dep't of Educ.*, No. 3:16-cv-613 (M.D. Tenn. Mar. 6, 2017).

211.    As a 2003 Senate Committee Report elaborates, the pleading standard for a due process complaint need not "reach the level of specificity and detail of a pleading or complaint filed in a court of law" with its purpose being to "ensure that the other party . . . will have an awareness and understanding of the issues forming the basis of the complaint." S. Rep. No. 108-185, at 34 (2003), https://www.congress.gov/108/crpt/srpt185/CRPT-108srpt185.pdf.

212.    N.S. testified at length on the District's refusal to allow her to meaningfully participate. *See* Tr. 220, l. 10-19; Tr. 361, l. 17 - Tr. 362, l. 7. N.S.'s testimony was

corroborated by the IEPs themselves, which consistently failed to accurately incorporate information provided by N.S. regarding W.F.'s current performance and needs. Tr. 231, l. 14 - Tr. 233, l. 24; Tr. 361, l. 6 - Tr. 362, l. 7.

213.    The ALJ's finding that the District did adequately involve N.S. and respond to her concerns is not supported by the preponderance of the evidence in the record.

214.    The ALJ's finding that the District developed IEPs that provided W.F. with FAPE at the April 2020, April 2021, and January 2022 IEP meetings is not supported by the preponderance of the evidence in the record.

215.    The ALJ's factual conclusions to the contrary were unsupported and ignored critical evidence in the record.

### SPS failed to implement positive behavior intervention supports (PBIS) to support W.F.'s specific behavioral needs

216.    The ALJ erred with respect to N.S.'s claim that the District failed to implement PBIS to support W.F.'s specific behavioral needs.

217.    In her description of the issue, the ALJ correctly cited IDEA's requirement that PBIS be considered where a student's behavior impacts his learning or that of others (34 C.F.R. § 300.324(a)(2)(i)) and that the "IEP must include [a] statement of the special education and related services and supplementary aids and services, *based on peer-reviewed research to the extent practicable*, to be provided to the child." 34 C.F.R. § 300.320(a)(4) (emphasis added). The ALJ further correctly states N.S.'s contention that the District failed to meet this requirement for the period in question from two years of the date of filing.

218.    However, in finding the District met this requirement, the ALJ erroneously relied upon only two behavior plans created by the district, and the copied-and-pasted "supports" listed within the IEP.

219.    As Dr. Bateman explained, PBIS is not just a series of unrelated supports, but rather it encompasses *both* "the necessary programs and an instruction they will bring to provide to alter the child's behavior instead of just have it just be something that is a negative." Tr. 64, l. 21-25. It is a clear plan to "provide positive supports for a student instead of just punishing or suspending the student." Tr. 64, l. 18-21.

220.    However, as can be seen in W.F.'s IEPs and disciplinary record, W.F. continued to be punished and removed from the classroom versus receiving any positive supports. Tr. 97, l. 5-9; Tr. 195, l. 9-18; Tr. 240, l. 22-24; Tr. 306, l. 2-8.

221.    There was also no evidence presented from the District that any of the supports listed within the IEP was evidence-based or that it was impracticable to utilize evidence-based positive behavior supports, as the ALJ acknowledged is required by IDEA.

222.    In contrast, N.S. presented evidence through Mr. Vanderweele's testimony that even seemingly appropriate or "reasonable" supports, as SPS claimed and the ALJ referenced were included in W.F.'s IEP, are in fact *not* evidence-based or appropriate for a particular student if *there is no data to support the intervention's use*. Tr. 140. The District again failed to provide any evidence or data to support the appropriateness of the supports within W.F.'s IEPs.

223.    The ALJ's finding that that the District's behavior plan constituted PBIS is similarly flawed. As initially testified to by Dr. Bateman, and then corroborated by Mr.

56

Vanderweele, a behavior plan can *only* be created *after* there has first been a functional behavior assessment. Tr. 74, l. 17-22; Tr. 1. 17, 21-23.

224. The District failed to conduct a functional behavior assessment, the District subsequently failed to develop an actual, evidence-based behavior plan to address W.F.'s behaviors, and the District failed to present any evidence that first conducting a functional behavior assessment to create an evidence-based behavior plan would have been impossible or impracticable.

225. The ALJ's finding that the District implemented PBIS from two years of the date of filing is not supported by the preponderance of the evidence in the record.

226. The ALJ's factual conclusions to the contrary were unsupported and ignored critical evidence in the record.

*SPS failed to provide W.F extended school year services, from two years of the date of filing*

227. The ALJ erred with respect to N.S.'s claim that the District failed to provide W.F. extended school year (ESY) services from two years of the date of filing.

228. In analyzing the issue in her decision and order, the ALJ cited MDE's guidance in full, before erroneously relying on one potential factor, regression, to find against N.S.

229. The ALJ inexplicably dismissed N.S.'s testimony about the lack of discussion regarding ESY services in favor of a boiler-plate checkbox on the IEPs stating it was discussed, even though the district failed to present any evidence to support such a discussion ever taking place. Tr. 370, 378.

230. While the ALJ began discussing "severity of disability" as one factor that would qualify a student for ESY, then erroneously pivoted the analysis back to whether W.F. would regress, despite simultaneously citing the correct analysis of this factor in a footnote.

231.     The ALJ then ignored evidence from N.S. directly relating to the severity of W.F.'s

disabilities, including both written documentation within W.F.'s IEPs and progress report

regarding his decreasing reading skills and increasing behavioral difficulties accessing his

schoolwork and remaining in class; testimony from N.S. regarding the severity of W.F.'s

emotional impairment and his disabilities' direct relation to his behaviors and academic

performance; and even testimony from District staff regarding the increasing severity of

W.F.'s behaviors and his inability to maintain appropriate classroom behavior and

complete his work. Tr. 48, l. 19-20; Tr. 56, l. 19-23; Tr. 62, l. 5-12; Tr. 267, l. 22 - Tr. 268,

l. 25; Tr. 272, l. 10-24; Tr. 291, l. 23 - Tr. 292, l. 9; Tr. 316, l. 2 - Tr. 317, l. 21; Tr. 335, l.

8-22.

232.     The ALJ's finding that the District provided W.F. extended school year services

from two years of the date of filing is not supported by the preponderance of the evidence

in the record.

233.     The ALJ's factual conclusions to the contrary were unsupported and ignored critical

evidence in the record.

***SPS failed to consider all relevant information in finding that W.F.'s behavior was not a manifestation of his disability at the November 9, 2021, and December 6, 2021, Manifestation Determination Reviews***

234.     A preponderance of the evidence clearly demonstrates that the District failed to

consider all relevant information at the November and December 2021 Manifestation

Determination Reviews (MDRs). When a local educational agency (LEA) such as SPS

conducts an MDR of a student, it is required to do the following:

> ...within 10 school days of any decision to change the placement of a child
> with a disability because of a violation of a code of student conduct, the
> local educational agency, the parent, and relevant members of the IEP Team
> (as determined by the parent and the local educational agency) shall review

all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine— (I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

20 U.S.C. § 1415(k)(1)(E)(I).

235.     With respect to the November 2021 MDR, the District ignored significant evidence collected by both school personnel and N.S. indicating that W.F. had an emotional impairment, that he had a history of being argumentative and aggressive, that he had difficulty making appropriate choices in confrontational situations, and that a previous physical altercation had been found to be a manifestation of his disabilities, all of which was relevant to an assessment of whether the conduct in question during the November 4, 2021, incident was a manifestation of his disabilities. Compl. 28, ¶ 96.

236.     The form completed at the November 2021 MDR included very limited information. Instead of summarizing the relevant information in W.F.'s IEP, the form simply reads, "The IEP is current and up-to-date." P. Ex. 57, 1.  There is no information indicating that the IEP team reviewed the IEP or any specific provisions of it to understand whether or how its implementation affected W.F.'s behavior, or even what the IEP's contents were. Whether the IEP is current and up to date is not a required consideration at an MDR under the language of the IDEA. Rather, the purpose of reviewing the IDEA is to assess if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or if the conduct in question was the direct result of the LEA's failure to implement the IEP.

237.     Further, certain statements written on the form contradict the contents of W.F.'s IEP, such as: "[W.F.] engaged in the disciplinary action based on environmental factors

not pertaining to his area of eligibility." *Id*. at 3. In fact, W.F.'s IEP stated that his area of eligibility was Emotional Impairment, and that N.S. was concerned about W.F. reintegrating into in person school after being in virtual: "I am very worried about how integrating him back to a daily in person school life will go when virtual is no longer an option. After more then [sic] a year on virtual, it has the potential to be very catastrophic for him and staff." P. Ex. 49, 1. The IEP reiterated that the information it contained was only with respect to W.F.'s performance in a virtual setting:

    a. "Behavioral: [W.F.] has been attending school virtually since his last IEP. He has not presented with any behavioral needs. He has only attended three social work sessions, having stated that these sessions are boring to him. [W.F.]'s mom continues to report positive progress behaviorally." *Id*. at 3.

    b. "Social-Emotional: [W.F.] has been attending school virtually this past year. He has not presented with any social/emotional needs. His mom reports that he socializes virtually with peers after school." *Id*.

238.    With respect to the relevant information provided by parents, the MDR form simply reads: "Mom said that she has not noticed any behaviors lately related to his eligibility and that she thinks this incident was just when he was at a breaking point and didnt [sic] care anymore." P. Ex. 57, 1. However, at the hearing, N.S. testified at length about information she had provided to SPS which was not included in the MDR form and which was not considered at the MDR, including that W.F. frequently exhibited what she referred to as a "mad face," which she had discussed repeatedly with school staff and which was a signal that W.F. was experiencing a high level of emotion; that W.F. would ball his fists when experiencing a high level of emotion; that these physical manifestations of W.F.'s emotions

were related to W.F.'s autism as they occurred when he was having difficulty interpreting facial expressions or body language; that she had repeatedly asked for W.F.'s autism to be added to her concerns but that the District had failed to do so; and that W.F. had exhibited his "mad face" during the incident in question.  Tr. 288, l. 23 - Tr. 293, l. 8.

239.     N.S. also testified that she had told SPS staff that the number of breaks W.F. was receiving in school was insufficient to meet his needs, and that SPS did not increase W.F.'s breaks until January 2022, which also was not included in the MDR form. Tr. 295, l. 23 - Tr. 296, l. 12; *see* P. Ex. 57. N.S. testified that SPS staff asked her to keep W.F. home from school in late September 2021, just a little over a month before the incident in question, due to concerns about his behavior after returning from a trip, which was not included on the MDR form. Tr. 296, l. 13 - Tr. 298, l. 12; *see* P. Ex. 58.

240.     With respect to the December 2021 MDR, the form again includes very limited information. Again, the form simply reads, "The IEP is current and up-to-date." P. Ex. 66, 3. The form does not include any of the previously identified relevant information provided by N.S. to the District. *See* P. Ex. 66. And as for "All relevant information in the student's file," the form only references December 3, 2021, behavior logs – nothing else in W.F.'s file is identified as relevant. P. Ex. 66, 3-4. This cursory review of a very limited sliver of the ample relevant information about W.F. that was available to SPS does not meet the requirements of the IDEA.

241.     The Michigan Administrative Rules for Special Education (MARSE) define Emotional Impairment as follows:

> Emotional impairment shall be determined through manifestation of behavioral problems primarily in the affective domain, over an extended period of time, which adversely affect the student's education to the extent that the student cannot profit from learning experiences without special

education support. The problems result in behaviors manifested by 1 or more of the following characteristics:

(a) Inability to build or maintain satisfactory interpersonal relationships within the school environment.

(b) Inappropriate types of behavior or feelings under normal circumstances.

(c) General pervasive mood of unhappiness or depression.

(d) Tendency to develop physical symptoms or fears associated with personal or school problems.

MARSE R. 340.1706(1).

242.     The information provided by N.S. was clearly relevant to an analysis as to whether W.F.'s behavior during the two incidents in question was a manifestation of his identified disabilities of autism, Tourette's syndrome, disruptive mood dysregulation disorder, ADHD, major depressive disorder, generalized anxiety disorder, and unspecified communication disorder, the symptoms and manifestations of which qualified him for eligibility under the Emotional Impairment classification. The information N.S. shared was directly applicable to an assessment of whether W.F. was able to build or maintain satisfactory interpersonal relationships within the school environment, whether he was having inappropriate types of behavior or feelings under normal circumstances, and whether he had a general pervasive mood of unhappiness or depression.

243.     Regarding the November 4, 2021, incident, calling another student a "fiend" and engaging in a physical altercation are clear signs of W.F.'s inability to maintain satisfactory interpersonal relationships, that he was having an inappropriate type of behavior or feelings, and that he may have been unhappy or depressed. Regarding the December 6, 2021, incident, telling another student that "that is why your dad left you" and then

attacking that student after the student imitated him are all indications of an inability to build or maintain satisfactory interpersonal relationships within the school environment, inappropriate types of behavior or feelings under normal circumstances, a general pervasive mood of unhappiness or depression. The additional relevant information provided by N.S. would have assisted the IEP team to analyze W.F.'s conduct appropriately to assess whether it was a manifestation of his disability as required by the language of the IDEA.

244.     SPS provided no evidence to refute N.S.'s claim that the information considered at the November and December 2021 MDRs was deficient.  The ALJ was required to make a finding by a preponderance of the evidence. As N.S. presented significant documentary and testimonial evidence indicating that the information considered at the MDRs did not meet the requirements of the IDEA, and SPS did not provide any information or evidence to the contrary, the ALJ should have found that SPS violated the IDEA by failing to consider all relevant information in finding that W.F.'s behavior was not a manifestation of his disability at the November 9, 2021 and December 6, 2021 MDRs.

245.     The ALJ's decision misstated both N.S.'s arguments and the requirements of the IDEA.  The ALJ's decision seems to indicate that the ALJ believes that N.S.'s argument was that the IEP team failed to list all the information considered.  In fact, N.S. testified at length to the information she provided at the MDRs that was not considered.  Tr. 288-294, Tr. 326-327. It is not the failure to *list* the information on a form, but rather the failure to meaningfully *review* the information that forms the basis for N.S.'s objections to the MDR outcomes, as required by the IDEA:

> Within 10 school days of any decision to change the placement of a child
> with a disability because of a violation of a code of student conduct, the

LEA, the parent, and relevant members of the child's IEP Team (as determined by the parent and the LEA) must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—

(i) If the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or

(ii) If the conduct in question was the direct result of the LEA's failure to implement the IEP.

34 C.F.R. § 300.530(e)(1).

246.    The ALJ also wrongly relies on N.S.'s statement that she was "undecided" as to whether W.F.'s conduct was a manifestation of his disability in finding that SPS did not deny W.F. FAPE at the November 2021 MDR.  This is inappropriate as N.S. cannot, on her own – nor can any member of the IEP team – decide whether behavior is a manifestation of a student's disability one way or another.  N.S.'s argument is not that the IEP team should have done what she directed or that her voice should have been determinative.  Her argument is that information she provided was not appropriately reviewed, which the ALJ does not properly address in her decision.

247.    The ALJ's finding that the District properly reviewed information provided by N.S. at the MDRs in November and December 2021 is not supported by the preponderance of the evidence in the record.

248.    The ALJ's factual conclusions to the contrary were unsupported, ignored critical evidence in the record, and did not align with the requirements of the IDEA.

**COUNT II**
**Disability Discrimination in Violation of**
**Section 504 of the Rehabilitation Act**
**29 U.S.C. § 794 *et seq.***

249.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

250.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, in pertinent part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 20 U.S.C. § 794(a); see also 34 C.F.R. § 104.4(a).

251.     A person is an "individual with a disability" under Section 504 if that person experiences "a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. § 705(20)(B) (incorporating definition in 42 U.S.C. § 12102 by reference).

252.     "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

253.     In the context of public K-12 education, a "qualified individual with a disability" under Section 504 includes an individual with a disability of an age during which persons who do not experience disabilities are provided K-12 public education.  34 C.F.R. § 104.3(1)(2).

254.     A "program or activity" includes public K-12 school districts, a "department, agency, special purpose district, or other instrumentality of a State or of a local government," and "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government."  29 U.S.C. § 794(b) (referencing 20 U.S.C. § 7801(30)).

255.     Pursuant to 29 U.S.C. § 794(a), the predecessor to the U.S. Department of Education promulgated regulations regarding application of Section 504's antidiscrimination mandate to K-12 schools that receive federal funding.  The obligations under these regulations are in addition to the general antidiscrimination requirements of 29 U.S.C. § 794.

256.     Under these regulations, educational programs or activities must, *inter alia*:

    a.  provide a free appropriate public education to each qualified (individual with  a disability] who is in the recipient's jurisdiction, regardless of the nature or  severity of the person's [disability]," 34 C.F.R. § 104.33(a);

    b.  "educate, or ... provide for the education of, each qualified [individual with a disability] in its jurisdiction with persons who [do not experience disabilities] to the maximum extent appropriate to the needs of the [individual with a  disability]." 34 C.F.R. § 104.34(a);

    c.  "place [an individual with a disability] in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily. Whenever a recipient places a

person in a setting other than the regular educational  environment pursuant to this paragraph, it shall take into account the proximity of the alternate setting to the person's home."  34 C.F.R. § 104.34(a);

d.  "ensure that [individuals with disabilities] participate with non [disabled]  persons in [nonacademic and extracurricular services and activities, including  meals, recess periods, and other nonacademic services] to the maximum extent appropriate to the needs of the [individual with a disability] in question."  34 C.F.R. § 104.34(b). These nonacademic services include, but are not limited to: counseling services, athletics, transportation, health services, recreational activities, special interest groups or clubs sponsored by the recipients, and others. 34 C.F.R. § 104.37(a)(2);

e.  conduct evaluations in accordance with 34 C.F.R. § 104.35(b) "before taking  any action  with  respect  to  the  initial  placement  of  the  person [with a   disability] in regular or special education and any subsequent significant change in placement." 34 C.F.R. § 104.35(a);

f.  provide procedural safeguards, including, *inter alia*, notice, an opportunity to examine records, an impartial hearing, and a hearing review process. 34 C.F.R. § 104.36.

257.    Under Section 504, FAPE requires the provision of regular or special education and related aids and services that "(i) are designed to meet individual educational needs of [a child with a disability] as adequately as the needs of [non-disabled students] are met and (ii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R.] § 104.34, 104.35, and 104.36."

258.     Section 504's K-12 education regulations apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to  recipients that operate, or that receive Federal financial assistance for the operation of,  such programs or activities."  34 C.F.R. § 104.31.

259.     Defendant is a "program or activity" under Section 504 and a recipient of federal financial assistance for the provision of elementary and secondary education and is therefore obligated to comply with Section 504 and the regulations under 34 C.F.R. Part 104.

260.     At all times pertinent to this Complaint, W.F. was eligible for enrollment at SPS, and eligible for the receipt of public K-12 education from SPS, including a FAPE under Section 504.

261.     Through the acts and omissions set forth herein, Defendant, acting under color of law, discriminated against W.F. on the basis of disability and in violation of Section 504, including, but not limited to, the following:

a.  Defendant denied W.F. the opportunity to participate in the benefits of public education equal to that afforded others, including having access to educational instruction in an amount equal to that of his same-age, non-disabled peers.

b.  Defendant failed to provide W.F. an opportunity to participate in or benefit from the public education equal to that afforded others.

c.  To the extent Defendant provided any public educational services to W.F. during the time pertinent to this Complaint, such services were not appropriate or reasonably calculated to provide W.F. an opportunity to participate in or benefit from the public education equal to that afforded other public-school students.

d.   Defendant failed to educate W.F., or provide for W.F.'s education, with persons who do not experience disabilities to the maximum extent appropriate to W.F.'s needs.

262.    Defendant denied W.F. a FAPE in violation of Section 504 regulations, based upon the foregoing allegations and such other violations of Section 504 as may be discovered during the course of this matter.  All such claims are hereby reserved.

263.    Defendant's violations of Section 504 have caused, and continue to cause, actual and proximate harm to W.F.

264.    At the time Defendant violated W.F.'s rights under Section 504 as set forth above, Defendant, and its respective agents, had knowledge that a harm to a federally protected right was substantially likely, and was deliberately indifferent to that risk.

265.    Defendant, and its respective agents, acted with reckless or callous indifference to W.F.'s federally protected rights under Section 504.

266.    These repeated violations constitute a continuing violation of Section 504 of the Rehabilitation Act.

267.    As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

## COUNT III
### Disability Discrimination in Violation of
### Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12101 *et seq.*

268.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

269.     42 U.S.C. § 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

270.     Disability discrimination under Title II also includes a public entity's failure to make reasonable modifications necessary to avoid disability discrimination.  28 C.F.R. § 35.130(b)(7).

271.     ADA regulations specify, *inter alia*, that it is unlawful discrimination for a public entity either directly or through contractual, licensing, or other arrangements to:

    a.   Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

    b.   Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

    c.   Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others,

    d.   Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or  person that

discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

e.  Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1).

272.    Under the ADA regulations, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (1) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3).

273.    ADA regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  Pursuant to statutory authority, the U.S. Attorney General defined the "most integrated setting" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 FR 35696, 35705 (July 26, 1991) (incorporated at 28 C.F.R. pt. 35, App. B); see also 5 U.S.C. § 301.

274.    "Individual with disability" and "major life activities" have the same meaning under Title II of the ADA and under Section 504 as set forth above.  20 U.S.C. § 12102.

275.    Under Title II of the ADA, a public entity includes any state or local government and any "department, agency, special purpose district, or other instrumentality of a State or States or local government."  28 C.F.R. § 35.104.

276.    "Qualified individual with a disability" under ADA Title II means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 28 C.F.R. § 35.104.

277.    Through the acts and omissions described herein, Defendant, acting under color of law, discriminated against W.F. in violation of the ADA, including, but not limited to  the following ways:

   a.   Denying W.F. the opportunity to participate in or benefit from educational services equal to that afforded to others;

   b.   Denying W.F. educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

   c.   Denying W.F. the opportunity to receive educational programs and services in the most integrated setting appropriate to his needs;

   d.   Failing to make reasonable modifications to its programs and services necessary to avoid discrimination against W.F.;

e.  Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs with respect to W.F.

278.    Defendant's violations of the ADA have caused, and continue to cause, actual and proximate harm to W.F.

279.    At the time Defendant violated W.F.'s rights under the ADA as set forth above, Defendant, and its respective agents, had knowledge that a harm to a federally protected right was substantially likely, and was deliberately indifferent to that risk.

280.    Defendant, and its respective agents, acted with reckless or callous indifference to W.F.'s federally protected rights under the ADA.

281.    As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

**COUNT IV**
**Race Discrimination in Violation of**
**Title VI of the Civil Rights Act of 1964**
**42 U.S.C. § 2000d *et seq*.**

282.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

283.    Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

284.	As a public school district, SPS received and continues to receive federal financial assistance.

285.	A public school district can be held liable under Title VI for deliberate indifference to student-on-student racial harassment. *Williams v. Port Huron Area Sch. Dist. Bd. of Educ.*, No. 06-14556, 2010 WL 1286306, at *8 (E.D. Mich. Mar. 30, 2010), rev'd and remanded sub nom. *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612 (6th Cir. 2012).

286.	W.F. was subjected to racial harassment that was so severe, pervasive, and objectively offensive that it deprived W.F. of access to the educational opportunities and benefits provided by SPS.

287.	Defendant had actual knowledge of the racial harassment, evidenced by, among other things:

a.	The use of a racial slur by SPS teacher; and

b.	Use of racial slurs by another student against W.F. as witnessed by SPS staff.

288.	Defendant was deliberately indifferent to the racial harassment W.F. experienced; its response (or lack thereof) to the harassment W.F. reported was clearly unreasonable in light of the known circumstances described herein, including but not limited to:

a.	The use of a racial slur by SPS teacher; and

b.	Use of racial slurs by another student against W.F.

289.	As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

<u>**COUNT V**</u>
**Disability Discrimination in Violation of**
**Michigan's Persons with Disabilities Civil Rights Act**
**M.C.L. 37.1101 *et seq*.**

290.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

291.     SPS is an education institution as defined in PDCRA. M.C.L. 37.1401 *et seq*.

292.     PDCRA prohibits discrimination in educational institutions or facilities and public services because of a disability.  M.C.L. 37.1302; MCL 37.1402.

293.     PDCRA prohibits educational institutions from discriminating against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of a disability.  M.C.L. 37.1402(a).

294.     PDCRA prohibits places of public accommodation, including educational facilities, and public services from denying an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations because of a disability. M.C.L. 37.1302(a).

295.     Defendant's failure to accommodate W.F. and failure to provide W.F. with a full and equal enjoyment of their services constitute discrimination under PDCRA.

296.     Defendant denied W.F. access to a public education on the basis of his disability in violation of PDCRA.

297.     Defendant's violations of PDCRA have caused and continue to cause direct and proximate harm to W.F.

298.     Defendant, and its respective agents, acted with reckless and callous indifference to W.F.'s rights under PDCRA.

299.     As a direct and proximate result of Defendant's actions and inactions, W.F. has

sustained injuries and damages, including, but not limited to, loss of his fundamental

constitutional rights; educational loss; economic loss; mental and emotional distress,

including anxiety, mental anguish, humiliation, and embarrassment; psychological

damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

### COUNT VI
### Race Discrimination in Violation of
### Michigan's Elliott-Larsen Civil Rights Act
### M.C.L. 37.2301 *et seq.*

300.     Plaintiff realleges and incorporates by reference the allegations contained in the

previous paragraphs.

301.     ELCRA provides that an educational institution may not "[d]eny an individual in

the full utilization of or benefit from the institution, or the services, activities, or programs

provided by the institution because of...race." M.C.L. 37.2402(a).

302.     Because schools stand *in loco parentis* to offending students, schools may be

vicariously liable for hostile educational environment discrimination arising from student-

on-student harassment. *Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, No.

359190, 2022 WL 17868146, at *5 (Mich. Ct. App. Dec. 22, 2022).

303.     SPS is an educational institution as defined by ELCRA, M.C.L. 37.2301, and

M.C.L. 37.2401.

304.     W.F. is a member of a protected class due to his race.

305.     W.F. was subjected to racial harassment that was so severe, pervasive, and

objectively offensive that it unreasonably interfered with his education and created an

intimidating, hostile, and offensive educational environment.

306.     Defendant had actual knowledge of the racial harassment described herein.

307.     Defendant failed to adequately investigate or take prompt or appropriate remedial action upon notice of the hostile educational environment.

308.     Defendant violated ELCRA and deprived W.F. of his civil rights by their acts and omissions in response to the ongoing racially harassing conduct and communication to which he was subjected, which had the purpose and/or effect of denying him the full benefit of an SPS education and full and equal access to educational opportunity.

309.     As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment against Defendants as follows:

A.  Issue a Declaratory Judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the District violated the IDEA by knowingly failing to provide W.F. with a FAPE from April 2020 to April 2021;

B.  Vacate the February 1, 2023 Decision and Order of the ALJ;

C.  Award W.F. compensatory education in the form of two and a half years of one-on-one tutoring in reading, writing, and mathematics of five hours a week each, amounting to 450 hours at $100.00 per hour, or $45,000.00;

D.  Award W.F. two and a half years of weekly behavioral and mental health sessions of two hours a week, amounting to 260 hours at $150.00 per hour, or $39,000.00;

E.  For past, present, and future non-economic damages in an amount to be determined at trial;

F.  For past, present, and future general, specific, incidental, and consequential damages in an amount to be determined at trial;

G.  For any appropriate statutory damages;

H.  For costs of this suit;

I.  For punitive damages, according to proof, as appropriate to the individual cause of action;

J.  For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

K.  For reasonable attorney fees, costs, and interest, to the fullest extent allowed by law; and

L.  Order any other and further relief, both legal and equitable, that this Court may deem just and proper.

**<u>JURY DEMAND</u>**

Now comes Plaintiff, by and through her attorneys, Elizabeth K. Abdnour and Jacquelyn Babinski, and demands a trial by jury.

Dated: May 1, 2023                                         Respectfully Submitted,

**<u>s/Elizabeth K. Abdnour</u>** P78203
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 292-0067
Email: elizabeth@abdnour.com

**<u>s/Jacquelyn N. Babinski</u>** P83575
BARGER & GAINES
90 North Broadway, Suite 320
Irvington, New York 10533
Telephone: (914) 902-5918

78

Fax: (914) 902-5917
Email: jacquelyn@bargergaines.com

*Attorneys for Plaintiff*