UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

N.S. o/b/o W.F.,

      Plaintiff,                   Judge Paul L Maloney
                                                    Magistrate Judge Phillip J. Green
v                                                  No. 23-448

STURGIS PUBLIC SCHOOLS,

      Defendant.

_____/

| | |
|---|---|
| ELIZABETH K. ABDNOUR (P78203) | TIMOTHY J. MULLINS (P28021) |
| ELIZABETH ABDNOUR LAW, PLLC | KENNETH B. CHAPIE (P66148) |
| *Attorney for Plaintiff* | GIARMARCO, MULLINS & HORTON, P.C. |
| 1100 W. Saginaw St., Ste. 4A-2 | *Attorneys for Defendant* |
| Lansing, MI 48915 | 101 W. Big Beaver Road, 10th Floor |
| (517) 292-0067 | Troy, MI 48084-5280 |
| elizabeth@abdnour.com | (248) 457-7020 |
| | tmullins@gmhlaw.com |
| JACQUELYN N. BABINSKI (P83575) | kchapie@gmhlaw.com |
| BARGER & GAINES | |
| *Attorney for Plaintiff* | |
| 90 North Broadway, Ste. 320 | |
| Irvington, NY 10533 | |
| (914) 902-5918 | |
| jacquelyn@bargergaines.com | |

## ANSWER TO COMPLAINT

Defendant, STURGIS PUBLIC SCHOOLS, by and through its attorneys, GIARMARCO,

MULLINS & HORTON, P.C., states its Answer to Plaintiff's  Complaint as follows:

## INTRODUCTION

1. W.F., now fifteen years old  and in 9th grade, has been eligible for special education services
   since 2014.  Despite W.F.'s diagnoses of Autism Spectrum Disorder, Disruptive Mood
   Dysregulation  Disorder,  Attention-Deficit/Hyperactivity  Disorder  –  Combined  Type
   (ADHD), Unspecified Communication Disorder, Mood Disorder Not Otherwise Specified,

Anxiety Disorder Not Otherwise Specified, Moderate Psychosocial Stressors, Gastrointestinal Issues, and Hearing Impairment; his lack of academic progress year after year; as well as his mother, N.S.'s, persistent, vocal concerns about the inadequacy of W.F.'s accommodations and services, the District failed to comprehensively evaluate W.F. to accurately and comprehensively assess his educational needs.  Without accurate baseline data on W.F.'s academic and cognitive abilities or periodic reevaluations, W.F.'s Individualized Education Plan (IEP) consisted of inappropriate, unattainable goals and inadequate services and accommodations.  N.S. repeatedly asked the District for more services and supports for W.F and more data and tests to assess the appropriateness of W.F.'s IEP.  The District either ignored or rejected W.F.'s requests, instead continuing to utilize increased disciplinary measures in response to W.F.'s behaviors and to dismiss W.F.'s significant disabilities and related needs and their impact on his functional and academic performance. Accordingly, N.S. on behalf of W.F. alleges that the District denied him a Free and Appropriate Public Education (FAPE) by failing to evaluate him, failing to draft an IEP reasonably calculated to meet her educational needs, by failing to revise his IEP to enable her to make progress, and by failing to follow IDEA's disciplinary procedures when responding to W.F.'s behaviors.

**<u>ANSWER</u>:    Defendant admits that W.F. is 15 years of age and a 9th grade student and has received special education services provided by the School District. as to the remaining allegations contained in plaintiff's introductory paragraph, Defendant denies that allegation for the reason that they are inaccurate, untrue and/or not set forth appropriately pursuant to the Federal Rules of Pleading and, therefore, leaves Plaintiff to his proofs therein. Defendant specifically denies the allegations that the School District failed to evaluate**

**Plaintiff, provide him appropriate accommodative services. Defendant affirmatively avers that it has and continues to provide Plaintiff student with a free and appropriate public education.**

2.  Due to the District's denial of a FAPE, W.F. lacks the foundational skills needed to be a productive member of society and to access and make progress in the general education curriculum and toward his IEP goals.  W.F. continues to struggle academically and to regulate his behaviors consistently to be included in the general education setting. Thus, Plaintiffs now seek reversal of certain portions of the Administrative Law Judge's (ALJ) February 1, 2023, Decision and Order and an award of additional compensatory education services to help W.F. advance as far as possible towards his grade level in reading, writing, and math and to provide him behavioral and mental supports to address his underlying social-emotional needs.

**<u>ANSWER</u>:  Defendant denies the allegations contained therein for the reasons set forth in the decision of the Administrative Law Judge resulting from the due process hearing pursued by Plaintiff, which resulted in a Decision and Order dated February 1, 2023, which decisions and conclusions on which Defendant, in part, bases its denials and which decision Plaintiff expressly seeks to set aside herein.**

3.  W.F. has also suffered from years of discrimination based on both his disability and his race at SPS due to SPS's failure to train and supervise its staff and its failure to properly respond to incidents of discrimination he and N.S. have reported, and he now seeks damages to remedy these harms.

**<u>ANSWER</u>: Defendant denies the allegations contained therein for the reason that they are untrue.**

## JURISDICTION AND VENUE

4.  This Court has original jurisdiction over Plaintiff's federal claims under 29 U.S.C. § 626 and 28 U.S.C. § 1331.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

5.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

6.  The Court also has jurisdiction over Plaintiff's IDEA claims under 20 U.S.C. §§ 1415(i)(2)(A) and (3)(A) and under 34 C.F.R. § 300.516, which confer jurisdiction without regard to the amount in controversy.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

7.  The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C.

§ 1367.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

8. Plaintiff has exhausted all administrative remedies pursuant to 20 U.S.C. § 1415(l).

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

9. Pursuant to 28 U.S.C. § 1391(b), venue lies in the Western District of Michigan as the Defendants are located and operate in the Western District of Michigan and the events and omissions giving rise to this action occurred within the District.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

## PARTIES

10. W.F. is a fifteen-year-old individual who resides in the Sturgis Public Schools District. W.F. is biracial as his mother is White and his father is Black. He resides with his mother, N.S., and is in 9th grade at Sturgis High School. W.F. has been diagnosed with Autism Spectrum Disorder, Disruptive Mood Dysregulation Disorder, ADHD Combined Type, Unspecified Communication Disorder, Mood Disorder Not Otherwise Specified, Anxiety Disorder Not Otherwise Specified, Moderate Psychosocial Stressors, Gastrointestinal Issues, and Hearing Impairment. W.F. is eligible for special education and related services under the IDEA. W.F. is also an individual with a disability within the meaning of Title II

5

of the ADA and the PDCRA as he has a physical and mental impairment that substantially limits one or more major life activities including processing information, concentrating, and learning.  *See* 42 U.S.C. §§ 1202, 12131(2).

**ANSWER:  Defendant School District admits that Plaintiff student is a 9th grade student at Sturgis High School and that it has provided said student a special education and related services as appropriate. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiff to his proofs.**

11. Defendant Sturgis Public Schools is a local education agency subject to the provisions of the IDEA.  The District was responsible for providing W.F. a FAPE under the IDEA.  20 U.S.C. §§ 1400-1419.  The District is a recipient of federal financial assistance, subject to the requirements of Section 504, 34 C.F.R. § 104.31 *et seq.*, and Title VI of the Civil Rights Act of 1964, and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. § 12131, *et seq*. The District is a place of public accommodation subject to the provisions of PDCRA, M.C.L. 37.1101 *et seq.*, and an educational institution subject to the provisions of ELCRA, M.C.L 37.2301 *et seq*.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court. Notwithstanding the foregoing, Defendant affirmatively avers that it has provided Plaintiff with an appropriate free and public education and continues to do so at this time.**

## LEGAL FRAMEWORK

12. The IDEA requires that qualifying children with disabilities receive a FAPE.  20 U.S.C. §

1412(a)(1)(A); 34 C.F.R. § 300.101(a).

**ANSWER**:  **Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

13. To achieve this goal, the IDEA and its implementing regulations require that school districts design and develop an IEP for each qualifying child.  20 U.S.C. §§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.112, 300.320-24.

**ANSWER**:  **Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

14. In *Endrew F. v. Douglas County School District Re-1*, 137 S. Ct. 988, 999 (2017), the Supreme Court defined FAPE as an offer of education, "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  The Court further clarified that, in designing an IEP, "every child should have the chance to meet challenging objectives," and the IEP Team must give, "careful consideration to the child's present levels of achievement, disability, and potential for growth."  *Id.* at 999, 1000.

**ANSWER**:  **Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

15. Pursuant to the IDEA's Reevaluation mandate, a school district must ensure that "a reevaluation of each child with a disability is conducted . . . if the local educational agency

7

determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation." 20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. § 300.303(a)(1).

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

16. In conducting an evaluation, the IDEA and its implementing regulations require school districts to, "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . the content of a child's [IEP], including information related to enabling the child to be involved in and progress in the general education curriculum." 20 U.S.C. § 1412(b)(2)(A)(ii); 34 C.F.R. § 300.303(b)(2).

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

17. The IDEA and its implementing regulations also require school districts to "ensure that the IEP Team . . . revises the IEP as appropriate to address any lack of expected progress toward the annual goals and in the general education curriculum . . . ; the results of any reevaluation conducted . . . ; the child's anticipated needs; or other matters." 20 U.S.C. § 1414(d)(4)(A)(ii); 34 C.F.R. § 300.324(b)(1)(ii).

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact,**

**which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

18. While the IDEA guarantees individually tailored educational services, the ADA and Section 504 mandate non-discriminatory access to federally funded programs. *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

19. Public schools that receive federal funds must comply with all three statutes, and the same underlying conduct—including denial of a FAPE—can violate the IDEA, the ADA, and Section 504 all at once. *Id.* at 755-56.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

20. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

21. Further, under the Title II of the ADA, covered entities must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. § 35.130(b)(7).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

22. Similarly, Section 504 of the Rehabilitation Act and its implementing regulations provide that no one may be excluded from a program receiving federal funds "solely by reason" of her disability.  29 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4(a).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

23. Under Section 504 of the Rehabilitation Act,, a school district must provide a FAPE, meaning "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of [a child with a disability] as adequately as the needs of [non-disabled students] are met and (iii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R. §§] 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(a)-(b).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

24. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

25. Michigan's Persons with Disabilities Civil Rights Act also guarantees full and equal use of public accommodations, public services, and educational facilities free from discrimination because of a disability.  M.C.L. 37.1102.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

26. The PDCRA prohibits educational institutions and public services from "[d]iscriminat[ing] in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability . . . ." M.C.L. 37.1402(a).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

27. Michigan's Elliott-Larsen Civil Rights Act provides that an educational institution may not

"[d]eny an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of . . . race." M.C.L. 37.2402(a).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute incomplete statements of law, rather than allegations of fact, which Defendant neither admits nor denies, the accuracy and applicability of which are to be determined by the Court herein. As such, Plaintiff is left to his proofs thereon.**

## FACTS

28. W.F. has been diagnosed with Autism Spectrum Disorder, Disruptive Mood Dysregulation Disorder, ADHD Combined Type, Unspecified Communication Disorder, Mood Disorder Not Otherwise Specified, Anxiety Disorder Not Otherwise Specified, Moderate Psychosocial Stressors, Gastrointestinal Issues, and Hearing Impairment.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

29. W.F. has received special education services through an Individualized Education Plan (IEP) since 2014, initially under the eligibility category of Speech and Language Impairment, but under the eligibility category of Emotional Impairment (EI) since April 2018.

**ANSWER:  Defendant admits that it has provided Plaintiff with special education and other services pursuant to a number of Individualized Educational Plans as adopted and revised. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

30. Since April 2018, W.F. remained eligible for special education and related services under the EI category.

12

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

*2017-2018 School Year*

February 23, 2018, Review of Existing Evaluation Data (REED)

31. On February 23, 2018, REED meeting was held to re-evaluate W.F.'s eligibility category and educational needs in light of new information provided by N.S.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

32. Under Parent Input, the REED also noted N.S. was concerned about W.F.'s sensitivity to sounds.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

33. Under School Based Observations, concerns about W.F.'s impulse control, anxiety, personal space, facial expression, and struggles with unstructured times and substitutes were listed.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

34. Additional Evaluation Data also indicated W.F. had a history of disciplinary removals for destruction of property, defiance, and violent behaviors. W.F. also had a history of difficulties with speech articulation, specifically struggling with the /h, s, z, and sh/ sounds.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

35. Without citing to any evaluations, the REED claimed W.F.'s refusal to participate and lack

13

of motivation negatively impacted his ability to make progress.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

36. The REED listed the following evaluations would be completed to obtain additional data related to W.F.'s eligibility and disability-related needs: social/emotional adjustment, adaptive behavior, classroom/school observation, speech and language, cognitive, and achievement.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

37.  N.S signed her consent to the evaluation plan on March 2, 2018.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

April 23, 2018, Multidisciplinary Evaluation Team (MET) Report

38. A MET Report was completed for W.F. on April 23, 2018.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

39. Under "Reason for Referral," the report stated W.F. had been exhibiting aggressive behaviors at school.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

40. W.F.'s teacher reported the following:

   a.  W.F. struggled with writing and showing his math work.

   b.  W.F. experienced anxiety and insecurities but failed to use calming strategies

resulting in W.F. wanting to harm others.

c.  W.F. was often disruptive in class and had difficulty regulating his emotions and controlling his behavior.

d.  W.F.'s behaviors were often triggered by peer statements, not following math directions, and changes to routine.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

41. N.S. reported the following during her parent interview:

a.  W.F. is diagnosed with ADHD Combined Type, Anxiety Disorder Not Otherwise Specified, Gastrointestinal Issues, Disruptive Mood Dysregulation Disorder, Autism Spectrum Disorder, Hearing Issues, and Unspecified Communication Disorder.

b.  W.F. struggles with understanding other peoples' feelings.

c.  W.F. struggles with attention and impulsivity, as well as regulating his emotions when there are changes in his routine. W.F. is also over-sensitive to sounds.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

42. W.F. disclosed the following during his interview:

a.  His favorite subject is science, and his least favorite subject is math.

b.  He experiences some bullying from his peers.

c.  He struggles understanding instructions and sitting still.

d.  He is often angry, but having time to calm down and then talk to an adult helps.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

43. Based on observations by the school social worker and the Diagnostic Teacher Consultant the report included information stating that W.F often appeared distracted or fidgety, disruptive, or off task in the classroom compared to his peers.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

44. On the Woodcock Johnson Test of Cognitive Abilities, W.F. generally displayed average skills, but the MET Report noted W.F. presented lacking energy and exhibited decreased motivation as the test was administered. Therefore, the MET Report concluded W.F.'s General Intellectual Ability Score of 85 was not reliable.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

45. On the Kaufman Test of Educational Achievement, Third Edition, W.F. scored below average in Reading Composite, Reading Comprehension, Silent Reading Fluency, and Math Fluency.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

46. When given the Vineland-3, which measured W.F.'s adaptive behavior, W.F. scored in the 1st percentile on the Parent/Caregiver Form and in the 10th percentile on the Teacher Form.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

47. On the Behavior Assessment System for Children, Third Edition, which measured W.F's behaviors and self-perceptions, both N.S. and W.F.'s teacher scored W.F. as clinically

significant in aggression and at least one of them scored W.F. as clinically significant in the following areas: Externalizing problems, Anxiety, Somatization, Internalizing Problems, and Behavioral Symptom Index.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

48. Both W.F.'s parent and teacher rated W.F. in the severe range for autism spectrum symptoms using the Social Responsiveness Scale, Second Edition.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

49. The MET Report concluded, based on the evaluations and information obtained, W.F. qualified for services under the classification of Emotional Impairment and provided several recommendations for the school setting.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

April 23, 2018, Individual Education Plan (IEP)

50. On April 23, 2018, an IEP meeting was held. Participants included W.F., N.S., Kevin Thompson (speech pathologist), Marjorie Wisler (special education teacher), Kim Geibe (School Social Worker), Kasey Smith (General Education Teacher), Karen Wagner (Assistant Principal), Gretchen Ennis (Diagnostic Teacher Consultant), and Kayla Lange (Pines Behavioral Health Therapist).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

51. The Present Level of Academic Achievement and Functional Performance (PLAAFP)

section listed the following as areas of need: reading, behavioral, and communication. When describing behavior, the PLAAFP specifically noted W.F. struggled with unstructured areas and substitute teachers/

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

52. W.F.'s IEP provided the following goals:

    a.  Produce age-appropriate phonemes in connected speech independently with 90% accuracy, specifically the /h, s, z, and sh/ sounds at both the sentence and conversational levels.

    b.  Independently answer literal and inferential comprehension questions based on the passage with 80% accuracy.

    c.  Manage strong emotions (anger, anxiety) by using appropriate coping strategies with earning one or fewer discipline referrals per marking period.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

53. Despite the numerous behavior concerns identified for W.F., the IEP only provided W.F. with direct social work services for 15-30 minutes, 2-4 times a month.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

Remainder of 2017-2018 School Year

54. On May 1, 2018, there was an IEP Amendment to add additional accommodations based on N.S research and suggestions of additional ways to support W.F. in the school setting.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

18

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

55. On May 21, 2018, SPS created an Emergency Intervention Plan (EIP) for W.F., indicating seclusion or restraint would be used if W.F. was exhibiting physical aggression.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

56. No Positive Behavioral Interventions and Supports (PBIS) were discussed with N.S. or implemented into W.F.'s IEP.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

57. At the end of the 2017-2018 school year, W.F. had not met any of his IEP goal objectives and had approximately 19 disciplinary referrals.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

58. Despite the district's belief that W.F. needed an EIP due to behaviors and his minimal progress toward IEP goals, SPS failed to seek consent for a functional behavior assessment or other evaluations and SPS failed to review and revise the IEP to address these concerns.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

*2018-2019  School Year*

59. On September 25, 2018, another Amendment was made to W.F.'s IEP, changing the frequency of speech and language sessions from 1-2 times per week to 4-6 times per month. However, despite W.F.'s ongoing behavior issues (including 8 disciplinary referrals already this school year) and minimal progress toward IEP goals previously documented,

no actual increase or change to the type, amount, or frequency of services was made. Further, by altering the frequency of the speech and language sessions, the maximum number of sessions per month *decreased* by two sessions.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

60. SPS did not convene an IEP meeting for W.F. until April 27, 2019, despite W.F. having approximately 72 documented behavior incidents between September 25, 2018, and April 27, 2019, nor did SPS seek consent for a functional behavior assessment or other evaluations at any time in the 2018-2019 school year, prior to convening the IEP meeting.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

61. Participants at the April 27, 2019, IEP meeting included: N.S., Dara McLeod (Speech/Language Pathologist), Amy Cooper (ISD Social Worker), Michael Miller (Principal), Marjorie Wisler (Special Education Teacher), and Mindy Cardiel (General Education Teacher).

**ANSWER: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

62. Under parent concerns, the IEP noted W.F. may "sabotage" time during non-preferred subjects and that N.S. was a strong support during W.F.'s resource time, encouraging W.F.'s decision making.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

63. The PLAAFP section listed the same following areas of need: reading, behavioral, and

communication.

    a.   Under reading, the IEP noted W.F. was reading fluently at a 3rd/4th grade level, approximately 1-2 levels behind grade level, and that W.F. primarily struggled with motivation when required to completing reading assignments.

    b.   Under behavior, the IEP stated there had been 29 discipline referrals, despite many more incidents being reported in W.F.'s student dashboard. The IEP further noted W.F. had five out of school suspensions.

    c.   Under communication, the IEP reported W.F. continued to struggle with the same sounds (h, s/z, and sh), as well as the R sound.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

64. W.F.'s IEP provided the following goals:

    a.   Manage strong emotions (anger, anxiety) by using appropriate coping strategies with earning one or fewer discipline referrals per marking period. This goal was copied and pasted from the previous IEP.

    b.   Begin and maintain to a grade level classroom assignment with two or fewer adult reminders. The IEP claimed this goal was meant to address W.F.'s ability to read and comprehend grade level informational text.

    c.   Produce age-appropriate phonemes in connected speech independently with 75% accuracy, specifically the /h, s, z, sh/, and r sounds in low structure activities and conversational speech. This goal addressed the exact same sounds as the previous IEP, but added a new sound and *lowered* the threshold for mastery from 90% to 75%.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

65. Despite the severity of W.F.'s disability and its direct impact on his ability to meet grade level standards, particularly as it related to his speech and behaviors, that W.F. had missed numerous days of school due to disciplinary referrals, and that W.F. had seemingly made little to no progress since the last IEP, the IEP team claimed ESY services were not needed. There were also no changes to the supplementary aids and accommodations provided to W.F. from the previous IEP.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

66. Additionally, despite two of the three goals being carried over from the previous year, as well as W.F.'s ongoing below-grade level performance in reading and significant behavior struggles, the services provided to W.F. were either decreased or unchanged, with no rationale provided for the decrease in services.

   a. Speech and language therapy was only offered to W.F. 5-10 minutes, 4-6 sessions a month, compared to the previous IEP providing 15-30 minutes, and SPS considered discontinuing services entirely.

   b. W.F.'s time in the alternative special education program was changed to a minimum of 2 hours per week, compared to the previous IEP providing a minimum of 3.5 hours per week.

   c. Social work services remained the same at only 15-30 minutes, 2-4 times a month, less than one session per week.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

**of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

67. On May 28, 2019, a Manifestation Determination Review (MDR) meeting was convened for W.F.

   a. Participants included N.S., Karen Wegner (Assistant Principal), Marjorie Wisler (Special Education Teacher), Amy Cooper (School Social Worker), and Dara McLeod (Speech/Language Pathologist).

   b. W.F. received a disciplinary referral after a fight with another student in the lunch line, involving physical aggression, and W.F. continued to follow and taunt the other student after he walked away. Notably, prior to the fight, the boys had been physically playing and W.F. did ask the other boy to stop.

   c. The Team considered teacher observation of W.F., his IEP, his complete student record, and N.S.'s input to determine the behavior was a manifestation of W.F.'s emotional impairment.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

68. At the conclusion of the 2018-2019 school year, W.F. had a total of approximately 89 disciplinary referrals, including two days of in school suspensions and 6 days of out of school suspensions. Despite this, SPS failed to increase or change the services and accommodations offered to W.F., and SPS failed to seek parent consent for a Functional Behavior Assessment or any other evaluations to accurately identify W.F.'s educational and related needs.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

*2019-2020  School Year*

69. On August 27, 2019, SPS developed a behavior plan for W.F., describing proactive and reactive strategies to address W.F. following directions and physical aggression. However, there is no indication SPS made any effort to request parent consent for a functional behavior assessment prior to developing the behavior plan, to ensure the plan would be effective. Further, upon information and belief, this behavior plan was a separate plan, distinct from the Emergency Intervention Plan created on May 21, 2018.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

70. In September, the ASD consultant observed W.F., but claimed to not have any concerns, despite W.F. repeatedly being recertified for ASD with a high level of symptom severity.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

71. The Behavior Plan was updated on October 14, 2019, to also address work completion. Again, there is no indication that a functional behavior assessment was conducted or considered prior to revising the plan, or that PBIS were considered or used.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

72. Throughout October 2019, there were numerous emails exchanged between N.S. and SPS staff related to W.F.'s behaviors in school; absences due to disciplinary incidents, W.F.'s behaviors, or medical appointments; and the lack of communication regarding behaviors and makeup work having a negative impact on W.F.'s ability to access his learning. Notably, in one email, N.S. shared her frustration that one of W.F.'s teacher, Ms. Bowman,

made it a class assignment for every student to write down what they had seen W.F. do wrong.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

73. On November 7, 2019, following another behavior incident, N.S. emailed Karel Gundlach noting that an MDR would need to be scheduled as W.F. had 11 days out of the classroom, including Out of School Suspensions, In School Suspensions, and time in the Behavior Interventionist room. This did not include the numerous "excused absences" resulting from N.S. picking W.F. up early after staff had called her to get him due to behavior issues they were unable to manage. In an earlier email, sent that same day, N.S. also noted it had been seven days since she had requested an IEP and Behavior Plan meeting, but nothing had been scheduled yet.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

74. On November 11, 2019, N.S. sent a follow-up email about scheduling these meetings. In her response, Mrs. Gundlach claimed no MDR was required because there had been only 7 out of school suspensions, and the other days did not count as removals for an MDR. Mrs. Gundlach also provided availability for herself and Ms. George to meet, claiming they were the only individuals required to meet for an IEP amendment and behavior plan change.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

75. W.F.'s Behavior Plan was updated a second time on November 14, 2019, this time to

modify some of the strategies utilized. However, once again, there is no indication that a functional behavior assessment was conducted or considered prior to revising the plan to ensure the plan and the strategies utilized were appropriate and effective.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

76. On November 21, 2019, N.S. emailed SPS staff with questions and concerns regarding W.F.'s behavior plan. Upon information and belief, no one from SPS replied to this email or requested a follow-up behavior plan meeting to address N.S.'s concerns.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

77. On November 25, 2019, N.S. emailed W.F.'s teacher, Karel Gundlach, with suggestions for W.F.'s behavior plan and noted W.F. was in the hospital due to chest pains, rapid heart rate, and rapid respirations. N.S. further noted that W.F.'s personality was still altered and completely devoid of emotion, except for some crying spells that he had not exhibited since being a toddler. Previously, on November 20, 2019, N.S. had emailed the school with a concern that W.F. wasn't functioning normally and had elected to return from a hunting trip early.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

78. Also in November 2019, N.S. requested a mediation with the school to discuss W.F. and her concerns regarding his education. When SPS staff asked N.S. why she requested mediation, N.S. explained it was due to breakdown in communication between N.S. and SPS staff, SPS' failure to implement agreed-upon actions consistently and with fidelity,

26

SPS not following W.F.'s behavior plan, SPS failing to record suspensions and class removals accurately, SPS failing to provide W.F. makeup work during suspensions,  and SPS failing to address staff threatening, intimidating, or humiliating W.F. Previously, on October 17, N.S. had requested a complete copy of W.F.'s school record, but as of December 3, 2019, SPS had failed to provide the record or propose available dates and times for N.S. to come to the school to review the record.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

79. N.S. and SPS participated in mediation on December 10, 2019, and signed an agreement addressing communication for major behavioral incidents and the behavior plan, makeup work for W.F. during suspensions, implementation of the behavior plan, providing N.S. with a copy of W.F.'s educational file, and using restorative practice techniques to rebuild W.F.'s relationship with his teacher.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

80. On January 17, 2020, Heather George, SMS's Assistant Principal, sent a truancy letter to N.S., advising that W.F. had missed 303 class periods. However, despite this significant number of absences, many that were due to behavior removals, SPS failed to request consent for a functional behavioral assessment or any other types of evaluations to identify the underlying cause for all the absences and W.F.'s disability-related needs to improve his school engagement and attendance, and PBIS were still not considered or used.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

81. On January 23, 2020, N.S. provided a letter to the school from W.F.'s pediatric neurologist, Dr. Brian Woodruff, noting W.F. was being treated for Tourette syndrome and, due to this, may exhibit impulsive words or movements. Dr. Woodruff also requested the school provide accommodations for this new disorder. However, SPS failed to initiate any review or revision of the IEP upon receipt of this letter.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

82. On April 16, 2020, SPS convened an annual IEP meeting for W.F. Participants included: N.S., Karel Gundlach (Special Education Teacher), Heather George (Assistant Principal), Allison Carter (ELA Teacher), Megan Williams (Speech Therapist), and Ben Karle (School Social Worker).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

83. Under parent concerns, the IEP noted N.S. was concerned with W.F.'s motivation to learn and with the fact that he was experiencing incidents of racism, with some students commenting negatively on his skin color.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

84. No data was provided to indicate whether W.F. had met his previous IEP goals.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

85. The PLAAFP section listed the same following areas of need: reading, behavioral, and communication. The PLAAFP also added social-emotional learning as an additional area

of need.

    a.  Under reading, the IEP continued to claim W.F.'s primarily struggled with motivation when required to complete reading assignments, as well as that he continued to perform below grade level.

    b.  Under behavior, the IEP stated there had been 37 discipline referrals. The IEP further noted W.F. had been absent around 50 days, including nine days of out of school suspensions.

    c.  Under communication, the IEP reported W.F. continued to struggle with the same sounds (h, s/z, and sh) in conversational speech, as well as the R sound at the sentence level.

    d.  Under social-emotional, the IEP reported W.F. struggled with lack of motivation and fear of not doing well, impacting his attending to task. W.F. also struggled with following directions.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

86. W.F.'s IEP provided the following goals:

    a.  Attend to a task that he is given even when it is a struggle with 60% accuracy or 3 out of 5 trials.

    b.  Begin and maintain a grade level classroom assignment by completing 60% of his assignments. The IEP claimed this goal was almost identical to the previous IEP goal and again meant to address W.F.'s ability to read and comprehend grade level informational text.

    c.  Increase articulation skills with 75% accuracy, specifically the /h, s, z, sh/, and r

sounds in words, low structure activities, and conversational speech. This goal was again almost identical to the previous IEP.

    d.   With visual or verbal prompts, will identify his level of frustration and choose and use a strategy to reduce his frustration 50% of the time 4 out of 5 opportunities. This goal was also almost identical to the previous IEP, with only a different threshold for mastery utilized to measure progress.

**<u>ANSWER</u>: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

87. Again, despite the severity of W.F.'s disability and its direct impact on his ability to meet grade level standards, particularly as it related to his speech and behaviors, that W.F. had missed about 50 days of school, and that W.F. had seemingly made little to no progress since the last IEP, the IEP team claimed ESY services were not needed. There were also no changes to the supplementary aids and accommodations provided to W.F.

**<u>ANSWER</u>: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

88. Additionally, despite most of the goals being almost identical to the previous year, as well as W.F.'s ongoing below-grade level performance in reading and significant behavior struggles, the services provided to W.F. failed to be increased or changed to address the lack of appropriate progress.

    a.   Speech and language therapy was only offered to W.F. 10-20 minutes, 3-5 sessions a month, which was a slight increase in time, but a reduction in frequency.

    b.   W.F.'s maximum time in the alternative special education program increased to 13 hours per week, but the minimum remained only 2 hours.

c.  Social work services time was changed to 10-20 minutes, 3-5 sessions a month, which was a slight increase in frequency, but a reduction in the amount of time per session.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

*2020-2021 School Year*

89. N.S. elected to have W.F. attend the 2020-2021 school year virtually, due to concerns with COVID-19 and W.F.'s asthma.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

90. In January 2021, W.F. completed his NWEA testing and had decreased scores in reading.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

91. In February 2021, N.S. and W.F.'s special education teacher, Stacey Richardson, discussed how W.F. academically performed better, but was continuing to struggle emotionally. N.S. specifically noted that W.F. lacked the ability to name and communicate his emotions and lacked the ability to understand how his actions affected others and how to take personal responsibility for his actions.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

92. In March 2021, Mrs. Richardson emailed N.S. asking for input for the IEP and noting achievement testing wasn't necessary as it had been completed in January 2020. However, N.S. does not recall signing consent for any testing in January 2020 nor were any

31

documentation of completed achievement testing provided to N.S. in response to her request for W.F.'s educational records.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

93. In providing her input for the IEP, N.S. noted she had numerous concerns about W.F. returning to middle-school in person: W.F. continued to struggle with understanding and expressing facial expressions and body language; W.F. was highly impulsive (especially when he felt wrong or confused); W.F. had been diagnosed with Tourette syndrome, causing involuntary leg movement and vocal tics; and W.F. needed additional help during virtual learning when he didn't understand the material.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs. Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

94. In providing input specifically on W.F.'s speech performance, N.S. was not sure virtual speech therapy would be beneficial, but noted W.F. was continuing to work on the "s" sound. N.S. was not sure about the other sounds referenced in W.F.'s speech goal.  Other than collecting information from N.S., SPS did not evaluate W.F.'s speech performance.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

95. On April 14, 2021, SPS convened an annual IEP meeting for W.F. Participants included: N.S., Terisa Jones (Special Education District Administrator), Ben Karle (School Social Worker), Megan Williams (Speech Pathologist), Heather George (Assistant Principal),

Stacey Richardson (Special Education Teacher), and Aaron Hess (Online Mentor Teacher).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

96. Under parent concerns, N.S. noted there were no significant concerns with virtual learning, although W.F. could benefit from more help when he didn't understand schoolwork, but she had numerous concerns if W.F. were to be returned to in-person learning Specifically, N.S. observed that, after a year of virtual learning, reintegration could be "catastrophic" for him, a meeting would be needed prior to the return, and W.F. may need to attend partial days first.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

97. The PLAAFP section listed only reading and communication as needs. It entirely removed behavioral and social-emotional as needs, citing W.F.'s virtual attendance presenting no problems. No rationale was provided for the removal of these needs from the PLAAFP.

    a. Under reading, the IEP continued to claim W.F.'s primarily struggled with motivation when required to complete reading assignments, as well as showed signs of rapid guessing on his most recent NWEA testing.

    b. Under communication, the IEP reported W.F. continued to struggle with the same sounds (h, s/z, and sh) in conversational speech, as well as the R sound at the conversational level and with less structured activities.

    c. Despite claiming social-emotional and behavior were no longer areas of need, the PLAAFP observed W.F. still sometimes did not turn in schoolwork.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

98. W.F.'s IEP provided only one goal: Will use strategies to determine the context clues and background knowledge to determine word meaning and usage in a sentence with 80% accuracy. Despite the same deficits and lack of progress in communication, no communication goal was developed. Further, despite acknowledging that W.F. still struggled to turn in work consistently, the work completion goal was removed. No rationale was provided for the significant reduction in IEP goals.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

99. Again, despite the severity of W.F.'s disability and its direct impact on his ability to meet grade level standards, particularly as it related to his speech and ongoing concerns with ELA performance, and even though W.F. had seemingly made little to no progress since the last IEP, the IEP team claimed ESY services were not needed.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

100.    Numerous accommodations were removed from W.F.'s IEP, including visual supports (such as a timer), the use of the "cooling off" area, frequent breaks, the provision of frequent feedback, behavioral support, visual supports (such as a visual schedule), utilizing sensory strategies, verbal cues, and the provision of seating arrangements that met W.F.'s needs.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

101.    Additionally, all the services and programs provided to W.F. were decreased.

     a.   Social work services were only offered to W.F. as consultation, 5-15 minutes, one to two times per month.

     b.   Speech and language therapy was only offered to W.F. as consultation services, 5-20 minutes, 1-3 times per month.

     c.   W.F.'s alternative special education program was still direct; the frequency was reduced to 0.5-10 hours per week.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

102.     The only rationale SPS provided for removing the numerous goals and services was because W.F. had not been observed to engage in the same level of behavioral issues as he had with in-person schooling.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

103.     Under options considered, SPS stated speech services were changed to consult, in part due to W.F.'s slow progress and reduced motivation. SPS also noted that, despite W.F. being due for a triennial reevaluation, additional testing was determined unnecessary due to previous testing completed in 2020. However, SPS did not provide any documentation of testing or reevaluations to N.S. in W.F.'s educational record.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

***2021-2022 School Year***

104.     W.F. returned to school in person for the 2021-2022 school year. Despite N.S. previously noting an IEP meeting would be needed prior to W.F. returning, and that

returning to school without appropriate supports would be "catastrophic" for W.F., no IEP meeting was held nor were any IEP amendments made to address W.F.'s known additional needs in an in-person setting.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

105.      In August 2021, numerous text messages were exchanged between N.S. and Ms. Richardson regarding concerns and observations of W.F. returning to in-person learning. N.S. expressed concern about the order of W.F.'s classes, in case W.F. was removed from school for behaviors after lunch. While W.F.'s first couple days seemed to go well, by the end of August 2021, SPS staff had already made observations regarding W.F.'s mood and the possibility of needing extra supports.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

106.      On October 4, 2021, emails were exchanged between N.S. and James Lamb, the middle school principal. W.F. had been suspended for a physical altercation with another student.

    a.  Although Mr. Lamb claimed it was only a two-day suspension on the phone, W.F. was effectively suspended for three days as he had also been removed from school the proceeding Friday. W.F. was also removed from the football team. However, despite these consequences, upon information and belief, no Powerschool write ups, nor documentation from the school that a suspendable offense ever occurred, exists in W.F.'s educational record.

    b.  Further, N.S. asked about consequences for coaching staff regarding knowledge of

racially motivated comments made by other students toward W.F., which contributed to the altercation between the students, but Mr. Lamb did not respond to this concern.

**ANSWER: Defendant admits that W.F. was suspended for a physical altercation with another student. Defendant denies the remaining allegations contained therein for the reason that they are untrue.**

107.    On November 4, 2021, W.F. was involved in a physical altercation on the playground, resulting in disciplinary action and an MDR being held on November 9, 2021.

a.  Participants included: N.S., Heather Brew (General Education teacher), Kim Geibe (social worker), Heather George (Assistant Principal), Stacey Richardson (Special Education Teacher), and Megan Williams (Speech Pathologist).

b.  According to the incident report, W.F. called another student a "fiend," causing the student to slap W.F. W.F. initially walked away, but the other student followed and pushed W.F., so W.F. pushed back. The fight escalated until W.F. was hit in the nose, causing him to bleed, and another teacher was able to break up the fight.

c.  The MDR report simultaneously claimed N.S. hadn't noticed any behaviors lately related to W.F.'s emotional impairment, but also stated the incident occurred when W.F. was overwhelmed and therefore unmotivated to make other choices.

d.  The teacher observation for the day noted W.F. had been disruptive and confrontational from the moment he walked into class and ultimately was sent out for his behaviors.

e.  Despite W.F.'s documented emotional impairment, history of being argumentative and aggressive and having difficulty making appropriate choices in confrontational

situations, including a previous MDR where the team found W.F.'s involvement in a fight *was* a manifestation of his disabilities, *and* the fact that W.F. had been physically assaulted by this student twice before, here SPS decided this incident was not a manifestation of W.F.'s disabilities. Instead, SPS concluded without basis that W.F.'s involvement was because of the environment.

**<u>ANSWER</u>:  Defendant admits that W.F. was suspended for a physical altercation with another student. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.e.**

108.　　On November 29, 2021, N.S. shared a letter from W.F.'s pediatrician with the school noting W.F.'s history of autism, anxiety due to learning disabilities, and anger outbursts.  The letter noted that W.F. had experienced an increase in angry outbursts and anxiety and W.F. had been recommended for additional counseling from Pines Behavioral Health.

**<u>ANSWER</u>:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

109.　　Throughout September and October 2021, numerous messages were exchanged between N.S. and Ms. Richardson regarding W.F.'s problematic behaviors in school, including verbal aggression, disrupting the classroom, difficulty with substitute teachers, and refusing to complete work.

　　a.　As a result of many of these behavior incidents, W.F. was disciplined with either lunch detentions, after school detentions, in school suspensions, or an out-of-school suspension.

    b.  On one occasion, Ms. Richardson even specifically requested N.S. keep W.F. home after the family returned late from a vacation, due to preemptive concerns about W.F.'s behaviors.

    c.  However, despite the significant number of concerns with W.F.'s behavior and resulting disciplinary incidents, at no time did SPS request N.S.'s consent to conduct an FBA, update W.F.'s behavior plan, conduct an IEP meeting to revise W.F.'s IEP, or implement PBIS.

    d.  Within these messages, there were also multiple requests by N.S. for a meeting to discuss W.F. and review his IEP.

**ANSWER:  Defendant will admit that W.F. exhibited problematic behaviors in school, including verbal aggression, disrupting classroom, difficulty with substitute teachers and refusing to complete work. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

110.    In approximately late November 2021, SPS referred W.F. and N.S. to the juvenile court for truancy and a truancy conference was held on December 3, 2021. However, most of the absences were due to out of school suspensions or excused absences that N.S. had communicated to the school in advance and requested work for. One of these times specifically was because N.S. would be out of town and had no one available at home to pick up W.F. from school if there was a behavior incident, which occurred frequently.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

111.    On November 29, 2021, W.F. was involved in another physical altercation with a

student, resulting in an out of school suspension. According to the incident report, there was a verbal altercation between W.F. and the other student. The other student then repeated something W.F. said, imitating W.F. and his speech impairment. W.F. initially attempted to walk away, but then turned around and engaged in a physical altercation with the other student.

**ANSWER:  Defendant admits that W.F. was involved with another physical altercation with a student resulting in an out of school suspension. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

112.    Following the incident, on her own initiative, N.S. emailed SPS formally requesting an FBA, along with a meeting to review W.F.'s behavior plan and IEP.

    a.   In her email, N.S. specifically requested that the meeting occur before W.F. returned to school from his current suspension or, alternatively, that W.F.'s absences be excused, and no truancy proceedings take place until after such meeting.

    b.   In reviewing W.F.'s current absences, N.S. noted that, following the current suspension, over 20% of W.F.'s absences would be attributed to out of school suspension.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

113.    On December 6, 2021, another MDR was held for W.F. for the physical altercation that had occurred on November 29, 2021.

    a.   Participants included: N.S., Heather George (Assistant Principal), Stacey

Richardson (special education teacher), Anne Gaertner (Advocate), James Lamb (Principal), Amber Peters (general education teacher), Terisa Jones (Special Education Supervisor), and Jill Bissett (Behavior Interventionist).

b.  Both the teacher observation and behavior logs noted W.F. had been disruptive and combative, earning numerous strikes for his in-class behavior and being sent out of the classroom.

c.  Under parent concerns, N.S. identified W.F.'s history of struggling with peers and socialization and noted that here W.F. was specifically mocked for his disability.

d.  Once again, despite W.F.'s documented emotional impairment, including numerous verbal and physical altercations with peers, and the most recent letter from his pediatrician noting the increase in disability-related outbursts and anxiety episodes, SPS still claimed the behavior was not a manifestation of W.F.'s disability.

e.  W.F. was ultimately referred to the juvenile court and placed on informal probation for this incident.

f.  In preparation for the MDR meeting, SPS failed to provide all the relevant information to N.S. During the meeting, Ms. George read directly from student statements in discussing the incident and considering whether or not it was a manifestation, but initially refused to provide these to N.S. Only after numerous emails after the meeting, in which Ms. George initially denied using the statements in the MDR meeting, did Ms. George ultimately provide copies of the information to N.S.

**ANSWER**:  **Defendant neither admits nor denies the allegations contained therein for lack**

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

114.     On December 8, 2021, N.S. and Ms. Richardson exchanged emails scheduling a meeting to review W.F.'s behavior plan. When N.S. inquired whether her FBA request would also be considered at this meeting, Ms. Richardson stated no, claiming that was a different type of meeting that couldn't occur yet.  Ms. Richardson provided no explanation for why an FBA could not occur.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

115.     On December 10, 2021, SPS sent N.S. a notice of expulsion for W.F. but inviting her to participate in a due process meeting that morning, per a previous conversation that occurred on December 8, 2021.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

116.     On December 13, 2021, SPS held a meeting to review and revise W.F.'s Behavior Plan. Following the meeting, N.S. emailed her concerns with the behavior plan. In her email on December 14, 2021, N.S. specifically noted that the reason for including calls home for pick-up within the behavior plan was to avoid W.F. placing himself into a situation where he would commit a suspendable offense.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

117.     On December 17, 2021, Heather George (Assistant Principal) and Dave Northrup (Safety Security Director) completed a risk assessment for W.F., based on a statement W.F. made the day prior.

a. According to the assessment, on December 16, 2021, Jill Bissett (Behavior Interventionist) reported W.F. stated he was going "to take you out to the shed and shoot you in the back of the head," while walking out of class. However, Ms. Bissett did not report that the statement was directed at anyone.

b. When interviewed, W.F. denied making the statement to anyone, and explained he had been singing a song he heard on the app Tik Tok that goes, "take *me* out to the back of the shed. Shoot *me* in the back of the head." W.F. acknowledged this was probably not a good song for school.

**ANSWER:** **Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

118. On January 5, 2022, W.F.'s behavior plan was updated a second time. The number of target behaviors was significantly expanded from the previous behavior plan to now include inappropriate language, failing to charge his Chromebook, inappropriate phone use, inappropriate physical contact, being disruptive in class, failing to listen and follow directions, and failing to attempt to complete classwork.

**ANSWER:** **Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

119. On January 9, 2022, only days later, W.F.'s behavior plan was updated a third time to add additional strategies and to modify consequences. The plan also stated that if W.F. went home and it is not an OSS, it would be recorded in Powerschool as agreed upon by school and parent.

**ANSWER:** **Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

120.     Despite the numerous behavior plan revisions in a short amount of time, and N.S.'s

initial request to amend the IEP and complete an FBA on November 29, 2021, SPS had

still not completed or even scheduled an IEP meeting or a REED meeting.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

**of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

121.     An IEP meeting was not held until January 20, 2022. This was an IEP meeting only

and at no time did SPS request N.S.'s consent to conduct an FBA, as she had requested on

November 29, 2021, almost two months prior.

   a. Participants included: W.F., N.S., Kim Geib (School Social Worker), Aaron
      Claybaugh (General Education Teacher), Megan Williams (Speech Pathologist),
      Heather George (Assistant Principal), Stacey Richardson (Special Education
      Teacher), Preston Ferry (Special Education Teacher), and Nicholas Herblet (High
      School Principal).

   b. Under parent concerns, it only listed that N.S. was concerned with W.F.'s behavior
      plan was being followed and communication with her.

   c. Once again, despite the severity of W.F.'s disability and its direct impact on his
      ability to meet grade level standards, particularly as it related to his behavior
      concerns and ability to complete grade-level work in the classroom setting, the IEP
      team claimed ESY services were not needed.

   d. Under the supplementary aids and services, the IEP did reinstate the following
      accommodations, but failed to make any further additions or modifications
      compared to previous IEPs, despite W.F. exhibiting many of the same or increased
      academic and functional needs: Visual supports (such as a timer), the use of the

44

"cooling off" area, frequent breaks, the provision of frequent feedback, behavioral

support, visual supports (such as a visual schedule), utilizing sensory strategies,

verbal cues, and the provision of seating arrangements that met W.F.'s needs.

e.  Under options considered, SPS stated it considered increasing the amount of social

work referrals, but felt the offered number was more realistic for W.F.

**ANSWER:  Defendant admits that an IEP meeting was held on January 20, 2022. Defendant
neither admits nor denies the remaining allegations contained therein for lack of knowledge
upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

122.       The copy of the IEP provided to N.S. only included the even-numbered pages and,
therefore, the following sections are missing in whole or part for review: PLAAFP, goals,
complete supplementary aids and services, and the programs and services. N.S. emailed
the school requesting a complete copy on April 3, 2022, but to date, has not received a
response to her request.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are
untrue.**

123.       Notably, the IEP failed to include that W.F. is diagnosed with Autism Spectrum
Disorder. When N.S. initially reached out to Mrs. Richardson to address this, Mrs.
Richardson initially claimed it was left out because ASD eligibility is different than a
medical diagnosis. Only after N.S. noted the diagnosis had been included IEPs prior to
2020 under "other considerations" did Mrs. Richardson agree to look at having it added
back in. N.S. received no confirmation the IEP was amended accordingly.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are
untrue.**

124.     According to W.F.'s Winter 2022 MAP Growth scores, W.F. is in only the 3rd percentile for reading, and therefore likely to be found not proficient on the PSAT, ACT, and SAT.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

125.     On March 11, 2022, N.S. received a call from Mrs. Richardson advising that Mr. Lamb had approached her and stated he felt like W.F. should go home. Mrs. Richardson also asked if N.S. wanted to come in and get W.F. or talk to Mr. Lamb. N.S. advised she would come in.

   a.   When N.S. arrived at the school, Mr. Lamb met her outside and claimed Mrs. Richardson said N.S. wanted to talk to him. Mr. Lamb then proceeded to ask N.S. about W.F. being involved in drug use, including the use of vapes, and to express he was "pretty sure" W.F. was in fact using drugs and had hidden drug paraphernalia in a backroom at the school. N.S. then asked Mr. Lamb if he wanted W.F. to leave and Mr. Lamb stated yes, he thought that was best.

   b.   When N.S. picked up W.F., he was extremely upset at being forced to leave. W.F. had not been aware of any calls to his mother nor any reason for him to need to leave that day.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

126.     Upon information and belief, on March 17, 2022, Mr. Carey, the middle school gym teacher and football coach, advised another student not to associate with W.F. if he ever wanted to play football, and further advised the student that associating with W.F.

would only get him in trouble.

**ANSWER**:  **Defendant denies the allegations contained therein for the reason that they are untrue.**

127.    On March 18, 2022, W.F. was suspended again, this time indefinitely, for a behavior incident.

a.  At 11:50 a.m. that day, W.F. called N.S. extremely upset and anxious, repeating that he needed to be picked up because he could not handle the school day and believed SPS staff were purposely trying to get him arrested. Sensing W.F.'s significant distress, N.S. told W.F. to leave immediately and walk to a family friend's home nearby to be picked up.

b.  Ms. George observed W.F. leaving and began following him. N.S. attempted to call Ms. George to inform her that W.F. had left the school grounds on her permission and order but received no answer. N.S. then advised Mrs. Richardson, who alerted Ms. George and advised W.F. was not a flight risk.

c.  N.S. picked up W.F. and he explained that, prior to leaving math class, he asked the substitute teacher, Mr. Brooks, why another girl was required to stay behind. Mr. Brooks advised W.F. it was none of his business, to which W.F. responded, "you don't have to be a dick about it." Mr. Brooks then ordered W.F. to remain behind as well and blocked the exit, prohibiting W.F. from leaving. Per W.F.'s IEP and behavior plan, W.F. was very sensitive regarding timing and being restrained in an area, and Mr. Brooks' response violated appropriate protocols in W.F.'s IEP. A verbal altercation then occurred between W.F. and Mr. Brooks, as W.F. repeatedly asked Mr. Brooks to move, and Mr. Brooks refused. Mr. Brooks then

pretended to fall backwards and got back up. W.F. left the room after Mr. Brooks returned to his feet and immediately called his mother to get picked up.

d.   When N.S. spoke with SPS staff, they reported Mr. Brooks claimed W.F. had "bulldozed through him," knocking him to the ground. However, the three student witnesses all denied seeing W.F. push or touch Mr. Brooks.

e.   In the video of the incident, Mr. Brooks can be seen falling slowly and then returning to his feet. A nearby teacher did not appear concerned with the fall. W.F.'s hands did not show any movement and he did not leave the doorway until after Mr. Brooks had already stood back up.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

128.    On March 21, 2022, N.S. spoke with Mr. Lamb. During this conversation, Mr. Lamb denied any previous statements alleging or implying W.F. was involved with drugs. Mr. Lamb advised he did not know how long W.F. was going to be suspended for, as he was waiting to discuss the matter with W.F.'s probation officer. Mr. Lamb further dismissed Mr. Carey's statement to another student advising him against associating with W.F.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

129.    Later that day, Mr. Lamb emailed N.S. advising he still did not know how long W.F. would be suspended for. Mr. Lamb requested a written statement from W.F. and N.S. refused.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

130.      On March 22, 2022, only *after* N.S. had disclosed in a personal conversation with the assistant superintendent that she had retained a lawyer, did Mrs. Richardson reach out to N.S. and have her come to the school to sign the paperwork for the FBA. In apologizing for the delay, Mrs. Richardson claimed she did not know she was responsible for it and believed the responsibility was the ISD's, and Kim Geib from the ISD had been present when the initial request was made verbally.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

131.      Also on March 22, 2022, the school provided notice that W.F.'s suspension would last through March 23, 2022. In subsequent emails, Mr. Lamb claimed there would also be a one-day OSS due to inappropriate language, but this failed to account for the total of 3 days W.F. would have been removed from school. This was also the first time W.F. had received an out of school suspension for swearing, despite this being an area of identified need for W.F. and a consistent concern. Additionally, despite claiming the suspension was for language, the school documentation stated the suspension was for "Employee Physical Assault."

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

132.      For the remainder of the 2021-2022 school year, W.F. continued to have numerous behavior incidents and was sent home, either formally or informally, for related behavior concerns, as documented in text messages, emails, and behavior logs by SPS and N.S.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

*Administrative Due Process Complaint and Hearing*

133.     On April 13, 2022, N.S. filed a due process complaint against SPS with the
Michigan Department of Education (MDE).

**ANSWER:  Defendants admis the allegations contained therein.**

134.     On October 17, 18, and 19, 2022, a hearing was held before an Administrative Law
Judge to address whether the District denied W.F. a FAPE by:

a.  Failing to develop an IEP reasonably calculated to allow W.F. to make appropriate
progress in light of his unique circumstances at the April 16, 2020, April 14, 2021,
and January 20, 2022, IEP meetings;

b.  Failing to request N.S.'s consent for and conduct comprehensive reevaluations,
including a functional behavior assessment to address W.F.'s lack of progress
toward his IEP goals and in the general education curriculum, to conduct a
reevaluation upon receipt of new information provided by N.S., and to address
W.F.'s anticipated academic and behavior needs related to his ongoing conduct
resulting in formal or informal removals from the classroom, from two years of the
date of filing the complaint;

c.  Failing to seek N.S.'s consent to conduct a Functional Behavior Assessment within
10 school days of her making the request in writing;

d.  Failing to implement positive behavior intervention supports (PBIS) to support
W.F.'s specific behavioral needs;

e.  Failing to provide W.F. extended school year services, from two years of the date
of filing;

    f.    Failing to review and revise W.F.'s IEP to address his academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals and the general education curriculum from two years of the date of filing;

    g.    Failing to consider all relevant information and finding that W.F.'s behavior was not a manifestation of his disability at the November 24, 2021, and December 6, 2021 MDRs; and

    h.    Failing to consistently provide W.F. with services to allow him to make progress toward his IEP goals and the general education curriculum for all removals of W.F. after 10 removals within a school year, from two years of the date of filing.

**ANSWER:  Defendant admits that a hearing was held before an Administrative Law Judge on October 17, 18, and 19 of 2022. EEOC # 471-2023-04662. As to the remaining allegations alleged by Plaintiff and addressed by the ALJ, Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

135.    Expert witness Dr. David Bateman testified to his assessment and conclusions regarding whether W.F.'s IEPs, FBA, and evaluation provided him with FAPE.

**ANSWER:  Defendant admits that Dr. David Bateman testified in the course of the hearing. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

136.    Dr. Bateman is a professor at Shippensburg University in the Department of Educational Leadership and Special Education where he teaches courses on special education law, assessment, and facilitating inclusion. He is a former due process hearing officer for Pennsylvania.  In that role, Dr. Bateman presided over and issued decisions for

over 580 due process proceedings.  Dr. Bateman has authored or coauthored numerous publications on special education, including A Principal's Guide to Special Education; A Teacher's Guide to Special Education; Charting the Course: Special Education in Charter Schools; and Current Trends and Legal Issues in Special Education.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

137.     Dr. Bateman testified that his overall findings and conclusions were that W.F.'s IEP "was inconsistent…, lacking in detail, [and] needed additional supports and additional provisions for the student…the FBA was not comprehensive." Tr. 30.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

138.     As for the January 20, 2022, IEP, Dr. Bateman found that:

a.  There were no positive behavior intervention supports that would address W.F.'s specific behavioral needs (Tr. 40);

b.  It did not provide sufficient instruction on how to address behavioral referrals (Tr. 33);

c.  It lacked teacher observation data about his current status and curriculum-based measures (Tr. 35); and

d.  W.F.'s listed learning goals are too vague to define and measure progress or whether appropriate instruction is being provided (Tr. 37).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

139.     As a result, Dr. Bateman concluded that the January 20, 2022, IEP was not

reasonably calculated to allow the student to make progress in light of his unique circumstances, because it did not provide appropriate instruction on how to measure W.F.'s progress or implement adequate supports to address W.F.'s specific behavioral needs. Tr. 40-41.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

140.    The District provided no evidence to rebut Dr. Bateman's testimony regarding the January 2022 IEP.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

141.    As for the April 17, 2019, IEP, Dr. Bateman found that:

    a.  The language was too vague, and an understanding of W.F.'s specific needs was lacking (Tr. 44);

    b.  It did not provide a clear baseline of W.F.'s current performance (Tr. 45);

    c.  W.F.'s present levels did not match what was being measured by the goals (Tr. 46); and

    d.  It lacked information regarding disciplinary referrals and issues resulting in suspension (Tr. 47).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

142.    Dr. Bateman further testified that the goals listed in the April 17, 2019, IEP are identical to the goals listed in the April 16, 2020, IEP, which raised concern as it shows W.F. is not making progress. Tr. 48.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

143.      This finding led Dr. Bateman to conclude that the April 16, 2020, IEP was not reasonably calculated to allow W.F. to make progress, because it did not provide an understanding of his current functioning at that time, the goals were too vague to be effectively measured, and there was a lack of specificity of what services were being provided to him. Tr. 54.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

144.      The District provided no evidence to rebut Dr. Bateman's testimony regarding the April 2019 and April 2020 IEPs.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

145.      Dr. Bateman testified that the April 2021 IEP had updated NWEA scores, but these updates did not provide an actual understanding of W.F.'s current level of function. Tr. 55-56.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

146.      Dr. Bateman further testified that the updated goals were  better and that certain goals were reasonably calculated but tough to measure; but he also noted that this IEP still failed to implement any positive behavior intervention supports for W.F. Tr. 60.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

147.     While there were improvements from the April 2020 IEP to the April 2021 IEP, Dr. Bateman still concluded that the April 2021 IEP was not reasonably calculated to allow W.F. to make appropriate progress in light of his unique circumstances because it still lacked clarity as to his present level and goals, and it lacked understanding of what supports are necessary for him to make progress toward those goals. Tr. 61.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

148.     The District provided no evidence to rebut Dr. Bateman's testimony regarding the April 2021 IEP.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

149.     Overall, Dr. Bateman concluded that 2019, 2020, 2021, and 2022 IEPs did not have present levels written in a way that could have provided W.F. with FAPE, since the district could not sufficiently monitor progress, and there were no notable changes in educational programming. Tr. 61-64.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

150.     Dr. Bateman also reviewed the 2020 MET and concluded that the report was insufficient because it lacked information and observational data from teachers about W.F.'s current functioning level.  He further testified that the MET lacked testing that would provide sufficient information for an IEP to be reasonably calculated based on its findings since W.F.'s current function level could not be readily determined without more data. Tr. 70-72.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

151.     As for the FBA, Dr. Bateman testified that it lacked detail about W.F.'s functional level in different settings and where the problem behaviors are occurring in school. And as a result, the behavior intervention plan and IEP could not be conducive to W.F. making appropriate progress. Tr. 74-77.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

152.     The District provided no evidence to rebut Dr. Bateman's testimony regarding the 2020 MDE and FBA.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

153.     In summary, Dr. Bateman testified that, in his expert opinion, none of the IEPs were reasonably calculated to allow W.F. to make appropriate progress in light of his unique circumstances, the evaluations conducted lacked observational data to develop IEP goals and assess progress, positive behavior intervention supports were not being implemented, and that W.F.'s progress could not be accurately evaluated.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

154.     The District provided no testimony to rebut Dr. Bateman's conclusions.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

155.     Expert witness Nathan Vanderweele conducted an independent FBA of W.F. and

testified to W.F.'s behavioral needs and the appropriateness of W.F.'s current supports as listed in his IEP's. Mr. Vanderweele is a board-certified behavior analyst (BCBA), certified through the Behavior and Analyst Certification Board. He also holds a master's degree in behavior analysis, licensed as such through the State of Michigan. Mr. Vanderweele currently works as a Behavior Analyst in the Oswego Public Schools in Illinois, but at the time Mr. Vanderweele conducted his testing of W.F. and provided testimony, he was a Clinical Supervisor at the Kalamazoo Autism Center, part of Western Michigan University. Mr. Vanderweele had been in that position since 2017.

**ANSWER:  Defendant admits that Nathan Vanderweele testified in the course of the administrative hearing. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

156.    Mr. Vanderweele testified that he spent two days observing W.F. in school to conduct the FBA, but that this kind of observational data needs to be collected more frequently so appropriate modifications can be made to a BIP and an IEP as needed to ensure the supports are effectively meeting the student's needs. Tr. 118-119; Tr. 153-154.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

157.    As part of his FBA, Mr. Vanderweele conducted a "modified trial-based functional analysis." Tr. 120, l. 25 - Tr. 121, l. 1. Mr. Vanderweele testified that, while a functional analysis is not always a necessary component of an FBA, it was appropriate here given the context and type of W.F.'s behaviors, specifically his verbal outbursts and out-of-seat behaviors within the classroom. Tr. 120-121.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

158.        Mr. Vanderweele testified that there were constraints that prohibited his ability to conduct formal teacher interviews, a standard component of FBAs. Tr. 116-117.  The information gained from these interviews is crucial to gaining a full understanding of the problem behaviors and W.F.'s functioning in the classroom. Tr. 159. Mr. Vanderweele further testified while he typically reviews previous IEPs and any relevant previous assessments, including previous FBAs, in this instance SPS only provided him with W.F.'s current IEP upon his request for records. Tr. 157-158.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

159.        Although Dr. Bateman had expressed some concern over the limited amount of observation time (Tr. 35, 70-76), Mr. Vanderweele explained that given the high frequency of W.F.'s target behaviors, the verbal outbursts and out of seat behaviors, and that the observation occurred over four different settings, two days was sufficient to capture the necessary amount of data. Tr. 136-137. Mr.Vanderweele testified that with the two full days of observation and the functional analysis, even without the teacher interviews his FBA was a valid representation of W.F.'s current behavior and needs. Tr. 136; *See also* Tr. 159-160.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

160.        Through his FBA, Mr. Vanderweele identified the primary functions of W.F.'s behaviors were attention from teachers or peers and escape from demands. Tr. 128-129.

Mr. Vanderweele then testified to a variety of recommendations SPS could implement to address those functions and replace the maladaptive behaviors. Tr. 129-136.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

161.     Mr. Vanderweele memorialized these recommendations into a behavior plan for W.F. (Tr. 138), as well as testified to the necessary components of a behavior plan, including:

> a variety of strategies that are tailored towards the specific function of the behavior, along with the operation definitions of the behavior of interest, the context in which the behaviors may or may not occur . . . a visual of what is currently happening, what the current behavior is, what the desired behavior is, and what an appropriate alternative behavior is along with the consequences involved with each of those . . . things to consider for any additional supports, how data is collected, how frequent data may be collected and then depending on the scope of the behavior, whether the behavior is taking place and what environment that behavior plan was going to be implemented.

Tr. 118, l. 1-17.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

162.     In implementing a behavior plan, Mr. Vanderweele testified consistency in expectations and consequences across all classroom settings is necessary to manage the student's expectations, avoid a potential increase in variability of behaviors, and to promote more predictable outcomes and behaviors by the student. Tr. 148-150. Mr. Vanderweele also testified it is essential that the data be consistently collected to ensure the behavior plan is working, and it must be collected in a way that can inform decisions. Tr. 118-119; Tr. 190.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

163.     In reviewing the appropriateness of the supports and interventions the district claimed to be implementing, Mr. Vanderweele repeatedly testified to the need for data and clear definitions to determine whether or not the intervention was appropriate for W.F. Tr. 179-184.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

164.     SPS assistant superintendent Nicole Gittinger testified that she serves as the director of special education for the district and serves in multiple other roles, including overseeing curriculum, grants, and instruction for the district.  Tr. 498-499.

**ANSWER:   Defendant admits that Nicole Gittinger testified in the course of the administrative hearing. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

165.     Ms. Gittinger testified that she attended one "behavior-based" meeting for W.F. during the 2021-2022 school year in January 2022 but that she could not recall details of the meeting. Tr. 505.

**ANSWER:   Defendant admits that Nicole Gittinger testified in the course of the administrative hearing. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

166.     W.F.'s special education teacher, Stacey Richardson, testified to her qualifications and background, the development of the IEPS, W.F.'s behaviors, and evaluations.

**ANSWER:   Defendant admits that Stacey Richardson testified in the course of the administrative hearing. Defendant neither admits nor denies the remaining allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

167.     Ms. Richardson testified that she is not a certified special education teacher as she has not completed her master's degree in special education and is currently a long-term substitute in a special education role. Tr. 581, 593

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

168.     Notably, Ms. Richardson stated that for the two weeks at the beginning of the 2020-2021 school year, when it was unclear whether W.F. would be attending school virtually or in person, that he did not receive any educational services at all. Tr. 608-609.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

169.     Ms. Richardson testified that, despite not having completed formal certification or training, she prepared the April 2021 and January 2022 IEPs for W.F. Tr. 589.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

170.     As for W.F.'s FBA, Ms. Richardson testified that his FBA was the first one she had never worked on one before and is unfamiliar with MDE's guidance regarding behavior intervention plans and functional behavior assessments, yet was tasked with collecting teacher assessments for these plans and assessments. Tr. 614-615.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are**

**untrue.**

171.     Ms. Richardson testified to her opinion on whether some of W.F.'s behaviors and

actions are a result of his disabilities and his use of services even though she does not have

any formal training as to whether someone is making a choice or whether the behavior

stems from their disability. Tr. 634-635.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are**

**untrue.**

172.     The ALJ issued a Decision and Order on February 1, 2023, finding that SPS had

only partially denied W.F. FAPE, with the following specific conclusions:

a.   The district failed to develop an IEP reasonably calculated to allow W.F. to make

appropriate progress in light of his unique circumstances at the April 14, 2021, IEP,

but not at the April 2020 or January 2022 IEP meetings;

b.   The district failed to request parental consent for and conduct comprehensive

reevaluations, including a functional behavior assessment, to address W.F.'s lack

of progress toward his IEP goals and in the general education curriculum, upon

receipt of new information provided by N.S., and to address W.F.'s anticipated

academic and behavior needs related to his ongoing conduct;

c.   The district failed to seek N.S.'s consent to conduct a Functional Behavior

Assessment within 10 school days of making the request in writing;

d.   The district did <u>not</u> fail to implement PBIS to support W.F.'s specific behavioral

needs;

e.   The district did <u>not</u> fail to provide W.F. extended school year services from two

years of the date of filing;

    f.   The district failed to review and revise W.F.'s April 2021 IEP to address his academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals and the general education curriculum;

    g.   The district did <u>not</u> fail to consider all relevant information and finding that W.F.'s behavior was not a manifestation of his disability at the November 9, 2021, and December 6, 2021 MDRs;

    h.   The district did <u>not</u> fail to consistently provide W.F. with services to allow him to make progress toward his IEP goals and the general education curriculum for all removals of W.F. after 10 removals within a school year, from two years of the date of filing; and

    i.   The district did <u>not</u> fail to educate W.F. in the least restrictive environment.

**<u>ANSWER</u>: Defendant admits that the ALJ issued a Decision and Order on February 1, 2023. Defendant neither admits nor denies the remaining allegations as they are inaccurate or incomplete statements outlining the Decision and Order issued by the ALJ and, therefore, leaves Plaintiffs to his proofs. Defendant affirmatively avers that the Decision and Order of the ALJ is a matter of record and speaks for itself.**

173.    Where the ALJ did find a denial of FAPE, the only remedy she provided to W.F. was 65 hours of general compensatory education in the area of reading within six months, to be provided by the District, which was not sufficient to remedy even the limited harms her decision found.

**<u>ANSWER</u>: Defendant admits that the only remedy the ALJ afforded Plaintiff was 65 hours of additional general compensatory education to be provided by the School District. Defendant denies the remaining allegations contained therein for the reason that they are**

untrue.

### *Developments within SPS since the Due Process Hearing*

174.    Upon information and belief, SPS does not have the required continuum of

alternative placements, and lacks the necessary staff to identify appropriate programs that

may properly accommodate W.F., as documented in November 2022 news article:

> Members of the Sturgis Public Schools Board of Education recently reinstated its special education director position.
>
> Earlier this year, the board had approved a new, expanded position called special populations coordinator, which was to combine special education services with those of ESL (English as a second language).
>
> Most recently, Assistant Superintendent Nicole Gittinger had taken on responsibilities of special education coordinator, along with help from four special education lead teachers.
>
> At a meeting of the board last week, three separate job descriptions were unveiled: one for assistant superintendent, one for special education director, and one for ESL director.
>
> "I really feel like this is necessary for all three of these jobs to be done well," board member Emily Halling said Monday, Nov. 21. "These are heavy loads that require a lot of expertise, involvement and knowledge."

Michelle Patrick, *Special education director position reinstated at Sturgis Public Schools*,

Sturgis           Journal           (Nov.           29,           2022),

https://www.sturgisjournal.com/story/news/education/2022/11/29/sturgis-public-schools-

board-of-education-reinstates-special-education-director-position/69669306007/.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are**

**untrue.**

175.    Upon information and belief, as of the date of filing this Complaint, SPS still has

not hired a special education director or coordinator.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are**

**untrue.**

176.    Upon information and belief, SPS never even posted the position nor initiated any employment search for a special education director or coordinator.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

177.    St. Joseph County Intermediate School District (ISD), the ISD which provides services to SPS and several other school districts, closed its only Emotional Impairment secondary program at the end of 2022, leaving SPS no option for providing appropriate services to students like W.F.  As a result, W.F. is now being educated entirely online through a homeschooling program.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

*Race discrimination against W.F. and racially hostile environment at SPS*

178.    In or around November 2021, a Sturgis Middle School teacher was recorded on video using the "n-word," a racial slur.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

179.    The use of this word at school was extremely disruptive and disturbing to W.F., who is biracial.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

180.    W.F. reported this incident multiple times as a concern to SPS staff and teachers, and no one addressed his concerns.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

181.   Instead, W.F. was admonished by SPS staff for bringing up the "n-word" and told that his bringing up this concern was "racist."

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

182.   SPS staff's failure to respond properly to W.F.'s reports violated the SPS Anti-Harassment Policy, which reads:

> Students and other members of the School District community and third parties are encouraged to promptly report incidents of harassing conduct to a teacher, administrator, supervisor or other District official so that the Board may address the conduct before it becomes severe, pervasive, or persistent. Any teacher, administrator, supervisor, or other District employee or official who receives such a complaint shall file it with the District's Anti-Harassment Compliance Officer within two (2) school days….

> A student who believes s/he has been subjected to offensive conduct/harassment/retaliation hereinafter referred to as the "Complainant," may file a formal complaint, either orally or in writing, with a teacher, principal, or other District employee at the student's school, the Compliance Officer, Superintendent, or another District employee who works at another school or at the district level…. If a Complainant informs a teacher, principal, or other District employee at the student's school, Superintendent, or other District employee, either orally or in writing, about any complaint of harassment or retaliation, that employee must report such information to the Compliance Officer or designee within two (2) business days….

> Upon receiving a formal complaint, the Compliance Officer will consider whether any action should be taken in the investigatory phase to protect the Complainant from further harassment or retaliation, including, but not limited to, a change of work assignment or schedule for the Complainant and/or the alleged harasser….

> Within two (2) business days of receiving the complaint, the Compliance Officer or a designee will initiate a formal investigation to determine whether the Complainant has been subjected to offensive conduct/harassment/retaliation….

Although certain cases may require additional time, the Compliance Officer or a designee will attempt to complete an investigation into the allegations of harassment/retaliation within fifteen (15) business days of receiving the formal complaint….

Absent extenuating circumstances, within ten (10) school days of receiving the report of the Compliance Officer or the designee, the Superintendent must either issue a final decision regarding whether the complaint of harassment has been substantiated or request further investigation. A copy of the Superintendent's final decision will be delivered to both the Complainant and the Respondent.

*Anti-Harassment Policy*, Sturgis Public Schools Policy Manual (2019), http://go.boarddocs.com/mi/stur/Board.nsf/goto?open&id=BP6LPQ576F59.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

183.     Upon information and belief, no report was ever filed with SPS's Anti-Harassment Compliance Officers (identified in the policy as Mr. Herblet and Ms. Gittinger).

**ANSWER: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

184.     Upon information and belief, no investigation was conducted into W.F.'s reports.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

185.     Upon information and belief, no discipline or other corrective action was taken to respond to the teacher's use of an inappropriate and racially hostile word.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

186.     No final decision was ever provided to N.S. or W.F.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for lack**

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

187.     On or around September 15, 2022, another student targeted W.F. for his race and began using racial slurs against him, threatened to shoot him at school, later also threatened to shoot him over text messages, and verbally threatened him outside his home.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

188.     W.F. and N.S. reported this incident to SPS administrators.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

189.     Instead of addressing the incident properly, the district disciplined W.F. for defending himself against this student.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

190.     Upon information and belief, no report was ever filed with SPS's Anti-Harassment Compliance Officers.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

191.     Upon information and belief, no investigation was conducted into W.F. and N.S.'s reports.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

192.     No final decision was ever provided to N.S. or W.F.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack**

of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.

193.     Upon information and belief, while the district reported the shooting threats to the police, no discipline or other corrective action was taken to address the student's racial harassment of W.F.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

### COUNT I
### Violations of the Individuals with Disabilities in Education Act
### 20 U.S.C. § 1400 *et seq.* and implementing federal regulations

194.     The Administrative Law Judge ("ALJ") ignored or misinterpreted information in the record demonstrating the District's denial of a FAPE, reached several erroneous conclusions of fact and law, and gave undue deference to the District's main witness–a substitute teacher without a special education teaching certification.  The ALJ also committed errors of law by not considering several issues properly submitted for consideration. As a result, the remedy awarded by the ALJ for the limited issues that she did find for Plaintiff, was insufficient and not reasonably calculated to make the child whole. Accordingly, Plaintiff seeks review of the administrative decision as to all issues presented.  Reversal is warranted under the "modified de novo" standard and based upon a preponderance of the evidence in the record.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

***The District failed to develop an IEP reasonably calculated to allow W.F. to make appropriate progress in light of his unique circumstances at the April 2020 and January 2022 IEP meetings***

195.     The ALJ first erroneously concluded that W.F.'s April 2020 IEP was reasonably

69

calculated to allow him to make appropriate progress in light of his unique circumstances.

**ANSWER:** **Defendant denies the allegations contained therein for the reason that they are untrue.**

196.      In doing so, the ALJ entirely mischaracterizes the issue, solely looking at whether the supports could or were implemented in a virtual setting to determine reasonableness. This implementation question has nothing to do with whether the IEP was *developed* in compliance with IDEA's standards and omits all of N.S.'s evidence that, based on those standards, the *entirety* of the IEP - the goals, services, *and* supports - was inappropriate and not reasonably calculated to meet his needs, regardless of whether W.F. was in-person or remote.

**ANSWER:** **Defendant denies the allegations contained therein for the reason that they are untrue.**

197.      As the ALJ accurately acknowledged, Dr. Bateman repeatedly testified that the Present Level statements were vague and failed to provide clarity about W.F.'s specific needs, making it impossible to develop an IEP that was reasonably calculated to allow the student to receive FAPE and make progress toward his unique circumstances.

**ANSWER:** **Defendant denies the allegations contained therein for the reason that they are untrue.**

198.      Further, as Dr. Bateman testified and as the ALJ acknowledged, not only did the District fail to indicate what, if any, progress W.F. had made toward his previous goals, the reading goal failed to address W.F.'s stated reading need, W.F. had an increase in his disciplinary referrals, yet some of the objectives were just copied and pasted from the previous IEP.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

199.     Despite the lack of progress and lack of change in the goals, the copying and pasting wasn't limited to the goals and objectives, rather the supports and accommodations were entirely copied from the previous year. Direct services were also copied, with only nominal changes in service times from the 2019 IEP.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

200.     N.S. further corroborated the concerns with this IEP being substantially similar to the previous IEP and failing to address W.F.'s actual needs and deficits in her testimony. (Tr. 232-233, 235-236).

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

201.     In concluding the March 2020 IEP was developed to reasonably provide W.F. with FAPE, the ALJ failed to consider the testimony provided by Dr. Bateman, testimony by N.S., and the exhibits themselves showing a clear lack of progress and no substantive or meaningful change in the programs and services from the 2019 IEP. It does not matter whether or not W.F. could or did access the stated supports and services, the services *themselves* were not reasonably calculated to allow W.F. to make appropriate progress based on his unique circumstances.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

202.     The ALJ then did go on to find that the April 2021 IEP denied W.F. FAPE, but *only*

in regard to W.F.'s reading, considering only the declining score at his subsequent January 2022 IEP to find the April 2021 goal failed to provide W.F. FAPE. The ALJ erred when finding the remainder of the April 2021 IEP provided W.F. with FAPE.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

203.     In doing so, the ALJ dismissed or ignored all of N.S.'s evidence regarding W.F.'s continued areas of need and lack of progress, both academically and functionally, placing all blame on W.F., a student with a disability, for declining remote services, rather than the district for failing to offer reasonable in-person alternatives and accurately identifying W.F.'s needs and the responding interventions.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

204.     N.S. presented copious evidence on W.F.'s continued needs, lack of progress, and the lack of clarity or changes in the IEP at the April 2021 IEP meeting via testimony by Dr. Bateman, testimony by N.S., W.F.'s IEP progress reports, and W.F.'s IEPs themselves. (Tr. 55-64, 231-234, 236-237, 312-313). Minimal progress, or simply doing comparatively better at home than in a school classroom, does not mean a child has made appropriate progress or received FAPE. As the Supreme Court unanimously made clear in *Endrew F.* - IDEA requires more.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

205.     The ALJ then erroneously concluded that W.F.'s January 2022 IEP was reasonably calculated to allow him to make appropriate progress in light of his unique circumstances.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

206.    Even a cursory review of the January 2022 IEP compared to the three preceding IEPs provided the ALJ with a clear picture that W.F. had made no progress, and in fact had regressed, in both his reading and his classroom performance.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

207.    However, there remained no substantive changes to W.F's goals, his supports, or his direct services in the January 2022 IEP that would support the ALJ's conclusion that attempting them for a third, and in some cases *fourth*, time would suddenly now allow W.F. to make appropriate progress.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

208.    Dr. Bateman reiterated this in his testimony, again tying it back to the issues with the lack of clarity in the Present Levels (Tr. 32-41). Without accurately identifying the problems and W.F.'s needs, the District had no way to address those needs accurately and appropriately, and therefore it was *impossible* for them to be providing W.F. FAPE.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

209.    In addition, the ALJ made an error of law by failing to consider whether the District's denial of N.S. a meaningful participatory role in formulating W.F.'s IEPs amounted to denial of a FAPE.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are**

**untrue.**

210.     As set forth in 20 U.S.C. § 1415(b)(7)(A)(iii), a due process complaint need only include "a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem."  This is a low pleading standard that requires providing enough specificity "to allow the responding party to understand what the Petitioner believes the Respondent has done or failed to do . . . and how that action or inaction has harmed or interfered with Petitioner's education."  *F.C. v. Tenn. Dep't of Educ.*, No. 3:16-cv-613 (M.D. Tenn. Mar. 6, 2017).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

211.     As a 2003 Senate Committee Report elaborates, the pleading standard for a due process complaint need not "reach the level of specificity and detail of a pleading or complaint filed in a court of law" with its purpose being to "ensure that the other party . . . will have an awareness and understanding of the issues forming the basis of the complaint." S. Rep. No. 108-185, at 34 (2003), https://www.congress.gov/108/crpt/srpt185/CRPT-108srpt185.pdf.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

212.     N.S. testified at length on the District's refusal to allow her to meaningfully participate. *See* Tr. 220, l. 10-19; Tr. 361, l. 17 - Tr. 362, l. 7. N.S.'s testimony was corroborated by the IEPs themselves, which consistently failed to accurately incorporate information provided by N.S. regarding W.F.'s current performance and needs. Tr. 231, l.

14 - Tr. 233, l. 24; Tr. 361, l. 6 - Tr. 362, l. 7.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

213.     The ALJ's finding that the District did adequately involve N.S. and respond to her concerns is not supported by the preponderance of the evidence in the record.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

214.     The ALJ's finding that the District developed IEPs that provided W.F. with FAPE at the April 2020, April 2021, and January 2022 IEP meetings is not supported by the preponderance of the evidence in the record.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

215.     The ALJ's factual conclusions to the contrary were unsupported and ignored critical evidence in the record.

**ANSWER:   Defendant denies the allegations contained therein for the reason that they are untrue.**

*SPS failed to implement positive behavior intervention supports (PBIS) to support W.F.'s specific behavioral needs*

216.     The ALJ erred with respect to N.S.'s claim that the District failed to implement PBIS to support W.F.'s specific behavioral needs.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

217.     In her description of the issue, the ALJ correctly cited IDEA's requirement that PBIS be considered where a student's behavior impacts his learning or that of others (34

C.F.R. § 300.324(a)(2)(i)) and that the "IEP must include [a] statement of the special education and related services and supplementary aids and services, *based on peer-reviewed research to the extent practicable*, to be provided to the child." 34 C.F.R. § 300.320(a)(4) (emphasis added). The ALJ further correctly states N.S.'s contention that the District failed to meet this requirement for the period in question from two years of the date of filing.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

218.       However, in finding the District met this requirement, the ALJ erroneously relied upon only two behavior plans created by the district, and the copied-and-pasted "supports" listed within the IEP.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

219.       As Dr. Bateman explained, PBIS is not just a series of unrelated supports, but rather it encompasses *both* "the necessary programs and an instruction they will bring to provide to alter the child's behavior instead of just have it just be something that is a negative." Tr. 64, l. 21-25. It is a clear plan to "provide positive supports for a student instead of just punishing or suspending the student." Tr. 64, l. 18-21.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

220.       However, as can be seen in W.F.'s IEPs and disciplinary record, W.F. continued to be punished and removed from the classroom versus receiving any positive supports. Tr.

97, l. 5-9; Tr. 195, l. 9-18; Tr. 240, l. 22-24; Tr. 306, l. 2-8.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

221.    There was also no evidence presented from the District that any of the supports listed within the IEP was evidence-based or that it was impracticable to utilize evidence-based positive behavior supports, as the ALJ acknowledged is required by IDEA.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

222.    In contrast, N.S. presented evidence through Mr. Vanderweele's testimony that even seemingly appropriate or "reasonable" supports, as SPS claimed and the ALJ referenced were included in W.F.'s IEP, are in fact *not* evidence-based or appropriate for a particular student if *there is no data to support the intervention's use*. Tr. 140. The District again failed to provide any evidence or data to support the appropriateness of the supports within W.F.'s IEPs.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

223.    The ALJ's finding that that the District's behavior plan constituted PBIS is similarly flawed. As initially testified to by Dr. Bateman, and then corroborated by Mr. Vanderweele, a behavior plan can *only* be created *after* there has first been a functional behavior assessment. Tr. 74, l. 17-22; Tr. 1. 17, 21-23.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

224.    The District failed to conduct a functional behavior assessment, the District

subsequently failed to develop an actual, evidence-based behavior plan to address W.F.'s behaviors, and the District failed to present any evidence that first conducting a functional behavior assessment to create an evidence-based behavior plan would have been impossible or impracticable.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

225.     The ALJ's finding that the District implemented PBIS from two years of the date of filing is not supported by the preponderance of the evidence in the record.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

226.     The ALJ's factual conclusions to the contrary were unsupported and ignored critical evidence in the record.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

***SPS failed to provide W.F extended school year services, from two years of the date of filing.***

227.     The ALJ erred with respect to N.S.'s claim that the District failed to provide W.F. extended school year (ESY) services from two years of the date of filing.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

228.     In analyzing the issue in her decision and order, the ALJ cited MDE's guidance in full, before erroneously relying on one potential factor, regression, to find against N.S.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

229.     The ALJ inexplicably dismissed N.S.'s testimony about the lack of discussion regarding ESY services in favor of a boiler-plate checkbox on the IEPs stating it was discussed, even though the district failed to present any evidence to support such a discussion ever taking place. Tr. 370, 378.

**<u>ANSWER</u>:  Defendant denies the allegations contained therein for the reason that they are untrue.**

230.     While the ALJ began discussing "severity of disability" as one factor that would qualify a student for ESY, then erroneously pivoted the analysis back to whether W.F. would regress, despite simultaneously citing the correct analysis of this factor in a footnote.

**<u>ANSWER</u>:  Defendant denies the allegations contained therein for the reason that they are untrue.**

231.     The ALJ then ignored evidence from N.S. directly relating to the severity of W.F.'s disabilities, including both written documentation within W.F.'s IEPs and progress report regarding his decreasing reading skills and increasing behavioral difficulties accessing his schoolwork and remaining in class; testimony from N.S. regarding the severity of W.F.'s emotional impairment and his disabilities' direct relation to his behaviors and academic performance; and even testimony from District staff regarding the increasing severity of W.F.'s behaviors and his inability to maintain appropriate classroom behavior and complete his work. Tr. 48, l. 19-20; Tr. 56, l. 19-23; Tr. 62, l. 5-12; Tr. 267, l. 22 - Tr. 268, l. 25; Tr. 272, l. 10-24; Tr. 291, l. 23 - Tr. 292, l. 9; Tr. 316, l. 2 - Tr. 317, l. 21; Tr. 335, l. 8-22.

**<u>ANSWER</u>:  Defendant denies the allegations contained therein for the reason that they are untrue.**

232.     The ALJ's finding that the District provided W.F. extended school year services from two years of the date of filing is not supported by the preponderance of the evidence in the record.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

233.     The ALJ's factual conclusions to the contrary were unsupported and ignored critical evidence in the record.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

***SPS failed to consider all relevant information in finding that W.F.'s behavior was not a manifestation of his disability at the November 9, 2021, and December 6, 2021, Manifestation Determination Reviews***

234.     A preponderance of the evidence clearly demonstrates that the District failed to consider all relevant information at the November and December 2021 Manifestation Determination Reviews (MDRs). When a local educational agency (LEA) such as SPS conducts an MDR of a student, it is required to do the following:

> ...within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine— (I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

20 U.S.C. § 1415(k)(1)(E)(I).

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

235.     With respect to the November 2021 MDR, the District ignored significant evidence collected by both school personnel and N.S. indicating that W.F. had an emotional impairment, that he had a history of being argumentative and aggressive, that he had difficulty making appropriate choices in confrontational situations, and that a previous physical altercation had been found to be a manifestation of his disabilities, all of which was relevant to an assessment of whether the conduct in question during the November 4, 2021, incident was a manifestation of his disabilities. Compl. 28, ¶ 96.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

236.     The form completed at the November 2021 MDR included very limited information. Instead of summarizing the relevant information in W.F.'s IEP, the form simply reads, "The IEP is current and up-to-date." P. Ex. 57, 1.  There is no information indicating that the IEP team reviewed the IEP or any specific provisions of it to understand whether or how its implementation affected W.F.'s behavior, or even what the IEP's contents were. Whether the IEP is current and up to date is not a required consideration at an MDR under the language of the IDEA. Rather, the purpose of reviewing the IDEA is to assess if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or if the conduct in question was the direct result of the LEA's failure to implement the IEP.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

237.     Further, certain statements written on the form contradict the contents of W.F.'s IEP, such as: "[W.F.] engaged in the disciplinary action based on environmental factors

not pertaining to his area of eligibility." *Id*. at 3. In fact, W.F.'s IEP stated that his area of eligibility was Emotional Impairment, and that N.S. was concerned about W.F. reintegrating into in person school after being in virtual: "I am very worried about how integrating him back to a daily in person school life will go when virtual is no longer an option. After more then [sic] a year on virtual, it has the potential to be very catastrophic for him and staff." P. Ex. 49, 1. The IEP reiterated that the information it contained was only with respect to W.F.'s performance in a virtual setting:

    a.  "Behavioral: [W.F.] has been attending school virtually since his last IEP. He has not presented with any behavioral needs. He has only attended three social work sessions, having stated that these sessions are boring to him. [W.F.]'s mom continues to report positive progress behaviorally." *Id*. at 3.

    b.  "Social-Emotional: [W.F.] has been attending school virtually this past year. He has not presented with any social/emotional needs. His mom reports that he socializes virtually with peers after school." *Id*.

**ANSWER**: **Defendant denies the allegations contained therein for the reason that they are untrue.**

238.    With respect to the relevant information provided by parents, the MDR form simply reads: "Mom said that she has not noticed any behaviors lately related to his eligibility and that she thinks this incident was just when he was at a breaking point and didnt [sic] care anymore." P. Ex. 57, 1. However, at the hearing, N.S. testified at length about information she had provided to SPS which was not included in the MDR form and which was not considered at the MDR, including that W.F. frequently exhibited what she referred to as a "mad face," which she had discussed repeatedly with school staff and which was a signal

that W.F. was experiencing a high level of emotion; that W.F. would ball his fists when experiencing a high level of emotion; that these physical manifestations of W.F.'s emotions were related to W.F.'s autism as they occurred when he was having difficulty interpreting facial expressions or body language; that she had repeatedly asked for W.F.'s autism to be added to her concerns but that the District had failed to do so; and that W.F. had exhibited his "mad face" during the incident in question.  Tr. 288, l. 23 - Tr. 293, l. 8.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

239.  N.S. also testified that she had told SPS staff that the number of breaks W.F. was receiving in school was insufficient to meet his needs, and that SPS did not increase W.F.'s breaks until January 2022, which also was not included in the MDR form. Tr. 295, l. 23 - Tr. 296, l. 12; *see* P. Ex. 57. N.S. testified that SPS staff asked her to keep W.F. home from school in late September 2021, just a little over a month before the incident in question, due to concerns about his behavior after returning from a trip, which was not included on the MDR form. Tr. 296, l. 13 - Tr. 298, l. 12; *see* P. Ex. 58.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

240.  With respect to the December 2021 MDR, the form again includes very limited information. Again, the form simply reads, "The IEP is current and up-to-date." P. Ex. 66, 3. The form does not include any of the previously identified relevant information provided by N.S. to the District. *See* P. Ex. 66. And as for "All relevant information in the student's file," the form only references December 3, 2021, behavior logs – nothing else in W.F.'s file is identified as relevant. P. Ex. 66, 3-4. This cursory review of a very limited sliver of

the ample relevant information about W.F. that was available to SPS does not meet the requirements of the IDEA.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

241.    The Michigan Administrative Rules for Special Education (MARSE) define Emotional Impairment as follows:

> Emotional impairment shall be determined through manifestation of behavioral problems primarily in the affective domain, over an extended period of time, which adversely affect the student's education to the extent that the student cannot profit from learning experiences without special education support. The problems result in behaviors manifested by 1 or more of the following characteristics:
>
> (a) Inability to build or maintain satisfactory interpersonal relationships within the school environment.
>
> (b) Inappropriate types of behavior or feelings under normal circumstances.
>
> (c) General pervasive mood of unhappiness or depression.
>
> (d) Tendency to develop physical symptoms or fears associated with personal or school problems.

MARSE R. 340.1706(1).

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

242.    The information provided by N.S. was clearly relevant to an analysis as to whether W.F.'s behavior during the two incidents in question was a manifestation of his identified disabilities of autism, Tourette's syndrome, disruptive mood dysregulation disorder,

ADHD, major depressive disorder, generalized anxiety disorder, and unspecified communication disorder, the symptoms and manifestations of which qualified him for eligibility under the Emotional Impairment classification. The information N.S. shared was directly applicable to an assessment of whether W.F. was able to build or maintain satisfactory interpersonal relationships within the school environment, whether he was having inappropriate types of behavior or feelings under normal circumstances, and whether he had a general pervasive mood of unhappiness or depression.

**ANSWER**: **Defendant denies the allegations contained therein for the reason that they are untrue.**

243.     Regarding the November 4, 2021, incident, calling another student a "fiend" and engaging in a physical altercation are clear signs of W.F.'s inability to maintain satisfactory interpersonal relationships, that he was having an inappropriate type of behavior or feelings, and that he may have been unhappy or depressed. Regarding the December 6, 2021, incident, telling another student that "that is why your dad left you" and then attacking that student after the student imitated him are all indications of an inability to build or maintain satisfactory interpersonal relationships within the school environment, inappropriate types of behavior or feelings under normal circumstances, a general pervasive mood of unhappiness or depression. The additional relevant information provided by N.S. would have assisted the IEP team to analyze W.F.'s conduct appropriately to assess whether it was a manifestation of his disability as required by the language of the IDEA.

**ANSWER**: **Defendant denies the allegations contained therein for the reason that they are untrue.**

244.     SPS provided no evidence to refute N.S.'s claim that the information considered at the November and December 2021 MDRs was deficient.  The ALJ was required to make a finding by a preponderance of the evidence. As N.S. presented significant documentary and testimonial evidence indicating that the information considered at the MDRs did not meet the requirements of the IDEA, and SPS did not provide any information or evidence to the contrary, the ALJ should have found that SPS violated the IDEA by failing to consider all relevant information in finding that W.F.'s behavior was not a manifestation of his disability at the November 9, 2021 and December 6, 2021 MDRs.

**ANSWER**:  **Defendant denies the allegations contained therein for the reason that they are untrue.**

245.     The ALJ's decision misstated both N.S.'s arguments and the requirements of the IDEA.  The ALJ's decision seems to indicate that the ALJ believes that N.S.'s argument was that the IEP team failed to list all the information considered.  In fact, N.S. testified at length to the information she provided at the MDRs that was not considered.  Tr. 288-294, Tr. 326-327. It is not the failure to *list* the information on a form, but rather the failure to meaningfully *review* the information that forms the basis for N.S.'s objections to the MDR outcomes, as required by the IDEA:

> Within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the LEA, the parent, and relevant members of the child's IEP Team (as determined by the parent and the LEA) must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—
>
> > (i) If the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or
> >
> > (ii) If the conduct in question was the direct result of the LEA's failure to implement the IEP.

34 C.F.R. § 300.530(e)(1).

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

246.     The ALJ also wrongly relies on N.S.'s statement that she was "undecided" as to whether W.F.'s conduct was a manifestation of his disability in finding that SPS did not deny W.F. FAPE at the November 2021 MDR. This is inappropriate as N.S. cannot, on her own – nor can any member of the IEP team – decide whether behavior is a manifestation of a student's disability one way or another. N.S.'s argument is not that the IEP team should have done what she directed or that her voice should have been determinative. Her argument is that information she provided was not appropriately reviewed, which the ALJ does not properly address in her decision.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

247.     The ALJ's finding that the District properly reviewed information provided by N.S. at the MDRs in November and December 2021 is not supported by the preponderance of the evidence in the record.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

248.     The ALJ's factual conclusions to the contrary were unsupported, ignored critical evidence in the record, and did not align with the requirements of the IDEA.

**ANSWER: Defendant denies the allegations contained therein for the reason that they are untrue.**

## COUNT II
### Disability Discrimination in Violation of
### Section 504 of the Rehabilitation Act
### 29 U.S.C. § 794 *et seq.*

249.     Plaintiff realleges and incorporates by reference the allegations contained in the

previous paragraphs.

**ANSWER:   Defendant hereby incorporates by reference its responses contained in**

**paragraphs 1 through 248 inclusive, as if fully set forth herein.**

250.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing

regulations provide, in pertinent part, that "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of his or her disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance." 20 U.S.C. § 794(a); see also 34

C.F.R. § 104.4(a).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the**

**reason that they constitute conclusions of law, rather than allegations of fact, and, therefore,**

**leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

251.     A person is an "individual with a disability" under Section 504 if that person

experiences "a physical or mental impairment which substantially limits one or more major

life activities."  29 U.S.C. § 705(20)(B) (incorporating definition in 42 U.S.C. § 12102 by

reference).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the**

**reason that they constitute conclusions of law, rather than allegations of fact, and, therefore,**

**leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

252.     "Major life activities" include, but are not limited to, "caring for oneself,

performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

253.    In the context of public K-12 education, a "qualified individual with a disability" under Section 504 includes an individual with a disability of an age during which persons who do not experience disabilities are provided K-12 public education.  34 C.F.R. § 104.3(1)(2).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

254.    A "program or activity" includes public K-12 school districts, a "department, agency, special purpose district, or other instrumentality of a State or of a local government," and "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government."  29 U.S.C. § 794(b) (referencing 20 U.S.C. § 7801(30)).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

255.    Pursuant to 29 U.S.C. § 794(a), the predecessor to the U.S. Department of

Education promulgated regulations regarding application of Section 504's antidiscrimination mandate to K-12 schools that receive federal funding.  The obligations under these regulations are in addition to the general antidiscrimination requirements of 29 U.S.C. § 794.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

256.    Under these regulations, educational programs or activities must, *inter alia*:

a.   provide a free appropriate public education to each qualified (individual with  a disability] who is in the recipient's jurisdiction, regardless of the nature or  severity of the person's [disability]," 34 C.F.R. § 104.33(a);

b.   "educate, or ... provide for the education of, each qualified [individual with a disability] in its jurisdiction with persons who [do not experience disabilities] to the maximum extent appropriate to the needs of the [individual with a  disability]." 34 C.F.R. § 104.34(a);

c.   "place [an individual with a disability] in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily. Whenever a recipient places a person in a setting other than the regular educational  environment pursuant to this paragraph, it shall take into account the proximity of the alternate setting to the person's home." 34 C.F.R. § 104.34(a);

d.   "ensure that [individuals with disabilities] participate with non [disabled]  persons

in [nonacademic and extracurricular services and activities, including meals, recess periods, and other nonacademic services] to the maximum extent appropriate to the needs of the [individual with a disability] in question." 34 C.F.R. § 104.34(b). These nonacademic services include, but are not limited to: counseling services, athletics, transportation, health services, recreational activities, special interest groups or clubs sponsored by the recipients, and others. 34 C.F.R. § 104.37(a)(2);

e. conduct evaluations in accordance with 34 C.F.R. § 104.35(b) "before taking any action with respect to the initial placement of the person [with a disability] in regular or special education and any subsequent significant change in placement." 34 C.F.R. § 104.35(a);

f. provide procedural safeguards, including, *inter alia*, notice, an opportunity to examine records, an impartial hearing, and a hearing review process. 34 C.F.R. § 104.36.

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

257. Under Section 504, FAPE requires the provision of regular or special education and related aids and services that "(i) are designed to meet individual educational needs of [a child with a disability] as adequately as the needs of [non-disabled students] are met and (ii) are based upon adherence to procedures that satisfy the requirements of [34 C.F.R.] § 104.34, 104.35, and 104.36."

**ANSWER: Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore,**

leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.

258.     Section 504's K-12 education regulations apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31.

**ANSWER**:  **Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

259.     Defendant is a "program or activity" under Section 504 and a recipient of federal financial assistance for the provision of elementary and secondary education and is therefore obligated to comply with Section 504 and the regulations under 34 C.F.R. Part 104.

**ANSWER**:  **Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

260.     At all times pertinent to this Complaint, W.F. was eligible for enrollment at SPS, and eligible for the receipt of public K-12 education from SPS, including a FAPE under Section 504.

**ANSWER**:  **Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

261.     Through the acts and omissions set forth herein, Defendant, acting under color of law, discriminated against W.F. on the basis of disability and in violation of Section 504,

including, but not limited to, the following:

    a.  Defendant denied W.F. the opportunity to participate in the benefits of public education equal to that afforded others, including having access to educational instruction in an amount equal to that of his same-age, non-disabled peers.

    b.  Defendant failed to provide W.F. an opportunity to participate in or benefit from the public education equal to that afforded others.

    c.  To the extent Defendant provided any public educational services to W.F. during the time pertinent to this Complaint, such services were not appropriate or reasonably calculated to provide W.F. an opportunity to participate in or benefit from the public education equal to that afforded other public-school students.

    d.  Defendant failed to educate W.F., or provide for W.F.'s education, with persons who do not experience disabilities to the maximum extent appropriate to W.F.'s needs.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

262.    Defendant denied W.F. a FAPE in violation of Section 504 regulations, based upon the foregoing allegations and such other violations of Section 504 as may be discovered during the course of this matter.  All such claims are hereby reserved.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

263.    Defendant's violations of Section 504 have caused, and continue to cause, actual and proximate harm to W.F.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are**

untrue.

264.     At the time Defendant violated W.F.'s rights under Section 504 as set forth above, Defendant, and its respective agents, had knowledge that a harm to a federally protected right was substantially likely, and was deliberately indifferent to that risk.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

265.     Defendant, and its respective agents, acted with reckless or callous indifference to W.F.'s federally protected rights under Section 504.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

266.     These repeated violations constitute a continuing violation of Section 504 of the Rehabilitation Act.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

267.     As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

## COUNT III
### Disability Discrimination in Violation of
### Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12101 *et seq.*

268.    Plaintiff realleges and incorporates by reference the allegations contained in the

previous paragraphs.

**ANSWER:    Defendant hereby incorporates by reference its responses contained in**

**paragraphs 1 through 267 inclusive, as if fully set forth herein.**

269.    42 U.S.C. § 12132 provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity."

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the**

**reason that they constitute conclusions of law, rather than allegations of fact, and, therefore,**

**leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

270.    Disability discrimination under Title II also includes a public entity's failure to

make reasonable modifications necessary to avoid disability discrimination.  28 C.F.R. §

35.130(b)(7).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the**

**reason that they constitute conclusions of law, rather than allegations of fact, and, therefore,**

**leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

271.    ADA regulations specify, *inter alia*, that it is unlawful discrimination for a public

entity either directly or through contractual, licensing, or other arrangements to:

a. Deny a qualified individual with a disability the opportunity to participate in or

benefit from the aid, benefit, or service;

95

b. Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

c. Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others,

d. Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

e. Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

272.     Under the ADA regulations, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (1) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

273.    ADA regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  Pursuant to statutory authority, the U.S. Attorney General defined the "most integrated setting" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 FR 35696, 35705 (July 26, 1991) (incorporated at 28 C.F.R. pt. 35, App. B); see also 5 U.S.C. § 301.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

274.    "Individual with disability" and "major life activities" have the same meaning under Title II of the ADA and under Section 504 as set forth above.  20 U.S.C. § 12102.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

275.    Under Title II of the ADA, a public entity includes any state or local government and any "department, agency, special purpose district, or other instrumentality of a State or States or local government."  28 C.F.R. § 35.104.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the**

**reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

276.　　"Qualified individual with a disability" under ADA Title II means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 28 C.F.R. § 35.104.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

277.　　Through the acts and omissions described herein, Defendant, acting under color of law, discriminated against W.F. in violation of the ADA, including, but not limited to  the following ways:

　　a.　Denying W.F. the opportunity to participate in or benefit from educational services equal to that afforded to others;

　　b.　Denying W.F. educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

　　c.　Denying W.F. the opportunity to receive educational programs and services in the most integrated setting appropriate to his needs;

　　d.　Failing to make reasonable modifications to its programs and services necessary to avoid discrimination against W.F.;

e.  Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs with respect to W.F.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

278.   Defendant's violations of the ADA have caused, and continue to cause, actual and proximate harm to W.F.

**ANSWER:**

279.   At the time Defendant violated W.F.'s rights under the ADA as set forth above, Defendant, and its respective agents, had knowledge that a harm to a federally protected right was substantially likely, and was deliberately indifferent to that risk.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

280.   Defendant, and its respective agents, acted with reckless or callous indifference to W.F.'s federally protected rights under the ADA.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

281.   As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are**

**untrue.**

<u>**COUNT IV**</u>
**Race Discrimination in Violation of**
**Title VI of the Civil Rights Act of 1964**
**42 U.S.C. § 2000d** *et seq.*

282.    Plaintiff realleges and incorporates by reference the allegations contained in the

previous paragraphs.

**<u>ANSWER</u>:   Defendant hereby incorporates by reference its responses contained in**

**paragraphs 1 through 281 inclusive, as if fully set forth herein.**

283.    Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United

States shall, on the ground of race, color, or national origin, be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance."  42 U.S.C. § 2000d.

**<u>ANSWER</u>:  Defendant neither admits nor denies the allegations contained therein for the**

**reason that they constitute conclusions of law, rather than allegations of fact, and, therefore,**

**leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

284.    As a public school district, SPS received and continues to receive federal financial

assistance.

**<u>ANSWER</u>:  Defendant admits the allegations contained therein.**

285.    A public school district can be held liable under Title VI for deliberate indifference

to student-on-student racial harassment. *Williams v. Port Huron Area Sch. Dist. Bd. of*

*Educ.*, No. 06-14556, 2010 WL 1286306, at *8 (E.D. Mich. Mar. 30, 2010), rev'd and

remanded sub nom. *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612 (6th Cir. 2012).

**<u>ANSWER</u>:  Defendant neither admits nor denies the allegations contained therein for the**

**reason that they constitute conclusions of law, rather than allegations of fact, and, therefore,**

leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.

286.     W.F. was subjected to racial harassment that was so severe, pervasive, and objectively offensive that it deprived W.F. of access to the educational opportunities and benefits provided by SPS.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

287.     Defendant had actual knowledge of the racial harassment, evidenced by, among other things:

    a.  The use of a racial slur by SPS teacher; and

    b.  Use of racial slurs by another student against W.F. as witnessed by SPS staff.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

288.     Defendant was deliberately indifferent to the racial harassment W.F. experienced; its response (or lack thereof) to the harassment W.F. reported was clearly unreasonable in light of the known circumstances described herein, including but not limited to:

    a.  The use of a racial slur by SPS teacher; and

    b.  Use of racial slurs by another student against W.F.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

289.     As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological

damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

### COUNT V
**Disability Discrimination in Violation of**
**Michigan's Persons with Disabilities Civil Rights Act**
**M.C.L. 37.1101 *et seq.***

290.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

**ANSWER:   Defendant hereby incorporates by reference its responses contained in paragraphs 1 through 289 inclusive, as if fully set forth herein.**

291.     SPS is an education institution as defined in PDCRA. M.C.L. 37.1401 *et seq.*

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

292.     PDCRA prohibits discrimination in educational institutions or facilities and public services because of a disability.  M.C.L. 37.1302; MCL 37.1402.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

293.     PDCRA prohibits educational institutions from discriminating against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of a disability.  M.C.L. 37.1402(a).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the**

102

**reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

294.     PDCRA prohibits places of public accommodation, including educational facilities, and public services from denying an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations because of a disability. M.C.L. 37.1302(a).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

295.     Defendant's failure to accommodate W.F. and failure to provide W.F. with a full and equal enjoyment of their services constitute discrimination under PDCRA.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

296.     Defendant denied W.F. access to a public education on the basis of his disability in violation of PDCRA.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

297.     Defendant's violations of PDCRA have caused and continue to cause direct and proximate harm to W.F.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

298.     Defendant, and its respective agents, acted with reckless and callous indifference to W.F.'s rights under PDCRA.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

299.     As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

### COUNT VI
### Race Discrimination in Violation of
### Michigan's Elliott-Larsen Civil Rights Act
### M.C.L. 37.2301 *et seq.*

300.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

**ANSWER:   Defendant hereby incorporates by reference its responses contained in paragraphs 1 through 299 inclusive, as if fully set forth herein.**

301.     ELCRA provides that an educational institution may not "[d]eny an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of...race." M.C.L. 37.2402(a).

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

302.     Because schools stand *in loco parentis* to offending students, schools may be

vicariously liable for hostile educational environment discrimination arising from student-on-student harassment. *Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, No. 359190, 2022 WL 17868146, at \*5 (Mich. Ct. App. Dec. 22, 2022).

**ANSWER:   Defendant neither admits nor denies the allegations contained therein for the reason that they constitute conclusions of law, rather than allegations of fact, and, therefore, leaves Plaintiff to his proofs thereon with a final determination to be made by the Court.**

303.      SPS is an educational institution as defined by ELCRA, M.C.L. 37.2301, and M.C.L. 37.2401.

**ANSWER:  Defendant admits the allegations contained therein.**

304.      W.F. is a member of a protected class due to his race.

**ANSWER:  Defendant neither admits nor denies the allegations contained therein for lack of knowledge upon which to form a belief and, therefore, leaves Plaintiffs to his proofs.**

305.      W.F. was subjected to racial harassment that was so severe, pervasive, and objectively offensive that it unreasonably interfered with his education and created an intimidating, hostile, and offensive educational environment.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

306.      Defendant had actual knowledge of the racial harassment described herein.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

307.      Defendant failed to adequately investigate or take prompt or appropriate remedial action upon notice of the hostile educational environment.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are**

**untrue.**

308.    Defendant violated ELCRA and deprived W.F. of his civil rights by their acts and omissions in response to the ongoing racially harassing conduct and communication to which he was subjected, which had the purpose and/or effect of denying him the full benefit of an SPS education and full and equal access to educational opportunity.

**ANSWER:  Defendant denies the allegations contained therein for the reason that they are untrue.**

309.    As a direct and proximate result of Defendant's actions and inactions, W.F. has sustained injuries and damages, including, but not limited to, loss of his fundamental constitutional rights; educational loss; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; pain and suffering; and loss of the ordinary pleasures of everyday life.

**ANSWER:  Defendant admits the allegations contained therein.**

<strong>REQUESTED RELIEF</strong>

WHEREFORE, Defendant, STURGIS PUBLIC SCHOOLS, respectfully requests that this Honorable Court enter an order of no cause of action as to Defendant, together with costs and attorney fees so wrongfully sustained.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant

DATED: July 21, 2023

<strong><u>AFFIRMATIVE DEFENSES</u></strong>

Defendant, STURGIS PUBLIC SCHOOLS, by and through its attorneys, GIARMARCO, MULLINS & HORTON, P.C., states its Affirmative Defenses as follows:

106

1.      Plaintiff's Complaint fails to set forth a claim or cause of action upon which relief can be granted as prayed.

2.      Defendant will show that at all times relevant hereto, it was engaged in a governmental function acting within the scope of its authority and, as such, is immune from suit for civil damages as set forth in Plaintiff's Complaint.

2.      Plaintiff's claims against Defendant fail because Plaintiff cannot show that Defendant acted with deliberate indifference regarding Plaintiff's allegations of discrimination.

3.      Plaintiff has failed to exhaust his administrative remedies generally and specifically with the Individuals With Disabilities Education Act, the Americans With Disabilities Act, Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, Title VI of the Civil Rights Act of 1964, Michigan's Persons with Disabilities Civil Rights Act and Michigan's Elliott-Larsen Civil Rights Act.

4.      Plaintiff's claims under the Persons with Disability Act are precluded by the Michigan Special Education Act, MCL 380.1701.

5.      Defendant is entitled to qualified immunity.

6.      Defendant has not violated any clearly established constitutional or statutory right.

7.      Plaintiff's ADA and Section 504 claims are preempted by the IDEA.

8.      Plaintiff's claim is barred because they did not notify Defendant of the actions complained of.

9.      Plaintiff's claim is barred by the Statute of Limitations.

10.     Defendant will show at the time of trial that there was no discriminatory intent.

11.     Plaintiff has failed to mitigate his damages, if any.

12.     Plaintiff has failed to satisfy a condition precedent to filing this lawsuit.

13.     Defendant strictly observed all legal duties and obligations imposed by operation of law and otherwise, and all actions of its agents, servants, and/or employees were careful, prudent, proper, and lawful.

14.     Plaintiff has failed to set forth a claim or cause of action upon which relief can be granted.

15.     Plaintiff's voluntary conduct and/or comparative negligence may act to bar this claim in whole or in part.

16.     Any damages complained of by Plaintiff were not proximately caused by Defendant.

17.     The Court lacks jurisdiction over Plaintiff's state law claims because the state law claims substantially predominate the federal claims.

18.     Plaintiff's claims are barred because Defendant took prompt, remedial, and corrective action to all known claimed acts of discrimination of harassment.

19.     Plaintiff's claims are barred because Plaintiff lacks capacity to sue.

20.     Defendant will show at trial that any injury complained of by Plaintiff was preexistent and/or proximately caused by the acts of third persons not under the control of Defendant.

21.     Plaintiff's Complaint is conclusory in nature and fails to state a claim and sufficient facts upon which relief can be granted as required by the Individuals With Disabilities Education Act, the Americans With Disabilities Act, Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, Title VI of the Civil Rights Act of 1964, Michigan's Persons with Disabilities Civil Rights Act and Michigan's Elliott-Larsen Civil Rights Act.

22.     Defendant will show that at all times relevant hereto, it acted without malice, ill

will and in good faith in the performance of its duties and, as a result, is immune from suit and

recovery by Plaintiff in this case.

23.     Defendant will show that Plaintiff has failed to prove any deprivation of a Federal

right, nor has Plaintiff alleged or proven an act of deprivation taken under color of law sufficient

to maintain an action based upon the American with Disabilities Act and/or the Persons with

Disabilities Civil Rights Act.

24.     Defendant will show at the time of trial that Plaintiff Minor was guilty of negligence

or other conduct which contributed to the incident complained of, and his conduct in this regard

was the sole or partial cause of any injury complained of, and Plaintiff's recovery should be barred

or diminished to the extent of such conduct.

25.     Defendant will show and rely upon at the time of trial that Plaintiff, as a matter of

law, is not entitled to exemplary or punitive damages.

26.     Plaintiff did not request an accommodation.

27.     Plaintiff did not act in good faith.

28.     Defendant is excused from performance of its duties due to impracticability and

impossibility.

29.     Defendant reserves the right to amend its Answer, including additional Affirmative

Defenses, upon completion of investigation and discovery of this cause.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant

DATED:  July 21, 2023

## RELIANCE UPON JURY DEMAND

Defendant, STURGIS PUBLIC SCHOOLS, by and through its attorneys, GIARMARCO,

MULLINS & HORTON, P.C., hereby relies upon the jury demand previously filed by Plaintiff as

to all issues of trial.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant

DATED: July 21, 2023

## CERTIFICATE OF ELECTRONIC SERVICE

TIMOTHY J. MULLINS states that on July 21, 2023, he did serve a copy of the **Answer, Affirmative Defenses and Reliance on Jury Demand** via the United States District Court electronic transmission.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com
P28021