UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

N.S. o/b/o W.F.,

      Plaintiff,

v

STURGIS PUBLIC SCHOOLS,

      Defendant.

_____/

Judge Paul L Maloney
Magistrate Judge Phillip J. Green
No. 23-448

| | |
|---|---|
| ELIZABETH K. ABDNOUR (P78203) | TIMOTHY J. MULLINS (P28021) |
| JACQUELYN N. KMETZ (P83575) | KENNETH B. CHAPIE (P66148) |
| RENEE A. STROMSKI (OH: 0101347) | LINDSAY P. HAZEN (P85861) |
| ABDNOUR WEIKER LLP | GIARMARCO, MULLINS & HORTON, P.C. |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |
| 500 E. Michigan Ave., Ste. 130 | 101 W. Big Beaver Road, 10th Floor |
| Lansing, MI 48912 | Troy, MI 48084-5280 |
| (517) 994-1776 | (248) 457-7020 |
| liz@education-rights.com | tmullins@gmhlaw.com |
| jacquelyn@education-rights.com | kchapie@gmhlaw.com |
| renee@education-rights.com | lhazen@gmhlaw.com |

# DEFENDANT STURGIS PUBLIC SCHOOLS' MOTION[1] FOR SUMMARY JUDGMENT

**Statement Regarding Concurrence Pursuant to LR 7.1(d):** The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter expressly denied concurrence.

**Request for Oral Argument:** Defendant Requests Oral Argument Pursuant to L.R. 7.2(d).

---

[1] With Brief Incorporated.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iv

STATEMENT OF ISSUES AND MOST CONTROLLING AUTHORITY ........................... ix

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

     1.     The IDEA and its Framework .......................................................... 3

     2.     The District has Provided W.F. with Appropriate Supports and
             Services ......................................................................................... 4

          a.     Elementary School .............................................................. 4

          b.     Middle School ................................................................... 5

     3.     Due Process Proceedings ................................................................. 9

     4.     Racial Discrimination Claims ........................................................ 11

     5.     This Lawsuit ................................................................................ 12

STANDARD OF REVIEW ..................................................................................... 13

I.     The Administrative Law Judge Appropriately Considered the Evidence
     and Interpreted the Law ......................................................................... 13

II.     Plaintiff's Disability Discrimination Claims Fail as a Matter of Law ........................ 19

     A.     Many of Plaintiff's Claims are Barred by the Statute of Limitations .............. 20

     B.     Plaintiff was only Entitled to a Reasonable Accommodation that
           Allowed Meaningful Access to the School and its Programs ......................... 21

     C.     Plaintiff has not Established Deliberate Indifference to Federally
           Protected Rights ............................................................................. 23

     D.     Plaintiff's Section 504 Claim should also be Dismissed for Independent
           Reasons ....................................................................................... 25

     E.     Plaintiff's PWDCRA Claim Fails for the Same Reasons ................................ 25

     F.     Plaintiff's PWDCRA Claim is also Preempted ................................................ 26

III.    Plaintiff's Title VI Claim Fails as a Matter of Law ......................................................26

    A.  Plaintiff has not Identified Actionable Peer Harassment ........................................27

    B.  Defendant was not Deliberately Indifferent to the Known Acts
      of Actionable Harassment ........................................................................................29

IV.    Plaintiff's ELCRA Claim Fails as a Matter of Law......................................................32

CONCLUSION ..............................................................................................................33

# TABLE OF AUTHORITIES

*A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660 (E.D.N.Y. 2012)....................21

*Alexander v. Choate*, 469 U.S. 287 (1985) ..........................................................................ix,21

*Alexander v. Sandoval,* 532 U.S. 275 (2001)..............................................................................x

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................................xi,26

*B.M. v. Bd. of Ed. of Scott Co., KY*, 2008 WL 4073855 (E.D. Ky. 2008) ...............................23

*Bd. of the Cnty Comm'rs v. Brown*, 520 U.S. 397 (1997) .........................................................24

*Bedford v. Michigan*, 722 Fed. Appx. 515 (6th Cir. 2018)................................................x,21,22

*Bennett v. Hurley Med. Cen.*, 86 F.4th 314 (6th Cir. 2023)....................................................x,25

*Burilovich v. Bd. of Educ.*, 208 F.3d 560 (6th Cir. 2000) ..................................................x,15,16

*Campbell v. Bd. of Ed. of Centerline Sch. Dist.*, 58 Fed. Appx. 162 (6th Cir. 2003)..x,19,21,22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................13

*Chambers v. Trettco, Inc.*, 463 Mich. 297 (2000)..................................................................xi,32

*Cordrey v. Euckert*, 917 F.2d 1460 (6th Cir. 1990), *cert. denied*, 499 U.S. 938 (1991) ..........16

*Crocker v. Tennessee Secondary Sch. Athletic Ass'n.*, 873 F.2d 933 (6th Cir. 1989) ..............15

*D.K. v. Abington Sch. Dist.*, 696 F.3d 233 (3d Cir. 2014) ........................................................16

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)......................................................xi,24

*Deal v. Hamilton Cnty Bd. of Ed.*, 392 F.3d 840 (6th Cir. 2004) .....................................x,14,15

*Doe v. Bd. of Ed. of Tullahoma City Sch.*, 9 F.3d 455 (6th Cir. 1993) ................................ix,14

*Doe v. Claiborne Cnty.*, 103 F.3d 495 (6th Cir. 1996) ........................................................24,29

*Doe v. Plymouth-Canton Cmty. Sch.*, No. 19-10166, 2022 WL 1913074,
(E.D. Mich. June 3, 2022)...........................................................................................xi,27

*Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, No. 165441, __ N.W.2d __,
2024 WL 3573522 (Mich. July 29, 2024)...................................................................32

*Dong v. Bd. of Ed. of the Rochester Cmty. Schs.*, 197 F.3d 793 (6th Cir. 1999) ..................... 17

*Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386 (2017) ............................................. ix,17

*Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960 (6th Cir. 2020) .............................. 29

*Frank v. Sachem Sch. Dist.*, 84 F. Supp. 39 172 (E.D.N.Y. 2015) .......................................... 24

*Fry v. Napolean Cmty Schs.*, 580 U.S. 154 (2017) .............................................................. ix,14

*G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623 (6th Cir. 2013) .............................................. ix,19

*Gaines v. Runyon*, 107 F.3d 1171 (6th Cir. 1997) ............................................................... ix,22

*Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998) ................................................ 28

*Gordon v. Traverse City Area Pub. Schs.*, 686 Fed. Appx. 315 (6th Cir. 2017) ................. xi,29

*Hankins v. The Gap*, 84 F.3d 797 (6th Cir. 1996) ................................................................ 22

*Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176 (1982) ................. x,14,15,16,17,18

*Honig v. Doe*, 484 U.S. 305 (1988) .................................................................................... 3

*I.A. v. Seguin Ind. Sch. Dist.*, 881 F. Supp. 2d 770 (W.D. Tex. 2012) ................................... 24

*Ingraham v. Wright*, 430 U.S. 651 (1977) .......................................................................... 30

*Jenkins v. Carney-Nadeau Pub. Sch.,* 505 N.W.2d 893 (Mich. Ct. App. 1993) ................. ix,26

*Jones v. Potter*, 488 F.3d 397 (6th Cir. 2008) ..................................................................... 25

*Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432 (6th Cir. 1998) ............. 22

*Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755 (6th Cir. 2001) ...................... 17

*Knox Cnty, Tennessee v. M.Q.*, 62 F.4th 978 (6th Cir. 2023) ............................................. ix,20

*Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613 (6th Cir. 2019) ........ xi,27,29,30

*Li v. Revere Local Sch. Dist.*, No. 21-3422, 2023 WL 3302062 (6th Cir. 2023) .................... 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............................. 13

*Mayville v. Ford Motor Co.*, 2006 WL 3040672 (Mich. Ct. App. Oct. 26, 2006) ................. 32

*McCormick v. Miami Univ.*, 693 F.3d 654 (6th Cir. 2012)........................................................20

*McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004) ....................................................21

*McLaughlin v. Holt Pub. Schs. Bd. of Ed.*, 320 F.3d 663 (6th Cir. 2003) ................................15

*Metro. Bd. of Pub. Educ. v. Guest*, 193 F.3d 457 (6th Cir. 1999) ...................................ix,15,17

*Miller v. Lord*, 686 N.W.2d 800 (Mich. Ct. App. 2004).........................................................ix,26

*Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 Fed. Appx. 95 (2d Cir. 2013).......................21

*Moore v. Philip Morris Cos.*, 8 F.3d 335 (6th Cir. 1993) ..........................................................13

*Paasewe v. Ohio Arts Council*, 74 Fed. Appx. 505 (6th Cir. 2003) ..........................................33

*Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356 (6th Cir. 2012)...........................xi,27,28,30

*Perez v. Sturgis Pub. Schs.*, 598 U.S. 142 (2023) .....................................................................14

*R.K. v. Bd. Of Ed. Scott Co. KY*, 637 Fed. Appx. 922 (6th Cir. 2016) .................................ix,23

*Radtke v. Everett*, 442 Mich. 368 (1993) .............................................................................32,33

*S.S. v. E. Ky. Univ.*, 532 F.3d 445 (6th Cir. 2008) .................................................................ix,20

*Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005)............................................................16

*Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524 (4th Cir. 1998) ...............................................20

*Sharbowski v. Utica Cmty. Sch.,* No. 18-CV-10869, 2019 WL 587274
(E.D. Mich. Feb. 13, 2019) .........................................................................................................14

*Sheridan v. Forest Hills Pub. Sch.*, 247 Mich. App 611 (2001)...........................................xi,32

*Smith v. Leggett*, 220 F.3d 752 (6th Cir. 2000)..................................................................xi,27,29

*Southerland v. Hardaway Mgmt. Inc.*, 41 F.3d 250 (6th Cir. 1994).........................................20

*Stacy v. Shoney's, Inc.*, 142 F.3d 436 (6th Cir. 1998) ..............................................................29

*Stiles ex rel. D.S. v. Grainger Cnty., Tenn.,* 819 F.3d 834 (6th Cir. 2016)..........................xi,29

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) .................................................13

*Taylor v. Bringman*, No. 1:22-CV-519, 2023 WL 2563662 (W.D. Mich. Feb. 10, 2023), report and recommendation adopted, 2023 WL 2562310 (W.D. Mich. Mar. 17, 2023) .........20

*Trepka v. Bd. of Educ.*, 28 Fed. Appx. 455 (6th Cir. 2002) .....................................22

*Troy Sch. Dist. v. Boutsikaris*, 250 F. Supp. 2d 720 (E.D. Mich. 2003)................................15

*Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008) ...........................................ix,21,23

*Vance v. Spencer Cnty Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir 2000) .....................................30

*Wells v. Farmington Public Schools* No. 21-11265, 2022 WL 17361286 (E.D. Mich. Dec. 1, 2022)................................................................xi,33

*Whitaker v. Tennessee Valley Auth. Bd. of Directors*, No. 3:08-1225, 2010 WL 1493899 (M.D. Tenn. Apr. 14, 2010)...........................................25

*White v. Kentuckiana Livestock Mkt., Inc*., 397 F.3d 420 (6th Cir. 2005)................................25

*Williams v. Port Huron Sch. Dist.*, 455 Fed. Appx. 612 (6th Cir. 2012) ..............................x,30

*Woolcott v. State Bd. of Ed*., 351 N.W.2d 601 (Mich. Ct. App. 1984)................................ix,26

*Yaldo v. Wayne State Univ*., 266 F.Supp.3d 988 (E.D. Mich. 2018).......................................21

## <u>Statutes</u>

20 U.S.C. § 1400...........................................................................3,12,26

20 U.S.C. § 1401(9), (26), (29)..................................................................3

20 U.S.C. § 1414................................................................................3

20 U.S.C.  § 1415(b)(6), (f)(1)(A) ...........................................................3

20 U.S.C. § 1415(e) ..........................................................................4,17

20 U.S.C. § 1415(f)...........................................................................4

20 U.S.C. § 1415(f)(1)(B)(i) ..................................................................4

20 U.S.C. § 1415(g)(1) .......................................................................4

20 U.S.C. § 1415(i)(2)(A).................................................................ix,4,11

20 U.S.C. § 1415(i)(2)(C)..................................................................141

20 U.S.C. § 1415(i)(2)(C)(i) ................................................................................14

29 U.S.C. § 794 ....................................................................................................12

42 U.S.C. § 12101 ................................................................................................12

42 U.S.C. § 12112(b)(5)(A) .............................................................................ix,21

42 U.S.C. § 2000d ...........................................................................................12,26

MCL 37.1101 ...................................................................................................12,26

MCL 37.2301 ........................................................................................................12

MCL 380.1701 ......................................................................................................26

MCL 380.1701(a) .................................................................................................17

MCL 380.1711(1)(a) ............................................................................................17

MCL 380.1751(1) .................................................................................................17

MCL 600.5805(2) .................................................................................................17

## **Rules**

28 C.F.R. 35.160 ..................................................................................................22

34 C.F.R. 300.114 ..................................................................................................3

34 C.F.R. 300.507(a)(2) .......................................................................................14

34 C.F.R. 300.530(f)(1) ..........................................................................................8

Fed. R. Civ. P. 56 .................................................................................................13

Fed. R. Civ. P. 56(a) ............................................................................................13

## STATEMENT OF ISSUES AND MOST CONTROLLING AUTHORITY

**Issue One:** Is Defendant entitled to Summary Judgment on Plaintiff's claims arising under the IDEA where there is ample evidence that Defendant complied with IDEA and developed an IEP for W.F. under the implementing regulations that would enable him to receive educational benefits? **YES.**

**Issue Two:** Should this Court affirm the ruling by the Administrative Law Judge in the underlying special education due process matter where Plaintiff cannot cite any evidence the Judge failed to consider or identify any specific errors in their interpretation of the law? **YES.**

**Most Controlling Authority for Issues One and Two**
- *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386 (2017)
- 20 U.S.C. § 1415(i)(2)(A)
- *Fry v. Napolean Cmty Schs.*, 580 U.S. 154 (2017)
- *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176 (1982)
- *Doe v. Bd. of Ed. of Tullahoma City Sch.*, 9 F.3d 455 (6th Cir. 1993)
- *Deal v. Hamilton Cnty Bd. of Ed.*, 392 F.3d 840 (6th Cir. 2004)
- *Metro. Bd. of Pub. Educ. v. Guest*, 193 F.3d 457 (6th Cir. 1999)
- *Burilovich v. Bd. of Educ.*, 208 F.3d 560 (6th Cir. 2000)

**Issue Three**: Is Defendant entitled to Summary Judgment on Plaintiff's disability discrimination claims pursuant to Section 504, Title II and the PWDCRA where Plaintiff has not produced any evidence of a violation? **YES.**

**Most Controlling Authority for Issue Three**
- *G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623 (6th Cir. 2013)
- *Campbell v. Bd. of Ed. of Centerline Sch. Dist.*, 58 Fed. Appx. 162 (6th Cir. 2003)
- *Knox Cnty, Tennessee v. M.Q.*, 62 F.4th 978 (6th Cir. 2023)
- *S.S. v. E. Ky. Univ.*, 532 F.3d 445 (6th Cir. 2008)
- *Alexander v. Choate*, 469 U.S. 287 (1985)
- 42 U.S.C. § 12112(b)(5)(A)
- *Bedford v. Michigan*, 722 Fed. Appx. 515 (6th Cir. 2018)
- *Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008)
- *Gaines v. Runyon*, 107 F.3d 1171 (6th Cir. 1997)
- *R.K. v. Bd. Of Ed. Scott Co. KY*, 637 Fed. Appx. 922 (6th Cir. 2016)
- *Bennett v. Hurley Med. Cen.*, 86 F.4th 314 (6th Cir. 2023)
- *Woolcott v. State Bd. of Ed.*, 351 N.W.2d 601 (Mich. Ct. App. 1984)
- *Jenkins v. Carney-Nadeau Pub. Sch.,* 505 N.W.2d 893 (Mich. Ct. App. 1993)
- *Miller v. Lord*, 686 N.W.2d 800 (Mich. Ct. App. 2004)

**Issue Four:** Is Defendant entitled to Summary Judgment on Plaintiff's race discrimination claims pursuant to Title VI and ELCRA where Plaintiff has not produced any evidence W.F. was subjected to severe **and** pervasive **and** objectively offensive race-based harassment that the

District was deliberately indifferent to? **YES.**

**Most Controlling Authority for Issue Four**

- *Alexander v. Sandoval*, 532 U.S. 275 (2001)
- *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)
- *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356 (6th Cir. 2012)
- *Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613 (6th Cir. 2019)
- *Doe v. Plymouth-Canton Cmty. Sch.*, No. 19-10166, 2022 WL 1913074 (E.D. Mich. June 3, 2022)
- *Smith v. Leggett*, 220 F.3d 752 (6th Cir. 2000)
- *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.,* 819 F.3d 834 (6th Cir. 2016)
- *Gordon v. Traverse City Area Pub. Schs.*, 686 Fed. Appx. 315 (6th Cir. 2017)
- *Williams v. Port Huron Sch. Dist.*, 455 Fed. Appx. 612 (6th Cir. 2012)
- *Chambers v. Trettco, Inc.*, 463 Mich. 297 (2000)
- *Sheridan v. Forest Hills Pub. Sch.*, 247 Mich. App 611 (2001)
- *Wells v. Farmington Public Schools*, No. 21-11265, 2022 WL 17361286 (E.D. Mich. Dec. 1, 2022)

## INTRODUCTION

The Minor Plaintiff, W.F., is a current special education student at Sturgis Public Schools (the "District"). Plaintiff brings essentially two lawsuits before the Court. First, Plaintiff appeals the result of a special education due process hearing regarding educational accommodations the District provided. Second, Plaintiff has filed suit for monetary damages. Plaintiff claims that W.F. was subjected to a racially hostile school environment in violation of Title VI and the ELCRA. Plaintiff also asserts that W.F. was discriminated against based on his disability, in violation of the ADA, Section 504 and the PWDCRA.

First, Plaintiff asks this Court to reverse the findings of the underlying special education due process decision without citing any evidence that the Administrative Law Judge failed to consider and without identifying any specific errors in their interpretation of the law. Second, Plaintiff alleges hostile environment and discrimination claims without describing sufficient evidence to support claims of disability and race discrimination.

W.F. is a school of choice student in the District. Though he could have attended school in his resident district, W.F. and N.S., his mother, made the choice to pursue an education in the District utilizing their special education services. N.S. and W.F. have a history of refusing services, refusing to participate in services, and placing blame on others. Despite W.F.'s daily defiance, chronic absenteeism, and mistreatment of staff and peers, the District made every effort to provide W.F. with a free and appropriate public education. The District does not pretend that development and implementation of the IEPs was perfect. Though minor procedural errors may have occurred, the Courts have long recognized that procedural violations alone are insufficient to justify substantive remedies.

District staff worked tirelessly, diligently, and professionally to educate W.F. and provided

N.S. with almost **daily** documentation and communication regarding W.F. and his activities at school. The District promptly responded to emails from N.S., several administrators gave N.S. their personal cell phone numbers which she frequently texted, and staff were always engaging in a dialogue with both N.S. and W.F.

The District has attempted to provide W.F. with the appropriate support and work with N.S. Every request or complaint from either individual was met with an effort to fully investigate, understand, and remedy when appropriate. This is evidenced by the award of a mere 65 hours of compensatory education in reading to W.F. after a special education due process hearing officer dismissed the majority of his claims against the District.

Defendant is entitled to Summary Judgment on Plaintiff's claims arising under the IDEA because there is ample evidence that Defendant complied with IDEA and developed an IEP for W.F. under the implementing regulations that would enable him to receive educational benefits.

Defendant is entitled to Summary Judgment on Plaintiff's State and Federal claims of race discrimination because plaintiff was not subjected to severe **and** pervasive **and** objectively offensive race-based harassment. And the District was not deliberately indifferent to the two complaints that plaintiff has alleged.

Finally, Defendant is entitled to Summary Judgment of Plaintiff's disability discrimination claims because, for the reasons set forth in more detail below, there is no evidence of any violation.

## STATEMENT OF FACTS

**1.  THE IDEA AND ITS FRAMEWORK.**

The Individuals with Disabilities Education Act ("IDEA") is a comprehensive and complicated statutory scheme dedicated to the education of disabled students. 20 U.S.C. § 1400, et. seq. The core purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education ("FAPE")." § 1400(d)(1)(A). A FAPE comprises "special education and related services"—both "instruction" tailored to meet a child's "unique needs" and sufficient "supportive services" to permit the child to benefit from that instruction. §§ 1401(9), (26), (29).

Under the IDEA, an "individualized education program" ("IEP") serves as the "primary vehicle" for providing each child with the promised FAPE. *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see* § 1414(d). IEPs are created by the child's "IEP Team," which is a group of school officials, teachers, and parents that work collaboratively to identify the student's educational needs. §§ 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B). The IEP documents the child's current "levels of academic achievement," specifies "measurable annual goals" for how he can "make progress in the general education curriculum," and lists the "special education and related services" to be provided so that he can "advance appropriately toward [those] goals." §§ 1414(d)(1)(A)(i)(I), (II), (IV)(aa). Part of the IEP process is ensuring students with disabilities receive their education in the "least restrictive environment," or alongside their peers without disabilities to the maximum extent appropriate. 34 C.F.R. § 300.114.

When parents and educators disagree on "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child," the parent and student must file an administrative complaint with local school officials. *See* 20 U.S.C. § 1415(b)(6), (f)(1)(A). Then the parties are instructed by statute to hold a "[p]reliminary meeting"

with an eye toward talking through the grievance and trying for an early resolution. *Id*. § 1415(f)(1)(B)(i). They can also choose to resolve their differences through mediation. *Id*. § 1415(e). But if no settlement satisfactory to both sides comes to pass, the parties must proceed to a sort of trial, what IDEA calls an "[i]mpartial due process hearing." *Id*. § 1415(f). If the hearing still doesn't satisfy parent and student, an administrative appeal may follow. *Id*. § 1415(g)(1). If the parent and student still remain "aggrieved by the findings and decision made" after this appeal process, they may then (and only then) "bring a civil action" in federal court. *Id*. § 1415(i)(2)(A).

### 2. THE DISTRICT HAS PROVIDED W.F. WITH APPROPRIATE SUPPORTS AND SERVICES.

W.F. is currently an 11th student at Sturgis High School and has been eligible for special education and related services since 2014. His eligibility has been based on a designation of emotional impairment since 2018. N.S. reports various outside medical diagnoses. The student has a history of disciplinary removals for disruption, defiance and violent behaviors that existed well before the allegations in this lawsuit. As a result, the District provided the student with an IEP that addressed his emotional impairment and specifically his behavioral concerns. The IEP also addressed speech and academic issues as W.F. had difficulty completing work.

#### a. *Elementary School.*

W.F. has had an IEP at the District since 2014. His area of eligibility was speech and language impairment until 2018, so the District also provided accommodations related to his behaviors through a 504 Plan. W.F.'s special education eligibility changed to emotional impairment pursuant to his April 23, 2018, IEP. Supports and services provided to W.F. included repeating directions, seating arrangements that matched his needs, verbal cues, sensory strategies, visual supports, behavioral supports such as a behavior plan, frequent feedback, text-to-speech assistance, frequent breaks, alternative test areas, extra time to answer questions, access to the

resource room for additional supports, access to a school social worker and speech and language therapy. (**Exhibit A**). His IEP also noted outside medical diagnoses including autism spectrum disorder. (Id. at 4). W.F.'s IEP was amended on May 1, 2018, to provide additional support pursuant to N.S.' request. (**Exhibit B**). This amendment added cool down spaces when W.F. is frustrated, access to a timer/clock and alternatives to written responses including oral responses. (Id.)

Throughout elementary school, W.F. made good progress towards his goals. (**Exhibit C**). Despite W.F.'s excessive absences each school year[2], the District offered an IEP reasonably calculated to enable W.F. to make progress appropriately in light of his circumstances.

### b. Middle School.

The gravamen of this case concerns W.F.'s middle school years in the District. Leading up to the Covid pandemic of 2020, W.F. attended Sturgis Middle School as a 6th grader. Throughout the 2019-20 school year, W.F. used inappropriate language including swears and offensive slurs, was insubordinate with teachers, often disrupted class, engaged in physical aggression, and used threatening language on almost a daily basis. (**Exhibit E**). In response to these issues, the District conducted an evaluation and provided W.F. with a behavior support plan that addressed all of his concerning disruptive behaviors, including his defiance and violent actions towards others. (**Exhibit F**). The behavior plan lists several proactive strategies for W.F. including built-in sensory breaks, fidgets, talking to N.S. or staying home if too much change was anticipated in the school setting that day. (Id.) The Covid pandemic effectively shut down the school system in March 2020. Nevertheless, an IEP meeting was held for W.F. on April 16, 2020. (**Exhibit G**). The IEP identified

---

[2] During the 2017-18 school year, W.F. had at least 25.5 absences. (**Exhibit D** at 1). During the 2018-19 school year, W.F. had at least 35 absences. (Id. at 2).

37 discipline referrals leading up to Covid. (Id. at 2). Notably, W.F. accrued 50 absences—nine related to suspensions—which impacted his academic progress and peer/adult relationships in the school setting. (Id.) Prior to Covid, the District completed substantial evaluations of W.F., his progress, and behaviors. (**Exhibit H**; **Exhibit I**).

For the 7th grade school year, during 2020-21, W.F. was given the option of attending school virtually or in person. He ultimately decided to attend virtually, and the District accommodated this choice. W.F.'s overall academic performance improved during the 2020-21 school year and there were no behavioral concerns as W.F. was learning remotely. (**Exhibit J**). W.F. slightly regressed in his standardized testing reading scores in January 2021. (Id. at 2). Based on teacher observations of W.F.'s overall academic performance, they opined that he was progressing appropriately and his scores were more indicative of a lack of effort. (Id.) Teacher observation is a common, and effective, measure to collect data in special education. (**Exhibit K**).

Despite the progress W.F. made, the District nonetheless provided W.F. with additional accommodations. Stacey Richardson, the special education teacher assigned to W.F., made herself available to meet with W.F. one-on-one at set times. (**Exhibit L** at 520, 523-524). But W.F. largely refused any assistance from Ms. Richardson, as he would only occasionally check in with her. (Id.). Additionally, W.F. declined direct social work services as an accommodation because he did not like the social worker provided to the District. (Id. at pp 519, 529). The District offered W.F. group sessions as an alternative, but he did not attend those either. (**Exhibit J** at 3). In April 2021, N.S. opined that it was appropriate for W.F. to take at least a year break from speech therapy. (Id. at 8). W.F.'s IEP was updated in April 2021 and, because W.F. had no behavioral or social-emotional needs in the virtual setting, those areas were removed. (Id. at 3). Because W.F.

underwent extensive achievement testing in 2020, both data and N.S. determined no additional testing was required in 2021. (**Exhibit M**).

Prior to the start of the 2021-22 school year, the District implemented a new protocol for determining eligibility for virtual learning. If a family had more than one student in the District, *all* students in the household had to either be virtual or in-person. Because her daughter wanted to return to in-person learning, N.S. enrolled all her children—including W.F.—to return to in-person rather than virtual schooling.

When W.F. returned for the 2021-2022 school year, the District could not immediately amend W.F.'s IEP to re-add behavioral and social/emotional goals because N.S. refused to make herself available for an IEP meeting. Still, the District had a plan to address W.F.'s behaviors should they return—the District had a pre-existing behavior plan for W.F. developed before Covid and virtual learning.

Behavior meetings were held on October 5 and 18, 2021, and W.F.'s behavior plan was revised. (**Exhibit N**; **Exhibit O**). At this point in the school year, W.F. was engaging in the same disruptive behaviors that he exhibited before Covid. (**Exhibit P**). A Manifestation Determination Review[3] ("MDR") meeting was properly held on November 9, 2021, after the student and a classmate engaged in a fistfight. It was determined that his behavior was not a manifestation of his disabilities. (**Exhibit Q**). A second MDR was held on December 6, 2021, after the student got into another physical altercation. On November 29, 2021, W.F. threw a classmate to the floor and punched him while in the fetal position on the ground. (**Exhibit R**). The parents of the other

---

[3] An MDR is required if a disabled student may face exclusionary discipline exceeding 10 school days to determine whether the problem behavior is a manifestation of his disability.

assaulted student pressed charges. It was determined that the student's behavior was not a manifestation of his disabilities.

N.S. also sent an email on November 29, 2021, requesting a Functional Behavior Assessment ("FBA") and a meeting to discuss W.F.'s behavior plan and IEP. While IEP and behavior plan meetings were scheduled after W.F.'s assault was addressed, an FBA was not completed until the end of the 2021-22 school year. Though an FBA was not immediately completed, the District had already reinstated the student's prior behavior plan that addressed these same behaviors. The District did not need to complete a new FBA because the behaviors observed were the same behaviors observed by the District prior to W.F.'s virtual learning period. (**Exhibit K** at 6). A new evaluation is only required if the cause of the behavior is *not clear* or the student exhibits new behaviors. (Id.); 34 C.F.R. § 300.530(f)(1). Therefore, instead of immediately conducting a new behavior evaluation, the District appropriately reimplemented the behavior plan that was in place as of March 2020. There is no dispute that the District immediately reinstated W.F.'s behavioral plan once these behaviors reemerged. (**Exhibit AA** at 44).

On December 3, 2021, N.S. also attended a truancy conference because W.F. had not been attending school regularly. (**Exhibit D** at 8-12). N.S. disputed the District's reported attendance, arguing that many tardies were actually the student using his IEP-provided break time. However, several absences stemmed from a hunting trip, a trip to see the student's father out of state, and a work trip mom felt she had to take the student on because she did not trust anyone. W.F.'s attendance record also reflects behavioral and disciplinary absences. (Id.)

Because of the nature of the assault on November 29, 2021, W.F. was recommended for expulsion. W.F. and N.S. attended a due process meeting on December 10, 2021, with Assistant Superintendent Nicole Gittinger. Ms. Gittinger did not recommend W.F. proceed to the Board of

Education for an expulsion hearing, and so he returned to school. On December 13, 2021, *another* meeting was held to work on the student's behavior plan. (**Exhibit S**).

Upon a return to the District after winter break, W.F.'s behavior plan was updated again on January 5, 2022. (**Exhibit T**). Another behavior plan meeting was held on January 9, 2022. (**Exhibit U**). On January 20, 2022, an IEP team meeting was held. (**Exhibit V**). N.S. reported W.F. is good at advocating for himself, but she is concerned about his behavior plan being followed. (Id.) At the time of this IEP, W.F. had earned 28 behavior referrals for being disruptive, non-compliance/insubordination, inappropriate language/comments, disrespect, physical contact/aggression and skipping. (Id.) W.F.'s social work services were increased from consult to direct services. (Id.)

### 3. DUE PROCESS PROCEEDINGS.

Plaintiff filed a due process complaint on April 13, 2022. Plaintiff made numerous complaints against the District, including that the District failed (1) to develop appropriate IEPs for the student; (2) to conduct comprehensive evaluations; (3) to conduct an FBA within 10 school days of a parent request; (4) to implement positive behavioral intervention supports; (5) to provide extended school year services; (6) to review and revise the student's IEPs; (7) to consider all relevant information at MDRs; (8) to provide the student with services after 10 removals; (9) to provide the student with the least restrictive environment; and (10) to provide compensatory education.

A due process hearing was held on October 17, 18, and 19, 2022. Plaintiff offered the testimony of W.F., N.S. and two experts, Dr. David Bateman and Nathan Vanderweele. The District offered the testimony of Ms. Gittinger and Ms. Richardson. The Administrative Law Judge ("ALJ") reviewed 49 exhibits admitted into the record in issuing her decision. This included IEPs,

District and independent evaluations, communications between N.S. and District staff including texts and emails, disciplinary records, educational records, and behavior plans. Following the hearing, ALJ Lindsay Wilson issued a thorough 73-page Decision and Order. (**Exhibit W**).

The ALJ largely dismissed the Plaintiff's due process claim. Specifically, the ALJ **rejected** Plaintiff's claims that (1) the District failed to develop appropriate IEPs for the student at the April 2020 and January 2022 IEP meetings; (2) the District failed to implement positive behavioral intervention supports ("PBIS") to support the student's specific behavioral needs; (3) the District failed to provide the student with extended school year services from two years of the date of filing; (4) the District failed to consider all relevant information in finding that the student's behavior was not a manifestation of his disability at the November 9 and December 6, 2021 MDR meetings; (5) the District failed to consistently provide the student with services after 10 removals within a school year; (6) the District failed to educate the student in the least restrictive environment; and (7) the District failed to provide the student with the appropriate amount of compensatory education.

In the limited circumstances where the ALJ did find a denial of FAPE, she ordered a remedy of 65 hours of general compensatory education in the area of reading to be completed within six months. This was far below what Plaintiff had requested. Though Plaintiff now claims that the award was low, it is undisputed that W.F. has refused to complete most of the offered compensatory education.

The District did offer compensatory services as ordered, but W.F. largely refused the District's offer to provide services in reading. The District went above and beyond to even offer transportation services so W.F. could attend compensatory education sessions. (**Exhibit CC**). But N.S. declined this offered accommodation as well. As a result of W.F.'s refusal to complete the

compensatory education, the timeline was extended for the services, and ultimately the Michigan Department of Education concluded that the services offered by the District had met the requirement of the ALJ's decision. (**Exhibit BB**). W.F. testified as to why he refused the schools' repeated efforts: he simply does not want to do the extra, unnecessary schoolwork. (**Exhibit Z** at 11-12; **Exhibit AA** at 83). Now, Plaintiff appeals all portions of the ALJ's decision wherein she did not find a denial of FAPE. After refusing to complete even a fraction of the 65 hours of compensatory education that was awarded, Plaintiff now inexplicably requests more than 10 times the amount of compensatory education.

Special Education Expert Cherie Wager reviewed the underlying due process record and found the conclusions of law were reliable, trustworthy, consistent, and appropriate. (**Exhibit K** at 5). IEPs revealed the District developed individualized standards for W.F. and an organized way to measure his progress. (Id. at 6). Further, the District acted in good faith to provide W.F. with FAPE by constantly seeking and implementing various educational strategies in the appropriate setting. (Id.).

### 4. RACIAL DISCRIMINATION CLAIMS.

Plaintiff's lawsuit also makes a meager attempt to allege race harassment. Plaintiff first alleges that a middle school teacher, Ms. Littlefield, was recorded using the N-word in class in November 2021. Apparently, the recording related to a student using the N-word in class. Ms. Littlefield reacted to hearing the slur and asked the class to stop saying the N-word. (**Exhibit Z** at 78). Students who had a copy of the video allegedly continued to share it throughout the school. The District, indeed, attempted to put an end to students sharing the video. (**Exhibit AA** at 105). W.F. was not in any of Ms. Littlefield's classes. (**Exhibit Z** at 77). While Plaintiff contends W.F. was punished for bringing up the teacher's use of the N-word in the video—this is untrue. W.F.

did not report the incident to the school. (**Exhibit Z** at 80). However, W.F. *was* overheard talking about the incident with students and using the N-word. (**Exhibit P** at 4; **Exhibit AA** at 107). He was told not to use the slur in class.

Additionally, on or around September 15, 2022, W.F. claims another student targeted him based on his race, used racial slurs, and threatened to shoot him. That student, M.M., is Hispanic. On this occasion, W.F. admitted to instigating a fight with M.M. based on M.M. pushing W.F.'s friend down weeks prior. (**Exhibit Z** at 90-94). After the fight began, M.M. used the N-word during the fight. (Id. at 93). After school that day, M.M. posted a picture of a bullet on social media with a "W" on it. N.S. reported this information to the District. (**Exhibit AA** at 119). As soon as the District learned of the social media posts, the District contacted police, a home safety search was conducted, the District performed a threat assessment, and the District suspended that student from school and placed him on a safety plan. (Id. at 119, 125). M.M. was criminally charged, pled guilty and was placed on probation. Interestingly, N.S. spoke on the student's behalf at the sentencing.

### 5. THIS LAWSUIT.

Parent N.S., on behalf of her minor son W.F., alleges the District discriminated against W.F. on behalf of his disability in violation of the IDEA, Section 504 of the Rehabilitation Act ("Section 504"), Title II of the Americans With Disabilities Act ("Title II"), and Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"). 20 U.S.C. § 1400, *et seq*.; 29 U.S.C. § 794 *et seq.*; 42 U.S.C. § 12101 *et seq.*; M.C.L. 37.1101 *et seq.* Plaintiff's lawsuit also makes multiple claims of alleged racial harassment in violation of Title VI of the Civil Rights Act of 1964 ("Title VI") and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"). 42 U.S.C. § 2000d *et seq.*; MCL 37.2301 *et seq.*

## STANDARD OF REVIEW

A court will grant a party's motion for summary judgment when the movant shows that "no genuine dispute as to any material fact" exists. Fed. R. Civ. P. 56(a). In reviewing the motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot merely rest on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993).

## I.    THE ADMINISTRATIVE LAW JUDGE APPROPRIATELY CONSIDERED THE EVIDENCE AND INTERPRETED THE LAW.

Though this motion is brought pursuant to Fed. R. Civ. P. 56, two standards of review actually apply because the gravamen of this case concerns Plaintiff's appeal of the underlying due process decision by the ALJ. Under the IDEA, a "party aggrieved by the findings and decision" of an administrative proceeding may "bring a civil action ... in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A). The district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision

on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id*. at § 1415(i)(2)(C).

As a preliminary matter, courts do not review administrative special education decisions when plaintiffs do not explicitly challenge them. *Sharbowski v. Utica Cmty. Sch.,* No. 18-CV-10869, 2019 WL 587274, at *8 (E.D. Mich. Feb. 13, 2019). Here, Plaintiff has not provided this Court with the records from the administrative proceedings, as required by law. 20 U.S.C. § 1415(i)(2)(C)(i). This Court may not have jurisdiction to entertain Plaintiff's appeal where they have failed to properly submit the underlying administrative record. Additionally, when the gravamen of Plaintiff's Complaint is the denial of FAPE, and she seeks relief for the denial of FAPE, then the exhaustion of IDEA's procedures is first required. *Fry v. Napolean Cmty Schs.*, 580 U.S. 154, 170-71 (2017); *see also Perez v. Sturgis Pub. Schs.*, 598 U.S. 142 (2023) (holding the IDEA exhaustion requirement does not preclude a lawsuit for compensatory damages). Federal law sets a 2-year time limit on challenging IEPs. 34 C.F.R. 300.507(a)(2). Plaintiff filed the due process complaint on April 13, 2022, thereby limiting the IDEA appeal to April 13, 2020, through April 13, 2022. Now, Plaintiff improperly alleges IDEA violations predating April 13, 2020, without exhausting administrative remedies. Because Plaintiff did not satisfy this exhaustion requirement, this Court cannot consider allegations predating April 13, 2020, when considering Plaintiff's alleged IDEA violation. *See Fry*, 580 U.S. at 170-71; *Perez*, 598 U.S. 142.

The Supreme Court has recognized that the statutory provision in the IDEA that permits review by courts of administrative decisions "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 206 (1982); *Deal v. Hamilton Cnty Bd. of Ed.*, 392 F.3d 840, 849 (6th Cir. 2004); *Doe v. Bd. of Ed. of Tullahoma City Sch.*, 9

F.3d 455, 458 (6th Cir. 1993). As the Sixth Circuit has observed, "[f]ederal courts are 'generalists with no expertise in the educational needs of handicapped students.'" *Metro. Bd. of Pub. Educ. v. Guest*, 193 F.3d 457, 464 (6th Cir. 1999) (quoting *Crocker v. Tennessee Secondary Sch. Athletic Ass'n.*, 873 F.2d 933, 935 (6th Cir. 1989)).

In light of this, the Supreme Court has held that "due weight **shall** be given" to the findings in administrative proceedings. *Rowley*, 458 U.S. at 206 (emphasis added); *see also Tullahoma*, 9 F.3d at 458 (district courts must apply a "modified de novo" standard of review in IDEA appeals and "should give due weight to the state administrative proceedings in reaching its decision"). "The amount of weight due to administrative findings depends on whether the finding is based on educational expertise." *Deal,* 392 F.3d at 849. When educational expertise is relevant to an ALJ's finding, the Court gives those findings more weight. *McLaughlin v. Holt Pub. Schs. Bd. Of Ed.*, 320 F.3d 663, 669 (6th Cir. 2003); *see also Deal*, 392 F.3d at 865 ("the ALJ is a representative of the state presumed to have both the educational expertise and the ability to resolve questions of educational methodology that the federal courts do not have").

The Sixth Circuit has interpreted "due weight" to mean that "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich v. Bd. of Educ.*, 208 F.3d 560, 566 (6th Cir. 2000); *see also Troy Sch. Dist. v. Boutsikaris*, 250 F. Supp. 2d 720, 729 (E.D. Mich. 2003). A court should, accordingly, "rely upon the hearing officer's presumed educational expertise, as long as the material facts underlying the officer's determination are not in dispute." *Burilovich*, 208 F.3d at 567 (citation omitted). Moreover, the ALJ is charged with the responsibility of judging the credibility of witnesses to assist the court in the event of judicial

review. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2014) ("[Courts] must accept the state agency's credibility determinations unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion").

Plaintiff has not identified any evidence that the ALJ failed to consider, nor have they identified any specific errors in her interpretation of law. Indeed, the ALJ considered a substantial amount of live testimony, including educational expert testimony, IEPs and evaluations, and precedent in providing her well-reasoned and thorough 73-page decision. The ALJ properly gave due weight to educational expertise in the underlying due process proceedings, as this Court now should, too. Unable to conjure any ignored evidence or cite erroneous legal conclusions, Plaintiff simply asks this court to substitute its judgment for that of the educational expert that reviewed the due process hearing, contrary to the modified de novo review standard. *See Rowley*, 458 U.S. at 206; *Burilovich*, 208 F.3d at 567. A modified de novo review of the administrative proceedings can only reasonably result in this Court affirming the decision of the ALJ.

In adjudicating the IDEA claims in this case, the burden of persuasion clearly rests with the party who is seeking relief. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 54-58 (2005). The burden of proof is also properly allocated to Plaintiff since they seek to appeal the administrative decision in this case, and it is their obligation to show that the ALJ's decision was erroneous regardless of who was the prevailing party at the administrative level. *Cordrey v. Euckert*, 917 F.2d 1460, 1466 (6th Cir. 1990), *cert. denied*, 499 U.S. 938 (1991).[4]

When a parent challenges the appropriateness of a program or placement offered to their disabled child by a school under the IDEA, a reviewing court must undertake a twofold inquiry.

---

[4] In the event Plaintiff does not file a dispositive motion by the Court issued deadline, Plaintiff effectively concedes they cannot meet the burden of proof and the ALJ's decision should be affirmed.

*Rowley*, 458 U.S. at 206-07. First, the court must ask whether the school has complied with the procedures set forth in the IDEA. *Id*. Second, the court must determine whether the IEP, developed through the IDEA's procedures, is reasonably calculated to enable the child to receive educational benefits. *Id*. There is no violation of the IDEA so long as the school has satisfied both requirements. *Id*.; *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001).

Under the first prong of *Rowley*, even if the Court concludes that Defendant did not comply with IDEA's procedural requirements, such a finding does not necessarily mean Plaintiff is entitled to relief. Rather, the Court must determine as to whether the alleged procedural violations have caused substantive harm to Plaintiff. *See Metro. Bd. of Pub. Educ.,* 193 F.3d at 464-65. Only if the Court finds that a procedural violation has resulted in such *substantive harm* may the court "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). The Supreme Court has held that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 399 (2017).

In addition to the federal obligations, Michigan also requires that an IEP be "designed to develop the maximum potential" of a handicapped child. MCL §§ 380.1701(a), 380.1711(1)(a), and 380.1751(1). However, this does not require a student to receive the "best education possible, or require 'a model education, adopting the most sophisticated pedagogical methods without fiscal or geographic constraints.'" *Dong v. Bd. of Ed. of the Rochester Cmty. Schs.*, 197 F.3d 793, 803 (6th Cir. 1999). As described in detail below, at all times Defendant complied with State and Federal regulations by designing an IEP that would promote the maximum potential for W.F.

The record evidence shows W.F. was provided with a FAPE, as he undisputedly made progress that was meaningful in relation to his potential. Testing of W.F.'s academic achievement

17

levels showed that they fell in the average range, as would be expected. (**Exhibits H, I, Y**). There was some improvement areas noted for W.F.—namely in the subject of reading. (**Exhibits G, J, V**). However, testing analytics showed W.F. was engaging in "rapid guessing" in the area of reading. (Id.; **Exhibit L** at 542, 620). Meaning, because of W.F.'s dislike of testing, his goal to finish as quickly as possible compromised his performance on tests. (Id. at 629-30). W.F.'s educators, who observed him in the classroom every day and worked one-on-one with him to encourage advancing reading skills, found he was capable of reading when the content interested him. (Id. at 576, 620).

W.F. underwent comprehensive psychological testing in the Fall of 2022 at the start of his 9th grade school year. The report provided: "Overall, the results [] indicate that [W.F.'s] **academic achievement is in the average range**." (**Exhibit Y** at 8) (emphasis added). Additionally, "[W.F.'s] cognitive abilities are average when compared to his same age peers." (Id. at 24). The evaluation confirmed W.F.'s low processing speed requiring him "more time to take in, make sense of, and respond to information." (Id.). Acknowledging this hurdle, W.F.'s IEPs have included additional time for answering questions and turning in work, repetition of directions, the ability to have someone else read questions aloud, and giving oral answers in lieu of written. (**Exhibits G, J, V**; **Exhibit Z** at 26-29; **Exhibit AA** at 76-77).

The main factor affecting W.F.'s progress has always been a lack of consistent effort and lack of follow-through on things he had control over. Moreover, W.F. has repeatedly demonstrated a disdain for the traditional learning environment. (**Exhibit Z** at 11-12). His goals and interests are more aligned with working with heavy equipment. (Id. at 14-15, 22-23; **Exhibit X**). His behaviors—both related and unrelated to his disabilities—have also affected his progress. (**Exhibit Z** at 35-36, 40, 50-51; **Exhibits E, P**). Plaintiff has also declined services. (**Exhibit J**). Plaintiff

cannot reasonably attribute any lack of progress to the District when W.F. and N.S. declined services and were noncompliant with services offered.

Now, Plaintiff asks this Court to award remedies that are actually detrimental to W.F. Plaintiff requests compensatory education in the form of two and a half years of one-on-one tutoring in reading, writing, and mathematics and counseling in behavioral and mental health for a total of 710 hours. (ECF No. 1, PageID.77). This is unrealistic. W.F. refused to complete the awarded 65 hours of compensatory education in reading from the ALJ. It makes little sense to award Plaintiff additional compensatory education, when W.F. sent a clear message that he will not do the minimum amount of work because he believes it is unnecessary. Regarding the additional claims of writing and mathematics, District and outside evaluations demonstrate that W.F. is functioning within the average IQ range. W.F. has not been identified as having additional disabilities in the areas of writing and math, so the request to address these two issues is an attempt to bury W.F. in unnecessary instruction. (**Exhibit K**).

## II.    PLAINTIFF'S DISABILITY DISCRIMINATION CLAIMS FAIL AS A MATTER OF LAW.

Generally, Section 504 and Title II prohibit discrimination on the basis of disability. These discrimination claims can be complicated to litigate. Plaintiffs must establish each of the following elements to prevail under either law:

> (1) The plaintiff is a "handicapped person" under the [law]; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 635 (6th Cir. 2013) (quoting *Campbell v. Bd. of Ed. of Centerline Sch. Dist.*, 58 Fed. Appx. 162, 165 (6th Cir. 2003)). Under, the third prong of the test:

> **A showing of discrimination requires evidence of something more than a school district's failure to provide a FAPE**. A plaintiff may allege disability discrimination under two available theories: intentional discrimination and failure to reasonably accommodate. An intentional discrimination claim lies where the defendant treated someone less favorably on account of his disability; 'proof of discriminatory motive is crucial.' To prevail in a failure to accommodate claim, the plaintiff must show that the defendant reasonably could have accommodated his disability but refused to do so, and that this failure to accommodate "impeded his ability to participate in, or benefit from, the subject program." The plaintiff must establish both that his preferred accommodation was reasonable, and that the accommodation provided to him was unreasonable. Courts are mindful of school administrators' educational expertise in reviewing the reasonableness of their selected accommodations.

*Knox Cnty, Tennessee v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023) (internal citations omitted) (emphasis added). In other words, merely establishing a violation of the IDEA alone does not establish disability discrimination under Section 504 or Title II. *Id.; S.S. v. E. Ky. Univ*., 532 F.3d 445, 453 (6th Cir. 2008) (quoting *Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524, 528-29 (4th Cir. 1998)); *Li v. Revere Local Sch. Dist.*, No. 21-3422, 2023 WL 3302062, at *12 (6th Cir. 2023).

### A.  Many Of Plaintiff's Claims Are Barred By The Statute Of Limitations.

Neither Section 504 nor Title II expressly contain a limitations period. *See Southerland v. Hardaway Mgmt. Inc*., 41 F.3d 250, 254 (6th Cir. 1994). In the absence of a limitations period, courts must borrow one from the most analogous state cause of action. *McCormick v. Miami Univ*., 693 F.3d 654, 663 (6th Cir. 2012). The statute of limitations for personal injury cases in Michigan, including PWDCRA claims, is three years. M.C.L. § 600.5805(2). Thus, the three-year statute of limitations period applies to Plaintiff's Section 504 and Title II claims. *Taylor v. Bringman*, No. 1:22-CV-519, 2023 WL 2563662 (W.D. Mich. Feb. 10, 2023), report and recommendation adopted, 2023 WL 2562310 (W.D. Mich. Mar. 17, 2023).

Plaintiff filed suit on May 1, 2023, and relies on allegations dating back to 2017. Thus, since the statute limitations is 3 years, any claims alleged to have occurred before May 1, 2020,

are barred by the statute limitations and should be dismissed.

### B. Plaintiff Was Only Entitled To A Reasonable Accommodation That Allowed Meaningful Access To The School And Its Programs.

Under Section 504 and Title II the District was only required to provide W.F. with "reasonable accommodations" to allow him "meaningful access" to the building and the programs and activities of the school to avoid discrimination. *Alexander v. Choate*, 469 U.S. 287, 301 (1985); 42 U.S.C. § 12112(b)(5)(A); *Bedford v. Michigan*, 722 Fed. Appx. 515, 519 (6th Cir. 2018); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n. 3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards"). "It naturally follows that when an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, 'reasonable' or not, need be provided by the grantee." *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 680 (E.D.N.Y. 2012), aff'd sub nom. *Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 Fed. Appx. 95 (2d Cir. 2013).

In the specific context of considering a student's request for an accommodation, the Sixth Circuit has found that a student is "entitled only to a 'reasonable' public accommodation of his disability." *Campbell*, 58 Fed. Appx. at 167; *Yaldo v. Wayne State Univ.*, 266 F.Supp.3d 988, 1010 (E.D. Mich. 2018). The student is not entitled to the "best possible accommodation," or to the accommodation that they request or prefer. *Campbell,* 58 Fed. Appx. at 167 (internal quotations omitted). Neither Section 504 nor Title II required the District to grant every accommodation allegedly demanded by W.F. Rather, the District was only required to make a reasonable accommodation, not the exact accommodation requested. *Tucker v. Tennessee*, 539 F.3d 526, 541 (6th Cir. 2008) ("[a public entity] is not required to meet [a disabled person's] exact requests. What is required by the ADA [] is an alternative which allows disabled persons to communicate as

effectively as a non-disabled person") (citing 28 C.F.R. § 35.160); *Bedford,* 722 Fed. Appx. at 519 (holding Title II "requires reasonable accommodations for persons with disabilities, to provide them 'an even playing field,' but does not require that disabled persons be treated preferentially or necessarily be given the accommodation of their choice").

Further, "Courts must also give deference to professional academic judgments when evaluating the reasonable accommodation requirement." *Campbell,* 58 Fed. Appx. at 166 (quoting *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 435 (6th Cir. 1998)). The Sixth Circuit has expanded this deferential treatment and held the school retains the "ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Hankins v. The Gap*, 84 F.3d 797, 800–01 (6th Cir. 1996) (quoting 29 C.F.R. pt. 1630, app. at 415); *Campbell*, 58 Fed. Appx. at 167 ("So long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under Section 504"). Accordingly, under Title II a student "is not entitled to a particular reasonable accommodation if another reasonable accommodation is provided." *Trepka v. Bd. of Educ.*, 28 Fed. Appx. 455, 459–60 (6th Cir. 2002). To prevail, the student must demonstrate a genuine issue of material fact with regard not only to his entitlement to his requested accommodation, but also to the inadequacy of the offered alternatives. *Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997).

Courts have regularly dismissed cases where reasonable accommodations were provided, even though they are not the accommodations the plaintiff requested, or even the best accommodation. *See Campbell,* 58 Fed. Appx. at 163. In *Campbell*, the student requested that the school enroll him in a private tutorial course at district expense to accommodate his dyslexia. The

school denied the request and instead assigned him to its standard remedial reading program, which was inferior to the reading program requested. Even though the student's requested accommodation was reasonable, the Court still dismissed the claim because the student had not proven that the school's chosen accommodation was "not a reasonable accommodation of [his] personal instructional requirements." *Id*. at 167; *see also B.M. v. Bd. of Ed. of Scott Co., KY*, 2008 WL 4073855 (E.D. Ky. 2008) (student's Title II and Section 504 claims dismissed because her diabetes was reasonably accommodated, even though they were not the accommodations she wanted).

Here, W.F. neither pleads nor provides evidence to indicate what accommodation he was allegedly not provided. The record evidence shows that District staff worked with W.F. and N.S. almost every day to determine what accommodations would work and be most effective for W.F. Moreover, Plaintiff has offered no evidence that the accommodations offered and provided by the District were anything but reasonable.

### C. Plaintiff Has Not Established Deliberate Indifference To Federally Protected Rights.

Even if Section 504 and Title II were violated because W.F. did not receive a reasonable accommodation, that is not enough to recover compensatory damages against the school district. Plaintiff must also demonstrate that the discrimination was **intentional**. *R.K. v. Bd. Of Ed. Scott Co. KY*, 637 Fed. Appx. 922, 925 (6th Cir. 2016). Surmounting that evidentiary hurdle requires proof that the school "acted with 'deliberate indifference' toward his federally-protected rights" under Section 504 and Title II. *Id.*; *see also Tucker v. Tennessee*, 443 F. Supp. 2d 971, 973 (W.D. Tenn. 2006) ("Compensatory damages may be recovered under the ADA only if the plaintiffs prove intentional discrimination").

The Supreme Court has described deliberate indifference as "a stringent standard of fault,

requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the Cnty Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). Deliberate indifference is shown only where the official responds to **known acts of discrimination** in a "clearly unreasonable" manner in light of the known circumstances. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). To establish deliberate indifference, it is insufficient for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties. Rather, the plaintiff must show that the "defendants' conduct amounted to a tacit authorization" of intentional discrimination. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 513 (6th Cir. 1996).

*R.K.* is instructive. 637 Fed. Appx. 922. In *R.K*, the disabled student sought money damages for the district's decision to assign him to a school with a full-time nurse. The court found no deliberate indifference on the part of the district. The court reasoned that the disabled student failed to produce evidence that the district knew that it would likely violate his rights when it assigned him to the particular school. The court also reasoned that the district did not ignore the disabled student's parents' request for help, and **instead the parents simply disagreed with the district** as to whether the nurse was necessary.

The fact that a school district attempted to accommodate, even if imperfectly, establishes a lack of intentional discrimination. *See e.g., I.A. v. Seguin Ind. Sch. Dist.*, 881 F. Supp. 2d 770, 780 (W.D. Tex. 2012) (court found no intentional discrimination when the district denied a student's request that the school provide accessible desks for his wheelchair, because the school maintained open communication with the family and attempted to accommodate the student in other ways). Moreover, disagreement with an IEP team's decision does not amount to deliberate indifference. *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 39 172, 187 (E.D.N.Y. 2015).

Here, as in *R.K.*, the District always attempted to accommodate W.F. and N.S. The District

communicated with N.S. about strategies to accommodate W.F. almost daily. Plaintiff did not propose better reasonable accommodations other than expressing dissatisfaction. Thus, the District's attempt to accommodate W.F., even if imperfect, establishes a lack of intent to discriminate.

### D.  Plaintiff's Section 504 Claim Should Also Be Dismissed For Independent Reasons.

While the rights and remedies afforded to plaintiffs under Section 504 and Title II are almost entirely duplicative, Section 504 has a heighted causation standard. *S.S.,* 532 F.3d at 452-53. Section 504 requires proof that disability discrimination was the **sole** reason for the alleged act. *Id.* The Sixth Circuit has interpreted the use of the word "solely" as the **only** reason. *See White v. Kentuckiana Livestock Mkt., Inc*., 397 F.3d 420, 426 (6th Cir. 2005). Thus, Plaintiff has the burden of showing that the discrimination based on his disability was the *only reason* for denying him access to the building. *Jones v. Potter*, 488 F.3d 397, 409 (6th Cir. 2008).

Moreover, alleged discrimination cannot be the sole reason when there are other nondiscriminatory reasons present. *See Id.*; *Whitaker v. Tennessee Valley Auth. Bd. of Directors*, No. 3:08-1225, 2010 WL 1493899, at *5 (M.D. Tenn. Apr. 14, 2010) (dismissing Section 504 claim where the plaintiff acknowledged a non-discriminatory reason could have also contributed to the decision, thus the sole reason was not discriminatory). Here, W.F. was often noncompliant with accommodations or refused services offered. Thus, alleged discrimination cannot be the sole reason where there are other nondiscriminatory factors present.

### E.  Plaintiff's PWDCRA Claim Fails For The Same Reasons.

Plaintiff's claim under the PWDCRA fails for the same reason as their Section 504 and Title II claims fail. *See Bennett v. Hurley Med. Cen*., 86 F.4th 314, 324 (6th Cir. 2023) (The PWDCRA "substantially mirrors" Title II, and these claims are "generally analyzed identically");

*R.K.*, 637 Fed. Appx. at 925.

**F.  Plaintiff's PWDCRA Claim Is Also Preempted.**

PWDCRA is a general civil rights statute applicable to disabled persons. MCL §37.1101. The Michigan Special Education Act ("MSEA"), MCL §380.1701, is a statute that contains special rules for providing a FAPE to disabled students and was enacted under the IDEA. 20 U.S.C. § 1400. Michigan Courts have held that when the challenged conduct concerns a disabled child's FAPE and could be dealt with in the student's IEP, then the plaintiff's claims under the PWDCRA are precluded under the MSEA and should be dismissed. *See Woolcott v. State Bd. of Ed.*, 351 N.W.2d 601, 605 (Mich. Ct. App. 1984)*; Jenkins v. Carney-Nadeau Pub. Sch.,* 505 N.W.2d 893, 894 (Mich. Ct. App. 1993); *Miller v. Lord*, 686 N.W.2d 800, 802-803 (Mich. Ct. App. 2004).

Here, Plaintiff's theory is that Defendant discriminated against W.F. based on provisions of his IEP and behavior plan, which is incorporated into his IEP. Therefore, under *Jenkins*, *Woolcott*, and *Miller* Plaintiff's PWDCRA claim should be dismissed

**III.    PLAINTIFF'S TITLE VI CLAIM FAILS AS A MATTER OF LAW.**

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits race discrimination in "any program or activity receiving federal financial assistance." Title VI, like Title VII, "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (citing *Choate*, 469 U.S. at 293).

Because they are nearly identical Spending Clause statutes, courts have analyzed Title VI student harassment claims the same as Title IX claims. *Davis*, 526 U.S. 629. A school is liable for student-on-student harassment under Title VI if the student pleads and ultimately proves: (1) racial harassment that "was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school"; (2) the

school "had actual knowledge of the [racial] harassment"; and (3) the school "was deliberately indifferent to the harassment." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012).

### A.  Plaintiff Has Not Identified Actionable Peer Harassment.

The standard for actionable conduct under Title IX is much higher than under Title VII. *See Davis*, 526 U.S. at 653. To be actionable, the harassment must be severe **AND** pervasive **AND** objectively offensive sex-based harassment. *Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 621 (6th Cir. 2019). "'Severe' means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass. The *Davis* Court made an explicit admonishment that 'simple acts of teasing and name-calling' are not enough, 'even where these comments target differences in gender.'" *Id.* (citing *Davis*, 526 U.S. at 652). "'Pervasive' means 'systemic' or 'widespread.'" *Id.* "'Objectively offensive' means behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim." *Id.* "Although it is possible to assert a Title IX claim based exclusively on verbal harassment, it is uncommon, because courts tend to consider verbal harassment to be less severe than physical harassment." *Doe v. Plymouth-Canton Cmty. Sch.*, No. 19-10166, 2022 WL 1913074, at *8 (E.D. Mich. June 3, 2022).

Illustrating this heightened standard, the Sixth Circuit has found that occasional use of the "'N word' and other racially demeaning terms" on their own does not satisfy the severe **and** pervasive standard. *See Smith v. Leggett*, 220 F.3d 752 (6th Cir. 2000) (interpreting the lower Title VII standard).

Title IX's actionable harassment standard is indeed a high bar. In *Pahssen*, for instance, the Sixth Circuit held that harassment comprising a shove into a locker, an "obscene sexual

gesture," and a "request for oral sex" did "not rise to the level of severe, pervasive, and objectively offensive conduct." 668 F.3d at 363. In *Plymouth-Canton*, the Court found that ten reports of stalking and verbal harassment, which included repeatedly telling the student rape victim that she should get raped again, and one incident of physical assault over a one-year period did not meet the high standard of severe and pervasive harassment. 2022 WL 1913074, at *8.

In this case, W.F. asserts that he experienced a racially hostile environment at the District. He bases this claim on (1) an allegation the District did not respond to W.F. repeatedly reporting a teacher was recorded using the N-word and (2) inappropriately disciplining W.F. for his involvement in an altercation wherein another student—M.M.—targeted W.F. because of his race. (ECF No. 1, PageID.48-50). Indeed, W.F. admitted he never had the teacher accused of using the N-word at the District, did not witness the incident, acknowledged the teacher was recorded telling other students to stop using the N-word and that was a good thing, he never reported her using the N-word to the District and he was not aware of her using the word at any other time. (**Exhibit Z** at 77-80, 86-87; **Exhibit AA** at 105, 108-109); *see Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 291 (1998) (comments by a teacher alone are insufficient to hold school district liable). Additionally, W.F. admitted to instigating the fight with M.M. (**Exhibit Z** at 92; **Exhibit AA** at 119). As soon as the District learned of M.M.'s subsequent social media posts threatening W.F., police were contacted, a threat assessment was performed, M.M. was suspended from school and placed on a safety plan. (Id. at 124-125).

When compared with *Pahssen* and *Plymouth-Canton*, the alleged conduct here—even if substantiated—is not severe **and** pervasive **and** objectively offensive enough to satisfy the heightened Title IX standard. Plainly stated, two sporadic incidents occurring across two different school years does not amount to severe and pervasive harassment. This alleged conduct is not even

severe or pervasive enough to satisfy the lower Title VII standard. *See e.g., Leggett*, 220 F.3d 752 (occasional use of the "'N word' and other racially demeaning terms" by co-employees and telling racist jokes was not severe or pervasive enough under Title VII); *Stacy v. Shoney's, Inc.*, 142 F.3d 436 (6th Cir. 1998) (not severe or pervasive under Title VII where a male supervisor made **continual** comments about the female plaintiff's appearance, touched her breast, leered at her, and told her that if he had someone like her, he would never let her leave the house).

### B. Defendant Was Not Deliberately Indifferent To The Known Acts of Actionable Harassment.

Deliberate indifference is a "high bar" that only requires that school administrators respond to known student-on-student harassment in a manner that is not "clearly unreasonable in light of the known circumstances." *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.,* 819 F.3d 834, 848 (6th Cir. 2016). The modifier "clearly" is important. It means that deliberate indifference is "not a 'mere 'reasonableness' standard.'" *Id*. Thus, a showing of negligence, or even "a collection of sloppy, or even reckless, oversights," does not suffice. *Claiborne Cnty.*, 103 F.3d at 508.

To evaluate deliberate indifference, courts are to "ask not whether the school's efforts were ineffective but whether they amounted to 'an official decision ... not to remedy the violation.'" *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 968 (6th Cir. 2020). "Ordinarily, 'deliberate indifference' means that the defendant both knew and consciously disregarded the known risk to the victim." *Kollaritsch*, 944 F.3d at 621. A plaintiff fails to show deliberate indifference where "the school's disciplinary and remedial responses were reasonably tailored to the findings of each investigation." *Gordon v. Traverse City Area Pub. Schs.*, 686 Fed. Appx. 315, 324 (6th Cir. 2017).

The "clearly unreasonable" standard is intended to afford flexibility to school administrators. *Davis*, 526 U.S. at 648. As such, courts have identified certain guideposts on the

deliberate indifference standard. First, school administrators are not required to "remedy" or "'purge their schools of actionable peer harassment' or 'engage in particular disciplinary action' to avoid Title IX liability." *Stiles*, 819 F.3d at 848.

The Sixth Circuit has clarified that the occurrence of further harassment after responding to actionable harassment is not enough by itself to establish deliberate indifference. *Kollaritsch*, 944 F.3d at 622. For example, in *Pahssen*, 668 F.3d at 365, no deliberate indifference was found where, in response to initially addressing reports of sexual misconduct, the accused student committed a sexual assault. *See also Williams v. Port Huron Sch. Dist.*, 455 Fed. Appx. 612 (6th Cir. 2012) (no deliberate indifference to at least three years of ongoing abhorrent racial harassment after the district addressed initial complaints). The key is not continuing to *only* use the same methods to respond to actionable harassment that the school knows is ineffective. *Vance v. Spencer Cnty Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir 2000).

Further, "victims of peer harassment" do not "have a Title IX right to make particular remedial demands." *Davis*, 526 U.S. at 648. Instead, "[a]ssessment of the need for, and the appropriate means of maintaining, school discipline is committed generally to the discretion of school authorities." *Ingraham v. Wright*, 430 U.S. 651, 681-82 (1977). The Court has also warned that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. It is also important to recognize that the "deliberate indifference" standard acknowledges the "legal constraints on [school administrators'] disciplinary authority" to respond to peer harassment. *Id*. at 649. "One student's demand for a quick response to her harassment complaint will conflict with the alleged harasser's demand for due process," putting the school in a position where it is "beset with litigation from every side." *Kollaritsch,* 944 F.3d at 627 (6th Cir. 2019).

*Stiles* illustrates the contours of the deliberate indifference standard and confirms that Plaintiff's hostile environment claim should be dismissed. 819 F.3d 834. *Stiles* involved one-and-a-half years of constant sex-based name-calling, harassment, and occasional physical assaults from multiple different students; longer, more pervasive and more physical than what Plaintiff alleges here. In *Stiles*, the student plaintiff was directly called "bitch," "faggot," and "queer" almost every day in seventh grade, and several times a week in eighth grade. The plaintiff was assaulted on at least four occasions. One of the physical assaults involved two students attacking the plaintiff in the bathroom, punching him in the stomach, and kicking him as he lay on the floor. The plaintiff suffered a compression fracture, wedging vertebra and back pain.

Although the harassment continued over such an extended period, and the district was unable to stop the harassment, the court still found that the district was not deliberately indifferent. The Sixth Circuit reasoned that the district investigated *almost* every incident that was reported, and each offending student was disciplined by a warning to short term suspension, depending on the severity of the allegations. In finding no deliberate indifference, the Sixth Circuit held, "[o]ne-and-a-half years of similar, but not rote, responses to incidents that each involved a different student or group of students do not amount to clearly unreasonable conduct." *Id*. at 851. "Although the school's efforts did not end [the student's] problems, Title IX does not require school districts to **eliminate** peer harassment." *Id*. (emphasis added).

Similar to *Stiles*, the District here was not deliberately indifferent to the two sporadic incidents of alleged race-based harassment. At the outset, the teacher used the N-word when scolding a student who used the word in class; she repeated the phrase when stating it should never be used. The incident was investigated by the District, and when it was learned students distributed recordings of the incident, the District made efforts to stop students from spreading the video.

When the District learned of the altercation between W.F. and M.M., the District contacted police, performed a threat assessment of M.M., suspended M.M. from school and placed him on a safety plan. The District's response to M.M. was in fact so severe that W.F.'s mother spoke out on M.M.'s behalf for leniency. These actions are not indicative of deliberate indifference. Rather, the school acted swiftly and decisively to curb any alleged racial hostility at its roots.

## IV.    PLAINTIFF'S ELCRA CLAIM FAILS AS A MATTER OF LAW.

Unlike sexual harassment, the ELCRA does not specifically prohibit, or even address, harassment based on race. *See Mayville v. Ford Motor Co.*, 2006 WL 3040672, *3 (Mich. Ct. App. Oct. 26, 2006) ("The MCRA's ban on sexual discrimination encompasses sexual harassment. MCL 37.2103(i). The statute does not contain an analogous provision defining racial discrimination to include racial harassment"). To the extent such a claim is recognized, it can only be judicially implied. Thus, the deliberate indifference standard applicable to Title VI claims addressed above should apply.

Assuming the Court interprets ELCRA to prohibit race harassment in the school in the same manner it interprets sexual harassment claims as suggested by *Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, No. 165441, __ N.W.2d __, 2024 WL 3573522 (Mich. July 29, 2024), this claim should still be dismissed. Michigan courts have employed a workplace discrimination analysis—a decidedly high hurdle for plaintiffs to overcome.

For employment cases, a plaintiff alleging a hostile environment must establish *respondeat superior* liability. *Radtke v. Everett*, 442 Mich. 368, 396 (1993). To meet this requirement, an employer is liable for hostile environment harassment ***only*** if it fails to take prompt and appropriate remedial action after receiving adequate notice of the harassment. *Chambers v. Trettco, Inc.*, 463 Mich. 297, 318-319 (2000); *Sheridan v. Forest Hills Pub. Sch.*, 247 Mich. App 611, 621 (2001).

An employer, of course, must have notice of alleged harassment before being held liable for not implementing action. *Radtke*, 442 Mich. at 396–397.

Plaintiff fails to provide a scintilla of evidence that any alleged actions were predicated on W.F.'s race. This alone is fatal to his ELCRA claim. Nevertheless, Michigan courts have determined one incident, in isolation, does not establish a prima facie case of race discrimination. For example, in *Wells v. Farmington Public Schools*, a high school student brought ELCRA and Title VI violations against the district and a teacher alleging the teacher discriminated against him by intentionally calling him a racial slur and "assaulting him based on his race," the district had notice of the discrimination and did not take proper action, and black students were suspended at a disproportionate rate in the district. No. 21-11265, 2022 WL 17361286 at *12 (E.D. Mich. Dec. 1, 2022). The *Wells* Court found the plaintiff failed to meet his evidentiary burden where all his prior suspensions were for non-discriminatory reasons pursuant to fighting, the teacher was accused of one singular use of a racial slur, and the district immediately suspended the teacher and investigated the accusations. *Id.* at *2-3; *see also Paasewe v. Ohio Arts Council*, 74 Fed. Appx. 505, 507 (6th Cir. 2003) (holding racially derogatory, offensive, or insensitive stray statements are not enough to demonstrate direct evidence of intentional discriminatory motive).

As discussed above, the Defendant promptly and appropriately responded to all reports of racial harassment. Thus, there is no genuine issue of material fact and Plaintiff's ELCRA claim fails.

## CONCLUSION

For all the reasons stated above, Defendant requests that this Court dismiss this case in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 56.

Respectfully submitted,

/s/KENNTH B. CHAPIE
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant

DATED: November 15, 2024

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the type-volume limitations of L.Civ.R. 7.2(b)(ii). The brief was prepared in Microsoft Word 2010, using a Times New Roman 12 pt. font. Microsoft Word 2010 has a function that calculates the number of words in a document. According to that function, there are 10,500 words in this brief.

/s/KENNETH B. CHAPIE
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant

## CERTIFICATE OF ELECTRONIC SERVICE

KENNETH B. CHAPIE states that on November 15, 2024, he did serve a copy of **Defendant's Motion for Summary Judgment** via the United States District Court electronic transmission.

/s/KENNETH B. CHAPIE
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7048
kchapie@gmhlaw.com
P66148