# EXHIBIT K

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
N.S. o/b/o W.F. (Plaintiff)

vs.

Sturgis Public Schools
(Defendant)

Case No. 1:23-vv-448
Honorable Paul L. Maloney

Brief Expert Report prepared by Cherie Ann Wager, Ed.S.

April 16, 2024

## I.   BACKGROUND AND QUALIFICATIONS

I am a former special education teacher and special education administrator, fully licensed in the State of Michigan, having education, specialized training, and experience in special education.

I have a bachelor's degree in elementary education from Western Michigan University, special education endorsement in learning disabilities, a M.A. in reading from Oakland University, and an Ed.S. with an emphasis in special education from Saginaw Valley State University. My graduate training involved additional special education rotations and student teaching, including training and application utilizing research-based reading strategies. I completed my administrative training by receiving my Education Specialist degree from Saginaw Valley State University. The program completion enhanced my academic skill and knowledge base for preparation as an educational leader. My training also prepared me to meet the increasingly complex challenges of special education.

I began my career in general education teaching pre-school, adult education, and alternative education. Once enrolled in a course of study for special education, I was hired by Montrose Community Schools where I taught middle school special education for 11 years. During those 11 years, I was successfully able to provide specially designed instruction to students on my caseload. I also provided individualized special education services, supplemental aids and services, and accommodations in the general and special education setting.

Seeking a leadership role in special education, I enrolled in an administrative course of study which allowed me to assume the role of special education director and assistant principal. My dual roles were a perfect combination to gain experience in both the general education and special education setting. At Carter Elementary in Montrose, I provided administrative support serving approximately 650 children from pre-school through fourth grade. Within the building I provided leadership to implement a school-wide positive behavioral interventions and supports (PBIS) system. I also utilized my leadership role to systemize the student assistant team process, provide positive discipline approaches, and implemented data-based decision making. Concurrently, I provided special education leadership across the district and became the President of the Genesee County Association of Special Education Administrators.

My next career step led me to the Genesee Intermediate School District (GISD) as Director, Special Education Services Administration. This role was multifaceted with an array of responsibilities for the 5th largest ISD in the state of Michigan. Most importantly, I assumed the responsibility of leadership, oversight, and monitoring of special education compliance for Genesee County which is comprised of 21 Local Educational Agencies (LEA's) and 14 Public School Academies (PSA's). During this time, our special services department began to take leadership for a county-wide approach to literacy and PBIS. Working collaboratively with the Michigan Department of Education (MDE), through the former Michigan's Integrated Behavior and Learning Support Initiative (MiBLISi) framework, our work evolved for the next six and a half years. This opportunity provided for additional academic, and behavior supports for students with disabilities, but also for the general education students. During this time, I provided county-wide leadership to implement the new MDE model form for the Individualized Education Program

(IEP), training over 200 hundred special education educators and personnel. Genesee ISD has had an electronic based IEP system since 2002 and these additional changes required adaptation of the electronic system. A train-the-trainer model was adopted to ensure the entire county had proper professional development and access to resources to ensure individualized IEP development and compliance.

Stepping next into the role of Assistant Superintendent for Special Education Services allowed for a variety of new special education opportunities. Working with MDE and other outside resources, the focus of growth for educators was to improve student performance using data-based decision making. GISD developed and provided professional development to special education educators to understand and implement the aspects of specially designed instruction. Regionally, we strengthened the utilization of a Multi-Tiered Systems of Supports (MTSS) framework for PBIS and literacy. I was also responsible for the oversight of implementation of the Michigan Administrative Rules for Special Education (MARSE) and the Individuals with Disabilities Education Act (2004) or IDEA (2004). GISD experienced opportunities for improvement via agency monitoring, special education complaints, and due process hearings. During this period, I was challenged to provide special education leadership due to the Flint Water Emergency. This included enhancing our current Early On ® program for children birth through three years of age. GISD was charged with increasing outreach to parents and families and enriching services to support children who were impacted. Within this time frame Special Education Services was charged with developing, the first national, Early On ® program for children 3-5 years of age. A multi-tiered system of supports was established, including enhanced data collection, to support children impacted 0 – 5 years of age. Over 100,000 services were provided to children and families during my tenure. Services were then further expanded to students in the K-12 setting, utilizing the same framework.

I have advanced my knowledge and training in the field of special education and for the last 34 years my career has included the leadership and implementation of special education programs and services to the highest extent possible.

On March 22, 2024, attorney Kenneth Chapie of Giarmarco Mullins and Horton, P.C., retained me to provide my opinion regarding the Due Process Hearing Decision and Order under the IDEA, 20 United States Code (USC) §1400 et seq. with the MDE.

## II. MATERIALS REVIEWED

| Record No. | Date | Record Description | Record Origin |
|---|---|---|---|
| 1 | August 27, 2019; October 14, 2019; November 14, 2019, March 2, 2020 | Behavior Plans for Student | Sturgis Public Schools |
| 2 | March 11, 2020 | Multidisciplinary Evaluation Team Report | Sturgis Public Schools |

| 3 | April 16, 2020 | IEP Team Report-Meeting Date | Sturgis Public Schools |
|---|---|---|---|
| 4 | January 21, 2020 | Progress Report | Sturgis Public Schools |
| 5 | April 16, 2020 | Progress Report | Sturgis Public Schools |
| 6 | 2019-2020 | 1st Half of year - Communication Log | Sturgis Public Schools |
| 7 | 2019-2020 | 2nd Half of year – Communication Log | Sturgis Public Schools |
| 8 | January 20, 2020 | Review of Existing Evaluation Data (REED) | Sturgis Public Schools |
| 9 | 2019-2020 | Report Card 2019-20 | Sturgis Public Schools |
| 10 | 2019-2020 | School Behavior Log Entries | Sturgis Public Schools |
| 11 | October 13, 2020 | IEP Amendment | Sturgis Public Schools |
| 12 | October 21, 2020 | IEP Amendment | Sturgis Public Schools |
| 13 | April 14, 2021 | IEP Team Report | Sturgis Public Schools |
| 14 | April 14, 2021 | Progress Report | Sturgis Public Schools |
| 15 | April 16, 2021 | Review of Existing Evaluation Data (REED) | Sturgis Public Schools |
| 16 | 2020-2021 | Report Card | Sturgis Public Schools |
| 17 | 2020-2021 | School Behavior Log Entries | Sturgis Public Schools |
| 18 | November 9, 2021 | Manifestation Determination Review | Sturgis Public Schools |
| 19 | February 1, 2022 | IEP Team Report | Sturgis Public Schools |
| 20 | October 4, 2021 | Behavior Plan | Sturgis Public Schools |
| 21 | October 5, 2021 | Behavior Plan | Sturgis Public Schools |
| 22 | October 2, 2021 | Behavior Plan - additional revisions | Sturgis Public Schools |
| 23 | October 19, 2021 | Behavior Plan | Sturgis Public Schools |
| 24 | December 9, 2021 | Behavior Plan | Sturgis Public Schools |
| 25 | December 8, 2021 | Behavior Plan | Sturgis Public Schools |
| 26 | January 9, 2021 | Behavior Plan | Sturgis Public Schools |
| 27 | November 22, 2021 | Progress Report | Sturgis Public Schools |
| 28 | January 20, 2022 | Progress Report | Sturgis Public Schools |
| 29 | June 3, 2022 | Progress Report | Sturgis Public Schools |
| 30 | March 22, 2022 | Consent Form for FBA | Sturgis Public Schools |
| 31 | May 11, 2022 | Behavior Support Plan SJCISD | Sturgis Public Schools |
| 32 | 2021-2022 | School Behavior Log | Sturgis Public Schools |
| 33 | 2021-2022 | Report Card | Sturgis Public Schools |
| 34 | October 10, 2022 | IEP/FBA Review | Dr. David Bateman |

| 35 | September 21, 2022 | Independent Educational Evaliuation | Kaufman Psychological Services |
|----|-------------------|-------------------------------------|-------------------------------|
| 36 | September 28, 2022 | Functional Behavior Assessment | Nathan VanderWeele |
| 37 | February 2, 2023 | Hearing Office Decision and Order | State of Michigan |
| 38 | May 1, 2023 | Plaintiff Complaint - Case No. 1:23-cv-448 | United States District Court Western District Southern Division |
| 39 | September 12, 2022 | IEP Amendment | Sturgis Public Schools |
| 40 | November 11, 2022 | IEP Team Report | Sturgis Public Schools |
| 41 | 2022-2023 | Report Card to date | Sturgis Public Schools |

## III.   STATEMENT OF COMPENSATION

For all the services provided in this matter, including document review, report writing and deposition and trial testimony, I am charging an hourly rate of $325 dollars per hour.

## IV.   BRIEF SUMMARY OF METHODOLOGY

Upon review of the above-mentioned materials, I recognized certain issues which I believe would have had significant relevance in aiding the fact finder in fairly and thoroughly analyzing the evidence and information provided at the Due Process Hearing  The bases for the opinions expressed here are accepted principles in the areas of educational pedagogy, learning disabilities and cognitive functioning, social-emotional well-being, behavioral interventions and supports, in addition to current knowledge based on research and evidenced based practices.

I am familiar with appropriate scientific research and principles, and applicable literature, including the results of studies recognized in the field and published in peer-reviewed journals. During 34 years of educational practice, I have reviewed, evaluated, and instructed on the development of Individualized Education Programs (IEPs) birth through age 26.

The conclusions and opinions stated herein are based on document reviews provided in this case from both N.S. o/b/o W.F.  and Sturgis Public Schools (the District).  These documents were produced by professional educators, outside professional evaluators, and other professionals. Educators have been professionally trained to objectively review, record, and document the special education services provided, drawing from their own sources of information, analysis, and conclusions. Conclusions which are derived from multiple data points and from multiple unbiased sources of information are most likely to be trustworthy.  The outside evaluations are considered to have been conducted within the context of a clinical setting.

If asked, I would be willing to testify regarding relevant educational pedagogy and practices which could be applied to case-specific facts and general knowledge about effective practices in special education.

CASE 1:23-cv-448

The above statements are a summary of my analysis of the discovery listed beforehand; I have based my opinions in part on a large data base of knowledge, best practices, and research methods well accepted in the relevant special educational community.

### V. OPINION

**1. The Administrative Law Judge Made Appropriate Conclusions at the Due Process Hearing.**

As a result of my analysis in the context of special education knowledge and expertise, it is my opinion that the conclusions of law provided by by Lindsay Wilson, Administrative Law Judge in her written decision and order dated February 1, 2023, were reliable, trustworthy, consistent, and appropriate. My opinion is based on the fact there were appropriate applications of the Individuals with Disabilities Education Act (2004) or IDEA (2004), and the Michigan Administrative Rules for Special Education (MARSE), found in the Michigan Administrative Code R. 340.1700. As a result of this review, I offer my professional opinions on specific claims within the decision and order.

> A. *The District developed Individualized Education Programs (IEPs) reasonably calculated to allow the Student to make appropriate progress in light of his unique circumstances at the April 16, 2020, April 14, 2021, and January 20, 2022, IEP Meetings.*

I support the ALJ's decision on these issues and opine that the District acted with good faith and within accepted standards to provide W.F. with a free appropriate public education (FAPE). The purpose of special education remedies is to provide a "spotlight" on special education procedures and practices, not a hammer.

34 CFR § 300.39(b)(3), defines "specially designed instruction" as follows:

Specially designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content methodology, or delivery of instruction –
(i)  To address the unique needs of the child that result from the child's disability; and
(ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

In review of the April 14, 2021, February 1, 2022, and November 11, 2022, IEPs, the District had identified Common Core State Standards, in literacy, to support their selection of goals and objectives. Utilizing these standards is an expected use of practice in IEP development. It also indicates that the District identified and carefully selected an individualized standard for the Student. It should also be noted that COVID-19 presented a series of challenges and learning opportunities to educators when students returned to school.

I dispute Dr. Bateman's claim regarding the provision of services, specifically the development of the IEPs and Behavior Plan. It is the IEP team's responsibility to develop and implement an IEP, using their professional judgement, pedagogy, best practices, and relevant research. Regarding the development of the Student's Present Level of Academic Achievement and Functional Performance (PLAAFP), while every IEP has the ability to be more clear, the District met accepted standards and acted in good faith. The District provided context for areas in which the student's disability impacted performance in reading. The District selected and aligned a Common Core State Standard (CCSS) in reading, which indicates the intentionality of planning for the Student's disability. The IEP team also prescribed goals and objectives in alignment with the CCSS and current performance as described in the PLAAFP. The District, in the IEP dated January 2022, did develop the PLAAFP more thoroughly and aligned the goals and objectives in assessing and measuring progress. The IEP team in this case identified the area concern, developed a plan to measure the concern, and had an organized way to measure progress. I disagree with Dr. Bates conclusion that the goals and objectives were not designed to measure progress. The District, from the onset of the IEP development and implementation, included the measurement of reading performance. The special education professional utilized the collection method of teacher observation. In my experience this is a common measure used to collect data.

The feasibility of the Petitioner's request awarding 350 hours of compensatory education is beyond this professional's comprehension. The District acted within accepted standards in providing W.F. a FAPE, was consistently in communication with the parent, developed multiple behavior intervention plans to support the student (utilizing proactive strategies), adjusted, and developed IEPs accordingly with parent input and what also appears to be a true concern and care for the student. The educators developed a rapport with the student, despite challenging behaviors, while continuing to provide educational services.

> B. *The District addressed the Student's progress toward his IEP goals through appropriate reevaluations, assessments, and behavior plans.*

I support the ALJ's decision on these issues and opine that the District acted with good faith and within accepted standards to provide W.F. with FAPE. The District completed the Functional Behavior Assessment (FBA) in the spring of 2020 and restored the student's prior behavior plan in the interim. However, if no new behaviors are observed, it is reasonable and an accepted practice to reinstate a prior behavior plan. Because the student did not display any new or novel behaviors, it was appropriate for the District to reinstate the behavior plan developed prior to the COVID-19 shutdown. The fact that the District immediately reinstated this plan shows the District acted in good faith.

Moving forward, the District had additional data to support the development of the PLAAFP and IEP goals. Throughout this time, the District did have in place a Behavior Intervention Plan to address the Student's behavioral challenges. Having an intervention plan, and an emergency intervention plan in place indicates the District was proactively responding to the student. Upon return to school after attending virtual school due to the COVID-19 Pandemic, the District continued to implement the prior behavior plan. In this instance, having a behavior plan in place, in the event the student returns with similar behaviors, is a proactive approach. Following the Students' return, when demonstrating behaviors, multiple revisions and amendments to the

behavior plans took place. At the same time, parent concerns were consistently identified in IEPs and Amendments.

In addition, during this time span the District utilized The Zones of Regulation Curriculum (https://zonesofregulation.com) as a strategy for the educators to help students self-regulate their behaviors. The curriculum is designed to have a proactive, skills-based approach to support self-regulation. It was designed to be adopted for all learners, in all settings, and was utilized by Sturgis Public School staff.

Once again, the District was seeking and implementing various educational strategies, not lessening their FAPE responsibility.

C. *The District made the appropriate assessment regarding the provision of extended year services.*

I support the ALJ's decision on these issues and opine that the District acted with good faith and within accepted standards to provide W.F. with FAPE. In alignment with the Michigan Department of Education (MDE) released guidance specific to this issue, the IEP Team did review, as reported, the consideration of ESY services. No evidence was presented, during multiple IEPs, demonstrating the student would experience a regression of skills or knowledge that cannot be recouped within a reasonable period. The IEP Team therefore determined ESY services were not needed, on multiple IEPs.

D. *The District conducted appropriate Manifestation Determination Reviews on November 9, 2021, and December 6, 2021.*

I I support the ALJ's decision on these issues and opine that the District acted with good faith and within accepted standards to provide W.F. with FAPE. Upon review of the MDRs dated November 9, 2021, and December 6, 2021, the IEP Team documented that they had considered and recorded required procedural information when conducting a manifestation determination review. The parent, as a member of the team, did provide relevant input in both instances. The IEP Team followed the correct procedural process in determining the outcome of the MDRs.

E. *The District appropriately provides the Student with an education in the Least Restrictive Environment.*

I support the ALJ's decision on these issues and opine that the District acted with good faith and within accepted standards to provide W.F. with FAPE. Upon review of current IEPs, the IEP Team indicated on each occasion the student would best receive services in the general education setting, with supplemental aids and services in place, to enable the student to make progress. The Student's intellectual capabilities indicate that exposure to the general education curriculum, in the general education setting, are most appropriate. I further state that without access to a curriculum that is designed to challenge the student academically, the Student would likely have more challenges in a more restrictive setting.

F. *The ALJ awarded the Student with a generous amount of compensatory education.*

7

I support the decision of compensatory education award by the ALJ on this claim. The ALJ's decision indicating the Student would be awarded 65 hours of compensatory education in reading, in my opinion is appropriate, but most likely viewed as a generous award of compensatory services.

The Petitioner's request of 710 hours of compensatory education is a grossly inflated amount of compensatory services for the Student. Academically, 450 hours of compensatory education, in reading, would be the equivalent of 75 additional school days for procedural findings. The ALJ indicated that the District's failure to review and revise the Student's April 2021 IEP until six school months later, was the *only* factor that resulted in a loss of education services, in reading. At no point during this time did the District intentionally deny special education services. The District did not exercise gross negligence or misjudgment during the six-month time frame. The Student continued to participate in the general education curriculum while receiving special education services.

It was noted the District went "above and beyond" to provide access to the compensatory services, including transportation. The District did offer compensatory services as ordered, but the Student was minimally responsive to the District's offer to provide services in reading. As a result, the timeline was extended for the compensatory services, and ultimately the Michigan Department of Education concluded that the compensatory services offered by the District had met the requirement of the ALJ's decision.

## 2. The Record Suggests the District Has Appropriately Provided the Student With FAPE.

The IDEA requirement that school Districts provide disabled students with FAPE does not require that the school either maximize a student's potential or provide the best possible education at public expense. Rather, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.

The ALJ appropriately found that the District implemented PBIS to support the Student's specific behavioral needs and that, when significant discipline problems did arise, the District properly conducted MDRs as to whether the conduct was a manifestation of his disability. As to the observations regarding the Student's reading level, though his NWEA scores slightly dropped, classroom observations suggest that the standardized scores did not reflect the student's true progress and abilities and that the testing scores more accurately reflected a lack of effort. Relying on classroom observations and daily measures of progress is an accepted educational practice.

It is my opinion the District exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals. The District made every effort to provide the student with the appropriate supports.

## VI. Conclusion

In conclusion, it is my opinion that the ALJ's decision and order in response Case No.: DP-22-043 was appropriate as described above. Although there were procedural errors identified by the District, this does not support the Student was denied FAPE.

The Plaintiff's request to award W.F. compensatory education in the form of two and a half years of one-on-one tutoring in reading, writing, and mathematics of five hours a week, for a total of 450 hours is preposterous. This request is unrealistic from a feasibility standpoint, for the student. The student was unable to fully participate and respond to the awarded 65 hours from the first award of compensatory services. With the ALJ's decision and order for compensatory services for reading, this requirement was met. Regarding the additional claims of writing and mathematics, District and outside evaluations demonstrated that the Student is functioning within the average IQ range with a score of 94. In addition, the student has not been identified as having additional disabilities in the areas of writing and math, so the compensatory request to address these two issues are an attempt to bury the child in unnecessary additional instruction.

_Cherie Ann Wager_
Cherie Ann Wager, Ed.S

4-15-24
Signed April 15, 2024

9