# EXHIBIT W

**STATE OF MICHIGAN**
**MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES**

IN THE MATTER OF:                          Docket No.: 22-011246

N.S. o/b/o W.F.,                           Case No.:    DP-22-0043
      Petitioner
                                           Agency:      Education
v
                                           Case Type:  ED Sp Ed Regular
Sturgis Public Schools,
      Respondent                        Filing Type: Appeal

_____/

**Issued and entered**
**this 1st day of February 2023**
**by: Lindsay Wilson**
**Administrative Law Judge**

**DECISION AND ORDER**

**Procedural History**

On April 13, 2022, N.S. (Petitioner) filed a Due Process Hearing Request under the Individuals with Disabilities Education Act (IDEA), 20 United States Code (USC) § 1400 *et seq*. with the Michigan Department of Education (MDE) on behalf of her child, W.F. (Student).[1]

On April 14, 2022, the Due Process Complaint was forwarded to the Michigan Office of Administrative Hearings and Rules (MOAHR) for hearing and was assigned to the undersigned Administrative Law Judge (ALJ), Lindsay Wilson.

On April 18, 2022, the undersigned issued an Order Regarding Timeliness.  Also, on April 18, 2022, an Order Scheduling Prehearing Conference via teleconference for April 21, 2022, was issued.

On April 18, 2022, Attorneys Michele Eaddy and Erin Walz from Thrun Law Firm, P.C., on behalf of Sturgis Public Schools (Respondent) filed an Appearance and Notice of Appearance.

On April 21, 2022, the telephone prehearing commenced and concluded.  On April 29, 2022, the undersigned issued an Order Following Prehearing Conference and Notice of Hearing, which set forth filing deadlines, scheduled the hearing for July 12-15, 2022, and extended the hearing deadline to August 1, 2022.

---

[1] Student will be used in place of child's name to protect the minor child's identity.

22-011246
**Page 2**

On April 25, 2022, Respondent filed its Answer to Petitioner's Due Process Complaint.

On June 24, 2022, the parties filed a Stipulated Motion for Adjournment of Hearing Dates and All Attendant Dates.

On June 29, 2022, the undersigned issued an Order Granting Adjournment of Hearing and Order Scheduling Telephone Prehearing Conference for July 7, 2022.

On July 7, 2022, telephone prehearing conference commenced and concluded. On July 7, 2022, the undersigned issued an Order Following Second Prehearing Conference and Notice of Hearing, which set forth filing deadlines, rescheduled the hearing for October 17-20, 2022, and extended the hearing deadline to November 30, 2022.

On October 12, 2022, Attorney Cathleen Dooley from Thrun Law Firm, P.C., on behalf of Respondent filed an Appearance and Notice of Appearance.

On October 17, 18, and 19, 2022, the hearing was convened via videoconference.  The undersigned presided. Attorneys Elizabeth Abdnour and Jacquelyn Babinski appeared on behalf of Petitioner N.S. Petitioner N.S. was also present.  Attorneys Erin Walz and Cathleen Dooley appeared on behalf of Respondent.

At the conclusion of the hearing, the undersigned allowed both parties to submit post-hearing briefs. On October 21, 2022, the undersigned issued an Order Establishing Briefing Schedule and Extending Hearing Deadline.[2]

On December 2, 2022, the parties filed a Joint Motion to Extend Filing Deadline for Closing Briefs and Waive Response Briefs. On December 2, 2022, the undersigned issued an Order Granting Joint Motion to Extend Filing Deadline for Closing Briefs and Waive Response Briefs, which ordered that all closing briefs be filed no later than December 16, 2022.

On December 16, 2022, both parties submitted their briefs summarizing their respective positions.  On December 16, 2022, the record was closed.

**Summary of Evidence**

The following individuals testified at the hearing on behalf of Petitioner:

---

[2] The Order Establishing Briefing Schedule and Extending Hearing Deadline states that the hearing deadline was extended to January 30, 2022; however, this was a typographical error and should read 2023.

22-011246
Page 3

1. David Bateman, Ph.D., Professor of Special Education at Shippensburg University and principal researcher for American Institutes for Research.[3]

2. Nathan Vanderweele, Board Certified Behavior Analyst with Kalamazoo Autism Center at Western Michigan University.

3. W.F., Student.

4. N.S., mother of Student.

The following individuals testified at the hearing on behalf of Respondent:

1. Nicole Gittinger, Assistant Superintendent with Respondent.

2. Stacey Richardson, Special Education Teacher with Respondent.

**Exhibits**

The following exhibits were offered on behalf of Petitioner and admitted into the record:

1. Exhibit 23 is an Individualized Education Program Team (IEPT) Report dated April 17, 2019.

2. Exhibit 37 is a REED dated January 20, 2020.[4]

3. Exhibit 38 is a Letter from Dr. Woodruff dated January 23, 2020[5].

4. Exhibit 39 is the Multidisciplinary Evaluation Team (MET) Report dated March 11, 2020.[6]

5. Exhibit 40 is an IEPT Report dated April 16, 2020.[7]

6. Exhibit 44 is Text Messages between Petitioner and Ms. Richardson.[8]

7. Exhibit 46 is February 2021 emails between Petitioner and District Staff.

8. Exhibit 47 is March 2021 emails between Petitioner and District Staff.

---

[3] Qualified as an expert in special education, IEP development and implementation.
[4] Exhibit 37 and Exhibit A are the same document.
[5] Exhibit 38 was admitted over Respondent's relevance objection.
[6] Exhibit 39 and Exhibit C are the same document.
[7] Exhibit 40 and Exhibit D are the same document.
[8] Exhibits 44, 46, 47, 48, may not include the complete messaging between the parties.

22-011246
Page 4

9.  Exhibit 48 is April 2021 emails between Petitioner and District Staff.

10. Exhibit 49 is an IEPT Report, dated April 14, 2021.[9]

11. Exhibit 50 is May 2021 emails between Petitioner and District Staff.

12. Exhibit 52 is August 2021 text messages between Petitioner and Ms. Richardson.

13. Exhibit 53 is September 2021 text messages between Petitioner and Ms. Richardson.

14. Exhibit 55 is October 2021 text messages between Petitioner and Ms. Richardson.

15. Exhibit 56 is November 2021 text messages between Petitioner and Ms. Richardson.

16. Exhibit 57 is a Manifestation Determination Review (MDR) dated November 9, 2021.[10]

17. Exhibit 58 is an Attendance Log dated November 19, 2021.

18. Exhibit 61 is December 2021 emails between Petitioner and District Staff.

19. Exhibit 64 is a Notice of Truancy Conference with Family Court dated December 3, 2021.

20. Exhibit 65 is Petitioner's notes from the MDR dated December 6, 2021.

21. Exhibit 66 is an MDR dated December 6, 2021.[11]

22. Exhibit 68 is a School-Based Therapist Referral dated December 13, 2021.

23. Exhibit 71 is January 2022 emails between Petitioner and District Staff.

24. Exhibit 73 is January 2022 text messages between Petitioner and Ms. Richardson.

25. Exhibit 75 is a Behavior Plan dated January 5, 2022.

---

[9] Exhibit 49 and Exhibit G are the same document.
[10] Exhibit 57 and Exhibit I are the same document.
[11] Exhibit 66 and Exhibit J are the same document.

**22-011246**
**Page 5**

26. Exhibit 77 is a Behavior Plan dated January 9, 2022.

27. Exhibit 79 is a Behavior Log dated January 18, 2022.

28. Exhibit 81 is Petitioner's Notes from an IEP Meeting dated January 20, 2022.

29. Exhibit 82 is an IEP Progress Report dated January 20, 2022.

30. Exhibit 83 is an IEPT Report, dated January 20, 2022.

31. Exhibit 84 is a Map Growth Winter 2022 Family Report dated January 20, 2022.

32. Exhibit 89 is an Independent Comprehensive Psychoeducational Evaluation dated September 21, 2022. [12]

33. Exhibit 91 is an Independent Functional Behavior Assessment dated September 28, 2022.

34. Exhibit 93 is an Independent Behavior Support Plan, dated October 3, 2022.

35. Exhibit 95 is a review by David Bateman, Ph.D., of Student's Evaluation/ IEP/FBA dated October 10, 2022.

Petitioner's Exhibits 1 through 22, 24 through 36, 41 through 43, 45, 51, 59, 60, 62, 63, 67, 69, 70, 72, 74, 76, 78, 80, 85 through 88, 90, 92, and 94, were not offered. These exhibits are not part of the record.

The following exhibits were offered on behalf of Respondent and admitted into the record:

1. Exhibit A is a REED dated January 20, 2020.

2. Exhibit B is a Behavior Plan dated March 2, 2020.[13]

3. Exhibit C is a MET Report dated March 11, 2020.

4. Exhibit D is an IEP dated April 16, 2020.

5. Exhibit E is an IEP dated October 13, 2020.

6. Exhibit F is an IEP dated October 21, 2020.

---

[12] Exhibit 89 was admitted over Respondent's hearsay objection.
[13] Exhibit B was admitted over Petitioner's objection to lack of foundation/authentication.

22-011246
Page 6

7.  Exhibit G is an IEP dated April 14, 2021.

8.  Exhibit H is a REED dated April 16, 2021.

9.  Exhibit I is an MDR dated November 9, 2021.

10. Exhibit J is a MDR dated December 6, 2021.

11. Exhibit K is a Behavior Plan dated January 9, 2022.

12. Exhibit L is a Contingency Learning Plan dated February 1, 2022.

13. Exhibit N is a Discipline Log for 2018 through 2022.

14. Exhibit R is 2021-2022 Attendance.

Respondent's Exhibits O, P, Q, S, T, U were not offered.  Respondent's Exhibit M was offered but withdrawn. These exhibits are not part of the record.

## Issues

As identified and clarified at the prehearing conference, the issues for hearing were as follows:

1.  Whether Respondent failed to develop an Individualized Education Program (IEP) reasonably calculated to allow Student to make appropriate progress in light of his unique circumstances at the April 16, 2020, April 14, 2021, and January 20, 2022, IEP meetings?

2.  Whether Respondent failed to request parent consent for and conduct comprehensive reevaluations, including a functional behavior assessment, to address Student's lack of progress toward his IEP goals and in the general education curriculum, to conduct a reevaluation upon receipt of new information provided by N.S., and to address Student's anticipated academic and behavior needs related to his ongoing conduct resulting in formal or informal removals from the classroom, from two years of the date of filing the complaint?

3.  Whether Respondent failed to seek Parent's consent to conduct a Functional Behavioral Assessment within 10 school days of her making the request in writing?

4.  Whether Respondent failed to implement positive behavior intervention supports (PBIS) to support Student's specific behavioral needs?

22-011246
**Page 7**

5. Whether Respondent failed to provide Student extended school year services from two years of the date of filing?

6. Whether Respondent failed to review and revise Student's IEP to address his academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals and the general education curriculum, from two years of the date of filing?

7. Whether Respondent failed to consider all relevant information and finding that Student's behavior was not a manifestation of his disability at the November 24, 2021[14] and December 6, 2021 Manifestation Determination Reviews?

8. Whether Respondent failed to consistently provide Student with services to allow him to make progress toward his IEP goals and the general education curriculum for all removals of the Student after 10 removals within a school year, from two years of the date of filing?

**Applicable Law**

    A. Burden of Proof

Petitioner, as the party challenging Respondent's determination or implementation of special education and related services, has the burden of proof by a preponderance of the evidence for all claims raised in this matter.  *Schaffer v Weast,* 546 US 49; 126 S Ct 528; 163 L Ed 2d 387 (2005); *Doe v Defendant I,* 898 F2d 1186 (CA 6, 1990).

As the Michigan Supreme Court has stated, "[p]roof by a preponderance of the evidence requires that the fact finder believe that the evidence supporting the existence of the contested fact outweighs the evidence supporting its nonexistence." *Blue Cross and Blue Shield of Michigan v Milliken,* 422 Mich 1; 367 NW2d 1 (1985).  A "preponderance of evidence" is best described as that evidence having the greatest weight.

    B. Special Education Regulations and Case Law

The Code of Federal Regulations, 34 CFR § 300.39(a)(1)(i) and (ii), defines "special education" as follows:

    Special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including—

---

[14] This is a typographical error. The date of the MDR is actually November 9, 2021, not November 24, 2021.

22-011246
Page 8

(i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (ii) Instruction in physical education.

Michigan Administrative Rules for Special Education (MARSE), R 340.1701c(c), Rule 1c, defines "special education" as follows:

"Special education" means specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a disability and to develop the student's maximum potential. Special education includes instructional services defined in R 340.1701b(a) and related services.

34 CFR § 300.39(b)(3), define "specially designed instruction" as follows:

Specially designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—

(i) To address the unique needs of the child that result from the child's disability; and

(ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

Students protected by the provisions of IDEA are entitled to be appropriately identified, evaluated, placed, and provided a free appropriate public education (FAPE) that includes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.  20 USC § 1400(d); 34 CFR § 300.1.

Under 20 USC § 1415(f)(3)(E), it may be found that FAPE has been denied to a disabled student based on either substantive or procedural violations of the Individuals with Disabilities Education Act (IDEA or Act).  To find a denial of FAPE based on procedural violations of the Act, it must also be found that the procedural violation impeded the student's right to FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to their child or caused a deprivation of educational benefits.

In *Board of Education of Hendrick Hudson Central School District v Rowley,* 458 US 176, 102 S Ct 3034, 73 L Ed 2d 690 (1982), the U.S. Supreme Court articulated the two bases for assessing the provision of FAPE.  The first was whether the school district had complied with the procedural requirements of the Act, and the second was whether

22-011246
Page 9

the student's Individualized Educational Program (IEP) was "reasonably calculated" to enable the student to receive educational benefits.  *Id*. at 206-07.

In assessing whether a student's IEP was reasonably calculated to enable the student to receive educational benefits under *Rowley*'s second basis above, our Sixth Circuit Court of Appeals noted that nothing in *Rowley* precludes the setting of a higher standard than the provision of "some" or "any" educational benefit and held that the IDEA requires an IEP to confer a "meaningful educational benefit gauged in relation to the potential of the child at issue."  *Deal v Hamilton County Bd of Ed*, 392 F3d 840, 862 (CA 6, 2004).

Nevertheless, the IDEA requirement that school districts provide disabled children with a free appropriate public education does not require that a school either maximize a student's potential or provide the best possible education at public expense.  *Doe v Tullahoma City Schools,* 9 F3d 455 (CA 6, 1993); *Fort Zumwalt Sch Dist v Clynes,* 119 F3d 607, 612 (CA 8, 1997), *cert den,* 523 US 1137 (1998).  In *Endrew F. v. Douglas County Sch. Dist. RE-1*, 137 S Ct 988 (U.S. 2017), the US Supreme Court expanded its explanation of FAPE concerning *Rowley's* second prong.   In *Endrew F*, the US Supreme Court stated that for a school district "[t]o meet its substantive obligation under IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Id*. at 999.

The primary responsibility for formulating the education to be accorded a disabled child, and for choosing the educational method most suitable to the child's needs, was left by IDEA to state and local educational agencies in cooperation with the parents or guardians of the child.  Reviewing courts may not substitute their own notions of sound educational policy for those of the school authorities which they review. *McLaughlin v. Holt Pub Schs*, 320 F3d 663 (CA 6, 2003).

    C.  <u>IEP Regulations</u>

34 CFR § 300.323, when IEPs must be in effect, states the following, in pertinent part:

> (a) General. At the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP, as defined in § 300.320.

* * *

22-011246
Page 10

(c) Initial IEPs; provision of services. Each public agency must ensure that -

(1) A meeting to develop an IEP for a child is conducted within 30 days of a determination that the child needs special education and related services; and

(2) As soon as possible following development of the IEP, special education and related services are made available to the child in accordance with the child's IEP.

\* \* \*

(e) IEPs for children who transfer public agencies in the same State. If a child with a disability (who had an IEP that was in effect in a previous public agency in the same State) transfers to a new public agency in the same State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide FAPE to the child (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency either -

(1) Adopts the child's IEP from the previous public agency; or

(2) Develops, adopts, and implements a new IEP that meets the applicable requirements in §§ 300.320 through 300.324.

\* \* \*

(g) Transmittal of records. To facilitate the transition for a child described in paragraphs (e) and (f) of this section -

(1) The new public agency in which the child enrolls must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous public agency in which the child was enrolled, pursuant to 34 CFR 99.31(a)(2); and

(2) The previous public agency in which the child was enrolled must take reasonable steps to promptly respond to the request from the new public agency.

**22-011246**
**Page 11**

34 CFR § 300.324, development, review, and revision of IEP, states the following, in pertinent part:

* * *

(a) Development of IEP -

    * * *

(2) Consideration of special factors. The IEP Team must -

    (i)    In the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior;

    * * *

(b) Review and revision of IEPs-

    (1)  General. Each public agency must ensure that, subject to paragraphs (b)(2) and (b)(3) of this section, the IEP Team -

    (i) Reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved; and

    (ii) Revises the IEP, as appropriate, to address -

        (A) Any lack of expected progress toward the annual goals described in § 300.320(a)(2), and in the general education curriculum, if appropriate;

        (B) The results of any reevaluation conducted under § 300.303;

        (C) Information about the child provided to, or by, the parents, as described under § 300.305(a)(2);

        (D) The child's anticipated needs; or

        (E) Other matters.

22-011246
Page 12

34 CFR § 300.301, initial evaluations, states the following, in pertinent part:

(a) General. Each public agency must conduct a full and individual initial evaluation, in accordance with §§ 300.304 through 300.306, before the initial provision of special education and related services to a child with a disability under this part.

34 CFR § 300.303, revaluations, states the following:

(a) General. A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311 -

(1) If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

(2) If the child's parent or teacher requests a reevaluation.

(b) Limitation. A reevaluation conducted under paragraph (a) of this section -

(1) May occur not more than once a year, unless the parent and the public agency agree otherwise; and

(2) Must occur at least once every 3 years, unless the parent and the public agency agree that a reevaluation is unnecessary.

Mich Admin Code R 340.1721b, timelines, states as follows:

(1) Within 10 school days of receipt of a written request for any evaluation, the public agency shall provide the parent with written notice consistent with 34 CFR § 300.503 and shall request written parental consent to evaluate. The time from receipt of parental consent for an evaluation to the notice of an offer of a free appropriate public education or the determination of ineligibility shall not be more than 30 school days. This time line begins upon receipt of the signed parental consent by the public agency requesting the consent. This time line may be extended if agreed to by the parent and public agency. Any extension to this time line shall be both of the following:

22-011246
Page 13

    (a) In writing.

    (b) Measured in school days.

(2) The parent has 10 school days after receipt of the notice of an initial offer of a free appropriate public education to provide the public agency with written parental consent to provide initial special education programs and services.

(3) Within 7 school days from the date of the individualized education program team meeting, the public agency shall provide the parent with the notice of an offer of a free appropriate public education or determination of ineligibility. The public agency shall document mode and date of delivery. The notice shall identify where the programs and services are to be provided and when the individualized education program begins.

(4) Unless a parent has filed an appeal under R 340.1724f, the public agency, as defined under 34 CFR § 300. 33, shall initiate a proposed special education individualized education program as soon as possible and not more than 15 school days after the parent's receipt of written notification under R 340.1721b(3), or not more than 15 school days after receipt of written parental consent under R 340.1721b(2). The parties may agree to a later initiation date if the later date is clearly identified in the individualized education program. An initiation date later than 15 school days shall not be used to deny or delay programs or services because they are unavailable and shall not be used for purposes of administrative convenience.

(5) For students with an individualized education program in effect at a previous public agency who transfer public agencies within the same school year, the new public agency shall immediately provide a free appropriate public education. A decision regarding implementation of an individualized education program in accordance with 4 CFR § 300.323 shall be made within 30 school days of enrollment.

34 CFR § 300.106, Extended school year services, provides as follows:

(a) General.

(1) Each public agency must ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section.

22-011246
Page 14

(2) Extended school year services must be provided only if a child's Individualized Education Program (IEP) team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child.

(3) In implementing the requirements of this section, a public agency may not:

(i)     Limit extended school year services to particular categories of disability; or

(ii)    Unilaterally limit the type, amount, or duration of those services.

(b) Definition. As used in this section, the term extended school year services means special education and related services that:

(1) Are provided to a child with a disability:

(i) Beyond the normal school year of the public agency;
(ii) In accordance with the child's IEP; and
(iii) At no cost to the parents of the child; and

(2) Meet the standards of the state education agency (SEA).

Further, in relation to discipline for students with disabilities under the IDEA, the Code of Federal Regulations, 34 CFR 300.530, states in pertinent part:

§ 300.530

Authority of school personnel.

* * *

*(e)* Manifestation determination.

(1) Within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the LEA, the parent, and relevant members of the child's IEP Team (as determined by the parent and the LEA) must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—

22-011246
Page 15

>    (i)  If the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or
>
>    (ii) If the conduct in question was the direct result of the LEA's failure to implement the IEP.
>
> (2) The conduct must be determined to be a manifestation of the child's disability if the LEA, the parent, and relevant members of the child's IEP Team determine that a condition in either paragraph (e)(1)(i) or (1)(ii) of this section was met.
>
> (3) If the LEA, the parent, and relevant members of the child's IEP Team determine the condition described in paragraph (e)(1)(ii) of this section was met, the LEA must take immediate steps to remedy those deficiencies.

## Findings of Fact

Based on the entire record in this matter, including the testimony and admitted exhibits, the following findings of fact are established:

A.  Student's Background

1.  Student is presently 15 years old and in ninth grade.

2.  N.S.[15], Petitioner, is the mother of Student.

3.  Student is currently eligible for special education and related services as a student with an emotional impairment (EI). [Pet. Exh. 83, p 1].

B.  Student's Diagnoses

4.  In October 2015, Student was evaluated and diagnosed with Mood Disorder, Attention-Deficit/Hyperactivity Disorder (ADHD), and anxiety disorder. [Pet. Exh. 37, p 2; Tr. Vol. I, pp 206-208].

5.  In November 2017, Student was evaluated at Pines Behavioral Health. Student received a new diagnosis of Autism Spectrum Disorder. Pines Behavioral Health recommended speech therapy for Student. [Tr. Vol. I, pp 208-209; Tr. Vol. II, p 324].

---

[15] Hereinafter referred to as "Petitioner".

22-011246
Page 16

6. On October 29, 2019, Student had another evaluation for Autism at Pines Behavioral Health. This evaluation qualified Student to receive ABA[16] therapy. Student participated in ABA therapy for approximately four to six months. Petitioner ultimately discontinued the ABA therapy for Student because he was too old and because it was not an effective therapy for Student. [Tr. Vol. I, p 211; Tr. Vol. II, pp 379-380].

7. Petitioner notified Respondent of Student's Autism diagnosis. Petitioner was informed by Respondent that there is a difference between a medical diagnosis and an educational diagnosis and that all services provided under EI are essentially the same. [Tr. Vol. I, pp 212-213].

8. Petitioner took Student to see Brian E. Woodruff, M.D., for a neurological examination as a result of Student being frequently kicked out of class. On January 23, 2020, Dr. Woodruff wrote a letter on behalf of Student indicating that Student had been diagnosed with Tourette's Disorder. The letter further stated that Student may occasionally "have repetitive sounds, impulsive words or movements. Please provide accommodations for this diagnosis as well as the most inclusive school environment possible. It is best to just ignore his tics." Petitioner provided this letter to Respondent. [Tr. Vol. I, p 214; Pet. Exh. 38].

C. 2018-2019 School Year (Fifth Grade)

9. On April 17, 2019, Respondent held an IEP meeting, and an IEP Team Report was created for Student. Under "Parent input/concerns", Petitioner notes that Student "has an outside medical diagnosis of "Autism Spectrum Disorder"." The IEP states that this diagnosis "impacts [Student's] daily relationships and interactions with peers and adults. This is impacting the student's academic progress . . .". [Tr. Vol. I, pp 210-211; Pet. Exh. 23, pp 1-2].

D. 2019-2020 School Year (Sixth Grade)

10. On January 20, 2020, a Review of Existing Evaluation Data (REED) was completed for Student. The REED was completed at Petitioner's request for a cognitive evaluation of Student. The REED stated that Student "has made good progress toward his goal of improving his articulation skills" but that Student would also "likely benefit from additional support services." The REED further stated that additional data was needed "to determine the present levels of performance and educational needs of the student" and "to determine whether additional modifications to special education & related services are needed to enable student to meet annual goals and to progress in the general curriculum".

---

[16] Applied Behavior Analysis.

22-011246
Page 17

As such, the REED concluded that cognitive testing would be conducted for Student. [Pet. Exh. 37, pp 1, 3; Resp. Exh. A, SPS 017, 019].

11. On March 2, 2020, a Behavior Plan was updated and revised for Student. The plan describes Student's target behaviors as "following directions, disrespectful, and work completion." The 2020 Behavior Plan lists several proactive strategies for Student, including a built-in sensory break for the first 10 minutes of every class, which he was "permitted regardless of behavior or circumstances". This plan also states that Student may be offered the use of fidgets when he is escalating and that if Student insists on talking to Petitioner, he can do so "once he can show that he is calm". [Resp. Exh. B, SPS 022-023].

12. The March 2020 Behavior Plan also indicated that Petitioner may keep Student home as a proactive behavior strategy since Student had a record of not dealing well with change. Petitioner did keep Student home on one occasion when over 50% of his classes had substitute teachers. [Tr. Vol. II, pp 403-404].

13. A Multidisciplinary Evaluation Team (MET) Report was completed for Student on March 11, 2020.  Under "Reason for Referral" it states that, "[Student's] mother requested updated cognitive testing to provide relevant information on his learning style and cognitive skills." The Wechsler Intelligence for Children, Fifth Edition (WISC-V) was administered to determine Student's intellectual functioning. Under "Student Interview/Testing Observations", it states that, "[o]verall, [Student] attempted all tasks presented to him exhibiting no signs of fatigue, stress, or noncompliance. . . . so assessment scores obtained in the test session should be accurate representations of [Student's] current cognitive skill levels." Under the section for "Evaluation Results" it states that most of Student's scores were within the average range, except for his scores in "Processing Speed", which fell in the "very low" range in comparison to other children his age. [Pet. Exh. 39, pp 2-3, 5; Resp. Exh. C, SPS 027-028, 030].

14. On March 13, 2020, Respondent closed due to the COVID-19 pandemic. The last day students were in the building was on March 12, 2020. Respondent was closed through the conclusion of the school year due to the government ordered shutdown. [Tr., pp 500-501].

15. On April 16, 2020, an IEP Team Report was created for Student for the upcoming 2020-2021 school year. As of the date of the April 2020 IEP, the understanding was that Student would be virtual for the upcoming school year due to the pandemic. [Tr. Vol. I, p 236; Tr. Vol. II, pp 383-384; Pet. Exh. 40, pp 1, 10; Resp. Exh. D, SPS 032, 041].

16. The April 2020 IEP lists Petitioner's concerns as Student's "motivation to learn" and "racism". Petitioner's concerns further indicate that Student "has been reacting to people who say things on voice chat. If someone brings something up about his color it is a new "hot button." [Pet. Exh. 40, p 1; Resp. Exh. D, SPS 032].

17. Petitioner indicated she also raised concerns about Student's in-school behaviors at the April 2020 IEP, but that those concerns were not documented in the IEP. Petitioner stated that she again reported Student's Tourette's and autism diagnoses because she was told that outside medical diagnoses do not go into the IEP unless she asks for them to go under the parent comment section. [Tr. Vol. I, pp 218-221; Tr. Vol. II, p 382].

18. The April 2020 IEP addressed Student's struggles with attention, reading, speech/communication, and behavioral issues. The IEP provided annual goals and short-term objectives for each of these areas of need. [Pet. Exh. 40, pp 3-5; Resp. Exh. D, SPS 034-036].

19. Under the Present Level of Academic Achievement and Functional Performance (PLAAFP) section of the April 2020 IEP, it states the following as it related to Student's behavioral needs:

> 2020: [Student] has maintained at least four friendships with other students. [Student] struggles with impulsive control and managing his negative emotions, such as anger and irritability. According to Powerschool data, [Student] has 37 discipline referrals for inappropriate language, disrespect, and disruption. [Student] is working on responding respectfully to requests that he finds frustrating. He has a Behavior Support Plan to assist with prevention and response interventions. When frustrated, [Student] has engaged in arguing, loud responses, non-compliance, and swearing. [Student] has been diagnosed with Tourette's Syndrome. [Student] has been absent around 50 days this school year [.] with about nine of these days relating to Out of School Suspension. This is impacting the student's academic progress and his/her peer and adult relationships in the school setting.

> [Pet. Exh. 40, p 5; Resp. Exh. D, SPS 036].

20. Petitioner indicated that Student's attendance issues in 2020 were related to Student being kicked out of class for behaviors as well as Student's long-term issues with sleeping and incidents where Student has needed to go home to "reset". [Tr. Vol. II, pp 383-384].

22-011246
Page 19

21. Under the section entitled "Review of Previous IEP's Goal/Objectives", the April 2020 IEP states that Student "continues to work on consistency and accuracy with speech goals. Increase in behavior referrals, therefore goal one will continue. Assignments are not completed/turned in." [Pet. Exh. 40, p 5; Resp. Exh. D, SPS 036].

22. Under the section entitled "Supplementary Aids/Service/Support", the April 2020 IEP indicates that Student would receive the following supports: ability to answer test questions orally; ability to record/dictate/type answers to assignments; to be provided with visual supports in the classroom and throughout the building; allowed the use of a "cooling off" area; provided extra time to answer questions and formulate responses; permitted to take tests in an alternative location; allowed frequent breaks, frequent positive feedback; behavioral support from the use of a behavior plan; visual supports; utilization of sensory strategies; verbal cues; accommodated seating; repeated directions; and the option of having text above second grade level read out loud to Student. [Pet. Exh. 40, pp 6-8; Resp. Exh. D, SPS 037-039].

23. While all students were virtual for April 2020 and May 2020, Respondent's Special Education teacher, Stacey Richardson, provided social and emotional support to students. Ms. Richardson was available daily to provide student supports through Google Meets, texts, or emails. Ms. Richardson did not recall if Student participated in these supports during this time period. [Tr. Vol. III, pp 513-514].

24. Stacey Richardson began working for Respondent as a day-to-day substitute in 2016. She is currently the Special Education teacher in a long-term substitute position, which she has held since 2018. [Tr. Vol. III, pp 581-582].

25. As a substitute teacher, Ms. Richardson began working with Student when he was in second grade. Ms. Richardson became Student's long-term teacher when Student was in middle school. Ms. Richardson provides push-in support in Student's general education classes and helps with Student's behavior interventions.  [Tr. Vol. III, pp 512-513, 609-612].

26. Ms. Richardson is currently finishing her M.A. in Special Education at Grand Canyon University. Ms. Richardson also has a Master's in Business Administration and Accounting. Ms. Richardson does not yet have a teaching certification, although she has passed her first certification test. Ms. Richardson indicated that until she passes all training and certification tests, she is still considered a long-term substitute, although she has all the same responsibilities as a certified teacher. [Tr. Vol. III, pp 581, 583-584, 593-594].

22-011246
Page 20

E.  2020-2021 School Year (Seventh Grade)

27. For 2020-2021 school year, Petitioner was given the option of Student attending school virtually or in person. [Tr. Vol. III, p 501].

28. At the start of the 2020-2021 school year, Student was not in school for the first two weeks while the team was trying to decide whether Student would be attending school virtually. Student was not receiving any educational services during those first two weeks because he was not yet set up for virtual. [Tr. Vol. III, pp 608-609].

29. Once the decision was made for Student to attend virtually, Student was provided with a Chromebook. Per Student's April 2020 IEP, the Chromebook allowed for Student to type his answers to assignments and to have assignments read to him. [Tr. Vol. I, p 229; Tr. Vol. II, p 384; Pet. Exh. 40, p 6; Resp. Exh. D, SPS 037].

30. On September 3, 2020, Respondent issued a Contingency Learning Plan (CLP) for Student. The CLP form indicated that Student had "[n]o goals for speech at this time". Related to social work services, Student was to "[w]ork on following school and classroom expectations and improve interactions with peers and adults" and was given supports of 10 to 30 minutes for 1-4 times a month. For special education, Student was to complete tasks virtually, improve his reading fluency, and use "visuals and dialogue to provide aid in identifying frustration." The CLP form stated that this was "a temporary plan to help provide access to appropriate educational materials and provider(s) during the closure of traditional school as is safe and practicable at this time." The CLP went on to state that the plan was created by staff reviewing Student's IEP in the context of Respondent's "Continuous Learning and COVID-19 Response Plan approved by the Intermediate School District" and that the plan "may be reviewed and revised as necessary to provide your Student with continued access . . .". [Tr. Vol. III, pp 515-517; Resp. Exh. L, SPS 077-078].

31. Student had two classes per semester for the 2020-2021 school year. Ms. Richardson facilitated Student's virtual classes through the Odysseyware program and provided assistance when needed. Ms. Richardson was also able to monitor Student's completion of assignments through Odysseyware in order to track Student's progress. [Tr. Vol. III, pp 519-520, 522-523].

32. For those students who were virtual, Respondent required that students log-in to the system every day during school hours. Ms. Richardson made herself available to meet with Student one-on-one at set times. Student would occasionally check-in with Ms. Richardson but did not meet with her on a regular

22-011246
Page 21

basis. Ms. Richardson tried to keep Petitioner updated if Student had not logged in for a couple of days or if any assignments were missing. [Tr. Vol. III, pp 520, 523-524].

33. According to the April 2020 IEP, Student was permitted extra time to answer questions. While Student was able to work on his own time in the virtual setting, some of his assignments were marked as "late", causing Student to lose some credits. [Tr. Vol. I, pp 218-229; Pet. Exh. 40, p 6; Resp. Exh. D, SPS 037].

34. On October 13, 2020, an IEP amendment was created to allow for the development of the CLP dated September 3, 2020. [Tr. Vol. III, pp 517-519, 636; Resp. Exh. E, SPS 044].

35. On October 21, 2020, another IEP amendment was created for consideration of a life skills or emotional wellness classes. The amendment stated that since Student was doing well with virtual learning, Respondent determined those behavior supports were not necessary. [Tr. Vol. III, pp 519, 529; Resp. Exh. F, SPS 050].

36. On January 19, 2021, Ms. Richardson sent a text message to Petitioner, stating that Student had a six-point growth in Math and that his scores were the "scores of kids in advanced level math." [Tr. Vol. III, p 522; Pet. Exh. 44, p 4].

37. Student was offered virtual social work services with school social worker, Ben Karle. The IEP team decided that Student should receive check-in services as opposed to direct, one-on-one services because Student had not been participating in the direct services offered. [Tr. Vol. III, pp 524, 605; Pet. Exh. 40, p 8; Resp. Exh. D, SPS 039].

38. Petitioner sent an email to Ms. Richardson, stating that "[a]cademically [Student] is doing great, but I think emotionally he is just doing ok most of the time because no one at school is pushing him?" On February 2, 2021, Ms. Richardson replied via email and asked Petitioner to "encourage [Student] to join Mr. Karle's group chats." Petitioner replied that she tries to get Student to join the group chats, but Student "refuses because he doesn't like Mr. Karle" and "finds him boring with no common interests." [Pet. Exh. 46, pp 1-2].

39. On February 18, 2021, Ms. Richardson informed Petitioner via email that Student was doing a good job by continuing to log in and work on the material. [Pet. Exh. 46, p 4].

40. During the 2020-2021 school year, Student accepted the face-to-face time he was offered by Respondent quite a few times. [Tr. Vol. II, pp 384-385].

22-011246
Page 22

41. On March 23, 2021, Ms. Richardson sent an email to Petitioner stating that an IEP meeting would be held and that she did not believe any new achievement testing was needed because it was done last year in January but asked Petitioner to let her know if she would like testing to be done. Ms. Richardson also asked specific questions for Petitioner to answer, which were as follows: 1.) What are your concerns about your child's education? 2.) Has there been any major changes in your child's life in the last 3 years? 3.) What do you feel are your child's strengths? 4.) What does your child like for rewards? 5.) Are there any medical situations we need to be aware of? and 6.) Comments? [Pet. Exh. 47, pp 1-2].

42. On March 24, 2021, Petitioner responded to Ms. Richardson's emailed questions. Petitioner stated she did not have any "current concerns as long as he is in virtual school. I have ALOT [sic] of concerns if that is not an option next year for him." Petitioner mentioned that the pandemic was one of the major changes in Student's life along with transitioning into middle school. Petitioner listed Student's strengths as being able to master information related to topics that interest him and that he liked to have money as a reward. Petitioner noted that Student has been diagnosed with autism and that his "autism is very impulsive, especially if he feels he was wronged or doesn't understand what is going on. He is high energy, likes to move and HATES being touched." Petitioner also noted that Student had been diagnosed with Tourette's and that Student "has a tendency to make involuntary movements with his legs and vocal tics. These are exacerbated when he is frustrated, they can also be a source of frustration he is unaware he is doing." Petitioner also stated that "[v]irtually, I am not worried about him, he could use a tad more help when he doesn't understand school work BUT he is receiving very good grades, grades I haven't seen since 1st grade with him." Petitioner further indicated that she was "very worried about how integrading [sic] him back to a daily in person school life will go when virtual is no longer an option. After more then [sic] a year on virtual, it has the potential to be very catastrophic for him and staff." Petitioner also indicated that she believed a meeting would be necessary to discuss Student attending partial days where he only attends his "core classes with no electives for a short period to ease him back into the routine." Petitioner concluded by stating she did not believe more testing was necessary at this point. [Tr. Vol. I, pp 229-232; Tr. Vol. II, p 390; Pet. Exh. 47, pp 2-4].

43. On April 12, 2021, Ms. Richardson asked Petitioner some questions from the speech therapist. On April 13, 2021, Petitioner responded via email stating that she did not "really have any concerns" about Student's speech. Petitioner states that Student "still has issues, but I see he is trying to correct them and is more aware of them." One of the questions asked about virtual therapy sessions and Petitioner responded by stating "[v]irtual is hard because he refuses to go to a

quiet area of the house" and that she does not believe Student will receive any benefit from virtual speech therapy. Petitioner's email states that she would be "OK with taking at least a year off speech," especially if he is allowed to continue with virtual next year. [Pet. Exh. 48, pp 1-3; Tr. Vol. II, p 381].

44. Petitioner believes that Student "aged out" of speech therapy and that Student got to a point where he no longer saw the value in what was being taught. [Tr. Vol. II, p 393].

45. On April 14, 2021, an IEP Team Report was created for Student by Ms. Richardson. Most of Petitioner's responses from her email dated March 24, 2021, were included under "Parent input/concerns"; however, Petitioner's responses related to Student's autism and Tourette's diagnoses were not included in the IEP. [Tr. Vol. I, pp 232-233; Tr. Vol. III, p 589; Pet. Exh. 47, p 3; Pet. Exh. 49, p 1; Resp. Exh. G, SPS 052].

46. The April 2021 IEP identified Student's areas of need to be academic and communication. Under the area of need for "Communication", it states that "although [Student] is successful at the sound and word level with his target sounds, he struggles with sentences, reading, and other less structured activities." The "Communication" section goes on to state that Student's "progress has appeared to slow down over the past year, and this has possibly increased due to poor attendance. In addition, he does not consistently demonstrate appropriate levels of motivation/effort. The deficits in this area impair the student's ability to effectively and clearly communicate in his/her classroom and community settings." The April 2021 IEP also provided an annual goal and short-term objectives for the area of English Language Arts (ELA) and literacy. The PLAAFP section noted that Student's NWEA score decreased from 212 in the fall to a 204 in the winter and that Student "showed signs of rapid guessing on his work and struggles with motivation." [Pet. Exh. 49, pp 2-4; Resp. Exh. G, SPS 053-055].

47. Under the section entitled "Review of Previous IEP's Goal/Objectives", the April 2021 IEP states that Student "has elected to attend school from home option for the 2020-2021 school year. His previous goals were ones that were able to be monitored in the classroom setting." The April 2021 IEP also included the following description for why Student's previous areas of need related to his behavioral and social-emotional needs were no longer needed:

[Student] has been attending school virtually since his last IEP. He has not presented with any behavioral needs. He has only attended three social work sessions, having stated that these sessions are boring to him. [Student's] mom continues to report positive progress behaviorally.

[Student] has been attending school virtually this past year. He has not presented with any social/emotional needs. His mom reports that he socializes virtually with peers after school. His special education teacher has stated that he sometimes does not turn in work. When [Student] has attended virtual social work sessions he has reported stable emotional wellness. He interacts respectfully. In additional to individual virtual sessions, he has also been offered the opportunity to attend group sessions with in-person students. He has not attended the group sessions.

[Pet. Exh. 49, pp 3-4; Resp. Exh. G, SPS 054-055].

48. At the time the April 2021 IEP was drafted, the IEP team was unsure of whether Student was going to be virtual for the upcoming 2021-2022 school year. [Tr. Vol. I, p 236].

49. On April 16, 2021, a REED was completed for Student for the purpose of a re-evaluation. The REED used the data from Student's assessment performed on March 11, 2020. Under Parent Input, Petitioner's emailed concerns sent on March 24, 2021, were partially copied, and pasted into the REED document, including her notations about Student's autism Tourette's diagnoses as well as her agreement that Student does not need any more testing at this point. Under "School Based Observations", the REED states that Student "has done a great job on his academic work. He is meeting his goals and has maintained passing grades in his online classes." Under "Additional Evaluation Data" for behavior, the REED indicates that Student "has not had any behavioral concerns during seventh grade, as he has been attending school virtually. He reports a stable emotional state." The behavior section further indicates that Student "has received direct social work services. He has expressed that he finds this service to be boring, though his relationship with this provider improved progressively during sixth grade. [Student] has attended three sessions this school year. [Student] does not consistently respond to emails from the social worker to set up appointments." Based on the IEP Team's review of the PLAAFP and Petitioner's input, "it was determined that no additional evaluation data is needed" in establish Student's eligibility or educational needs." [Tr. Vol. III, pp 529-531; Pet. Exh. 47, pp 2-4; Resp. Exh. H, SPS 060-061].

22-011246
Page 25

50. At the end of the 2020-2021 school year, Petitioner contacted the Assistant Superintendent and Director of Special Education, Nicole Gittinger, to inform her of how well Student had done with virtual learning and asked whether the same option would be available for the next school year. [Tr. Vol. III, p 502].

51. According to Ms. Richardson, Student worked hard and made progress on his academic goals during the 2020-2021 school year. [Tr. Vol. III, pp 522-523, 526].

F. 2021-2022 School Year (8th Grade)

52. For the 2021-2022 school year, Ms. Gittinger and the Superintendent decided that only families with children who were medically at risk would be provided the option for online learning. [Tr. Vol. III, pp 502-503].

53. Petitioner contacted Ms. Gittinger to indicate that Student would be attending in person for the 2021-2022 school year. [Tr. Vol. II, p 396; Tr. Vol. III, p 503].

54. On August 9, 2021, Ms. Richardson and Petitioner communicated via text message about Student's school schedule. Ms. Richardson indicated that Student's electives and language arts class would occur prior to lunch with science and math classes after lunch. [Pet. Exh. 52, pp 1-4].

55. In response to Petitioner's April 2021 request for an in-person meeting before Student returned to in-person learning, on August 18, 2021, Ms. Richardson sent Petitioner a text message stating in part, "[m]y plan is to set up a meeting after two weeks of school to see how [Student's] transition back into the swing of school is going." Ms. Richardson indicated there was a delay in scheduling due to the difficulty in scheduling a meeting during the first week of school. Ms. Richardson further indicated that a 2-week adjustment period would allow Respondent to see what behavior needs Student might have after spending the last school year as a virtual student. [Tr. Vol. III, p 536; Pet. Exh. 52, p 7].

56. When Student returned to in-person learning in the Fall of 2021, Respondent did not update Student's IEP to include or add Student's behavioral and social/emotional goals that were previously part of his April 2020 IEP. [Tr. Vol. I, pp 238-239; Pet. Exh. 40; Resp. Exh. D].

57. On August 23, 2021, Petitioner sent a text message to Ms. Richardson with first day impressions from Student. Petitioner's text message states that Student's "first impression of his ELA teacher is she is not nice." Petitioner goes on to state that, "[g]iven past experiences this will become a problem in the near future and he will most definitely need support for that room. Especially since it is his least favorite subject." [Tr. Vol. II, pp 411-412; Pet. Exh. 52, pp 9-10].

22-011246
Page 26

58. For the 2021-2022 school year, Student had "push-in" support from Ms. Richardson in his ELA class. Student also had the resource room available to him if he needed additional support. [Tr. Vol. III, pp 532-534].

59. On September 1, 2021, Petitioner sent a text message to Ms. Richardson, asking about the purpose of an upcoming meeting with Principal James Lamb. Ms. Richardson replied that Mr. Lamb "wants to discuss expectations being back at the school." Ms. Richardson also informed Petitioner that Student had told "a teacher to "f off" under his breath" and that Student "admitted that he should have made a better choice." Ms. Richardson's text messages to Petitioner also reference a meeting scheduled for September 8, where they "will need to develop or start developing [Student's] behavior plan." Ms. Richardson indicates that football will likely be the biggest influence on Student's behavior. [Tr. Vol. II, p 419; Tr. Vol. III, p 538; Pet. Exh. 53, pp 2-4].

60. On September 6, 2021, Petitioner sent a text message to Ms. Richardson, cancelling the meeting scheduled for September 8. Petitioner cited a football scrimmage as the reason for the cancellation. Ms. Richardson informed Petitioner that the meeting would be rescheduled. [Pet. Exh. 53, p 6].

61. On September 14, 2021, Petitioner sent a text message to Ms. Richardson stating that the meeting needed to be rescheduled as soon as possible because she could tell Student was at the point "where he is either going to give up for the rest of the year or keep trying. . . He's already feeling like everything is stacked against him." Ms. Richardson responded by offering available dates for the meeting. Petitioner indicated that certain dates would not work since she was going to be out of town. Petitioner also stated that she could not make a meeting time after school. Ms. Richardson asked Petitioner if she could join for an after-school meeting by phone. Petitioner and Ms. Richardson agreed to reschedule the meeting for the morning of the following Tuesday. [Tr. Vol. II, pp 421-424; Pet. Exh. 53, pp 17-21].

62. On September 20, 2021, Ms. Richardson sent a text message to Petitioner stating, "[w]e have to re-schedule our behavior meeting for next week. With NWEA testing this week, teachers cannot attend the meeting." Petitioner replies that the meeting will need to be sometime next week because she and Student will be out of town. [Pet. Exh. 53, pp 28-29].

63. On September 22, 2021, Ms. Richardson sent a text message to Petitioner stating that she "was proud of [Student's] NWEA yesterday. He went up. Today he gave 0 craps and dropped from a 204-193, with a 71% rapid guess rate." [Pet. Exh. 53, p 31].

22-011246
Page 27

64. Rapid guess rate means that Student is not taking the time to read or listen to the reading of the materials before selecting an answer. Ms. Richardson does not force Student to listen to the questions as it is his choice. [Tr. Vol. III, pp 542-543; Pet. Exh. 53, p 31].

65. On September 28, 2021, Petitioner sent a text message to Ms. Richardson stating that Student would be late to school because they did not return home until around 2:00 a.m. Ms. Richardson asked Petitioner if Student wanted a rest day at home because she was "worried [Student] is going to be super exhausted and grumpy." Petitioner agreed with Ms. Richardson's concerns but wondered whether Student would be able to play in the football game if he missed school. Ms. Richardson checked with Student's coach and informed Petitioner that Student "will have very limited playing time." Petitioner gave Student the option of going to school that day and Student agreed to stay home. [Tr. Vol. II, pp 477-478; Pet. Exh. 53, pp 35-38].

66. During the 2021-2022 school year, Student's behavior and disciplinary incidents were documented daily in a Google document so that Petitioner could see when Student was kicked out of class and why. This same type of document was also utilized during Student's sixth grade year. [Tr. Vol. I, pp 217-218; Tr. Vol. II, pp 397-398].

67. On September 29, 2021, Petitioner was notified of Student's classroom disruption and disrespectful behavior towards a teacher. In a text message, Ms. Richardson states that Student will be given after school detention today or Monday. Petitioner asked why Student needs after school detention and Ms. Richardson replies that "after detention is standard for all students after so many offenses." Petitioner replied that after school detention is not an option because Student had a game and Monday was too far away because his IEP states "he needs same day consequences." Petitioner further states that "[a]nything outside of school hours is going to be damn near impossible for me this year. 6 kids, 4 different schools, 4 different start and end times, clubs and sports." [Pet. Exh. 53, p 41; Resp. Exh. N, SPS 096].

68. On September 29, 2021, Ms. Richardson sent a text message to Petitioner asking when a good time for the rescheduled meeting would be. Ms. Richardson also states that Student's "current IEP does not state he gets same day consequences. We can look at adding that." [Pet. Exh. 53, pp 40-42].

69. After Petitioner expressed concerns about Student attending after school detention, Ms. Richardson tried to make adjustments to accommodate Petitioner's scheduling conflicts. Where possible, Ms. Richardson started having

22-011246
Page 28

Student serve consequences at in-school suspensions (ISS) or lunch detentions. [Tr. Vol. III, p 552; Pet. Exh. 55, pp 12-13].

70. On September 30, 2021, Student and a peer engaged in an altercation in the locker room after football practice. A review of the video showed the two exchanging words and Student punching the other student. Student mentioned to his coaches that this student has used the "N" word at practice and that he thought he heard the student say that word again in the locker room. [Resp. Exh. N, SPS  096].

71. Based on the September 30, 2021 incident, Student's football coach contacted Petitioner to tell her Student was suspended and kicked off of the football team. [Tr. Vol. II, pp 447-448; Resp. Exh. N, SPS 096].

72. On October 1, 2021, Ms. Richardson sent a text message to Petitioner asking for any input on developing a successful plan for Student. Petitioner replied by stating she is "worried about racism. I wasn't aware of how often it was happening to him until last night." Ms. Richardson replied by stating she has not heard any racist comments, "[w]ith the exception of [Student] saying "you are making me do (insert school work here) because I'm black."  [Pet. Exh. 55, pp 1-4].

73. According to the most recent behavior plan from March 2020, Student was to have built-in sensory breaks the first 10 minutes of every class. Petitioner indicated Respondent was not following this part of the plan during the 2021-2022 school year. Petitioner further indicated that Student's behaviors of inappropriate physical contact and inappropriate language were not included in the most recent behavior plan, which Petitioner believed were related to Student's autism and Tourette's diagnoses. [Tr. Vol. I, pp 243-244; Tr. Vol. II, pp 401-402; Resp. Exh. B, SPS 022-023].

74. On October 5, 2021, a meeting was held to discuss changing Student's behavior plan since he was frequently getting kicked out of class or suspended. The meeting was also scheduled to discuss some new interventions to try with Student. [Tr. Vol. II, pp 240-241; Tr. Vol. III, p 547; Pet. Exh. 55, p 6].

75. A follow-up behavior meeting was held on October 18, 2021, to go over Student's behavior plan and ensure Student knows the expectations before classes started. [Tr. Vol. II, p 435; Tr. Vol. III, p 548; Pet. Exh. 55, pp 8-9].

76. On November 1, 2021, Ms. Richardson sent a text message to Petitioner indicating that Student was tardy to class 11 times. Petitioner responded by stating that Student "said he was using the extra time for a break" and that she

22-011246
Page 29

felt a couple more breaks should be built into Student's schedule. Ms. Richardson responded that she would look into giving Student a break before 8th hour. [Tr. Vol. II, pp 456-457; Pet. Exh. 56, pp 1-3].

77. On November 1, 2021, at recess, Student called a classmate a "fiend". The classmate slapped Student. Student walked away, but the classmate followed Student and pushed Student in the back. The two began yelling at each other and Student pushed the classmate to the ground. At that point, both Student and his classmate were punching each other. [Pet. Exh. 57, pp 1, 3; Resp. Exh. I, SPS 065, 067; Resp. Exh. N, SPS 094].

78. On November 9, 2021, a Manifestation Determination Review (MDR) meeting was held regarding the November 1, 2021 incident. The MDR form described Student's misconduct and provided that the following information was reviewed: Student's IEP, relevant information provided by parent, teacher observation of student, and the behavior logs. Under the section for "Relevant Information Provided by Parent", it states that Petitioner "has not noticed any behaviors lately related to his eligibility and that she thinks this incident was just when he was at a breaking point and didn't care anymore." The MDR IEP team determined that the behavior was not a manifestation of Student's disabilities as "[Student] engaged in the disciplinary action based on environmental factors not pertaining to his area of eligibility." The IEP team further concluded that "the incident did not result in a failure by the school district to make sure services were provided." [Tr. Vol. II, p 287; Pet. Exh. 57, pp 1, 3; Resp. Exh. I, SPS 065, 067; Resp. Exh. N, SPS 094].

79. Petitioner was undecided as to whether Student's conduct that led to the November 9, 2021 MDR was a manifestation of his disability. [Tr. Vol. II, pp 288-290, 451; Pet. Exh. 57, pp 1, 3; Resp. Exh. I, SPS 065-068].

80. On November 10, 2021, Ms. Richardson sent a text message to Petitioner, informing her that Student would be in in school suspension (ISS) for calling his teacher "a stupid f'ing bitch. After already getting multiple strikes". Petitioner replied by stating she believes Student will refuse to go to ISS because he states that Respondent does not follow his plan and because he does not "deserve it". Petitioner further states that she does not know how to justify the ISS to Student because he does not understand the strikes he received before swearing at his teacher. Ms. Richardson replies by stating that if Student refuses to serve ISS, he makes the choice to go home. [Pet. Exh. 56, pp 9-12].

81. When Student is sent home or suspended from school, Student thinks of it as a vacation, rather than a consequence. [Tr. Vol. I, p 195; Tr. Vol. II, p 458].

22-011246
Page 30

82. Ms. Richardson indicated that Student was having an ongoing problem with using profanity in class. Ms. Richardson believed it was Student's decision to use profanity because he would not use profanity around students with lower cognitive levels but would use profanity in a regular general education classroom setting. Ms. Richardson further indicated that she could see a difference in Student's mannerisms, vocabulary, and general persona when he was triggered by something based on his disability. [Tr. Vol. III, pp 555, 634-635].

83. Petitioner believes that Respondent is not trying to figure out why Student is using profanity at school. Petitioner testified that while she will advocate for Student not to use profanity at school, she does not know how to justify to Student why profanity is bad since he is not a "neurotypical kid". [Tr. Vol. II, pp 460-461].

84. On November 29, 2021, Student was involved in an incident that was captured on camera. In the video, Student was seen closing a classmate's locker. The classmate told Student to stop, and Student said, "this is why your dad left you." The classmate repeated the phrase by imitating Student's speech. Student initially walked away but turned around and "runs into [the classmate] pushing him and [the classmate] attempts to resist. [Student] then throws him to the floor is on top of him punching him. [The classmate] rolls into the fetal position at times to protect his face. [Student] continues to throw and land punches while [classmate] is on the ground." Student received a 10 day out of school suspension for this incident. [Resp. Exh. N, SPS 094].

85. On November 29, 2021, Petitioner sent an email to various members of Respondent's staff requesting a Functional Behavioral Assessment (FBA) as soon as possible and a meeting to discuss Student's behavior plan and IEP. [Tr. Vol. II, pp 305-306; Pet. Exh. 61, pp 13-14].

86. On December 1, 2021, Petitioner emailed Principal Lamb after learning that the parents of the student involved in the November 29, 2021 incident were pressing charges against Student for assault. Petitioner requested to see the video footage and was eventually allowed to see the video. [Tr. Vol. II, pp 303-304, 332-333].

87. On December 2, 2021, Petitioner asked for an update on the meeting she had requested. [Pet. Exh. 61, p 7].

88. During the fall 2021 semester, Student also had several excused and unexcused absences, tardiness to class, behavioral interventions, and out of school suspensions. [Resp. Exh. R, SPS 179-181].

22-011246
Page 31

89. Petitioner received a Notice of Truancy Conference from the 45th Circuit Court-Family Division, indicating the Court had received notification from Respondent that Student had not been attending school regularly. The Notice further stated that a truancy conference was scheduled for December 3, 2021. [Tr. Vol. II, p 321; Pet. Exh. 64].

90. Petitioner color-coded an Attendance Log for the period of August 23, 2021 through November 19, 2021, to indicate a reason for Student's absence or her disagreement with how Student's attendance was marked. For the dates on which Student was tardy, Petitioner's log indicates that Student was using the time for breaks. Petitioner indicated that at that time, Student was only allowed one break for the entire day, which Petitioner states was not sufficient. Petitioner also noted one date where Student was marked as "unexcused" for his 8th hour class, when he was actually present. In mid-October 2021, Petitioner kept Student out of school for four days because she did not trust anyone to keep Student safe while she was out of state. Petitioner also indicated that Student was absent from school for a few days at a time to go hunting and once to visit his father out of state. Petitioner indicated that upon their return from the trip to see Student's father, both she and Respondent's staff agreed that Student should be kept home as a rest day due to their trip. [Tr. Vol. II, pp 275-276, 294-297; Pet. Exh. 58].

91. Petitioner agreed with some of Student's suspensions but disagreed with the length of some of the suspensions. [Tr. Vol. II, p 298].

92. On December 6, 2021, an MDR meeting was held in relation to the incident with Student on November 29, 2021. The MDR form listed the individuals who participated in the meeting and reviewed Student's conduct on the date in question. At the MDR, the Assistant Principal reviewed her notes of what occurred prior to the altercation. Petitioner was allowed to provide some input but was stopped before she was able to go through all of her notes. The MDR form provided that the following information was reviewed: Student's IEP, relevant information provided by parent, teacher observations of student, and the behavior logs. [Tr., pp 322-324; Pet. Exh. 66; Resp. Exh. J, SPS 069-071].

93. Under the section for "Relevant Information Provided by Parent", it states:

> [Petitioner] is concerned because [Student] was given strikes in two classes in a row and that he should have had [Petitioner] called to let her know. [Petitioner] said that his MET report states he has low socialization scores and that he struggles with interactions with peers. Pscyh evals show his GAF scores are very low. Per conversation with [Student] on the day of the incident he was

22-011246
Page 32

teased for his speech. Per conversation with [Student] the student said the words [Student] used while mocking [Student's] speech.

[Pet. Exh. 66, p 2; Resp. Exh. J, p SPS 070].

94. At the end of the December 6, 2021 MDR meeting, all the participants had an opportunity to state whether they believed the conduct was a manifestation of Student's disability. The Principal and General Education Teacher said "no", while Petitioner said "yes". Ms. Richardson and the Behavior Interventionist stated they "did not know", and the ISD Special Education Supervisor did not give an answer. [Tr., pp 327-328].

95. Since the consensus of those who answered the question of whether the conduct was a manifestation of Student's disability had stated "no", the conduct in question was found to not be caused by or directly and substantially related to Student's disability. On the MDR form, under "Describe why there was no relationship between the disability and the behavior", it states, "[t]he incident was due to [Student] shutting a locker of a student and other students engaging in dialogue that resulted in an act of aggression by [Student]. The majority of the team agree that the behavior was not a result of the disability. [Petitioner] found that the behavior was linked in part to his behavior and disability." [Tr. Vol. II, pp 329-330; Pet. Exh. 66, p 3; Resp. Exh. J, SPS 071].].

96. On December 8, 2021, Ms. Richardson emailed a meeting invitation to Petitioner for a BIP meeting to be held on December 13, 2021. The meeting invitation stated, "[t]his meeting is for us to work on developing a stronger behavior plan to help [Student] be successful in the classroom and school setting." Petitioner sent an email asking whether this meeting would also be an IEP meeting. Ms. Richardson replied that the meeting would be just for the behavior plan. Ms. Richardson further stated that the FBA meeting and meeting to amend Student's IEP "is a different meeting and cannot happen yet. I am still working on getting details and planning those meetings." [Tr. Vol. II, pp 309-312; Pet. Exh. 61, pp 16-20].

97. On December 13, 2021, Petitioner completed a referral for a school-based therapist based on the recommendation from truancy court. On the form, Petitioner writes, "He's autistic. We need to open communication with him and school staff to help prevent physical aggression with his peers." [Tr. Vol. II, pp 331, 463-464; Pet. Exh. 68].

98. The meeting on Student's behavior plan occurred as scheduled on December 13, 2021. On December 14, 2021, Petitioner emailed one of Student's general education teachers, stating that she felt they got "quite a bit

22-011246
Page 33

accomplished", but thinks that Student's prohibition on the use of phones "will be a disaster". Petitioner's email further states that "the reason I want the call or to speak to him is not just so I can bring him home. While the # of times I need to pick him up is rare, it is something that is necessary to prevent suspendable [sic] offenses." [Tr. Vol. II, pp 466-468; Pet. Exh. 61, pp 7-8].

99. On December 15, 2021, Petitioner sent a text message to Ms. Richardson asking for a copy of the behavior plan. Ms. Richardson replied that she was working on the plan over break and would email it to Petitioner. Petitioner followed up on her request on January 3, 2022, and Ms. Richardson stated she would have the plan finalized on January 5, 2022. [Tr. Vol. II, pp 319-320; Pet. Exh. 73, pp 1-2].

100. On January 4, 2022, Student was disciplined for refusing to put away a fidget that was loud and disruptive to the class and for subsequently asking a substitute if she was racist like one of the other teachers. That same day, Petitioner sent a series of text messages to Ms. Richardson voicing concerns about why Student was told he could not have a fidget since it was in his behavior plan. Petitioner's email stated that, ". . . a small noise from a fidget is not a distraction to the class and if it is, why is he in general education. It makes zero sense!! I feel like he can't win for losing!!" Petitioner also informed Ms. Richardson that Student was supposed to be seated next to students he gets along with, as discussed at the behavior meeting, but that this portion of the plan was not being followed. [Tr. Vol. II, pp 346-348; Pet. Exh. 73, pp 3-5, 7-10].

101. On January 5, 2022, Petitioner sent an email to various members of Respondent's staff to discuss the incident with the fidget. Petitioner's email states, in part, that Student "will NOT be serving after school detention for this, nor will he serve lunch detention or ISS." Petitioner further stated that the incident would not have occurred if Student's behavior plan had been followed and he had not been asked to put away his fidget toy. [Pet. Exh. 71, p 5].

102. On January 5, 2022, the Assistant Principal replied to Petitioner's email stating, "[t]here are consequences for his behavior so he will be OSS tomorrow." [Pet. Exh. 71, pp 5-6].

103. On January 5, 2022, a Behavior Plan was developed for Student. The FBA was still not completed by Respondent at the time this Behavior Plan was issued. [Tr. Vol. II, p 352; Pet. Exh. 75].

104. Respondent did not conduct an occupational therapy evaluation for Student to ensure Student was being provided with effective sensory strategies for his behavior. [Tr. Vol. II, pp 478-479].

22-011246
**Page 34**

105. On January 6, 2022, Ms. Richardson sent a text message to Petitioner stating that digital clocks were being delivered for Student's classes. Ms. Richardson went on to state that this "means per FAPE he is not to have his phone with him." Ms. Richardson indicated that Respondent ordered digital clocks since the analog clocks in the classrooms are not always accurate and Student is insistent about knowing the precise time. [Pet. Exh. 73, pp 14-15; Tr. Vol. II, p 414; Tr. Vol. III, pp 564-565].

106. On January 7, 2022, Petitioner sent a text message to Ms. Richardson, asking when the MDR and IEP meeting would be held. Ms. Richardson replied stating that they should combine Student's new IEP and annual IEP into one. Ms. Richardson further states that "[w]e also need to have his FBA (which was the reason for the new IEP) done which I am getting with our school social worker to work on. Let me check timeframe on that and we should be able to schedule all of it together." Petitioner responded in part that her first concern is for Student's behavior plan to be reattached to his IEP and that an IEP meeting needs to be held since Student's most recent IEP still shows Student as being virtual. [Tr., pp 348-351; Pet. Exh. 73, pp 15-19].

107. On January 9, 2022, another meeting was held to update Student's Behavior Plan. The Behavior Plan was not based on a completed FBA, but rather on the collective knowledge of Student by those who attended the meeting, which included Petitioner, Ms. Richardson, Student's core and elective teachers, administration, and members of the ISD. [Tr. Vol. II, pp 355-356; Tr. Vol III, pp 567-568, 609-612; Pet. Exh. 77; Resp. Exh. K].

108. Some of Student's target behaviors in the January 2022 Behavior Plan included no inappropriate language, leaving phone in locker or secure location, appropriate physical school interaction, and no class disruptions, i.e., outbursts, arguing, rude comments, swearing, making a scene, prohibiting the lesson, listening and following directions, and attempt to complete the classwork. [Pet. Exh. 77, p 1; Resp. Exh. K, SPS 073].

109. The January 9, 2022 Behavior Plan allowed Student "a built-in sensory break for the first 10 minutes of his 4th hour which he is permitted regardless of behavior or circumstance" and indicated that the break could not be taken without another adult. During the break, Student would be given the option of using his phone. The break during 4th hour was selected because it was the halfway point of the school day and Student did not like the subject of his 4th hour class. The break before this class would give Student time to get in the right mind set to do a non-desired task. [Tr. Vol. III, pp 568-569; Pet. Exh. 77, p 1; Resp. Exh. K, SPS 073].

22-011246
Page 35

110. The January 9, 2022 Behavior Plan allowed for Student to be able to go to a STEM class and use his phone for the last five minutes of the day, if Student goes through the day without walking out or being asked to leave class. On the days where a substitute was in the classroom, the plan allowed Student the option of reporting to the focus center or resource room, if Student "feels he is unable to work in his classroom." On the days where Student was having a difficult time, Student would be released three to four minutes early to report to the focus center before his next class. Ms. Richardson indicated that this would help Student manage and regulate his emotions. [Tr. Vol. III, pp 569-570; Pet. Exh. 77, p 2; Resp. Exh. K, SPS 074].

111. The January 9, 2022 Behavior Plan used "Reactive Strategies", for when Student was escalating, i.e., disruptive behaviors, blurting out, refusing to work. In those instances, Student would be offered fidgets and "[i]f fidgets would not suffice, [Student] may have the option to pace at the back of the classroom or take a break" with an adult. These strategies help make sure Student and classmates remain in a safe environment. [Tr. Vol. III, p 571; Pet. Exh. 77, p 2; Resp. Exh. K, SPS 074].

112. The January 9, 2022 Behavior Plan also provided for consequences for insubordination or inappropriate physical actions with Students. The majority of Student's consequences for these behaviors occurred during school hours as the after-school consequences were discouraged due to Petitioner's availability and concerns for the student. [Tr. Vol. III, p 572; Pet. Exh. 77, p 3; Resp. Exh. K, SPS 075].

113. In January 2022, Ms. Richardson sent a series of text messages to Petitioner regarding Student rushing through his reading test and his scores going down. Ms. Richardson stated that Student agreed to retake the test and "actually take his time." Ms. Richardson noted in her message that Student "dropped to a 1st grade level. He was at a 75% rushing rate." Ms. Richardson informed Petitioner that she was not going to record the score since Student is going to take the test again. [Pet. Exh. 73, pp 37-38].

114. On January 20, 2022, Respondent held an IEP meeting, and an IEP Team Report was created for Student. Under the Section for Parent Input/Concerns, it stated as follows:

> Per conversation on 1/20/2022, [Petitioner] sees a strength for [Student] in that he is able to correct people when he is misquoted. She also notes that he has improved objectivity. [Petitioner] is concerned with making sure his behavior plan is followed. She wanted to make it clear that issues for [Student] may stem from

22-011246
Page 36

something small (either an outside influence or his own thought). Communication with [Petitioner] on a regular basis is important.

[Pet. Exh. 83, p 1].

115. Petitioner raised Student's autism diagnosis at the IEP meeting, but it was not included in the January 2022 IEP report. [Tr. Vol. II, pp 361-362; Pet. Exh. 83].

116. The January 20, 2022 IEP listed two annual goals, an English Language Arts (ELA) literacy goal and a social/emotional goal. [Pet. Exh. 83, pp 5-6].

117. For Student's reading goal, the PLAAFP states in part:

. . . [Student] is vocal about not liking to read or wanting to participate in ELA classes. He does not find the material interesting and does not see the point of having to do the work for that reason. When he does engage in activities he rushes to get done as quickly as possible. On the Winter NWEA assessment (January 2021[17]) [Student] "scored a 189 and had a 75% rushing rate on the reading assessment finishing 40 questions in only 9 minutes. The score of a 189 puts [Student] at a mid third grade reading level. This supports his in class rushing through work but does not help give an accurate portrayal of his reading ability. [Student] continues to have difficulty in the area of informational text: language, craft, and structure (176). These deficits impact the student ability to understand (comprehend) written text at grade level.

[Pet. Exh. 83, p 5].

118. Ms. Richardson indicated there is not much she was able to do to prevent Student's rushing on these non-desired tasks, other than to encourage him to slow down. Ms. Richardson believes that if Student slowed down, he would have a higher score and that his previous scores have shown this to be true. Ms. Richardson also indicated that she often reads with Student and knows that he is capable of. Ms. Richardson would put Student roughly between a third-grade level to an eighth-grade level, depending on the text and his level of interest. Ms. Richardson indicated it was hard to judge reading comprehension when a student does not engage because of their interest. [Tr. Vol. III, pp 552-553, 573-574, 620-621, 630].

---

[17] This appears to be a typographical error and should read 2022.

22-011246
Page 37

119. Under Student's Annual Goal for reading, the January 20, 2022 IEP states:

> When given an informational text at [Student's] instructional level he will read, both collaboratively and independently to determine and state the authors purpose for text to help him reach his postsecondary goal of being a heavy equipment operator in the construction field with 80% accuracy by January 2023. The following evaluation procedures will be used: Analysis of Work Samples, Standardized Assessment, Teacher made test.
>
> [Pet. Exh. 83, p 6].

120. Ms. Richardson indicated that Student prefers true stories or fact-based reading as opposed to something made up. [Tr. Vol. III, pp 576-578, 619; Pet. Exh. 83, p 6].

121. For Student's Social/Emotional PLAAFP, the January 20, 2022 IEP states as follows:

> When [Student] has checked in with the social worker, [Student] has been respectful and responded appropriately to questions asked of him. [Student] has struggled with following the school and classroom rules consistently. [Student] has earned twenty-eight behavior referrals for the current school year for being disruptive (11), non-compliance/insubordination (4), inappropriate language/ comments (5), disrespect (3), physical contact/aggression (4), and skipping (1). [Student] is not completing all of his assignments in class which is impacting his grades. [Student] is currently not passing four of his classes. Since [Student] has returned to in person learning this school year and because there has been an increase in referrals, social work services will increase from consult services to direct social work services. These behaviors impact the student's ability to function independently in the general education setting. [Pet. Exh. 83, p 6].

122. Beginning February 1, 2022, Student's social work services were changed to direct services for 10 to 30 minutes once a week. [Tr. Vol. III, pp 574-575; Pet. Exh. 83, pp 2, 8].

22-011246
Page 38

123. The January 2022 IEP also provided 0.5 to 12 hours per week in the Alternative Special Education Program, which is the special education resource room. Ms. Richardson indicated that the sizeable time range was to ensure Student received a full range of supports from the special education teacher as needed. [Tr. Vol. III, pp 575-576; Pet. Exh. 83, p 8].

124. The January 20, 2022 IEP also had supplementary aids and services for Student, which included the use of a computer or word processing equipment, behavioral support from the use of a Behavior Plan, seating arrangements that matches Student's needs, utilization of sensory strategies, frequent breaks, frequent feedback, alternative test area, extra time to answer questions and formulate responses, allowing Student to answer test questions orally, reading of test and assignment questions to Student, repeating directions, and allowing Student to use the "cooling off" area. [Pet. Exh. 83, pp 7-8].

125. Student has not received Extended School Year (ESY) services in any of his IEPs from 2019 through 2022. [Tr. Vol. II, p 370; Pet. Exh. 23; Pet. Exh. 40; Pet. Exh. 49; Pet. Exh. 83; Resp. Exh. D; Resp. Exh. G].

126. A MAP Growth Family Report for Winter 2022 shows Student in "Average Achievement 50th Percentile" and "High Average Growth 80th Percentile" in math, while he received "Low Achievement 3rd Percentile" and "Low Growth 6th Percentile" in reading. The report further indicated that Student is likely to be "not proficient on the PSAT (if taken in Spring 2022)." [Pet. Exh. 84].

127. Respondent did not complete Student's FBA until the end of the 2021-2022 school year. Student's Behavior Plan was updated after the FBA was completed. [Tr. Vol. I, pp 242-243; Tr. Vol. III, pp 612-614].

G. September 21, 2022 Independent Psychological Evaluation

128. Petitioner hired Dr. Cimone Safilian, MA, Ph.D., TLLP, with Kaufman Psychological Services, PLLC, as the Independent Educational Evaluation (IEE) evaluator to be paid for by Respondent for Student's psychoeducational testing. [Tr. Vol. II, pp 374-376, 474-475; Pet. Exh. 89].

129. On September 21, 2022, a Comprehensive Psychological Evaluation was completed for Student. The evaluation states that it "will clarify the meaning and function of the interplay of psychological and academic difficulties [Student] is experiencing, which will guide treatment planning and academic supports." [Pet. Exh. 89, p 1].

130. The psychological evaluation lists Student's medical diagnoses as well as his current prescriptions. The evaluation states that, "[Student] does not take any of his medication (aside from allergy/asthma medication as needed or Benadryl to sleep) because he does not like taking medication." [Pet. Exh. 89, p 3].

131. According to the psychological evaluation, the Wechsler Individual Achievement Test 3rd Edition (WIAT-III) was administered to measure Student's abilities in reading and writing. Student scored in the "low average" range for word reading and pseudoword decoding, although his total reading score was in the 19th percentile, which was considered "average". For written expression, Student scored in the "very low" range in sentence composition, "below average" in sentence combining, and "low" range in sentence building. Student's total achievement indicated an Average score as compared to his same age peers. [Pet. Exh. 89, pp 8-10].

132. The Wechsler Intelligence Scale for Children- Fifth Edition (WISC-V) was also administered, which shows Student at or above average in all areas, with the exception of Processing Speed Index, for which Student's score was ranked "extremely low". The evaluation indicated that "low scores indicate an under-developed ability to identify visual information, to make accurate decisions, and to implement those decisions in an accelerated manner. [Student's] Extremely Low score on this subtest may be indicative of impaired fine-motor speed." [Pet. Exh. 89, pp 16, 18].

133. The psychological evaluation indicated that Student's WIAT-III scores in the "low average" range in word reading and pseudoword decoding, "correspond with low Processing Speed on the WISC-V." [Pet. Exh. 89, p 24].

134. The psychological evaluation also contained a Behavior Assessment System for Children (BASC-3). Student self-reported in the "Clinically Significant" range for: attitude at school, attitude to teachers, and depression. Petitioner reported Student in the "Clinically Significant" range for: hyperactivity, aggression, attention problems, and functional communication. The Teacher Report was completed by Respondent's Vice Principal, who reported Student in the "Clinically Significant" range for aggression, conduct problems, somatization, and learning problems. [Pet. Exh. 89, pp 19-20].

135. The psychological evaluation concluded the following as it related to Student's behaviors:

> [Student's] presentation of psychological difficulties and maladaptive behavior patterns may be influencing his academic performance as well. His oppositional and unruly behavior at school

22-011246
Page 40

> has negatively influenced his academic performance." The number of days he was suspended from attending classes is a contributing factor in his failing grades. [Student] has many symptoms consistent with ADHD that may significantly impact his ability to perform in the classroom. These difficulties include: sustaining attention and difficulty completing tasks, hyperactivity and being disruptive, and memory. These behaviors were evidenced by elevated scores on the Brown EF/A Parent, Conners-3 Parent, Conners-3 Teacher, ASRS Parent, BASC-3 Parent, and BASC-3 Teacher.
>
> [Pet. Exh. 89, p 24].

136. The psychological valuation recommended that Student engage in weekly individual psychotherapy. Based on his academic scores, the evaluation concluded that Student would benefit from continued special accommodations at school and gave recommendations for how Student may benefit when completing homework. Finally, the evaluation indicates that because Student "has suffered multiple concussions, a neurological examination may be warranted." [Pet. Exh. 89, pp 25-27].

137. Ms. Gittinger stated that Respondent's high school staff will receive a copy of the IEE, which will be used to create a plan for Student. [Tr. Vol. III, pp 509- 510; Pet. Exh. 89].

   H. September 2022 Independent FBA

138. Nathan Vanderweele obtained his M.A. in behavior analysis from Western Michigan University in 2017. Mr. Vanderweele is a Board Certified Behavior Analyst (BCBA) and a licensed behavior analyst in the state of Michigan. Mr. Vanderweele works at Kalamazoo Autism Center of Western Michigan University as a clinical supervisor. In this position, he supervises clients and behavior technicians, conducts assessments, writes assessment results, behavior plans, behavior treatment plans, support plans, and provides ongoing training and support of staff. [Tr. Vol. I, p 115].

139. Mr. Vanderweele was retained to complete an independent FBA for Student and develop a behavior plan. [Tr. Vol. I, p 116; Pet. Exh. 91].

140. Mr. Vanderweele was given the January 20, 2022 IEP to review as part of his assessment of Student. [Tr. Vol. I, pp 122-123; Pet. Exh. 91, p 1].

22-011246
Page 41

141. Mr. Vanderweele did not have access to Student's behavior records, although he requested those records from the Assistant Principal. [Tr. Vol. I, p 158].

142. Mr. Vanderweele sent a questionnaire to Petitioner to gain a better understanding of Student's behaviors. Petitioner informed Mr. Vanderweele that Student enjoys football and working on cars. Mr. Vanderweele indicated that these interests could be used as motivators that are contingent on Student's success in his academic classroom. [Tr. Vol. I, pp 123, 135-136].

143. Mr. Vanderweele briefly interviewed three teachers and asked if they had any notable behaviors of concern, what type of support they would like to have, and how Student performed in the classroom. Each teacher stated that Student struggles staying on task, will often leave the classroom for a break, and make disruptive comments. Mr. Vanderweele did not conduct full interviews with the teachers due to scheduling issues and to minimize any distractions in the classroom. [Tr. Vol. I, pp 123-124, 159; Pet. Exh. 91, pp 2-3].

144. On September 26, 2022 and September 27, 2022, Mr. Vanderweele observed Student in Transitional Algebra, Physics, History, and lunch period. In his report, Mr. Vanderweele states that on September 26, 2022, the "narrative ABC data was collected to observe any patterns with things that occurred right before and right after behavior. On 9/27/2022, data was also collected on [Student's] inappropriate behavior compared to his peers' inappropriate behaviors using partial interval recording." For the interval recording, Mr. Vanderweele recorded whether Student's behaviors were occurring during 60 second intervals in order to get an estimated percentage of time that Student was on task compared to his peers. [Tr. Vol. I, pp 136-137; Pet. Exh. 91, pp 1, 3-4].

145. Mr. Vanderweele observed Student engaging in verbal outbursts and out of seat behaviors across a variety of settings. Mr. Vanderweele completed his FBA on September 28, 2022 and noted that most of Student's behaviors "were followed by some form of attention, either from peers or his teachers, indicating that attention may be a function of these behaviors." Mr. Vanderweele indicated that avoidance of unpleasant situations may also be a function of Student's frequent requests to leave the classroom. [Tr. Vol. I, pp 122-123, 127-128; Pet. Exh. 91, p 4].

146. Mr. Vanderweele's September 28, 2022 FBA report concluded the following:

> . . . [Student's] problem behaviors observed during this assessment range from simply not following instructions, to verbal outbursts in class, to talking to peers about inappropriate topics, to cursing at teachers or peers. No elopement behavior (walking out of the

22-011246
Page 42

classroom or assigned area) or aggressive behavior was observed during this assessment. When reviewing the patterns surrounding [Student's] behavior, the somewhat mild inappropriate behavior observed is likely maintained by peer or teacher attention or escape/avoidance of tasks that leads to more desirable attention. In other words, peer or teacher attention could be functioning as a positive reinforcer for verbal outbursts, while wandering around the classroom could function as a negative reinforcer that results in a positive reinforcer (peer/teacher attention).

[Pet. Exh. 91, p 7].

147. Mr. Vanderweele used the term "mild behaviors" because several other of Student's peers were engaging in these behaviors at varying rates. [Tr. Vol. I, p 162; Pet. Exh. 91, p 5].

148. Mr. Vanderweele recommended that Student be seated next to well-liked peers that were also well-behaved in class who can serve as a model and help provide re-direction. Mr. Vanderweele further recommended that a peer check-in be developed to provide positive attention as well as having Student's teachers make clear their classroom expectations and consequences for not following those expectations. For Student's behavior interventions, Mr. Vanderweele recommended teaching Student when to seek peer and teacher attention at the appropriate times and outlining what a break should look for Student. For the consequences interventions, Mr. Vanderweele recommended increasing appropriate peer attention for appropriate behaviors, rather than inappropriate behaviors. Another intervention recommended was for teachers to set up classroom expectations by setting a reinforcement system where all students need to be engaging in a certain behavior in order to receive a reward. [Tr., pp 129-135; Pet. Exh. 91, pp 8-9].

149. Mr. Vanderweele also created a Behavior Support Plan for Student. The target behaviors were verbal outburst and out of seat behaviors, since those were the only two behaviors observed by Mr. Vanderweele. [Tr., pp 137-140; Pet. Exh. 93].

150. Mr. Vanderweele's Support Plan listed antecedent strategies he recommended for Student that would help to reduce the behaviors, which included: seating Student next to a well-liked and well-behaved peer to serve as a model for Student and who can also re-direct Student when he is off task; develop a peer check-in system to provide reinforcement for coming to class; set clear rules and expectations for behaviors; and non-contingent attention and breaks. [Tr., pp 141-142; Pet. Exh. 93, pp 7-8].

151. Mr. Vanderweele acknowledged Respondent cannot require a peer to be a part of Student's behavior plan. However, Mr. Vanderweele believes that a peer can be involved as long as the peer does not know it is part of Student's behavior plan or if the system could be implemented classroom wide so that Student does not know he is being singled out. [Tr. Vol. I, pp 169-170, 172-173].

152. Mr. Vanderweele indicated that Student's attention seeking during the appropriate times could be peer mediated to increase Student's "buy in". While he has seen some peer check-ins successfully implemented in other schools, Mr. Vanderweele has not seen a classroom-wide check-in system implemented with success in a general education high school setting. [Tr. Vol. I, pp 146, 188-192].

I. Dr. Bateman's Report (Petitioner's Expert Witness)

153. David Bateman has a master's in special education from the College of William and Mary, and a Ph.D. in special education from the University of Kansas. He is currently a professor of special education at Shippensburg University in Pennsylvania and a principal researcher at the American Institutes for Research in Washington, D.C. [Tr. Vol. I, pp 16-17; Pet. Exh. 95, p 3].

154. As a professor, Dr. Bateman teaches and advises both undergraduate and graduate student courses on introduction to special education law, assessments, IEP development, and school law. Dr. Bateman has also co-authored several publications on the topic of special education. [Tr. Vol. I, pp 19, 21-22].

155. Dr. Bateman leads the audit wing at the American Institutes for Research, where he audits school districts related to special education and helps school districts understand their responsibilities in providing a free appropriate public education. Dr. Bateman has trained school districts in the creation and implementation of IEP's. [Tr. Vol. I, pp 19-20].

156. Dr. Bateman previously worked as a certified classroom teacher where he was responsible for case management of IEP's for approximately 24 to 30 students. Dr. Bateman has also worked with children who are deaf and hard of hearing. Dr. Bateman also held a position as a coordinator, where he attended IEP meetings for a number of students. Dr. Bateman last worked in these positions in 1990. [Tr. Vol. I, pp 17, 24-25, 81].

22-011246
Page 44

157. From 1998 to 2008, Dr. Bateman was a first-tier special education due process hearing officer in the Commonwealth of Pennsylvania and presided over hundreds of due process hearings. Dr. Bateman recently contracted to be a second level hearing officer of the State of South Carolina. [Tr. Vol. I, pp 22-23; Pet. Exh. 95, p 24].

158. Following the Supreme Court's *Endrew F.* decision, Dr. Bateman helped develop modules on legally compliant IEPs for the U.S. Department of Education. Dr. Bateman has also led workshops in data collection, progress monitoring, and identifying/creating appropriate supports and services for students.  [Tr. Vol. I, pp 20-21; Pet. 95, p 3].

159. From October 2021 to July 2022, Dr. Bateman worked as a neutral factfinder in a class action lawsuit against the Oregon Department of Education. [Tr. Vol. I, pp 16-17; Pet. Exh. 95, p 23].

160. Dr. Bateman indicated that the most important part of a student's IEP is the 'present level statement' since it dictates the services, needs, and the level of instruction. If the 'present level statement' is incomplete, a school cannot make a determination about what to provide for the student. [Tr. Vol. I, p 29].

161. On October 10, 2022, Dr. Bateman authored a report based on his review of the evaluation report, the IEP, the FBA, and correspondence between Petitioner and Respondent. Dr. Bateman concluded that "the IEP and program offered to Student was inappropriate, especially given the number of suspensions received." [Pet. Exh. 95, p 4; Tr. Vol. I, p 30].

162. Dr. Bateman reviewed the March 2020 MET performed by Respondent. Dr. Bateman thought the WISC scores were "nicely done" but noted that more observational data from teachers was needed to know how Student is currently functioning. Dr. Bateman maintained that the March 2020 MET does not provide sufficient information for Respondent to create an IEP that was reasonably calculated to allow Student to make appropriate progress in light of his unique circumstances. [Tr. Vol. I, pp 69-72; Pet. Exh. 39; Resp. Exh. C].

163. Following the March 2020 MET evaluation, Dr. Bateman would have recommended additional evaluations for Student such as achievement testing and a BASC to better understand Student's needs as well as behavioral data to determine where Student is functioning. [Tr. Vol. I, p 72].

164. Although he did not reference the April 16, 2020 IEP in his report, Dr. Bateman did review the April 2020 IEP. As it related to the academic data, Dr. Bateman indicated that listing Student's scores from a NWEA test in 2019 failed to

22-011246
Page 45

demonstrate that Student had learned anything for the last year. Dr. Bateman also indicated that the reading goals were not actually reading goals, but rather attention goals. Additionally, Dr. Bateman noted that the behavior goals did not indicate any progress towards the previous goals and the objectives are the same as the prior IEP. Dr. Bateman also observed that Student had more discipline referrals than he did in the prior year. Dr. Bateman further indicated that Student's social/emotional goals lacked specificity. As it related to the supplementary aids and services, Dr. Bateman stated that they were vague, put a lot of burden on Student, that there were no notable changes from the prior IEP, and they did not identify any positive behavior intervention supports specific to Student's behavior needs. [Tr. Vol. I, pp 48-54; Pet. Exh. 23; Pet. Exh. 40; Resp. Exh. D].

165. Dr. Bateman does not believe the April 2020 IEP is reasonably calculated to allow Student to make progress in light of his unique circumstances because Student's present levels do not articulate an understanding of where he is currently functioning. Dr. Bateman indicated that without present levels of functioning, it is hard to measure progress. Additionally, Dr. Bateman indicated that the goals are vague and thus difficult to measure. [Tr. Vol. I, p 54].

166. Dr. Bateman also reviewed the April 14, 2021 IEP for Student. Dr. Bateman noted that this IEP had updated NWEA scores and states that Student regressed. As it relates to communication needs, Dr. Bateman indicated there were additional supports and clarity provided. Dr. Bateman also noted that Student's social/emotional needs were removed from the April 2021 IEP since Student was virtual; however, he noted this does not mean Student's behaviors have disappeared. Dr. Bateman further indicated that Respondent should have paid more attention to the information from the parent to complete this portion, rather than removing it all together. Dr. Bateman observed that the reading goal in this IEP has more focus on an actual reading goal unlike the prior IEP, but that it does not state Student's current levels and thus it would be difficult to determine whether this goal is reasonable calculated to allow Student to make progress. As it relates to the supplementary aids and services, Dr. Bateman indicated this section is getting better, but is still vague and puts the burden on Student. Dr. Bateman further indicated that the IEP did not identify any positive behavior supports within the IEP. [Tr. Vol. I, pp 33, 55-60; Pet. Exh. 49; Resp. Exh. G].

167. Dr. Bateman does not believe the April 2021 IEP was reasonably calculated for Student to make appropriate progress because there is a lack of clarity in the goals and a lack of understanding of what supports are necessary for Student as a part of the program. [Tr. Vol. I, pp 60-61].

22-011246
Page 46

168. Dr. Bateman also reviewed the January 20, 2022 IEP and found it to be inconsistent, lacking in detail, and in need of additional supports and provisions for Student. More specifically, Dr. Bateman indicated that there is a lack of information about the 28 behavioral referrals, which he indicates is a red flag that Student needs more supports. Dr. Bateman further indicated that the reading goals in the IEP need more data in the PLAAFP on where Student is currently functioning, and any curriculum-based measurements provided to Student. Additionally, Dr. Bateman indicated the goals are vague and thus are not measurable to determine whether Student is making progress. Dr. Bateman further indicated that Student's needs under the Supplementary Aids/Service/Support are also vague and do not really identify positive behavior intervention supports for Student's behavioral needs. [Tr. Vol. I, pp 30-40; Pet. Exh. 83].

169. Dr. Bateman concluded that the January 20, 2022 IEP was not reasonably calculated to allow Student to make appropriate progress in light of his unique circumstances because there is a lack of understanding of his unique circumstances and vague language used throughout. Dr. Bateman's report also concluded that the "IEP contains contradictory and incomplete information. There is no clear rationale for the decisions made. There is no clear connection between the PLAAFP, goals, and services. The stated purpose was an IEP review/revision and development of a transition plan. It appears the IEP was not fully reviewed/revised." [Tr. Vol. I, pp 40-41; Pet. Exh. 83; Pet. Exh. 95, pp 18-19].

170. Dr. Bateman concluded that for each of the IEP's from 2019-2022, Student's present levels were vague and written in such a way that Student could not be provided with a free appropriate public education. Dr. Bateman indicated that Respondent needed to improve the present levels and educational programming by providing greater clarity about Student's specific needs. [Tr. Vol. I, p 61].

171. Dr. Bateman did not see any data or progress monitoring for Student in relation to his goals in the IEP. Dr. Bateman notes that Student is maintaining and doing the same thing year after year. [Tr. Vol. I, pp 61-62].

172. Given the decrease in Student's NWEA reading scores and the number of disciplinary referrals, Dr. Bateman would expect to see additional or amended IEPs to address these issues. Dr. Bateman did not see any additional IEP's that were created to address those issues. Dr. Bateman did not see that Student showed progress based on any of the interventions Student was given. [Tr. Vol. I, pp 63-64, 77].

22-011246
Page 47

173. Dr. Bateman also reviewed an Independent Psychoeducational Evaluation from Kaufman Psychological Services, PLLC, dated September 21, 2022. Dr. Bateman expressed some concerns about the evaluation only containing a history from Petitioner and that there appeared to be a "very limited review of regular education/special education records". [Tr. Vol. I, pp 65, 86; Pet. Exh. 89; Pet. Exh. 95, pp 9-15].

174. As it relates to the psychological evaluation's review of Student's behaviors, Dr. Bateman indicated a concern about the evaluator incorrectly stating Student being suspended for 52 days, which is more than double the actual number of suspensions. Dr. Bateman's report notes that the behavioral section needs more information and that he would like to see more information to describe what behaviors Student was exhibiting at the time. [Tr. Vol., pp 87-91; Pet. Exh. 89, pp 2, 7; Pet. Exh. 95, pp 9, 11].

175. As it relates to Student's achievement and intellectual test results, Dr. Bateman noted that the WIAT-III test is out of date and thus does not give the most accurate information. Dr. Bateman also expressed concerns about the WISC-V as he indicated that the test is more skewed towards individuals with higher verbal ability. Dr. Bateman also noted a discrepancy between Student's performance on reasoning tasks versus processing tasks on the WISC-V, which could lead to the need for additional supplementary aids and services for Student. Dr. Bateman also noted that the psychological evaluation shows a concern about Student's written expression, which is not in Student's prior IEP's. Dr. Bateman believes that some of the information contained in this psychoeducational report could have been obtained by Respondent if Respondent had done any reevaluations between Student's annual IEP's. [Tr. Vol. I, pp 66-69, 86, 92, 96-97; Pet. Exh. 89, pp 8-10, 16-18; Pet. Exh. 95, pp 9-15].

176. As it relates to the BASC-3 reports, Dr. Bateman indicated he had some concerns about the Vice Principal completing the BASC-3 rating scales and would have expected a classroom teacher to have provided that information. Dr. Bateman stated that he would have serious concerns about Student's self-report rating of "clinically significant" as to his attitude towards school and depression. [Tr. Vol. I, pp 65-66, 99-100].

177. Dr. Bateman noted that the September 2022 psychological evaluation had similar academic recommendations to what Student was already receiving but gave greater specificity as to what accommodations should be provided. [Tr., pp 68-69; Pet. Exh. 89, p 26].

22-011246
Page 48

178. Dr. Bateman understands that, in light of the references to Student's concussions, a neurological exam may be necessary. Dr. Bateman would also recommend that a neuropsychological evaluation be performed in order to provide Student with an IEP that is reasonably calculated to allow student to make progress appropriate in light of his unique circumstances. [Tr. Vol. I, pp 69, 110-111; Pet. Exh. 89, p 27].

179. Dr. Bateman would expect a parent to report any information related to concussions and/or self-harming behavior to the school district. [Tr. I, pp 88, 90].

180. Dr. Bateman also reviewed Mr. Vanderweele's Independent FBA. Dr. Bateman noted that the FBA was not comprehensive and that more observational data was needed of Student in different settings to understand Student's current functioning. Dr. Bateman further notes that a lack of formal teacher interviews does not allow for a thorough and well-informed FBA. [Tr. Vol. I, pp 30, 72-75, 102; Pet. Exh. 91; Pet. Exh. 95, pp 20-22].

181. Dr. Bateman believes that the independent FBA has some good recommendations, but notes that increasing attention to appropriate behaviors as opposed to focusing on negative behaviors is difficult. Dr. Bateman also agrees that Respondent cannot require Student's general education peers to provide supports as suggested in the FBA. [Tr. Vol. I, pp 75-76, 104-105].

182. Bateman suggests that another FBA be conducted to include observational data comparing Student to his peers across multiple settings and to provide the appropriate recommendations. [Tr. Vol. I, p 106].

## Conclusions of Law

The undersigned has reviewed the exhibits and the transcripts of the hearing in deciding this matter. It is clear from the record that Petitioner is a loving parent who wants the best for her child.  It is also clear from the record that Respondent personnel who have worked with Student also want what is the best for Student.

Petitioner bears the burden of proof, by a preponderance of the evidence, for all claims raised in this matter.  In the present case, there are eight claims that Petitioner raises against Respondent, which the undersigned addresses below.

A. *Whether Respondent failed to develop an Individualized Education Program (IEP) reasonably calculated to allow Student to make appropriate progress in light of his unique circumstances at the April 16, 2020, April 14, 2021, and January 20, 2022, IEP meetings?*

22-011246
Page 49

In *Endrew F v Douglas County School District*, the U.S. Supreme Court held that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F*, 137 S Ct at 999. The Court further held that ". . . a student offered an educational program providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low it would be tantamount to 'sitting idly . . . awaiting the time when they were old enough to 'drop out.'" *Id.* at 1001 (citing *Rowley*, 458 US at 179).

Moreover, the Court held that when a student is not in a general education setting, an IEP "need not aim for grade-level advancement" if that "is not a reasonable prospect for the child." *Id.* at 1000. Instead, an "educational program must be appropriately ambitious in light of [the child's] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* The Court in *Endrew F* noted that "[a]n IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth" *Id.* at 999. "Accordingly, for a child fully integrated in the regular classroom, an IEP typically should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."" Id. at 999 (citing *Rowley*, 458 US at 203-204). This analysis must be performed on a case-by-case basis because "the adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* at 1001.

Petitioner maintains that Respondent's IEPs offered Student vague and inconsistent goals and services for each of the years in question, failed to accurately identify Student's present level performance and needs, and thus did not provide Student the opportunity to make more than *de minimis* progress. [Pet. Closing Brief, pp 8-9].

Dr. Bateman testified that "the most important part of an IEP is the present level statement because that dictates the services, that dictates the needs, that dictates the level of instruction that's provided." [Tr. Vol. I, p 29]. Dr. Bateman concluded that the IEPs for 2020, 2021, and 2022 contained present levels that were vague and written in such a way that Student could not be provided with a free appropriate public education. Dr. Bateman indicated that Respondent needed to improve the present levels and educational programming by providing greater clarity about Student's specific needs. [Tr. Vol. I, p 61].

As it relates to Student's April 2020 IEP, Petitioner's expert, Dr. Bateman, noted that the IEP did not indicate whether Student had progressed on the reading goals and that Student's annual reading goal was actually more of an attention goal than a reading

22-011246
Page 50

goal. [Pet. Exh. 40, p 3]. For Student's behavior goals, Dr. Bateman indicated that the April 2020 IEP did not state whether Student made any progress towards the previous goals, although there was an increase on disciplinary referrals, and he noted that some of the objectives were the same as those listed in the prior IEP. [See Pet. Exh. 23, p 3; Pet. Exh. 40, p 5]. Dr. Bateman concluded that because Student's present levels were vague on Student's current functioning, the IEP was not reasonably calculated to allow Student to make progress in light of his unique circumstances. [Tr. Vol. I, p 54].

It is noted that the April 2020 IEP was amended on October 13, 2020, for the development of Student's Contingency Learning Plan (CLP) during the COVID-19 pandemic. [Resp. Exh. E]. The CLP indicated that Student would be able to access alternative learning through "phone, email, google hangouts" and by doing "hands on and interactive work. Computer based work." Respondent indicated that since Student was virtual for the 2020-2021 school year, the amendment was necessary as Student's goals were previously able to be monitored in the classroom setting. [Resp. Exh. D, E; Resp. Closing Brief, p 9].

Petitioner asserts that Student's April 2020 IEP was not appropriate to meet Student's needs because Student was not able to record answers to assignments, track time with a timer, have a cooling off space, extra time without marking Student down, or to get frequent positive feedback, visual supports, sensory strategies, and verbal cues. [Pet. Closing Brief, p 15]. The undersigned disagrees. Petitioner's April 2020 IEP and the related IEP amendments were implemented for the 2020-2021 school year, when Student was virtual. While Student was virtual, it was undisputed that Student was provided with a Chromebook where he was allowed to type his answers to assignments and was given the option of having his assignments read to him. [Tr. Vol. I, p 229; Tr. Vol. II, p 384; Pet. Exh. 40, p 6; Resp. Exh. D, SPS 037]. In addition, Student had the opportunity to meet daily with the special education teacher on Google hangouts to receive assistance and/or any visual supports. Petitioner does not dispute that Student was given extra time to submit assignments, although Petitioner asserts that some of Student's assignments were marked "late". Petitioner, however, failed to establish how often this occurred and further failed to establish how the "late" assignments had affected Student's grades or his ability to make progress in any particular class. [Tr. Vol. I, pp 218-229]. As it related to the other supports of providing Student a "cooling off space" or "sensory strategies", it is clear that Respondent was not able to provide these supports to Student in a virtual setting. Furthermore, there is no indication that while Student was virtual, he was not able to access any of these other supports.

Next, Petitioner argues that the U.S. Department of Education Office of Special Education and Rehabilitative Services, *Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak* (March 2020),

22-011246
Page 51

"has made it clear that school districts still had an obligation to provide appropriate educational services to students on IEPs during the COVID-19 pandemic." [Pet. Closing Brief, p 15]. Petitioner asserts that Respondent's failure to include the Contingency Learning Plan in the April 2020 IEP shows that Respondent failed to develop an IEP reasonably calculated to allow Student to make progress toward his IEP goals and the general education curriculum. [Pet. Closing Brief, pp 16-17].

The U.S. Department of Education's *Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak* (March 2020) states in part:

> If an LEA closes its schools to slow or stop the spread of COVID-19, and does not provide any educational services to the general student population, then an LEA would not be required to provide services to students with disabilities during that same period of time. Once school resumes, the LEA must make every effort to provide special education and related services to the child in accordance with the child's individualized education program (IEP) . . . .[18]

Based on the above referenced guidance, Respondent was not required to provide Student with educational services for the remainder of the 2019-2020 school year since Respondent had closed due to the government ordered shutdowns. [Tr. Vol. III, pp 500-501]. Petitioner indicates that Respondent did not create the Contingency Learning Plan until September 2020, and that the April 2020 IEP was not amended to add the plan until October 13, 2020. [See Resp. Exh. E and L; Pet. Closing Brief, p 16]. At the start of the 2020-2021 school year, Student was not in school for the first two weeks while the team was trying to decide between whether he would be attending school virtually. [Tr. Vol. III, pp 608-609]. Once Petitioner decided that Student would attend virtually, Student was provided with a Chromebook to be able to access his education. On October 21, 2020, a second IEP amendment indicated that Student was "doing well with virtual learning" and thus behavior supports were not necessary. [Resp. Exh. F, SPS 050]. By all accounts, Student made academic progress and had good grades during the virtual 2020-2021 school year. [See Tr. Vol. I, pp 229-232; Tr. Vol. II, p 390; Tr. Vol. III, p 522; Pet. Exh. 44, p 4; Pet. Exh. 47, pp 2-4]. Petitioner also informed the special education teacher that she thought Student emotionally was "doing just ok most of the time" because no one at school was pushing him. [Pet. Exh. 46, p 1]. Prior to the April 2021 IEP meeting, Petitioner stated she was not worried about Student's education in the virtual setting. [Pet. Exh. 47, pp 2-4]. Based on the evidence presented, while the April 2020 IEP had some procedural violations, those violations did not result in substantive harm to Student or a denial of Student's right to FAPE.

---

[18] https://sites.ed.gov/idea/files/qa-covid-19-03-12-2020.pdf, p 2.

22-011246
Page 52

Respondent also notes that while Student's April 2020 IEP provided for direct social work services and speech services, Student had declined these services. [Pet. Exh. 40, p 8; Resp. Exh. D, SPS 039]. As a result of Student's decision to decline services, the social work and speech services were changed in the April 2021 IEP from "direct" to "consult". [Resp. Exh. D and G; Resp. Closing Brief, p 9]. Respondent argues that "[t]his choice by Student and Petitioner tempers the District's responsibility to prove progress in this area." [Resp. Closing Brief, p 9; Resp. Exh. H, SPS 061-062].

Petitioner acknowledges declining virtual speech therapy but maintains that Student's April 2021 IEP noted that communication was still an area of need and that his progress had stalled. [Pet. Exh. 49, p 2; Pet. Exh. 83, p 3; Pet. Closing Brief, p 11]. Petitioner argues that the speech goals were not reasonably calculated to allow Student to receive educational benefits. [Pet. Closing Brief, p 11]. However, the undersigned disagrees. Petitioner cannot reasonably attribute Student's lack of progress on his speech goals on Respondent. In fact, according to Petitioner, virtual speech therapy for Student was difficult "because he refuses to go to a quiet area of the house". [Pet. Exh. 48, p 3]. Petitioner also informed Respondent that she did not believe Student would receive any benefit from virtual speech therapy, that she believed Student had "aged out" of speech therapy, and that Student no longer saw the value in what was being taught. [Tr. Vol. II, p 393]. Petitioner further informed Respondent that she was "OK with taking at least a year off speech," especially if Student continued with virtual learning. [Pet. Exh. 48, p 3]. Thus, it is clear Respondent attempted to provide Student with speech services and that it was through no fault of Respondent that these services were declined and not utilized by Student.

Similar to the speech therapy services, Student was offered virtual social work services. It was undisputed that Student had not been participating in the social work services being offered. [Tr. Vol. III, pp 524, 605; Pet. Exh. 40, p 8; Resp. Exh. D, SPS 039]. Petitioner indicated this was because Student did not like the social worker and found him "boring with no common interests." [Pet. Exh. 46, pp 1-2; Pet. Exh. 49, p 3; Resp. Exh. G, SPS 054]. Again, Respondent cannot be held accountable for Student's refusal to participate in the social work services that were being offered by Respondent.

As it relates to the April 2021 IEP, Respondent removed Student's previously identified social-emotional and behavioral goals. [Pet. Exh. 49, p 3; Resp. Exh. G, SPS 054]. The stated reason for the removal of these areas was that Student had attended school virtually for the past year and the fact that Student had not presented with any behavioral or social/emotional needs. Petitioner asserts that these goals were removed in spite of the special education teacher's testimony that Student had not been logging into his online classes consistently. [Pet. Closing Brief, p 11]. While there was some testimony that Student occasionally failed to log in online, Student later appeared to be making improvements on his logins and Petitioner indicated that Student accepted the face-to-face time he was offered by Respondent "quite a few times" during the 2020-

22-011246
Page 53

2021 school year. [Pet. Exh. 46, p 4; Tr. Vol. II, pp 384-385]. Other than stating Student was not logging in consistently, Petitioner did not raise any other behavioral or social-emotional issues that Student was experiencing during his virtual year and did not assert any other behavioral issues for Student that should have been addressed in the April 2021 IEP. It is also noted that Petitioner did not raise any behavioral concerns to Respondent during the virtual school year. Therefore, the temporary removal of these goals by Respondent was reasonable these circumstances.

Additionally, Petitioner argues that when Respondent created the April 2021 IEP for the virtual setting, it failed to provide any substantive changes to the supplementary aids or programs and services, other than to remove those directly associated with behavior or in-person instruction. [Pet. Closing Brief, p 16]. Petitioner further argues that Respondent failed to provide any additional or replacement supports to Student's 2021 IEP to ensure he could access his education and make progress toward his IEP goals in the virtual setting. [Pet. Exh. 40 and 49; Pet. Closing Brief, p 16]. However, the undersigned finds Petitioner's argument to be unpersuasive as Petitioner failed to indicate what supplementary aids, programs or services were not provided by Respondent in the virtual setting that violated Student's right to FAPE. Instead, the unrebutted evidence presented establishes that Student's virtual learning was successful, and that Student was performing well during the 2020-2021 school year.

Next, Petitioner acknowledges the April 2021 IEP provided Student with reading goals; however, Petitioner asserts that the goals do not state Student's current levels and thus makes it difficult to determine whether the goals are reasonably calculated to allow Student to make progress. [Tr. Vol. I, pp 33, 58-60; Pet. Closing Brief, pp 10-11].  Under the PLAAFP for reading it states that Student's NWEA score decreased from 212 in the fall of 2020 to a score of 204 in the winter. Student's special education teacher testified that this was a "small drop" and that "most students do drop from fall to winter and then they pick back up towards the spring", although this information was not included in the April 2021 IEP. The April 2021 IEP also does not state whether Student's score on the NWEA improved in the spring and there is also no reference to a spring NWEA score in the subsequent January 2022 IEP. The April 2021 IEP also fails to indicate what Student's goals will be to improve upon his testing scores or whether additional assessments will be provided to address the concerns about whether Student's NWEA scores were inaccurate or misleading. Moreover, the January 2022 IEP indicates an even further decline of Student's test scores occurred in the winter of 2022, when his score fell to 189. [Pet. Exh. 83, p 5]. Student's decline in reading scores indicates that the reading goals in the April 2021 IEP were not reasonably calculated to allow Student to make appropriate progress in light of his unique circumstances. Thus, Petitioner has

22-011246
**Page 54**

established that the April 2021 IEP violated Student's right to FAPE with respect to his reading goals.

With respect to the January 2022 IEP, Petitioner again acknowledges that the IEP provided an actual reading goal. Although Dr. Bateman testified that the January 2022 IEP used vague language and had incomplete information, the January 2022 IEP's PLAAFP did provide Student's current reading level and his most recent NWEA test scores. The IEP also provided annual goals as well as objectives for the area of reading. The annual goal provides a target date for Student to be able to read informational text at his instructional level and also breaks down this goal into short-term objectives to be achieved for each quarter. There are also specific percentages Student is expected to maintain for each quarter. [See Pet. Exh. 83, p 6]. At the hearing, Petitioner did not present any evidence to establish that the January 2022 IEP was not reasonably calculated for Student to make appropriate progress on the reading goals.

Petitioner asserts that Student's behavior goals in the January 2022 IEP were similarly vague and immeasurable, making it impossible to provide Student appropriate supports and measure his progress over the course of the IEP. [Pet. Closing Brief, p 11]. The undersigned notes that the January 2022 IEP returned Student's prior behavioral and social/emotional goals. [Pet. Exh. 83, p 6]. The IEP also lists many supplementary aids and services for Student that were meant to address Student's behavioral goals, which included ensuring that Student understood his expectations from the use of a Behavior Plan, provided seating arrangements that would match Student's needs, utilizing sensory strategies (i.e., fidgets), frequent breaks, and allowing Student to use a "cooling off" area. [Pet. Exh. 83, pp 7-8].

Petitioner argues that Respondent failed to collect the information and data necessary to determine what supplementary aids and services were reasonably calculated to meet Student's educational needs and allow him to access an educational benefit and make appropriate progress. [Pet. Closing Brief, pp 11-2]. Petitioner further asserts that while Respondent revised Student's programs and services to include a greater frequency and duration, Respondent failed to make any other substantive changes or clarity of the services to be provided, despite Student's "lack of identified progress toward previous IEP goals and his ongoing academic and behavior deficits and needs." [Pet. Closing Brief, p 12].

By way of example, Petitioner notes that the January 2022 IEP provided Student with "frequent breaks," but gave no explanation of how "frequent" was defined and required Student to initiate these breaks. [Pet. Exh. 83, p 7]. This example is somewhat misleading as the IEP states that the breaks can be "initiated by student request *or teacher direction*." (Emphasis added). Additionally, the IEP refers to Student's Behavior Plan, which contains more specific information about when Student may take breaks.

22-011246
Page 55

[See Resp. Exh. K, SPS 073-076]. Upon review of the supplementary aids and services provided in the January 2022 IEP, the undersigned concludes that Petitioner has not met her burden of establishing that these services failed to meet his educational needs or failed to allow Student to make appropriate progress.

Finally, Petitioner argues that Respondent failed to allow Petitioner to meaningfully participate in Student's IEP team meetings. [Pet. Closing Brief, p 13]. Petitioner maintains that Respondent created the IEP's "without fully considering her input", with the possible exception of the 2021 IEP. [Pet. Closing Brief, p 13]. Petitioner indicates that the volume of communications shows that Petitioner would not "sit silently in an IEP meeting and not contribute more than a couple of lines worth of information about her concerns." [Pet. Closing Brief, p 14]. The undersigned does not find this argument to be persuasive.

While it is clear that Petitioner voiced many concerns about Student via text messages and emails with Respondent's staff, the fact that each one of these concerns were not included word for word in the IEP's does not indicate that Petitioner was not allowed to "meaningfully participate" in the IEP. It was undisputed by Petitioner that she was invited to each IEP team meeting and was allowed to provide input and feedback. Thus, while Respondent may not have included every piece of information provided by Petitioner over the years, there was insufficient evidence presented by Petitioner that Respondent failed to consider her input when creating Student's IEPs from 2020 to 2022.

On review of the evidence presented, the undersigned concludes that Student's April 2021 IEP was not reasonably calculated for Student to make progress in light of his unique circumstances, only with respect to his reading performance. The undersigned concludes that Respondent's April 2021 IEP offered Student an educational program that did not provide Student with the ability to make appropriate progress in his reading goals.

   B. *Whether Respondent failed to request parent consent for and conduct comprehensive reevaluations, including a functional behavior assessment, to address Student's lack of progress toward his IEP goal and in the general education curriculum, to conduct a reevaluation upon receipt of new information provided by Petitioner, and to address Student's anticipated academic and behavior needs related to his ongoing conduct resulting in formal or informal removals from the classroom, from two years of the date of filing the complaint?*

In conducting an evaluation, IDEA and its implementing regulations require a local education agency to, "use a variety of assessment tools and strategies to gather

22-011246
**Page 56**

relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . the content of a child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum." 20 USC 1414 (b)(2)(A)(ii); 34 CFR 300.303(b)(2). The purpose of a reevaluation is two-fold: 1) to determine if the child continues to require special education and related services and 2) to determine whether any modifications or additions need to be made to the special education and related services in the child's IEP to ensure adequate progress on his measurable annual goals and to participate as appropriate in the general education curriculum. 34 CFR 300.305(a)(2)(i)(B), 300.305(a)(2)(iii)(B), 300.305(a)(2)(iv). The IDEA mandates a reevaluation should be completed every three years unless the parents and the district agree it is not necessary. 34 CFR 300.303(b)(2).

As testified to by Dr. Bateman, if the present levels are incomplete, it is impossible to effectively determine and provide services to the student. [See Tr Vol. I, p 29]. Dr. Bateman indicated that in addition to the academic evaluations performed as part of the March 2020 MET, Respondent should have observed and collected additional data on Student's behaviors and completed a BASC to determine where Student is functioning. [Tr. Vol. I, p 72].

With respect to Student's April 2020 IEP, Student continued to perform below grade level in reading, scored in the low 200 range on subtests of the NWEA in reading, and had 37 disciplinary referrals, which was increase in Student's inappropriate language and disruptive behaviors. [Pet. Closing Brief, p 19; Pet. Exh. 23, p 2; Pet. Exh. 40, pp 2-4; Resp. Exh. D, SPS 033-035]. With respect to Student's April 2021 IEP, the IEP showed Student had slightly regressed in his NWEA reading scores. [Pet. Closing Brief, pp 19-20]. The parties agreed that in spite of this decline, Student's overall academic performance had improved and that he generally received good grades for the 2020-2021 school year. Regarding Student's January 2022 IEP, Student's reading performance had regressed even further, with Student performing "at a mid-third grade reading level." [Pet. Exh. 83, p 5]. Additionally, after Student returned from virtual learning, Student earned 28 disciplinary referrals. [Pet. Exh. 83, p 2]. Petitioner asserts that following the January 2022 IEP, "[Student] continued to have significant behavior issues and disciplinary removals." [Pet. Closing Brief, p 20].

Petitioner maintains that the 2020 through 2022 IEPs continued to be vague and lacked specificity and that Respondent's offer of FAPE generally stayed the same despite Student's regression in reading and functional needs. [Pet Closing Brief, p 20]. Petitioner asserts that Respondent failed to make efforts to conduct additional, comprehensive evaluations after Student showed these regressions, with the exception of the cognitive evaluation requested by Petitioner in March 2020. [Pet. Exh. 37; Resp. Exh. A]. Petitioner points out that Respondent had an "opportunity to request parent consent for additional evaluations to address Student's current performance and needs

22-011246
**Page 57**

related to his documented increasing behaviors and regressing reading performance" but that Respondent failed to do so. [Petitioner Closing Brief, p 20].

In the alternative, Respondent argues that at the April 16, 2021 REED, Petitioner stated, "I do not believe we need any more testing at this point." [Resp. Exh H, SPS 061]. Respondent further notes that no one else on the Student's REED team believed more assessments were needed. [Tr Vol. III, p 532, Resp. Closing Brief, p 11]. Based on the information covered at the April 2021 REED, the undersigned agrees that Respondent was not obligated to conduct additional evaluations at that time.

Next, Petitioner argues that Respondent has its own separate obligations to determine whether an evaluation or additional assessments are necessary. In support, Petitioner cites to *MC obo J v Cent Reg'l Sch Dist*, 81 F3d 389, 397 (3d Cir 1996), which states in pertinent part:

> . . . a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith. Rather, it is the responsibility of the child's teachers, therapists, and administrators- and of the multi-disciplinary team that annually evaluates the student's progress- to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly. *MC obo J v Cent Reg'l Sch Dist*, 81 F3d 389, 397 (3d Cir 1996). [See Pet. Closing Brief, p 21].

Respondent also acknowledges that it is "obliged to conduct additional evaluations when that information is needed to address a student's educational needs". [See 34 CFR 300.305(a)(2)(i)(B); Resp. Closing Brief, p 11].

Petitioner notes that Respondent has stated that Student's regression on NWEA reading scores was the result of Student rushing through the test. [Tr. Vol. III, p 620; Pet. Exh. 49, p 2; Pet. Exh. 83, p 2]. Petitioner argues that "there was no academic achievement testing to support this" not does this assertion explain Student's reading deficiencies that have dated back to prior IEP's. [Pet. Exh. 23, p 3; Pet. Closing Brief, p 21]. The undersigned agrees. As indicated above, although Ms. Richardson stated Student's initial regression was within the "normal range" there was no evidence to support this assertion nor was there any notation of such in Student's April 2021 IEP. As stated by Petitioner, the IEP also failed to include Ms. Richardson's knowledge of what she indicates were Student's "actual" reading capabilities in either the April 2021 or January 2022 IEP.

Petitioner also argues that Student's behaviors in class were impacting his ability to access the general education curriculum and that the number of behavior referrals

22-011246
Page 58

should have prompted Respondent to conduct a reevaluation to identify the function of Student's behaviors and how to address those behaviors. [Pet. Closing Brief, p 22]. The parties do not dispute that Respondent did not conduct an FBA to understand Student's behaviors until the end of the 2021-2022 school year, which was several months after Petitioner had explicitly requested an FBA in writing. [Pet. Exh. 61, pp 13-14]. While Respondent did develop a behavior plan for Student in March 2020, this was developed without first conducting an FBA. Additionally, Respondent did not revise Student's March 2020 Behavior Plan until January 2022. The January 2022 Behavior Plan was also not based upon a completed FBA. [Tr. Vol. II, pp 355-356; Tr. Vol III, pp 567-568, 609-612; Pet. Exh. 77; Resp. Exh. K].  Both Dr. Bateman and Mr. Vanderweele provided unrebutted testimony that an FBA must be conducted before a behavior plan can be developed. [Tr. Vol. I, pp 74, 117; Pet. Closing Brief, p 22].

Next, Respondent asserts that "[a]s to behavior, a reevaluation is only required if the cause of the behavior was not clear." [*See Dist. Of Columbia Public Schools*, (SEA July 29, 2019); Resp. Closing Brief, p 11]. Respondent argues that Student's behaviors from 2020 to 2022 "were not new or unique" to Student. [Resp. Closing Brief, p 11]. The undersigned, however, disagrees.

According to Student's March 2020 Behavior Plan, Student's "target behaviors" were following directions, disrespectful, and work completion. Respondent then removed the behavioral needs and supports from the April 2021 IEP stating that Student "has not presented with any behavioral needs." [Pet. Exh. 49, p 3; Resp. Exh. G, SPS 054]. Once Student returned to in-person learning for the 2021-2022 school year, Student went from "no behavioral needs" to 28 behavior referrals in a span of about four months for incidents including Student being disruptive, showing non-compliance/ insubordination, using inappropriate language/comments, disrespect, physical contact/aggression, and skipping. [Pet. Exh. 83, p 2].  While some of these behaviors are the same as those listed in the prior behavior plan, there are several new behaviors which included Student's inappropriate language and physical contact/aggression. In addition to these behavior referrals, Petitioner was consistently sharing her concerns about Student's behaviors in text messages and emails during the fall of 2021. [See Pet. Exh. 55, 56, 61]. Based on these increased and escalated changes in some of Student's behaviors during the fall of 2021, Respondent was on notice that an FBA was clearly necessary to determine the cause of these behaviors.

Petitioner further argues that Respondent never requested parental consent to conduct an occupational therapy evaluation to ensure that the sensory strategies in the Behavior Plan were effective as part of Student's supplementary aids and services. [Pet. Closing Brief, pp 22-23]. However, Petitioner does not indicate which of the sensory strategies referenced in the behavior plan were ones she found to be inappropriate or ineffective for Student. In fact, on one occasion, Petitioner indicated her agreement with Student's

use of a fidget as an appropriate strategy and insisted that Respondent follow this strategy as part of Student's plan. [See Pet. Exh. 73, pp 3-5, 7-10].

In conclusion, the undersigned finds that Petitioner has met her burden of establishing that Respondent should have re-evaluated or re-assessed Student's behavioral issues upon his return to in-person learning in the fall of 2021, especially in light of the fact that Respondent was aware that Student had an increased number of disciplinary actions and was engaging in a number of physical behaviors that were not previously exhibited by Student in prior school years. It is further noted that even after Petitioner's request for an FBA in November 2021, Respondent initially failed to complete an FBA. The parties agreed that Respondent did eventually complete an FBA in the spring of 2022. As it relates to Respondent's continued reliance on Student's "rushing" through exams as an explanation for Student's declining reading scores, without further evidence, this was not a sufficient explanation for why additional evaluations or assessments were not conducted by Respondent to determine why Student was continuously regressing on his reading scores. Thus, Petitioner met her burden of establishing that Respondent failed to request parental consent to conduct comprehensive reevaluations, including a functional behavior assessment, to address Student's lack of progress toward his IEP goals and in the general education curriculum.

C. *Whether Respondent failed to seek Petitioner's consent to conduct a Functional Behavioral Assessment within 10 school days of her making the request in writing?*

The IDEA requires a local education agency to conduct a reevaluation "[i]f the child's parent or teacher requests a reevaluation." 20 USC 1414 (a)(2)(A)(ii); 34 CFR 300.303(a)(2). Pursuant to Michigan Administrative Rules of Special Education (MARSE), implementing IDEA, "Within 10 school days of receipt of a written request for any evaluation, the public agency shall provide the parent with written notice consistent with 34 CFR 300.503 and shall request written parental consent to evaluate." MARSE R 340.1721b(1).

Here, Petitioner requested an FBA in writing on November 29, 2021. [Pet. Exh. 61, p 13]. Respondent concedes that it did not obtain consent and conduct an FBA in the requisite time and that it did not complete the FBA until June 2022. [Resp. Closing, p 11]. Respondent indicates that it has paid for Petitioner to obtain an IEE FBA and Behavioral Support Plan. [Pet. Exh. 91, 93; Resp. Closing Brief, p 11]. Thus, Petitioner has met her burden of establishing that Respondent failed to seek her consent to conduct an FBA within 10 school days of her making the request in writing.

D. *Whether Respondent failed to implement positive behavior intervention supports (PBIS) to support Student's specific behavioral needs?*

22-011246
Page 60

In developing the IEP, where a child's "behavior impedes the child's learning or that of others," the IEP team must, "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 34 CFR 300.324(a)(2)(i). "The IEP must include [a] statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." 34 CFR 300.320(a)(4).

Petitioner maintains that Student's IEPs for the time period in question did not include any positive behavioral intervention supports (PBIS). [See Tr. Vol. I, pp 40, 54, 60; Pet. Closing Brief, pp 26-27].

On the other hand, Respondent argues that it used positive behavior interventions consistently with Student and that those interventions were set forth in the IEPs and in the behavior plans developed and implemented for Student. [See Resp. Exhs. B and K]. Respondent indicates that the January 9, 2022 Behavior Plan provided Student with a "cooling down" space, the choice of going to the Focus Center if there was a substitute in one of his classes, the option to pace in the back of his classrooms; early release from his classes so as not to be overwhelmed in the hallways during passing period; a three-strike plan for insubordination, and lunch or after-school detention, or in-school suspension, but only if all other measures to address his insubordination were not successful. [Resp. Exh. K; Pet. Exh. 37].

Alternatively, Petitioner argues that the plan developed by Respondent cannot be considered a Behavior Intervention Plan because it was not developed from a Functional Behavior Assessment, and therefore cannot be considered PBIS. [Pet. Closing Brief, p 27]. The undersigned does not find this argument to be persuasive. The question here is whether Respondent failed to implement PBIS to support Student's specific behavioral needs, not whether the BIP developed and implemented by Respondent was appropriate. Petitioner also seems to acknowledge there are differences when Petitioner indicates that a "behavior plan" is not the same thing as a positive behavior support plan. [Pet. Closing Brief, p 27].

Based on a review of the evidence presented, Respondent did develop and implement positive behavior supports as listed above when Student was exhibiting behavioral issues. With the exception of Student's virtual learning April 2021 IEP, the April 2020 and January 2022 IEP's contain goals and objectives specifically for social and behavioral areas of need for Student's in-classroom behaviors. In addition, Petitioner was provided with daily behavioral logs and reports outlining what Student's behavior was while at school for the day in question.

Respondent further argues that Petitioner's refusal to support consequences for inappropriate conduct undermined one of the goals to teach Student self-regulation and understanding consequences. [Resp. Closing Brief, p 13]. Respondent noted that

22-011246
Page 61

Petitioner insisted on same day consequences for Student. [Resp. Closing Brief, p 13]. Although Respondent tried to accommodate this request, Petitioner still indicated that it was nearly impossible for Student to be able to participate in any after-school detentions based on Petitioner's schedule.

Upon review of the evidence presented on the record, Petitioner did not meet her burden of establishing that Respondent failed to implement PBIS to support Student's specific behavioral needs.

E. *Whether Respondent failed to provide Student extended school year services, from two years of the date of filing?*

The IDEA requires that extended school year services (ESY) be provided to students if the IEP team determines it is necessary for them to receive FAPE. *See* 34 CFR 300.106(a)(2). While the IDEA and its implementing regulations do not provide specific criteria for when ESY is necessary for FAPE, the Michigan Department of Education (MDE) has released guidance specific to this issue. [Pet. Closing Brief, p 27].

In considering whether ESY services are needed, the IEP team must determine if there is "one or more current annual goal(s) that address skills which need to be maintained without interruption for the student to benefit meaningfully from a FAPE."[19] MDE's guidance goes on to state the following:

> There must be at least one current IEP goal where significant concerns exist regarding skill maintenance during a break in services. Goal areas of concern should represent skills essential to the progress of the student.

> The determination of the need for ESY services must be based on data. The IEP team needs to evaluate the data to determine which, if any, goals represent areas of concern that may present significant difficulties in maintaining skills during breaks (see Section 4 for a discussion on data sources).

> A student with a goal area of concern may be determined to need ESY services due to:

>> 1) A serious potential for regression of skills beyond a reasonable period of recoupment;
>> 2) The nature or severity of the disability; or
>> 3) Critical stages or areas of learning.

---

[19] https://www.michigan.gov/-/media/Project/Websites/mde/specialeducation/iep/GuidanceDocforESY.pdf, p 9.

22-011246
Page 62

- If there are no identified goal areas of concern, then ESY services are not needed for a FAPE.[20]

Petitioner argues that Respondent failed to provide Student with any ESY. Conversely, Respondent argues that Student did not qualify for ESY during the two summers at issue. Respondent indicates that the summer of 2020 was the first year of the pandemic and schools were not open. Additionally, Respondent notes that Petitioner stated Student did not need ESY for the Summer of 2021, although she thought it would have helped when Student was transitioning from middle school to high school. [Tr. Vol. II, pp 370-371; Resp. Closing Brief, p 15]. Respondent correctly points out that this is not the standard for entitlement to ESY services. [Resp. Closing Brief, p 16].

Petitioner argues that ESY services were necessary due to the severity of Student's disabilities, which directly caused Student to perform significantly below his peers both academically and behaviorally. [Pet. Closing Brief, p 30]. While Student's disabilities had some impact on Student's ability to make progress, Petitioner failed to show how Student's disability required ESY services "in order to maintain skills *that otherwise would be lost and not recovered in a reasonable amount of time*."[21] (Emphasis added). Petitioner further indicates that MDE defines "critical area of learning" as "an area of instruction that is essential to the student's development in becoming self-sufficient and independent."[22] Petitioner maintains that reading is an area that is essential to becoming self-sufficient and independent. [Pet. Closing Brief, pp 30-31]. Upon review of the MDE guidance, however, Petitioner failed to establish that Student affirmatively met the one or more of these questions on critical stages/areas of learning[23]. Petitioner also claims that Respondent never explained to her what ESY services were; however, this claim is contradicted by each of the prior IEPs, which indicate ESY services were discussed and determined not necessary for Student. Thus, the undersigned does not find this argument to be credible.

The Sixth Circuit Court has established that ESY is appropriate if it prevents significant regression of skills or knowledge retained by the student that may seriously affect the student's progress toward self-sufficiency. *Cordrey v. Euckert*, 917 F2d 1460 (CA 6,

---

.
[21] Id. at 11.
[22] Id. at 11.
[23] "The critical stage/critical area of learning must be identified, and the following questions must be answered: (a) Is there a skill that needs to be mastered immediately? If the student does not master the skill immediately, is the degree of mastery likely to be permanently reduced? What data support this? (b) Is the student at a critical stage of development where there is a window of opportunity that will be lost if services are not provided? What data support this? (c) Are there changes in the student's medical, physical, or sensory status that makes it possible to predict an accelerated rate of learning during the ESY period (critical stage)? What data support this? (d) Is the skill in a critical area of learning, and will a break in services result in the loss of a window of opportunity for mastering the skill? What data support this? (Id. at 11-12).

22-011246
Page 63

1990).  It is the Petitioner that bears the burden of establishing, through data or expert testimony, that the Student will experience regression which cannot be recouped within a reasonable period of time. This burden is not alleviated or eliminated by the Respondent's failure to keep such data regarding the Student. *Kenton County v. Hunt*, 384 F3d 269, 279 (CA 6, 2004); R 340.1721e(3).

In this case, Petitioner has not presented any evidence that shows that Student would experience a regression of skills or knowledge that cannot be recouped within a reasonable period of time. Additionally, the IEP teams for each of the at issue IEPs specifically considered the need for ESY services and determined that such services were not necessary. On review of the evidence presented, Petitioner has not shown, by a preponderance of the evidence, that Student's 2020-2022 IEPs should have provided services for an extended school year.

F.  *Whether Respondent failed to review and revise Student's IEP to address his academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals and the general education curriculum, from two years of the date of filing?*

IDEA and its implementing regulations require an LEA to "ensure that the IEP Team . . . revises the IEP as appropriate to address any lack of expected progress toward the annual goals and in the general education curriculum . . .; the results of any reevaluation conducted . . .; or other matters." 20 USC 1414 (d)(4)(A)(ii); 34 CFR 300.324(b)(1)(ii). While an LEA is not required to amend the IEP every time a parent expresses a concern or provides information, Petitioner argues that at the very least it should be fully considering that information and convening an IEP team meeting to determine whether new supports or changes are needed based on the new information. [Pet. Closing Brief, p 36].

Petitioner asserts that Respondent failed to conduct any substantive reviews and revisions of Student's IEP in spite of her raising concerns to the IEP team. Petitioner also indicated that she raised concerns about Student's Tourette's syndrome and that "although Respondent included the phrase "Tourette's syndrome" in the IEP, there were no goals or behavioral supports included in the IEP to address Student's needs with respect to the tics which manifested from his Tourette's syndrome." [Pet. Closing Brief, pp 32-33].

Petitioner further asserts that Respondent failed to add autism to her parent concerns in the IEP; however, a review of the April 2019 IEP shows that "autism spectrum disorder" was listed under parent concerns. [Pet. Exh. 23, p 1]. Additionally, although autism was not specifically listed on the subsequent IEPs, the impulsive nature related to Student's medical diagnosis was addressed by Respondent in both the IEP's and the behavior plan(s).

**22-011246**
**Page 64**

Petitioner further argues that Respondent did not properly update Student's IEP when virtual learning started at the beginning of the COVID-19 pandemic in April 2020 and thereby violated Student's right to receive FAPE. [Pet. Closing Brief, p 33]. The undersigned does not find this argument to be persuasive. The April 2020 IEP was written during a time period when Respondent was unsure of whether Student would be returning to in-person learning in the 2020-2021 school year. Once it was determined Student would be virtual for the 2020-2021 school year, Respondent created a CLP in September 2020, and amended the April 2020 IEP in October 2020. Student was also provided with the services necessary to be successful in the virtual environment, i.e., a Chromebook, ability to type answers, ability to have text read to Student, daily opportunities to meet with the special education teacher for assistance, etc. At the hearing, both parties seemed to agree that Student was successful with virtual learning. Therefore, the undersigned finds that Respondent properly updated and revised the April 2020 IEP and thus did not fail to provide Student with FAPE.

Petitioner testified that Student's behavior worsened when he returned to in-person learning and in turn affected his ability to benefit from his education. [Pet. Closing Brief, p 33]. The undersigned agrees that Student's April 2021 IEP was not updated timely upon his return to in-person school after attending school virtually for the 2020-2021 school year. The evidence establishes that Petitioner and Respondent only met over Student's behavior plan twice in October 2021 and that an IEP meeting was not held until January 20, 2022, even though Petitioner had made multiple requests to have an earlier meeting.

Respondent maintains that the IDEA regulations state that a hearing officer may find a denial of FAPE for a procedural violation only if the violation impedes the student's right to a FAPE, impedes the parent's opportunity to participate, or causes a deprivation of educational benefits. 34 CFR 300.513(a)(2). [Resp. Closing Brief, p 16]. Thus, Respondent indicates that Petitioner's argument is strictly procedural. [Resp. Closing Brief, p 16]. Respondent argues that Student was not denied a FAPE from August 2021 to January 2022, because he continued to receive his special education services, behavior supports, and all aids and services. [Resp. Closing Brief, p 16]. Absent any proof as to what manner or type of progress Student should have made but did not, there is insufficient evidence to find a denial of FAPE. *See Nack v Orange City Sch Dist*, 454 F 3d 604, 612 (CA 6, 2006); *A W v Loudon Cnty Sch Dist*, 2022 U S Dist LEXIS 177605, *37-38, 2022 WL 4545609 (E D Tenn, September 28, 2022).

Here, the undersigned agrees that Respondent failed to timely review and revise Student's April 2021 IEP to address Student's academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals. After Student switched from virtual to in-person learning in the fall of 2021, Respondent's failure to review and revise the April 2021 IEP until January 2022 establishes a violation. Petitioner has met her burden of establishing this procedural violation by Respondent

22-011246
Page 65

resulted in a denial of Student's right to a FAPE and caused a deprivation of educational benefits with respect to Student's progress in reading.

G. *Whether Respondent failed to consider all relevant information and finding that Student's behavior was not a manifestation of his disability at the November 9, 2021 and December 6, 2021 Manifestation Determination Reviews?*

With respect to Manifestation Determinations, the IEP team "must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents" in determining whether Student's conduct was a manifestation of his disability. *See* 34 CFR § 300.530(e); 20 USC 1415 (k)(1)(E)(I).

Regarding the November 9, 2021 MDR, Petitioner asserts that Respondent ignored evidence collected by both school personnel and Petitioner indicating that Student had an emotional impairment and a history of being argumentative and aggressive. [Pet. Closing Brief, p 37]. In support of this argument, Petitioner asserts that the MDR included limited information. By way of example, Petitioner points out that rather than summarizing relevant information from Student's IEP, the document reads "IEP is current and up-to-date". [Pet. Exh. 57; Resp. Exh. I; Pet. Closing Brief, pp 37-38]. Petitioner further indicates that the parent input section does not identify every concern she raised at the MDR, including that Student had exhibited "mad face" during the incident in question. [Pet. Closing Brief, p 39].

The November 9, 2021 MDR form described Student's misconduct and indicated that the team reviewed the following: Student's IEP, relevant information provided by parent, teacher observation of student, and behavior logs. Under the section for "Relevant Information Provided by Parent", the summary states that Petitioner "has not noticed any behaviors lately related to his eligibility and that she thinks this incident was just when he was at a breaking point and didn't care anymore." [Pet. Exh. 57, pp 1, 3; Resp. Exh. I, SPS 065, 067].

As indicated above, 34 CFR § 300.530(e), only requires that the IEP team review all relevant information in Student's file, teacher observations, and relevant information from the parent. However, there is no requirement that Respondent include every piece of information reviewed by the team. Thus, Petitioner's argument that the MDR form does not include notations as to every item discussed at the MDR does not establish that these items were not *reviewed* by the team as required. Upon review of the November 9, 2021 MDR form, Respondent properly listed the documents that were considered along with a brief summary of the information. Petitioner also failed to establish what relevant information the MDR team failed to consider before making its determination. Of further note, Petitioner testified that she "was undecided" as to

22-011246
Page 66

whether Student's conduct on this occasion was a manifestation of his disability. [Tr. Vol. II, pp 288-290].

Petitioner further argues that the MDR form contradicts the IEP, because the MDR states that Student "engaged in the disciplinary action based on environmental factors not pertaining to his area of eligibility"; however, Student's area of eligibility was an emotional impairment. [Pet. Closing Brief, p 38; Pet. Exh. 57, p 3; Resp. Exh. I, SPS 067]. Petitioner's argument here seems to suggest that any conduct engaged in by Student where he exhibits physical aggression should be characterized as being directly and substantially related to his disability. This argument is unpersuasive as it would negate the need for an MDR to be conducted if every behavior Student engaged in that resulted in a physical altercation would automatically be considered a manifestation of his disability.

Next, with respect to the December 2021 MDR, Petitioner again argues that the MDR form includes very limited information, does not include all relevant information provided by Petitioner, and does not reference anything other than the December 3, 2021 behavior logs. [Pet. Closing Brief, pp 39-40]. A review of the December 6, 2021 MDR form shows that Respondent listed the individuals who participated in the meeting and reviewed Student's conduct on the date in question. The MDR form also listed that the following was reviewed: Student's IEP, relevant information provided by parent, teacher observations of student, and the behavior logs/12-03-2021. [Pet. Exh. 66; Resp. Exh. J]. As already stated above, the IDEA does not require that all of the relevant information be documented on the MDR form, but rather only requires that the relevant information be reviewed by the team. Petitioner here failed to establish what relevant information the MDR team failed to consider before making its determination.

Petitioner also seems to suggest that Student's conduct in November 2021 and December 2021 was a manifestation of his disability. [Pet. Closing Brief, pp 40-41]. Whether Student's conduct was indeed a manifestation of his disability is not an issue before the undersigned and was not identified as an issue by Petitioner at the prehearing nor was it raised as an issue at the hearing.[24] Petitioner's issue identified at the prehearing was the more limited issue of whether Respondent properly reviewed all relevant information at the MDR. As indicated above, the undersigned finds that Respondent need only consider all relevant information at the MDR, and that Respondent summarized what information it considered on the MDR form. There is no evidence to suggest that the IEP team did not review all relevant information before making its determination as to whether Student's conduct was a manifestation of his disability for either the November 2021 or December 2021 MDRs. Thus, Petitioner has not met its burden of establishing that Respondent failed to consider all relevant information at the November 9, 2021 and December 6, 2021 MDRs.

---

[24] It is noted that the parties did not indicate at the prehearing that this matter involved any expedited issues.

22-011246
Page 67

H. *Whether Respondent failed to consistently provide Student with services to allow him to make progress toward his IEP goals and the general education curriculum for all removals of the Student after 10 removals within a school year, from two years of the date of filing?*

34 CFR 300.530(b) provides as follows:

(b) General.

(1) School personnel under this section may remove a child with a disability who violates a code of student conduct from his or her current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 consecutive school days (to the extent those alternatives are applied to children without disabilities), and for additional removals of not more than 10 consecutive school days in that same school year for separate incidents of misconduct (as long as those removals do not constitute a change of placement under § 300.536).

(2) After a child with a disability has been removed from his or her current placement for 10 school days in the same school year, during any subsequent days of removal the public agency must provide services to the extent required under paragraph (d) of this section.

Petitioner asserts that "[t]here is ample evidence in the record that Student was repeatedly removed from school through requests to Petitioner to take him home in the middle of the day or, in some instances, to not even bring him to school for the day at all, due to concerns about his behavior." [Pet. Closing Brief, p 43]. However, the undersigned disagrees. Petitioner only testified to one time that Respondent had asked her to keep Student home. This request followed a time period where Student was absent from school due to a family trip and had returned from the trip late the night before school. The evidence establishes that Petitioner agreed with the decision to keep Student home on this occasion. Petitioner also failed to provide clear and specific evidence as to her allegations that Respondent "repeatedly removed" Student "through requests to Petitioner to take Student home in the middle of the day."

Furthermore, Petitioner acknowledges that Student was chronically absent. Student was absent several days during the fall 2021 semester due to out-of-town trips, hunting trips, and on occasions where Petitioner kept Student home due to her safety concerns. Petitioner asserts that Respondent did not appropriately track Student's absences. In support, Petitioner submitted a copy of an attendance log where she color-coded the reasons for Student's absences. [Pet. Exh. 58]. This log, however, only shows one occasion where Student was marked as unexcused from an 8th hour class when he was

actually at school, two occasions where Student was marked unexcused for medical reasons, and the one occasion where Respondent staff had asked for Student to stay home following the family trip. Thus, it appears that many of Student's absences were for reasons other than Respondent's removals of Student for behavioral reasons.

Petitioner argues that Student's academic performance suffered because of his failure to receive the services to which he was entitled during his removals. Petitioner maintains that his transcripts show his grades dropped significantly from the 2020-2021 school year. It is noted that Petitioner did not present any evidence of this argument at the hearing. Petitioner's argument also cites to an exhibit that was not offered by Petitioner and thus this exhibit is properly not in evidence. [Pet. Closing Brief, p 44]. On review of the evidence presented, Petitioner did not meet her burden of establishing that Respondent failed to consistently provide Student with services to allow Student to make progress toward the IEP goals and the general education curriculum after 10 removals within a school year.

I. *Whether Respondent is not the Least Restrictive Environment (LRE) for Student*

Petitioner also asks this Tribunal to order Respondent to enter into a consulting services contract with the Kalamazoo Autism Center or another similar program to assist it with updating Student's IEP with the information provided to the district by Mr. Vanderweele and from information being collected through Student's upcoming neuropsychological evaluation and with identifying potential program placements that may provide Student with a FAPE. [Pet. Closing Brief, p 46].

Petitioner maintains that her failure to specifically request this remedy in her Complaint is no barrier to granting this relief. "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v Hood*, 327 U.S. 678, 684 (1946), and the existence of a statutory right implies the existence of all necessary and appropriate remedies. [Pet. Closing Brief, pp 44-45].

Petitioner argues that the nature of Student's disability is such that he cannot satisfactorily be educated in regular classes with the use of supplementary aids. Therefore, a more restrictive setting is appropriate to ensure Student is able to receive a FAPE. [Pet. Closing Brief, p 45].

Petitioner, however, failed to establish any evidence on the record as to why Student's current placement is not the least restrictive environment. Additionally, Petitioner failed to address this in the Complaint and Respondent did not have an opportunity to appropriately respond to this issue. Petitioner also references facts and exhibits not in evidence. [Pet. Closing Brief, pp 45-46]. At the hearing, none of the witnesses testified

22-011246
Page 69

or alleged that Student needed to be in an EI or autism program or that Respondent's school district was not the least restrictive environment.

As indicated by Respondent, under the federal regulations, the "party requesting the due process hearing may not raise issues at the due process hearing that were not raised in the due process complaint . . . unless the other party agrees." 34 CFR 300.511(d). Respondent notes that it did not agree to any additional issues at hearing. [See Resp. Closing Brief, p 6].

Petitioner's argument with respect to LRE is not timely under the IDEA. It is fundamentally unfair to offer arguments or evidence that the other side cannot respond or object to.  Thus, Petitioner's proposed additional remedy offered with her post-hearing briefs is not accepted.

Petitioner also asks this Tribunal to order Respondent to pay for the neuropsychological evaluation, as it will provide relevant information to determine appropriate special education services for Student. [Pet. Closing Brief, pp 46-47]. Again, no testimony was presented at the hearing to indicate that another neuropsychological evaluation was necessary for Student and thus the undersigned does not find this relief to be appropriate.

J.  *Compensatory Education*

Petitioner argues that Respondent failed to provide Student with a FAPE from July 2020 to October 2022. [Pet. Closing Brief, p 49]. As a remedy, Petitioner believes this Tribunal should award Student the monetary equivalent of 710 hours of compensatory education in a fund so Student may seek out appropriate educational providers and pay them directly. [Pet. Closing Brief, p 49]. Petitioner asserts that the multi-year failure to provide a FAPE to Student means that a multi-year remedy is appropriate. [Pet. Closing Brief, p 50]. Petitioner asserts that with the right providers, who would assist Student to learn how to manage his behavior so that it caused minimal disruption to his educational environment, Student could reasonably be expected to obtain a FAPE with this award. [See Pet. Closing Brief, p 51].

In support of this award, Petitioner notes that "hundreds of hours of compensatory education delivered from a school district may not be the most appropriate remedy for a student. Instead, the hours can be converted to a fund from which the parent draws to provide supports to the student that will provide them with maximum benefit." *See*, e.g., *Somberg v Utica Cmty Schs*, 908 F3d 162, 167 (6th Cir 2018) (converting 1,200 hours to a dollar figure). This is *not* considered "damages." *Id.* [p 48]. Rather, "[c]ompensatory education is meant to 'place children in the position they would have been in but for the violation of the Act.'" Id. (quoting *Draper v Atlanta Indep School Sys*, 518 F3d 1275, 1289 (11th Cir 2008)). [Pet. Closing Brief, pp 48-49].

22-011246
Page 70

Regarding academic instruction, Petitioner seeks a compensatory education award calculation based on an hourly rate of $85.00 "in the form of two and a half years of weekly academic sessions lasting five hours per week totaling 450 hours". [Pet. Closing Brief, p 5]. Petitioner does not explain how she arrived at the amount of 450 hours for academic instruction.

Given that the undersigned found that Student's April 2021 IEP was not reasonably calculated for Student to make progress on his reading goals, Student is owed compensatory education in reading instruction. The amount of 450 hours for compensatory education, however, needs to be reduced. First the amount needs to be reduced as the undersigned did not find that Respondent failed to provide Student a FAPE for the entire time period in question. Furthermore, the undersigned finds that Student's absences from school for personal reasons also partially contributed to Student's lack of progress on his reading goals. Based on these considerations, the undersigned believes that the five hours per week proposed by Petitioner should be reduced by half, or 2.5 hours per week. Respondent's failure to review and revise Student's April 2021 IEP until approximately six school months later, resulted in a loss of education for Student during that period of time. Thus, the proper period for compensatory education is six months or 26 weeks. At 2.5 hours per week for 26 weeks, Petitioner is entitled to 65 hours of compensatory education in ELA/reading.

As it relates to Petitioner's argument that the compensatory education hours should be paid as a monetary equivalent to Petitioner and Student directly, there is no evidence that Respondent's teachers are unable to provide this instruction to Student. Therefore, Respondent may provide the 65 hours of compensatory education by any qualified teacher. The 65 hours of compensatory education is meant to compensate for Student for the lack of appropriate reading goals and Respondent's failure to update Student's IEP after returning to in-person learning. Respondent shall complete this general education compensatory education within six months.

Regarding social-emotional services, Petitioner seeks a compensatory education award calculation based on an hourly rate of $125.00, for social emotional services, such as Applied Behavioral Analysis (ABA) therapy, "which would likely be appropriate for a student with autism like [Student]". [Pet. Closing Brief, p 50].

As indicated above, Student and Petitioner have declined social work services that Student has been offered by Respondent because Student did not like the social worker. Petitioner also testified at the hearing that she felt such services are necessary. Thus, an award of additional social services is not warranted given Student's refusal to participate in those services Respondent has already attempted to provide. Petitioner also proposes emotional services such as ABA therapy. It is first noted that none of the witnesses at the hearing testified as to the appropriateness of ABA therapy for Student. Second, Petitioner herself testified that she did not find ABA therapy to be helpful for

**22-011246**
**Page 71**

Student and testified that Student was "too old" and that it "was not an effective therapy" for Student. Without further information, Petitioner has failed to establish why an award of ABA therapy would be appropriate. On review of the evidence presented, the undersigned is not convinced that social-emotional services are warranted beyond what was already being offered by Respondent. The undersigned declines to find compensatory education is owed for social-emotional services for Student.

## Conclusion

1. Petitioner did establish, by a preponderance of the evidence, that Respondent failed to develop an IEP reasonably calculated to allow Student to make appropriate progress in light of Student's unique circumstances at the April 14, 2021 IEP meeting, but did not establish, by a preponderance of the evidence, that Respondent failed to develop an IEP reasonably calculated to allow Student to make appropriate progress in light of Student's unique circumstances at the April 2020 or January 2022 IEP meetings.

2. Petitioner did establish, by a preponderance of the evidence, that Respondent failed to request parental consent for and conduct comprehensive reevaluations, including a functional behavior assessment, to address Student's lack of progress toward Student's IEP goals and in the general education curriculum, to conduct a reevaluation upon receipt of new information provided by Petitioner, and to address Student's anticipated academic and behavior needs related to his ongoing conduct resulting in formal or informal removals from the classroom, after Student returned to in-person learning for the 2021-2022 school year.

3. Petitioner did establish, by a preponderance of the evidence, that Respondent failed to seek Petitioner's consent to conduct a Functional Behavioral Assessment within 10 school days of her making the request in writing.

4. Petitioner did not establish, by a preponderance of the evidence, that Respondent failed to implement positive behavior intervention supports (PBIS) to support Student's specific behavioral needs.

5. Petitioner did not establish, by a preponderance of the evidence, that Respondent failed to provide Student extended school year services, from two years of the date of filing.

6. Petitioner did establish, by a preponderance of the evidence, that Respondent failed to review and revise Student's April 2021 IEP to address his academic performance, ongoing and increasing behavior issues, and lack of progress toward his IEP goals and the general education curriculum.

22-011246
Page 72

7. Petitioner <u>did not</u> establish, by a preponderance of the evidence, that Respondent failed to consider all relevant information and finding that Student's behavior was not a manifestation of his disability at the November 9, 2021 and December 6, 2021 Manifestation Determination Reviews.

8. Petitioner <u>did not</u> establish, by a preponderance of the evidence, that Respondent failed to consistently provide Student with services to allow him to make progress toward his IEP goals and the general education curriculum for all removals of the Student after 10 removals within a school year, from two years of the date of filing.

9. Petitioner <u>did not</u> establish, by a preponderance of the evidence, that Respondent is not the least restrictive environment for Student.

<u>Order</u>

**NOW, THEREFORE, IT IS ORDERED** that Petitioner's due process complaint is hereby denied in part, and granted in part.

Respondent shall provide 65 hours of general education compensatory education in area of reading to Student within six months.

**IT IS FURTHER ORDERED** that the remainder of Petitioner's complaint is dismissed with prejudice.

**IT IS FURTHER ORDERED** that any claims or defenses not specifically addressed herein are dismissed with prejudice.

A party aggrieved by this decision may seek judicial review by filing an action in a court of competent jurisdiction within 90 days of the date of this order.

_____
**Lindsay Wilson**
**Administrative Law Judge**

22-011246
Page 73

<u>**PROOF OF SERVICE**</u>

I certify that I served a copy of the foregoing document upon all parties and/or attorneys, to their last-known addresses in the manner specified below, this 1st day of February 2023.

*Verna Curtis*
_____
**Verna Curtis**
**Michigan Office of Administrative Hearings and Rules**

<u>**Via Electronic Mail**</u>



Elizabeth Abdnour
Elizabeth Abdnour Law
1100 W. Saginaw Street, Suite 4A-2
Lansing, MI 48915
**elizabeth@abdnour.com**

Jacquelyn Babinski
Babinski Law, PLLC
P.O. Box 642
Ludington, MI 49431
**jacquelyn@babinskilaw.com**

Sturgis Public Schools
c/o Nicole Airgood, Special Education Contact
107 W. West Street
Sturgis, MI 49091
**nairgood@sturgisps.org**

Erin Walz
Thrun Law Firm, P.C.
P.O. Box 2575
East Lansing, MI 48826-2575
**ewalz@thrunlaw.com**

Michele R. Eaddy
Thrun Law Firm, P.C.
P.O. Box 2575
East Lansing, MI 48826-2575
**meaddy@thrunlaw.com**

Cathleen M. Dooley
Thrun Law Firm, P.C.
P.O. Box 2575
East Lansing, MI 48826-2575
**cdooley@thrunlaw.com**

Bethanie Eggleston
Michigan Department of Education
P.O. Box 30008
Lansing, MI 48933
**EgglestonB1@michigan.gov**

Precious Boone
Michigan Department of Education
P.O. Box 30008
Lansing, MI 48933
**MDE-Adminlaw@michigan.gov**